Cyrus Sullivan
P.O. Box 86653
Portland, OR 97286

FILED25 JUN '19 14:27USDC-ORP

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

3:19- CV- 995- SB

CYRUS ANDREW SULLIVAN
Plaintiff,

v.

Multnomah County, et. al.
Defendants,

Case No.

COMPLAINT: EXCESSIVE FORCE, DELIBERATE
INDIFFERENCE, DELIBERATE INDIFFERENCE TO
SERIOUS MEDICAL NEEDS, ASSAULT, BATTERY,
NEGLIGENCE, AND DEFAMATION.

JURY TRIAL DEMANDED

I Cyrus Andrew Sullivan ("Plaintiff"), pro se, hereby brings this complaint ("Complaint") under 42

U.S.C. 1983 ("Section 1983") for violations of civil rights under color of state law against Multnomah

County, the Multnomah County Sheriff's Office ("MCSO"), Multnomah County Sheriff Mike Reese, MCSO

Deputies Timothy Barker (DPSST# 35798), Matthew Ingram (DPSST# 34887), Wendy Muth (DPSST#

42885), Phillip Hubert (DPSST# 31450), Paul Simpson (DPSST# 31638), Uwe Pemberton (DPSST# 20600),

Timothy Moore (DPSST# 56200), Sgt. Gary Glaze (DPSST# 38350), and Lt. Kurtiss Morrison (DPSST# 38352),

former MCSO Deputy David Kovachevich (DPSST# 20856), medical technician Erika Barker, the

Multnomah County Health Department ("MCHD"), Dr. Michael Seale, Dr. Brook Holter, Dr. Angelina

Platas, and Halcyon Dodd ("Defendants"). Defendants are being sued in their official and individual

capacities. The Complaint covers a variety of conduct that may not apply to all Defendants equally. All

claims apply to Defendants Multnomah County, MCSO, and Mike Reese. Excessive force claims under

Section 1983 apply to Defendants Multnomah County, MCSO, Mike Reese, Timothy Barker, Matthew Ingram, Phillip Hubert, Paul Simpson, David Kovachevich, Timothy Moore, Gary Glaze, and Kurtiss Morrison. Deliberate indifference claims under Section 1983 apply to Defendants Multnomah County, MCSO, Mike Reese, Gary Glaze, and Kurtiss Morrison. Deliberate indifference to serious medical needs claims Section 1983 apply to Defendants Multnomah County, MCSO, MCHD, Dr. Brook Holter, Dr. Michael Seale, Dr. Angelina Platas, and Halcyon Dodd. Common law assault and battery claims apply to Defendants Multnomah County, MCSO, Mike Reese, Timothy Barker, Matthew Ingram, Phillip Hubert, Paul Simpson, David Kovachevich, Timothy Moore, Gary Glaze, and Kurtiss Morrison. Common law medical negligence claims apply to Defendants Multnomah County, MCHD, MCSO, Dr. Brook Holter, Dr. Michael Seale, Dr. Angelina Platas, and Halcyon Dodd. Common law defamation claims apply to Defendants Multnomah County, MCSO, Mike Reese, Timothy Barker, Matthew Ingram, Wendy Muth, Phillip Hubert, Paul Simpson, Uwe Pemberton, Timothy Moore, Gary Glaze, Kurtiss Morrison, David Kovachevich, Erika Barker, and Brook Holter.

## JURISDICTION

Section 1983 provides a federal forum for claims against Multnomah County, its agencies, and employees when they violate the constitutional rights of those in their custody. This Court has jurisdiction over Section 1983 claims filed against Defendants in this district in response to events that took place in this district. Because the Complaint is filed under Section 1983 it involves a federal question and the amount sought exceeds $75,000, so the requirements for this Complaint to be heard in this Court are met. The federal questions involve violations of the Fourteenth and Eighth Amendments.

This Court has jurisdiction over common law claims of negligence, intentional and negligent infliction of emotional distress, and assault and battery when such claims are brought as lesser included offenses in Section 1983 claims. See Lolli v. County of Orange, 351 F.3d 410 (2003) "Given that Lolli's federal constitutional claims against some of the individual officers survive summary judgment, the district court has jurisdiction to consider the state law claims. See 28 U.S.C. 1367."

This case is not barred by 42 U.S.C. 1997e also known as the Prison Litigation Reform Act ("PLRA") because I am no longer an inmate. See Talamantes v. Leyva, 575 F.3d 1021 (9th Cir. 2009) in which it was "undisputed that Talamantes was released from custody...before filing his action in federal court. Therefore, he was not required to exhaust administrative remedies before filing his action." Also, this case is not barred by my subsequent guilty plea in this Court in case number 3:13-CR-00306-JGZ because the guilty plea only covered my act of throwing chips in the face of Timothy Barker, did not endorse false statements previously made by the Defendants in an effort to make it look as if my arm were broken due to a legitimate use of force on the fifth floor that day, presents issue of material fact regarding those statements as well as others, and the events giving rise to this lawsuit took place after I was taken to the fourth floor that day. See Hooper v. County of San Diego, 629 F.3d 1127 (9th Cir. 2011) "Conviction...does not bar 42 USCS 1983 claim for excessive force under Heck when conviction and 42 USCS 1983 claim are based on different actions during one continuous transaction." Finally, Multnomah County and their officials are not protected by the Eleventh Amendment, see DeGenova v. Sheriff of DuPage County, 209 F.3d 973 (7th Cir. 2000) "Sheriff was county rather than state officer as manager of jail, and thus sheriff was not entitled to immunity in 42 USCS 1983 action against sheriff in his official capacity alleging that under sheriff's policies for managing jail, jail officials neglected inmate's medical condition."

## VENUE

This Court is the proper venue for suits against Multnomah County, its agencies, and employees brought under Section 1983 for misconduct that took place in this district.

## TIMELINESS

In Van Strum v. Lawn, 940 F.2d 406 (9th Cir. 1991) "the court affirmed the use of personal injury statute of limitations for both Bivens and 1983 claims because both required a uniform, generic, easily applicable limitations period that would safeguard the rights of civil rights litigants and emphasize the personal nature of constitutional wrongs 'because actions under 1983 and those under Bivens are identical save for the replacement of a state actor under 1983 by a federal actor under Bivens.'" "In determining the proper statute of limitations brought under 42 U.S.C. 1983, we look to the statute of limitations for personal injury actions in the **forum** state." Maldanado v. Harris, 370 F.3d 945 (9th Cir. 2004). The statute of limitations for filing a personal injury claim in the State of Oregon is two years under ORS 12.110, so I have until June 28, 2019 to file this Complaint.

## FACTUAL BACKGROUND

### Pre-Incident

I was already a big blip on the MCSO's radar months before my arm was broken. That is because I had created a website for exposing law enforcement misconduct and aggregating information those that

perpetrate it. On top of that I have priors for assaulting corrections personnel. This knowledge gives deputies two advantages. First, it helps them stay vigilant just in case I repeat the same behavior; Second, it gives them more ammunition to set me up because they can accuse me of assaulting them with no proof, say it is consistent with my history, and the disciplinary officer will rubber-stamp it as true no matter what evidence or lack of evidence conflicts with the story of the reporting deputy. That is because the word of a staff member is always considered to be correct and the inmate to be incorrect based on status alone. It is a culture that has developed over many years by an organization that does nothing to police its own and everything to punish others as they wish.

Shortly after my arrival my probation officer (Matthew Preuitt) contacted the jail and told them something to the effect of "[Sullivan] obsesses about staff and will post information about them online...client has also been assaultive with corrections staff and others...use caution around him" (Exhibit 1). This set the tone early for my interactions with staff. The first problem I had was trying to get the same amount of medication in jail as I was taking at home. Before my arrest I had developed a website for the purpose of exposing law enforcement activities that have a negative impact on people. That of course includes activities such as medical staff refusing to give inmates the right medication or the right dose of their medication. I threatened to add nurse practitioner Angela Lee to the website for refusing to give me the same amount of my medication that I had been taking at home (Exhibit 2) and I ended up in the hole for it. On my way there I was also retaliated against by Sgt. Jacobs for threatening to put him on the website for taking me to the hole when all I was doing was trying to get the right amount of medication. The write-up I received (Exhibit 3 p.2) charged me with "abuse of medical process, Extortion, blackmail, and Disrespect/harassment." So, for threatening to publicly criticize the medical staff if I did not receive medication that I had a valid claim of right to, they chose to put me in the hole instead of properly treating me. Hearings Officer Erika Murray eventually found me guilty of the charges, but there were additional unfounded accusations in the write-up that would become typical of most write-ups I received. It said,

"inmate submitted medical request form threatening specific medical staff member and staff member's family if he did not receive a specific dose of his medication." But if you look at the actual message (Exhibit 2) it contains no such language. This activity was also referred to as "cyber terrorism" by Deputy Stephen Pina in an April 10, 2017 email to Detective Kevin Odil (DPSST# 49890) (Exhibit 4). Odil was investigating me for criminal activity in response to how I chose to exercise my First Amendment right to criticize the staff at the jail and let them know about it. Odil is the detective that MCSO put in charge of investigating criminal activity at the jail, his job is not to investigate violations of the rules unless that violation also appears to be a crime. I was violating jail rules knowingly, intentionally, and frequently, but not in a criminal way. As far as I was concerned my incarceration was the result of law enforcement refusing to uphold the Constitution and therefore they had not legitimate right to keep me in custody, so anyone aiding or abetting law enforcement were part of the problem and deserving of any negative consequences that befell them in the course of such activities. Odil's involvement at that time was inappropriate. Sheriff Mike Reese, District Attorney Rod Underhill, and others were also involved at this point trying to find a way to prohibit me from exercising free speech (Exhibit 5).

While I was in disciplinary segregation, I received additional incident reports that contained similar combinations of truths and lies. On March 31, 2017 I received an incident report (Exhibit 6) accusing me of "Assault, Fighting, and/or Threatening A Person/Staff" for threatening to post information about Deputy Benjamin Eide (DPSST# 53829) on my website after he disrupted my phone call. Fortunately, I researched the rules and argued successfully at my disciplinary hearing that the rules require that the threat be physical or sexual, so I was not found guilty of that (Exhibit 6). After winning on that issue false accusations of physical and/or sexually violent threats followed. On May2, 2017 I was returning to my cell from court when Deputy James Harrington (DPSST#31532) stole promotional material from my cell window. In response to the theft I threatened to research his personal information and it on my website if my property were not returned immediately. Harrington responded by pulling my right arm through the

food port and down onto the food port door while it was still cuffed. As a result, I suffered pain and bruising. Later that evening I observed Harrington peaking at me through the blinds at the deputies' station. He then gave me a weird creepy looking finger wave. I was later served with an incident report (Exhibit 7) that falsely accused me of saying "my people are coming to your house!" And later saying "I'm coming to your house Harrington. I'm going to rape your kids and wife then I'm going to kill all of you!" (Exhibit 7 p.2-3). Later that night Harrington showed up at my window with a letter from my mother. He then pointed at the return address, said something like "I guess that settles that then," put a note that had the address on it in his pocket, and walked away. As a result of his false accusations I was found guilty of making physical threats. The hearings officer even got several emails from my probation officer trying to see if charges would be filed for threatening a deputy (Exhibit 8). This type of stuff has an impact beyond just disciplinary action in the jail. At the time I was yet to be sentenced for my supervised release violation, so the judge was able to consider these false accusations when deciding how long to keep me in jail for the violation. When I was later charged with a new crime, this stuff was relevant to pre-trial release decisions. The Government was able to refer to this as a history of threatening staff. It set the stage for future false allegations by making it look as though physical threats were escalating into real violence, so it would make sense for someone to accuse me of such behavior because true or not it fit a pattern.

**The Incident**

Tiffany Harris, my defense attorney in United States v. Cyrus Sullivan (Case No. 3:17-CR-00306-JGZ) could not have summarized the basis for this lawsuit better than she did in a letter USPO Teresa Fuchs on November 8, 2018 (Exhibit 9). Her summary was as follows:

*Mr. Sullivan's left humerus was broken after he had been escorted to "the hole," was isolated from the general population, and was pinned face down to a mattress by sheriff's deputies. Once Mr. Sullivan was face down, with deputies pressing on his upper back and limbs, T.B removed Mr. Sullivan's left hand from handcuffs, immobilized Mr. Sullivan's elbow on the mattress with one hand, and then wrenched Mr. Sullivan's hand away from the small of his back with the other. This fulcrum-like and purposeful action--undertaken long after the alleged scuffle upstairs--produced an acute, oblique (through-and-through) fracture of Mr. Sullivan's left humerus (the second largest bone in the human body). A biomechanics expert and former professor of radiology (who reviewed the x-ray films and incident reports) would have testified, under oath, that the fracture occurred in this manner. His detailed report, disclosed in advance of trial, is attached for your review and should be appended to the PSR. In light of this information, we ask that the report state, "sheriff's deputies escorted Mr. Sullivan to the disciplinary housing unit, pinned him face down to a mattress, and broke his arm in retaliation for his refusal to follow commands.*

At around 8:30 pm on June 28, 2017 Deputy Uwe Pemberton called me down to take my medication. After getting water another inmate (Stephen Worthington SWIS# 754255) handed me some Gatorade powder. Erika Barker was the medical technician handing out medication that night and she demanded that I give her the Gatorade. I thought her demand was quite petty and stupid. I had recently been released from the United States Penitentiary at Victorville, California ("USP Victorville") where unless you are fighting the staff usually leaves you alone and would never trip over Gatorade. At USP Victorville people could even leave the pill line with their pills sometimes without getting written up. I mixed the Gatorade with the water and drank it anyway. Pemberton then told me to go to the sally port, but instead I went back to my cell instead to dispose of contraband. On my way back I told Erika that I

would be posting information about her on my website. I also said something to Pemberton like "fuck you, come get me."

Once in my cell I immediately flushed the contraband down the toilet and watched as a group of guards came up the stairs. One guard hit my window with cuffs, opened the food port, and asked me to cuff-up. I told him to "fuck off." Then I started looking for something to throw at them if they came in. First, I grabbed a full bottle of hair gel, but I put it down because that could hurt someone. Then I grabbed a bottle of baby powder but didn't want to use my teeth to take the screen off. I wanted to hit them with a cup full of baby powder when they came it, but the screen only lets a little bit out. Then I noticed a nearly full bag of Cactus Annie's Scorchin Chips. Scorchin Chips are tortilla chips covered with spicy red seasoning sold on the commissary. The MCSO policy requires all opened commissary items to be thrown out when an inmate is sent to the hole, so I decided to try and eat as many as I could before the guards stormed the cell. At first, I tried to reason with them by explaining why I did not deserve to go to disciplinary. When that failed, I threatened to post information about Deputy Phillip Hubert, Deputy Paul Simpson, and Sgt. Matthew Ingram on my website. Hubert dared me to "come on over." I also instructed them to leave, but they failed to follow my directions. Then Deputy Paul Simpson pulled out his taser and debated with the others, that by then included Deputies Timothy Barker and Wendy Muth, whether to use it or not.

When they came into the cell I grabbed as big a handful of chips as I could and flicked it right into Sgt. Ingram's face knowing full well that his glasses were covering his eyes. Ingram then hit me in the face knocking my glasses off and I turned around to avoid him. As I did that, I grabbed the bunk. Ingram and the other guards then slammed into me, punched me several times, and cuffed me behind my back while I said stuff like "all right, all right, I'm cooperating."

When it came time to move me out of the cell I went limp in an effort to force them to carry me to the as a punishment for taking me there, I weighed about 230lbs at the time, so I figured carrying me would at least give them some sore muscles the next day, but they decided to carry me by giving me a wedgie, so I stopped and said "you don't have to give me a wedgie." As I walked towards the stairs, they kept giving me wedgies while pushing my head down and I had trouble keeping my balance. All the while Sgt. Ingram kept calling me a "sack of shit" and other similar things. This continued into the elevator and once down on the 4th floor until I was placed in cell 4F13.

Once in the cell I was placed face down on the mattress. Sgt. Ingram kneeled on my upper back while Deputy Barker got on top of my middle and lower back. Their combined weight, over 300 pounds of which b9 p.2), elonged to Barker alone, put so much pressure on my lungs that I could barely breathe. Sgt. Ingram (Exhibit 19 p.2) and Deputy Kovachevich (Exhibit 29 p.1-2) noted in their reports that they heard me tell them I could not breathe. When I said, "I can't breathe" Ingram shoved my face into the mattress and said, "if you couldn't breathe you couldn't talk." Every time I tried to lift my head for air, Sgt. Ingram would shove it down again. Eventually they cut my clothes off and undid my handcuffs. First, they wanted me to take my right hand and put it underneath my stomach, but that was difficult because I could not lift my body at all. Barker then undid my left hand, grabbed my left arm, pulled it away from my body, and kept pulling even after it snapped. Before leaving the cell, Sgt. Ingram shoved my head down one last time and said something like "I run this fucking jail not you."

After they left, I tried to get up, but I could not move my left arm, was in extreme pain, and even more pain whenever I moved any part of my body. I could not roll to my left, but if I rolled to my right my arm could not support itself due to the break and I could feel the bone move. I stayed there in shock until a black male nurse came back with Sgt. Ingram, took one look at my arm from several feet away, and said that my arm was broken. A short time later, paramedics arrived, helped me onto my back, made a makeshift sling out of my sheet, put me on a stretcher, and took me to the hospital.

While getting into the ambulance I noticed Deputy Hubert talking to Deputy Curt Bull (DPSST# 37923). He appeared to be describing how I reached into the bag and flicked a handful of chips. Bull laughed at him before riding with me to the hospital. At OHSU I was treated without incident, but I did answer "yes" when asked if I was thinking of harming others. Those others, I explained were the guards that broke my arm. At the hospital Dr. Jennifer Rossi diagnosed me with a left humerus fracture, gave me a sling and swathe to immobilize the arm, prescribed me oxycodone for pain, and said to come back in one week (Exhibit 10). I arrived back at the jail sometime during graveyard shift.

## Aftermath

The next day I had a visit from Sgt. Brandon Pedro (DPSST# 35287) who asked me "what were you thinking?" I asked what he meant, and he said that if he sprayed someone on the street with his pepper spray that would be assault. I agreed, but then he asked me if I threw powder. I was surprised and said "no." He replied, "I don't believe you" and left.

Sometime later I was served a write-up during swing shift (Exhibit 11). Pemberton's write-up accused me of failure to do as ordered, disruptive behavior, and threatening staff. Sometime after going to bed I was served with Sgt. Ingram's write-up (Exhibit 12) which added accusations of physically assaulting staff and possessing contraband created by converting a food item into a weapon to throw at staff.

Some days later I had a disciplinary hearing on both write-ups. I was told that Ingram's was being thrown out, but it would be used to support Pemberton's incident report. I got the impression that this

had more to do with duplicity and efficiency than merit. Pemberton made the first false written accusations of throwing power and threatening to put out a hit on Erika Barker. Ingram made the second false accusation of assault by accusing me of throwing an elbow. I was not found guilty of assault and the hearings officer seemed to agree that throwing chips is not assault. I said that getting my arm broken should be punishment enough, but I still got sixty days in the hole.

Some days later MCSO Detective Kevin Odil read me my rights through the food port. I asked, "who are you?" and he said he was a detective but did not give his name. I denied throwing powder and explained how my arm was broken. I also said that I was aware of the chip powder accusation and that throwing chips is not assault. He said, "that is why you are being charged with harassment" and left. I eventually received a police report in my discovery containing outrageous accusations (Exhibit 13).

In late July I found out that Deputy Timothy Barker and medical technician Erika Barker are married. That was the "icing on the cake" as to Deputy Barker's intentions as far as I was concerned. He broke my arm after his wife falsely informed him that I threatened to put out a hit on her. Like most married men he felt a certain kind of way against a man that he thought had just threatened to kill his wife. That is understandable, but even if I had threatened to put out a hit on her, that does not justify breaking my arm.

### Denial of Medical Care

I was not taken to OHSU for my follow up until August 3, 2017 (Exhibit 14 p.5). That was about five weeks after my arm was broken. OHSU wanted me back in 1 week (Exhibit 10 p.3). Medical staff at MCDC were well-aware of my need for a follow up. Had I had my follow up in time I would have been

placed in a brace, splint or a new sling that would have allowed my arm to heal properly. My medical records show that not only was MCSO and MCHD employees aware of the need for a follow-up, but that I began personally complaining no later than July 2, 2017 (Exhibit 14 p. 13), just five days after the incident to make sure that they knew to get me back there before it had been seven days. After it had been over a week I complained on July 6th, 9th, 11th, and 12th (Exhibit 14 p. 16-22).

My attorneys complained to Judge Marco Hernandez at several hearings and he directed the US Marshals to direct MCSO to take me to my follow up at least twice (Exhibit 15).

Throughout those five weeks my pain was managed with Norco three times a day (Exhibit 14 p. 13) when it should have been oxycodone every 6 hours (Exhibit 10 p. 4). According to medical staff that was due to a MCHD and/or MCSO policy which prohibited giving inmates any pain meds stronger than Norco. As a result, I was in more pain all the time than I should have been. I also requested a high bed that would have allowed me to sit up with less pain (Exhibit 14 p. 2-3). Instead they left me on the floor where it took several minutes for me to get up for any reason. I was overweight, so doing a sit-up was difficult even with a good arm, but having to roll to a good spot to use my right arm to lift my body and then get my legs under me while pieces of my left humerus moved around under the skin was a pain that made me dread having to get up for anything. I could have gotten up much easier from a higher bed, which the jail has plenty of for disabled people. On July 7, 2017 I fell while trying to get up and hit my left elbow on the toilet. This cause an increase in pain and swelling (Exhibit 14 p. 2-3).

Medical records show that I was scheduled for a follow up on July 7th, more than a week after the incident, and still they cancelled it saying "CI was due to be seen at OHSU Ortho today but was RS to 07/10/17 d/t appearance in federal court this am." (Exhibit 14 p.2). MCSO and MCHD employees failed to check the court docket before scheduling me for my follow up on a day that I had been scheduled to appear in court since June 6th. This conflict never would never have existed if I had been taken back to

OHSU within one week. On July 7th MCSO failed to inform the US Marshals that I could not be taken to court due to a conflicting hospital visit or if they did inform them, they failed to prevent them from taking me.

To make matters worse PA-C Brook Holter came to see me on July 12, 2017 as if visiting me at the jail were the same thing as taking me to my OHSO follow up. After a visit that accomplished little, she recommended that I be sent back to OHSU for a follow up within two weeks. As previously discussed, they took me to OHSU three weeks after her visit and five weeks after the incident. She recommended letting the arm hang lower to heal better, but the sling I had did not hang so low. She did not give me another sling that could have helped. She said that she worked mainly at the Inverness Jail and that she did not bring any slings with her. To add insult to injury; someone that may or may not have been PA-C Holter falsely quoted me as describing the breaking of my arm using Deputy Barker's version of events. This most likely had something to do with Deputy Barker escorting me to the visit and sitting near the doorway during my exam where he could easily hear me tell PA-C Holter the truth. I suspect Deputy Barker of doing something to either persuade PA-C Holter to record his story or get his wife to alter the record later (Exhibit 14 p. 3-4).

Medical records show that MCSO had scheduled me for a follow-up again on July 19th but cancelled it and rescheduled it for July 31st. Their justification stated, "was scheduled for OHSU referral apt 7/19/17, however, d/t Federal court unable to attend apt, so MSMD consulted and OHSU for resched of apt to wk of 7/31/17." (Exhibit 14 p.4). Once again MCSO and MCHD employees failed to schedule an appointment that did not conflict with a court appearance, failed to prevent the US Marshals from taking me to court on those days, and failed to make sure that I made it to my appointment.

On July 22nd, 25th, and August 1st I filed additional complaints documenting my pain, lack of proper healing, and lack of a follow up visit. (Exhibit 14 p. 22-24)

On August 3, 2017 I was finally taken to OHSU for my follow-up. The doctor tried to give me a sarmiento brace, but the deputies that escorted me there (Jon Burnett DPSST# 50882 and Marco Reyes) intervened and said that I couldn't have it because it contained metal. This was documented in my health records by MCHD staff which said, "Tried Sarmiento (brace) but not ok per Deputies" (Exhibit 14 p.5). So, MCSO appears to delegate medical decisions to corrections deputies instead of doctors. Since deputies are obviously not qualified to make medical decisions the result is a decision made for the good of the deputies and not the patient. I left the visit with a sling that let my arm hang lower at a better angle. A sling that I should have gotten in place of the brace I really needed one week after the break. At that point it was too late, and my arm had already healed somewhat at a bad angel. It was also recommended that ibuprofen be added to treat my pain.

When I got back to MCDC, Halcyon Dodd interpreted the order to add ibuprofen as an order to replace Norco with ibuprofen even though he himself stated that the order said, "ok for ibuprofen to augment Narcotic" (Exhibit 14 p.5). Augment means to modify not replace. As a result, what little assistance I was getting for my pain management ceased for the most part. I complained about it on August 7th, 8th, and 9th (Exhibit 14 p.26,28-29). Eventually, following a lot of work by my lawyer, an outside pain specialist permitted to visit me on August 11th. She diagnosed me with nerve pain and doubled my Gabapentin. That helped significantly and explained why Norco was not helping as much as it should have been because Norco was not designed to treat nerve pain (Exhibit 14 p.8-11). Still, I had problems just getting ice to put on my arm and more capsaicin cream. I complained about that on August 16th and 17th (Exhibit 14, p.30-31).

On August 21st I found out that the guards were preventing me from attending medical appointments in the jail itself by refusing to take me to medical even though I was housed on the same floor. As a result, medical staff had to come talk to me at my cell in front of other inmates. The nurse said, "Short interview through food port in 4F, as corrections staffing prevented client from being brought to clinic" (Exhibit 14 p.12).

In October of 2017 I had an x-ray done at FDC Sheridan that showed that the bone had not fully fused together, but that a lot or new bone formed at a bad angle. I believe that if I had been taken back to OHSU after a week that my arm would have been fine by then. I also believe that it may have been fixable when Brook Holter came to see me about 2 weeks after the incident, but new bone had started forming already so I'm not sure.

On November 19, 2017 I sent a tort claim notice to Multnomah County seeking damages for assault, battery, 14th Amendment violations, infliction of psychological trauma, and libel (Exhibit 16).

In late December of 2018 I was informed by Dr. Amador Cantu at FCI Sheridan that I had a non-union fracture. It turned out that Cantu was giving me the result of my October x-ray and my arm has since healed together. In response to what I believed to be a non-union fracture that would require surgery just to reconnect the bones, I decided to send in another tort claim notice for deliberate indifference and negligence. Although I do not have an urgent need for surgery, I would have to have surgery if I ever were going to fix my crooked arm, so I still want to make a claim for deliberate indifference. Due to my housing situation at FCI Sheridan I was not able to retain personal copies of the tort claim notice. I would have filed it sooner, but I was not sure just how bad my long-term problems would be due to their indifference until then. I also had more time to file my tort claim notice because the indifference for the most part continued through the end of August 2017, but in hindsight that second notice was unnecessary because deliberate indifference is covered by the first notice because I gave notice

of Fourteenth Amendment violations and deliberate indifference is barred by the Fourteenth Amendment.

## Subsequent Prosecution

On August 15, 2017 I was indicted on five counts of assaulting federal officers (Exhibit 17) based on false accusations made by several MCSO deputies including alleged victims Barker (Exhibit 18), Ingram (Exhibit 19), Muth (Exhibit 20), Hubert (Exhibit 21), and Simpson (Exhibit 22). The counts involving Barker and Muth both alleged physical injuries even though Assistant United States Attorney Greg Nyhus knew that efforts to find any proof of alleged injuries came up empty (Exhibit 23). The best piece of evidence in the case ended up being an Expert Witness Report by Dr. Wilson Hayes (Exhibit 24) which proved that I was telling the truth. The indictment was eventually dismissed.

## ARGUMENTS

### Excessive Force

Allegations of excessive force are judged under Eighth Amendment standards for inmates that are serving a sentence and the less strict standards of the Fourteenth Amendment for pre-trial detainees. Since I had yet to be sentenced the Fourteenth Amendment applies and since the Fourteenth is less strict than the Eighth, anything that satisfies the Eighth Amendment standard also satisfies the Fourteenth. See *McRorie v. Shimoda, 795 F.2d 780 (9th Cir. 1986)* "the guard's brutality deprived McRorie of his Eighth Amendment right to be free from cruel and unusual punishments and his Fourteenth Amendment right against a deprivation of liberty without due process of law." Eighth Amendment claims require that the

use of force was excessive, unnecessary, and intentionally used to cause harm.  "We think the Eighth Amendment, which is specifically concerned with the unnecessary or wanton infliction of pain in penal institutions serves as the primary source of substantial protection to convicted persons in cases such as this one where the deliberate use of force is challenged as excessive and unjustified." *Whitley v. Albers, 475 U.S. 312 (1986).* I argue that had I been a convicted person, the conduct of the Defendants in this case would have violated the Eighth Amendment because my arm was intentionally broken. As the Supreme Court has ruled "It is obduracy and wantonness, not inadvertence or error in good faith that characterize the conduct prohibited by the cruel and unusual punishments clause...The infliction of pain in the course of a prison security measure, therefore, does not amount to cruel and unusual punishment simply because it may appear in retrospect that the degree of force authorized or applied for security purposes was unreasonable, and hence unnecessary in the strict sense...We think the question whether the measure taken inflicted unnecessary and wanton pain and suffering ultimately turns" on the position previously taken by the Second Circuit in *Johnson v. Glick, 481 F.2d 1028 (2nd Cir. 1973)* which was "Whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically to cause harm." The intentional breaking of an arm by a corrections officer is the perfect example of a malicious and sadistic act intended to cause harm. This case is strikingly similar to *Smith v. Mattox, 127 F.3d 1416 (11th Cir. 1997)* in which the opinion said:

> *"Mattox put his knee on Smith's lower back to prepare to handcuff him. In the process of pulling Smith's left arm behind his back to fasten the handcuffs, Mattox put Smith's forearm to a position that caused Smith discomfort. Smith complained, and then with a grunt and a blow--but no sign of anger--Mattox broke Smith's arm...Smith cites no Fourth Amendment case, and this court has located none, in which a police officer subjected a previously threatening and fleeing arrestee to nondeadly force after the arrestee suddenly became docile. Smith therefore must show that Mattox's conduct was so far beyond the*

*hazy border between excessive and acceptable force that Mattox had to know he was*

*violating the Constitution even without caselaw on point...In this inquiry, the officer's*

*intent, whether evil or good, is irrelevant...The grunt and the blow that Smith asserts that*

*he heard and felt while Mattox was on Smith's back, coupled with the severity of Smith's*

*injury, push this case over the line... Furthermore, even if Smith was not actively resisting*

*arrest at the very moment the force was applied, he was before that moment; Mattox*

*could reasonably have believed that without some force restraining Smith, he would have*

*resumed either his attacks or his flight. Thus, it was not unreasonable for Mattox to think*

*that he was entitled to use some force to put Smith into cuffing posture. But, assuming as*

*we must that Smith was offering no resistance at all, the considerable effort and force*

*inferable from the grunt, Smith's sensation of a blow, and the broken arm was obviously*

*unnecessary to restrain even a previously fractious arrestee. We thus conclude that this*

*case falls within the slender category of cases in which the unlawfulness of the conduct is*

*readily apparent even without clarifying caselaw."*


Although *Smith* involved a Fourth Amendment unreasonable force standard for an arrestee, that

standard is the same under the Fourteenth Amendment for a pre-trial detainee. Barker's intentions were

like those of *Smith* and the guard in *McRorie* in which "McRorie was assaulted during a controlled strip

search: he was naked, spread eagle, with his hands against the wall and his back to the guard. By assaulting

McRorie in the manner alleged, the guard deliberately used excessive force that inflicted bodily harm

under circumstances when he knew or should have known that it was an unnecessary and wanton

infliction of pain." Like *McRorie* I was naked with my back to the guard and a guard can conduct a strip

search without breaking a prisoner's arm just like "a guard can conduct a strip search without plunging a

riot stick into a prisoner's anus." The only difference here is that I was not serving a sentence that the

Constitution says can't be carried out in a cruel and unusual way. I was a pre-trial detainee with a right to

be free from unreasonable force.

The behavior of the deputies in my case was similar to the behavior of prison guards in *Hudson v.*

*McMillian, 503 U.S. 1 (1992)* and *Hope v. Pelzer, 536 U.S. 730 (2002)*. In *Hudson* an officer placed an inmate

"in handcuffs and shackles, took the prisoner out of his cell and walked him toward the penitentiary's

administrative lockdown' area...on the way there, [the officer] punched [the inmate] in the mouth, eyes,

chest, and stomach while [another officer] held the inmate in place and kicked and punched him from

behind...the supervisor on duty, watched the beating, but merely told the officers 'not to have too much

fun'...As a result of the episode, [the inmate] suffered minor bruises and swelling of his face, mouth, and

lip...The blows...are not de minimis for Eighth Amendment purposes...Punishment 'incompatible with the

evolving standards of decency that mark the progress of a maturing society' or 'involving the unnecessary

and wanton infliction of pain' are repugnant to the Eighth Amendment...to deny...the difference between

punching a prisoner in the face and serving him unappetizing food is to ignore the 'concepts of dignity,

civilized standards, humanity, and decency' that animate the Eighth Amendment." In this case. like in

*Hope* "We may infer the existence of this subjective state of mind from the fact that the risk of harm is

obvious...Any safety concerns had long since abated by the time petitioner was handcuffed to the hitching

post because [the inmate] had already been subdued, hand cuffed, placed in leg irons, and transported

back to the prison...Despite the clear lack of an emergency situation, the respondents knowingly subjected

him to a substantial risk of harm." Like in *Hudson* I was injured while in restraints and a supervisor

"expressly condoned" the abuse. Like in *Hope* the abuse took place after "safety concerns had long since

abated." There are times when injuring an inmate to gain control is reasonable, but it is hard to think of a

more unreasonable act than breaking the arm of a subdued inmate that had been placed in restraints, is

cooperative, and totally helpless.

The intentional breaking of an inmate's arm constitutes extreme corporal punishment and torture. Corporal punishment was banned in this country long ago because "corporal punishment is easily subject to abuse in the hands of the sadistic and unscrupulous...[it] creates other psychological problems and makes adjustment to society difficult." *Jackson v. Bishop, 404 F.2d 571 (8th Cir. 1968)*. "Punishments of torture or unnecessary cruelty are forbidden by Constitutional provision against cruel and unusual punishments." *Wilkerson v. Utah, 99 U.S. 130 (1879)*. Such conduct violates "a clearly established constitutional right 'of which a reasonable person would have known,' *Harlow v. Fitzgerald, 457 U.S. 800 (1981)*." *Watts v. McKinney, 394 F.3d 710 (9th Cir. 2009)* "to suppose that a reasonable person, let alone a trained police officer, would not know that kicking a helpless prisoner's genitals was cruel and unusual conduct is beyond belief." In this case to suppose that a reasonable person, let alone a trained corrections deputy, would not know that breaking an inmate's arm was cruel and unusual punishment is beyond belief.

Unlike a convicted prisoner serving a sentence I need not prove that my punishment was cruel and unusual under the Eighth Amendment to prevail under the Due Process Clause of the Fourteenth Amendment. See *Kingsley v. Hendrickson, 135 S. Ct. 2466, 576 U.S. ___ (2015)* "Under 42 U.S.C. 1983, a pretrial detainee need only show that the force purposely or knowingly used against him was objectively unreasonable to prevail on an excessive force claim...*Whitley v. Albers, 475 U.S. 312*, and *Hudson v. McMillian, 503 U.S. 1*, lack relevance in this context because they involved claims brought by convicted prisoners under the Eighth Amendment's Cruel and Unusual Punishments Clause, not claims brought by pretrial detainees under the Fourteenth Amendment's Due Process Clause." The key difference is that a pretrial detainee is protected from being punished at all, so the punishment need not be cruel or unusual to constitute a punishment without due process of law in violation of the Fourteenth Amendment, so even though I believe that I can show that Deputy Barker's subjectively intended to break my arm I do not have to prove that "the officers were subjectively aware that their use of force was unreasonable."

In *Kingsley* "the officers concede[d] that they intended to use the force that they used. But the parties disagree[d] about whether the force used was excessive." Deputy Barker all but conceded that he used unreasonable force in his incident report (Exhibit 18 p. 2) "We told him that we were going to remove the restraints and follow our directions. I then removed the right handcuff and told to place his right hand under belly. Inmate Sullivan would not comply with simple directions and he had to be helped with this task by rolling him to the left a few inches, This move helped place his hand under him. I told him that I was going to remove the left side for him to do the same with his left hand. As I removed the handcuff and laid his left arm down beside him, he was told to place it under himself. This was the first time inmate Sullivan complained about his arm. He said he couldn't move his arm. I asked him again to place his hand under himself and he stated 'I think my arm is broke.'" As you can see Barker admits to giving me directions that no human being could physically comply with before using force to roll me to the left a few inches in order to get my right hand under my belly while he and at least one other deputy were on top of me. I believe that Barker was on top of my lower back and Ingram was on top of my upper back but I could not see Hubert. In Hubert's statement (Exhibit 21) he said "Asgt Barker was closest to the window and Sgt Ingram was at the head and I was kneeling on his back." Hubert and Barker are big guys, Barker weighs over 300 lbs. and Hubert is at least 230 lbs. Either one of those men kneeling on my back would have made it physically impossible for me to comply with directions to put my hand under my belly. This makes any use of force at that point unreasonable because I was never given an order that I could have complied with before force was used. At the time the Ninth Circuit had already established that "Officers cannot justify force as necessary for gaining inmate compliance when inmates have been given no order with which to comply." *Furnace v. Sullivan, 705 F.3d 1021 (9th Cir. 2013).* I argue that the same can be said for orders that can't possibly be complied with. Officers cannot justify force as necessary for gaining inmate compliance when inmates are not physically capable of complying with the order. If a man is nailed to a

crucifix it would not be reasonable to order him to lay down on the ground and then rip him down off the cross to compel compliance with the order. Other deputies involved never stated that I did anything to justify using force while uncuffing me. See the statements of Ingram (Exhibit 20) "Once the clothing was removed I gave clear directions to Sullivan about the removal of his hand cuffs. I ensured he understood the commands given by asking him to repeat them. He complied with the commands while Barker removed the handcuffs," Moore (Exhibit 28) "I stepped forward and assisted with removing Sullivan's jail issued pants by grabbing the end of the cuff on the right leg and pulling it toward me. Sullivan was given the white jumpsuit and instructed to remain in the prone position until deputies exited the cell," and Kovachevich (Exhibit 29 p. 2) "Sullivan began to comply with the directives being issued by Sgt Ingram: at this point A/Sgt. Barker began removing the handcuffs, I then let up off Sullivan's legs and pulled his blue pants off, Sgt. Ingram ordered Sullivan to remain belly down on the mattress until we exited the cell, which we then did, and the door was secured."

Under *Furnace* the use of force to compel my compliance with a strip search in 4F was completely unreasonable because I was never ordered to participate in a strip search. This is obvious from the incident reports in which Ingram said, "I decided for safety reasons, based on how the incident unfolded, it would be best to cut off his jail clothing." (Exhibit 19 p.2); Deputy Barker said, "Due to his unruly behavior, Sgt. Ingram asked for the cutters and we started to cut the clothes off of him." (Exhibit 18 p.2); Moore said "I opened the door to 4F-13 and deputies escorted Sullivan into the cell. Sullivan was placed in the prone position on the bed," (Exhibit 28); and Kovachevich said "it was my thinking that Ingram felt we would not be able to perform a strip search at this point, so he decided to cut Sullivan's clothing to remove it." Normally, when an inmate is placed in 4F, he is given a jumpsuit to change into following a strip search that is done through the cell window. When an inmate is unruly guards leave them in the cell with their handcuffs attached to a hobble and the hobble is used to pull the inmate to the door before uncuffing

him through the food port. After that if the inmate refuses to strip then they come in and cut off the clothes. I know this because in April of 2017 I refused to strip and that is what they did.

In addition to failing to order me to participate in a strip search, there is evidence of collusion between Deputies Kovachevich, Ingram, and Barker. Evidence that Kovachevich did not want to be questioned about so bad that he deliberately caused himself to be out of the state during the week that my trial should have happened, and it had to be delayed (Exhibit 29 p. 3-10). At 10:26 PM on June 28, 2017 Kovachevich sent an email to Barker and Ingram with the word "narrative" in the subject line (Exhibit 29 p.1). The body of the email is almost identical to the body of the incident report (Exhibit 29 p.2) that he filed at 6:52 AM the following day, but there is one noticeable addition to the incident report. The email stated "once in 4F, they moved Sullivan into Cell #13 and pushed him down upon the mattress belly down" and the incident report stated "Once in 4F, they moved Sullivan into Cell #13, Sullivan continued to struggle and fight and therefore it became necessary for Ingram and Barker to push him down upon the mattress belly down." Obviously Kovachevich must have received some feedback to his email indicating a need to justify using force to put me on the mattress. In fact, the only other deputies that claimed force was necessary to place me on the bed were the ones in the email chain. Ingram stated "We entered 4F13 Sullivan continued to twist and toss his hips from side to side. I ordered Sullivan to lay down on the mattress in 4F. My order was met with a no. Therefore, I and Barker slowly lowered him to the mattress face down." (Exhibit 19 p.2) and Barker stated "As we entered 4F13 I gave the order for inmate Sullivan to kneel down on the gray mattress. He complied. After he knelt down, I told inmate Sullivan to lay down face first while I helped him down. I held on to the front of his shoulder and lowered him down. He kept trying to pull away" (Exhibit 18 p.2). Despite their collusion Barker and Ingram still contradict each other with Ingram saying that I was twisting from side to side before refusing the order to kneel on the bed, and Barker saying that I did not refuse the order but kept trying to pull away after complying with it. The other deputies did not say that force was needed at all. Hubert said, "Once we arrived in 4F13 inmate

Sullivan was lowered to the mattress on his belly" and Moore said "I opened the door to 4F-13 and

deputies escorted Sullivan into the cell. Sullivan was placed in the prone position on the bed."

What all of the deputies fail to mention is that during the time between Deputy Barker removing

the left handcuff and when Deputy Barker laid my left arm beside me, I was screaming in agony as my arm

was being broken. A fellow inmate heard those screams and it was obvious to him that my agony started

in the cell, so I am currently trying to track down his statement from my former investigator. Dr. Wilson

Hayes would later join in supporting my story with his Expert Witness Report (Exhibit 24 p. 6-7):

> *Based on my review and analysis of the materials provided and my background, training*
>
> *and experience in anatomy and injury biomechanics, it is my opinion, to a reasonable*
>
> *degree of engineering and biomechanical certainty, that Mr. Sullivan's humeral fracture*
>
> *occurred in cell 4F13 of the fourth floor detention center when he was pinned to the*
>
> *mattress on the cell floor by Deputies Barker & Ingram and when his arm was 'twisted*
>
> *behind his back.' The analysis indicates that the level of force necessary to produce such*
>
> *fractures are consistent with those reported in the literature as associated with motor*
>
> *vehicle collisions[4,20], high-intensity arm wrestling[26], and fractures known to occur*
>
> *during high-velocity throwing motions[31]. Moreover, it is my opinion, to a reasonable*
>
> *degree of engineering and biomechanical certainty, that the facts of the case rule out the*
>
> *version of the events provided by the Deputies, asserting that the fracture occurred in Mr.*
>
> *Sullivan's cell 5D23 on the fifth floor as deputies were trying to handcuff Mr. Sullivan. The*
>
> *fundamental bases for these opinions include: 1) The spiral configuration and twist*
>
> *direction of the humeral fracture itself, including its mild angulation and displacement; 2)*
>
> *Peer-reviewed literature on the torsional strength of the humerus; 3) Mr. Sullivan's height*
>
> *and weight (and this anthropometry); 4) Incident Reports that indicate the details of the*
>
> *escort process by which Mr. Sullivan was transferred from the fifth to the fourth floor; 5)*

*My review and interpretation of the radiographs taken on June 28, 2017; and 6) My calculations, using the fundamental laws of engineering physics, that the twisting forces applied to Mr. Sullivan's forearm were both substantial and violent, applied in a manner that would be expected to cause injury, well within the capabilities of males similar to Deputies Barker and Ingram [1,5,25] and well above the reported torsional fracture strength of the humerus. These facts and analyses thus both comport with and rule in the assertions on injury causation provided by Mr. Sullivan and rule out the version of events described by the involved Deputies.*

What all the deputies do say is that I did not complain about my arm being broken until after my left hand was uncuffed. See statements of Barker (Exhibit 18 p.2) "As I removed the handcuff and laid his left arm down beside him, he was told to place it under himself. This was the first-time inmate Sullivan complained about his arm. He said he couldn't move his arm. I asked him again to place his hand under himself and he stated, 'I think my arm is broke.'"; Moore (Exhibit 28) "Sullivan was given the white jumpsuit and instructed to remain in the prone position until deputies exited the cell. At this time Sullivan indicated he had been injured during the incident and would need medical attention."; Kovachevich (Exhibit 29 p. 2) "As we left 4F, Sgt's Ingram and Barker commented to each other that they needed to call Medical to have Sullivan checked out as it appeared Sullivan may have suffered a broken left arm."; and Hubert (Exhibit 21) "The cutters were retrieved and his clothes were cut off and the handcuffs were removed. Inmate Sullivan was complaining that his arm was broken." This is important because nobody could suffer an injury like the one I suffered without visibly being in pain. It is not like some lesser fracture that results in a soreness so you think it might be broken and need an x-ray to make sure. In such a case an explanation like the ones of the deputies might make sense, but not with such a severe break. As Dr. Hayes explained:

*Here, the configuration of the fracture fragments in the radiographs, taken shortly after the fractures were sustained, are again telling. Given the various descriptions in the Incident Reports provided by the officers involved there was a considerable struggle as Mr. Sullivan was escorted from the fifth-floor cell to the fourth floor detention center. Mr. Sullivan was variously described as 'go[ing] passive', 'resisting by slumping down', 'resisting furiously', with Deputies Barker and Ingram performing the escort. Such a 'furious struggle', which more likely than not involved the application of forces to restrain and lift Mr. Sullivan's 'dead weight', is biomechanically and anatomically inconsistent with what is characterized in the medical records as a 'minimal anterior apex angulation,' 'Alignment is normal', and an impression of 'Mildly displaced humeraldiaphyseal fracture.' (Radiology Report, 6/28/17). While I would leave it to other experts to comment on whether or not Mr. Sullivan could, in the presence of a fractured humerus, mount such a violent struggle over the course of his transfer from one floor to another, his subsequent passivity just after he reported that 'I think my arm is broke' and his 'inability to rise" certainly belies the assertion that his fracture was sustained in his fifth floor cell.*

My journey from outside my cell on the fifth floor to 4F was a constant struggle to walk straight while being given wedgies. The entire way I was observed by surveillance cameras, but I found out later that none of the cameras record. As a result, "there is no video of this incident" (Exhibit 27 p.1), so we must rely on the word of my fellow inmates, Dr. Hayes, other medical professionals, and I to tell the truth about that transfer. Some of my fellow inmates spoke to my investigator and I am in the process of tracking down his notes, but I do recall my investigator saying that they recall observing me struggling to walk comfortably on my way out of the unit and do not recall me resisting or making any threats. My legal team did contact other experts in addition to Dr. Hayes. They shared his belief that I could not possibly

have mounted any form of resistance as alleged if my arm had already been broken the way that it was before leaving my cell on the fifth floor. I will elaborate further once I dig up more information that I know must be in my notes or the notes of my defense team somewhere. On top of that, Dr. Hayes made it clear that had the break taken place before the escort and I had managed to resist somehow, my injuries would have been worse. Dr. Hayes said the following:

> As part of my analysis of the second criterion, i.e. objective evidence of injury, I have already noted that the aligned and modest displacement of the fracture fragments do not comport with the 'fierce struggle' and forceful nature of the escort process as described by the Deputies. Given the lack of structural connection between the fracture fragments and the testimony that it was necessary to support Mr. Sullivan as he went limp (a process that almost certainly would have involved, at least in substantial part, the upper extremities, it would be highly unlikely for a through and through fracture of the humerus to maintain its alignment and mild displacement. In fact, the use of splints and air casts for trauma victims with serious fractures is for the very purpose of eliminating or at least reducing the relative motion and angulation of such fractures. I have also noted, although will defer to other experts on this issue, that Mr. Sullivan would likely be unable to struggle fiercely, simply because of pain, with this serious fracture. I have already noted that Mr. Sullivan did not report that 'I think my arm is broke' until after the events on the mattress in the fourth-floor detention center. Finally, Deputy Barker's Incident Report (Incident Report, 07.15.17, MCSO) also comports with a fracture mechanism that occurred on the mattress of the fourth-floor cell and not in the fifth floor cell. Deputy Barker's description of the fourth-floor incident is that he had 'removed the right handcuff and told [Mr. Sullivan] to place his right hand under [his] belly.' According to the Deputy, 'Inmate Sullivan would not comply with simple directions,' and 'he had to be helped with this task

*by rolling him to the left a few inches.' For Deputy Barker to use the left hand and wrist of*

*Mr. Sullivan to roll him to his left would require that the left wrist and forearm be lifted up*

*and away from its position at the small of Mr. Sullivan's back. This is precisely the*

*mechanism of torque application necessary to produce the spiral fracture of the left*

*humerus that Mr. Sullivan sustained. (Exhibit 24 p.13-14).*


Some of the Defendants have tried quite hard to make it look as if my arm was broken in the cell

on the fifth floor. This issue was explored a lot because of its impact on the credibility of the deputies. The

Government took the position that the timing of my broken arm was irrelevant to the charge that I

assaulted the deputies of the fifth floor. The Government was correct and their argument is highly relevant

to this lawsuit because by agreeing with the Government on that issue I can say that whether or not I

assaulted deputies on the fifth floor is irrelevant to my Complaint that Deputy Barker broke my arm by

using excessive force on the fourth floor. What is relevant to this complaint is whether or not the deputies

provided a reasonable alternative explanation for the broken arm. They did not. Deputy Barker stated "I

was able to get my right hand under his left arm and grab Sullivan's left wrist this is when I was trying to

pull his left arm behind his back. He kept pulling up and away from me and this is when I heard, what I

thought was a pop. I waited for a reaction indicating an injury and there was no indication of this." (Exhibit

18) and Deputy Ingram stated "He continued to resist against Barker not allowing his left hand to be placed

behind him. I again told him 'just stop fighting and put your hand to your back'. Soon thereafter I heard a

pop noise and his left wrist appeared to the small of his back" (Exhibit 19 p.2), but none of the other

deputies that were in the cell claimed to have heard such a noise. See incident reports by Hubert (Exhibit

21), Simpson (Exhibit 22), and Muth (Exhibit 20). So, the only two people that claim to have heard this

"pop" and have written reports trying to make it look like my arm was broken during a legitimate use of

force on the fifth floor, are the man that actually broke my arm and his immediate supervisor. That last sentence is the only part of their story that makes any sense. As Dr. Hayes explained:

> in describing the events on the fifth floor, Deputy Barker indicated that he was attempting to pull [Mr. Sullivan's] left arm behind his back, and that Mr. Sullivan 'kept pulling up and away from [him]' and that this is when he thought he heard a 'pop.' Such pulling actions would not apply torque to the humerus of sufficient magnitude and appropriate orientation to cause Mr. Sullivan's fracture. Thus, on the basis of all the displacement and alignment of the fracture fragments, the consistent descriptions among all the parties that Mr. Sullivan's complaints that his arm had been fractured occurred on the fourth floor, and the fact that Incident Report descriptions of the application of torque would produce a fracture on the mattress, rather than in the fifth floor cell, the facts and my analysis of the case lead me to conclude that the fracture occurred as Mr. Sullivan described. (Exhibit 24 p.14).

Now I must admit that the deputies that did not report hearing a "pop" in my cell on the fifth floor are not credible, but neither are the ones claiming to have heard the "pop" or the ones that did not come into the picture until I was taken to the fourth floor. Defendants Kovachevich, Moore, Hubert, and Ingram are just as responsible for breaking my arm as Deputy Barker. That is because they had an obligation to intervene when excessive force was being used and failed to do so. See *Smith v. Mensinger, 293 F.3d 641 (3rd Cir. 2002)* "a corrections officer's failure to intervene in a beating can be the basis of liability...if the corrections officer had a reasonable opportunity to intervene and simply refused to do so. Furthermore, we hold that a corrections officer cannot escape liability by relying upon his inferior or non-supervisory rank vis-a-vis the other officers." *and Buckner v. Hollins, 983 F.2d 119 (8th Cir. 1993)* "Prison guard's failure

to intervene to stop another officer's beating of naked, handcuffed, defenseless prisoner would constitute

deliberate indifference sufficient to preclude summary judgment." The supporting cast in this case had

every opportunity to intervene while Barker and Ingram were on top of me after using excessive force to

conduct the strip search in the first place. They themselves described hearing me cry out that I could not

breathe. When an inmate says that, deputies have an obligation to make sure that his breathing is not

compromised. They could have pulled them off me or at least asked them to calm down. I was not

combative as they claim, so there was no need to be on top of me like they were. What they were

witnessing, right before my arm was broken, were actions excessive for the purpose of conducting a strip

search. Even if I can't prove that it was intended as a punishment, Kingsley clearly states "in the absence

of an expressed intent to punish, a pretrial detainee can nevertheless prevail by showing that the actions

are not 'rationally related to a legitimate nonpunitive governmental purpose' or that the actions 'appear

excessive in relation to that purpose.'" While the strip search was done excessively in relation to its

purpose, the arm breaking had no legitimate nonpunitive governmental purpose. Motive for the

punishment can be found in the events that took place on the fifth floor. It began with Deputy Barker's

wife, Erika Barker, falsely accusing me of threatening her life (Exhibit 11) before several deputies including

Barker were threatened with having their personal information (including home addresses) posted online

(Exhibit 22) and had a handful of chips thrown in their faces when they entered the cell (Exhibit 20). There

is no question that Defendant Deputy Barker twisted my arm in the manner and with the force described

by Dr. Hayes. Under Kingsley I must prove by a preponderance of the evidence that Deputy Barker used

force "deliberately (not accidently or negligently)" and I "must show only that the force purposely or

knowingly used against him was objectively unreasonable." I can do that.

**Deliberate Indifference**

Defendants Multnomah County, MCSO, Mike Reese, Gary Glaze), and Kurtiss Morrison are responsible for failing to properly train or supervise deputies and nurturing a deviant culture that has existed within the MCSO at MCDC for many years. That culture tolerates and encourages deputies at MCDC to abuse inmates by failing to take simple steps to deter misconduct, failing to properly investigate reports of misconduct, having an unwritten rule for deputies to always protect fellow deputies by lying, and taking the word of deputies over those of inmates without properly investigating their claims and ignoring conflicting evidence if someone else investigates the same claims.

For a municipality like Multnomah County to be responsible for my broken arm I must prove that "a municipal 'policy' or 'custom' is the moving force behind the constitutional violation." *Canton v. Harris, 489 U.S. 378 (1989).* Failure to train constitutes deliberate indifference "only where failure to train reflects a 'deliberate' or 'conscious' choice by the municipality can the failure be properly thought of as an actionable city 'policy'...It may seem contrary to common sense to assert that a municipality will actually have a policy of not taking reasonable steps to train its employees. but it may happen that, in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need. In that event, the failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury...It could also be that the police, in exercising their discretion, so often violate constitutional rights the need for further training must have been plainly obvious to the city policymakers, who, nevertheless, are 'deliberately indifferent' to the need.'" *Canton*. Was Deputy Barker doing what he was trained to do when he broke my arm? If so, then any training

program that teaches deputies to apply so much force in that scenario is fatally flawed. Multnomah County would be liable for such a deliberately indifferent policy, so would MCSO and Sheriff Mike Reese because "as chief executive officers, sheriffs possess final authority with respect to the training of their deputies, and thus it may be fairly said that their actions constitute county policy on the subject." *Davis v. Mason County Sheriff's Department, 927 F.2d 1473 (9th Cir. 1989)*.

I doubt that Barker was trained to break arms as a means to move prone inmates to the left or move their arm from the small of their back to their side while he is on top of them. Such training would be in violation of Multnomah County's own use of force policies (Exhibit 30). In fact, it is hard to find any criticism to throw at such a well worded policy. As I read the policy, I noticed too many violations by the deputies involved in this case to list them all. The only criticism I have is that the term "excessive force" could be defined using less vague terminology, but the policy seems to follow the letter of the law exactly. That is why the real problem is not the written policy, but the customs that exist within the MCSO. The best policy in the world can be rendered useless by a custom not to follow the policy and protect each other from being held liable under the policy. This is where failure to supervise comes in. This failure is due mainly to failure to record footage from surveillance cameras, failing to make deputies wear body cameras, and a custom by supervising officers to rubber-stamp use of force incident reports.

Counties have been held liable under Section 1983 for such things. See *Marsh v. Butler County, 225 F.3d 1243 (11th Cir. 2000)* "jail inmates stated 42 USCS 1983 claim against county for deliberate indifference to substantial risk of serious harm at county jail, where county...did not have surveillance system." Even though Butler County had nor surveillance system at all it can be argued that a lack of body cameras combined with a surveillance system that does not record is just as poor at protecting inmates as no surveillance system at all. The current system gives the deputies an advantage when disturbances are seen on camera and they can respond faster, but it does nothing to gather evidence against the many people referred to the Multnomah County District Attorney's Office ("MCDA") for prosecution based on

allegations of assaulting deputies in the jail in recent years (Exhibit 25). The only conclusion I can come to for this is that the footage would be more of a liability to the MCSO than an asset to the MCDA. As it stands most cases are prosecuted based only on the word of deputies vs the word of inmates and the inmates do not have nice uniforms to wear to court. In that scenario the deputies almost always win and have used that to retaliate against inmates by falsely accusing them of assaulting them.

The rubber-stamping process in place at MCSO is illustrated well by Defendants Glaze and Morrison. In his review (Exhibit 26) Sgt. Gary Glaze just aggregates the allegations of his subordinates without any regard for conflicting stories. Beyond that he justifies use of force for the strip search by saying "Sullivan had been non-compliant the entire process and there was no reason for Sgt. Ingram to believe Sullivan would have been compliant with the strip search and clothing exchange." That justification is purely hypothetical since I was never given the opportunity to comply with a proper strip search and as I've already explained, the Ninth Circuit in *Furnace* has already held "Officers cannot justify force as necessary for gaining inmate compliance when inmates have been given no order with which to comply." This process is again repeated by Lt. Kurtiss Morrison in his review (Exhibit 27) with minor differences. The most notable difference being that Morrison at least acknowledges that there are some inconsistencies with Muth's, Barker's, and Ingram's stories, but only covers the part of the incident before they came into my cell on the fifth floor. Failing to properly investigate officers can be grounds for deliberate indifference. See *Brown v. Bryan County, 67 F.3d 1174 (5th Cir. 1995)* "County could be held liable for excessive force used by county officer, for purposes of 42 USCS 1983 action, where sheriff did not conduct good faith investigation of officer...hiring of officer amounted to deliberate indifference to public welfare." The lack of supervision proves failure to train because the MCSO can't possibly train its deputies to conduct themselves with the knowledge that they are always being recorded. Such knowledge changes behavior for anyone whether they are a reality tv star or a correctional officer. "County can be held liable under 42 USCS 1983 for injury to prisoner by correction officers, if county's failure to supervise

or properly train correction officers is so severe as to reach level of 'gross negligence' or 'deliberate indifference' to deprivation of plaintiff's constitutional rights." *Owens v. Haas, 601 F.2d 1242 (2nd Cir. 1979).* According to former MCSO Deputy Wallace Montoya there is "a strong culture in the corrections division countervailing against the reporting of physical force by a co-worker or more especially by a commanding officer unless the conduct was egregious." *Montoya v. Giusto, 2004 U.S. Dist. LEXIS 29363 (2004) (case no. 02-446-JE).*

The culture at the MCSO has contributed to countless beatings, sexual assaults, and even a few deaths over the past 20 years. When I was at FDC Sheridan I searched Lexis Nexis for written decisions about the Multnomah County jails in this district and the Ninth Circuit. I found plenty to establish that Multnomah County, MCSO, and Mike Reese are aware of this culture, but I feel that this part of my Complaint is incomplete because I was not able to use the internet until about a week before my filing deadline due to the statute of limitations, so I will most likely file an amended complaint in the near future containing more example of the culture at MCDC.

I will begin by discussing the aforementioned *Montoya* case, a lawsuit filed by former MCSO corrections deputy Wallace Montoya following his termination in response to a series of high-profile incidents around the year 2000. Montoya was a party to the excessive use of force against an inmate named Poe who was unnecessarily slapped by another deputy in a holding cell, "The incident involving Poe was the third time in a three-week period in which the use of force by MCSO employees raised concerns. Both inmates who were subjected to force in the other two incidents died." Due to the deaths there was a lot of media attention directed at the MCSO at that time. There was an investigation that revealed the presence of a gang of guards at MCDC with matching tattoos that said, "Brotherhood of the Strong." Montoya was part of the Brotherhood of the Strong and felt that he was made a scapegoat, "According to his affidavit, when he was interviewed by criminal investigators and IAU investigators, plaintiff Montoya was 'intimidated about implicating a commanding officer in inappropriate conduct due

to the fact that the Multnomah County Sheriff's office has a strong culture that employees do not rat out each other and the corrections division also has a strong culture of being a chain of command organization."

Montoya is not the only former MCSO employee to shed light on the culture there. As far back as 2002 a deputy claims to have been denied veterans benefits and retaliated against for filing a lawsuit to get the benefits he fought for, *see Edwards v. Staton, 2016 U.S. Dist. LEXIS 86391 (2016) (case no. 3:14-cv-00531-AC)*. In *Traxler v. Multnomah County, 2008 U.S. Dist. LEXIS 7456 (2008) (case no 06-1450-KI)* a former employee filed suit for whistleblower retaliation, "Traxler observed upper management, including [Director of Business Services] and [Chief of Corrections], protect certain employees and use budget cuts to get rid of employees that they did not want to keep. [Chief of Corrections] also instructed HR to work around County rules at times to give special treatment to preferred employees. Traxler witnessed [Chief of Corrections] treat family leave inconsistently. Employees he favored were allowed to retain their jobs after using up their medical leave but others lost their jobs. Traxler believes that [Chief of Corrections] wanted her out of an HR management position because she tried to apply HR rules equally for all employees. [Chief of Corrections] made snide comments about Traxler and her skills." Then from 2005 to 2006 she "saw abuses in timekeeping and overtime practices by sworn officers that resulted in payment of excessive sick time and overtime pay to officers. Corrections officers would collect overtime by calling in sick for a shift and working a different shift for another officer in the same 24 hour period...Traxler reported the abuses...Traxler could tell from comments to her from MCSO management that her reports of abuse were not welcome." In *Elliot v. Staton, 2012 U.S. Dist. LEXIS 87449 (2012) (case no. 3:11-cv-1536-ST)* another whistleblower lawsuit was filed by a former deputy that was given bad jobs in response for reporting misconduct.

Another victim of this culture is the general public, as was the case with former deputy Judith Locke whose epic tale of incompetence demonstrates what kinds of people can get hired as corrections

deputies by MCSO and what it takes for them to get fired, *Lucke v. Multnomah County, 2008 U.S. Dist. LEXIS 71861 (2008) (case no cv-06-1149-ST).* Her troubles began when she was stalked and sexually harassed by male deputies in 2002, "Both Lucke and [Laurie] Kimmell [another former deputy] testify that male deputies were treated more favorably than female deputies with respect to the terms and conditions of their employment including in the allotment of break time, shift assignments, and duties." The following year she was the subject of her first of six investigations by the Internal Affairs Unit ("IAU") after an inmate she escorted to the hospital "acquired a set of metal silverware from his hospital dinner tray which Lucke had failed to inspect before hospital staff gave it to him. After Lucke removed [inmate]'s restraints so he could change his pants, [inmate] brandished the knife and fork, held Lucke hostage, stole several of her personal effects, and escaped." Lucke was presumably armed with pepper spray, a taser, and a gun (like Bull was when he escorted me to the hospital), but was so poorly trained that she was no match for a hospitalized inmate with silverware. The Chief Deputy at the time ordered that she receive additional training "because he agreed that the escape was due in part to shortcomings in MSCO policies and procedures which included a failure to properly train deputies." Her second and fifth IAU investigations took place after she failed to engage inmates in support of fellow deputies during altercations at the jail. Her third IAU investigation took place after she encouraged an inmate to fight another inmate by saying in response to a complaint from one inmate about another "to patch it up, or have it out." When she was disciplined she said "there was never a legitimate basis for her discipline as she had heard others make similar statements during her training." Her fourth IAU incident took place for failing to maintain logbooks after an inmate was injured and "she was ordered to rewrite her report of the incident." Finally, her sixth IAU investigation led to her termination in 2007 when she "left her personal weapon loaded and unattended in the women's locker room in the MCIJ." Where it could be accessed by "deputies, civilian staff, staff family members, contractors and inmates who are assigned to clean the area." So, after a long period of continued incompetence that endangered inmates, the public, and fellow

deputies she still had not done enough to be terminated until the higher ups realized that keeping her on their staff might get them killed.

With people like Montoya and Lucke working at MCDC it should be no surprise that there have been many claims of excessive force made over the same time period and ever since. In 2003 Deputy Kovachevich used excessive force when an inmate was beaten in booking, *Anthony v. County of Multnomah, et. al., 2006 U.S. Dist. LEXIS 35806 (2006) (case no. 04-229-MO)*. In 2004 an inmate was beaten so bad that he was taken to the hospital, *Hall v. Multnomah County, 2006 U.S. Dist. LEXIS 27073 (2006) (case no. 04-921-JE)*, and another inmate was denied medical care after being the victim of excessive force even though he had bleeding surgical wounds, *MacDonald v. Pedro et.al., 2007 U.S. Dist. LEXIS 5658 (2007) (case no. 06-715-AA)*. In 2006 a female inmate was sexually assaulted by a staff member, *Hurt III. V. Multnomah County, 2006 U.S. Dist. LEXIS 64100 (2006) (case no. 06-1024-PK)*. In *Evans v. Multnomah County, 2013 U.S. Dist. LEXIS 55403 (2013) (case no. 3:07-CV-01532-BR)* a jury found that deputies and Multnomah County were liable for battery and excessive force due to events from 2006-7. In 2007 a mentally ill inmate was denied medication and tased by Deputy Harrington three times due to county customs, "The court agrees that Multnomah County's screening practice could reasonably be characterized as an unoffical policy capable of inflicting constitutional injury." *Yeo v. Washington County, 2011 U.S. Dist. LEXIS 31309 (2011) (case no. 08-1317-AC)*. In 2008 another female inmate was sexually assaulted by a corrections counselor that later faced criminal charges, *Crane v. Allen, 2012 U.S. Dist. LEXIS 22967 (2012) (case no. 3:09-CV-1303-HZ)*. In 2009 a 64 year old man in court for a traffic citation was shoved by a corrections deputy working at the courthouse and the shove, "propelled Dinan backwards into a marble door frame and a closed wooden and glass door." *Dinan v. Multnomah County, 2013 U.S. Dist. LEXIS 11088 (2013) (case no. 3:12-cv-00615-PK)*. From 2010-11 an inmate was forced to work as an indentured servant for the jail in hazardous conditions and was denied clothes for several days, *Webster v. Multnomah County, 2014 U.S. Dist. LEXIS 178852 (2014) (case no. 3:14-cv-00652-AC)*. A 2014 incident

led to *Davis v. Multnomah County, 2016 U.S. Dist. LEXIS 65215 (2016)*, in which MCSO employees "violated his civil rights by using excessive force while booking him and by depriving him of medical care during his incarceration... Multnomah County correctional officers, including Deputy Rosa and Sergeant Shaut who he named as defendants, used excessive force against him in the booking process, and did so in accordance with the official policy, custom, and practice of Defendant Multnomah County, Second, Davis alleges that Defendant Multnomah County and unnamed MCDC medical personnel were deliberately indifferent to his medical needs resulting from excessive force used against him." *Johnson v. Multnomah County Sheriff's Office, 2016 U.S. Dist. LEXIS 74603 (2016) (case no. 3:16-cv-00633-HZ)* was filed in response to 2015 incidents involving excessive force after an inmate was sent to the hole for questioning the competence of medical staff that failed to treat his chronic conditions, he was tased, roughed up, and put in a vehicle. Finally, in 2015 Defendant Wendy Muth was sued for excessive force and the court said "Deputy Muth observed that Plaintiff became more agitated the longer she waited...As the deputies walked Plaintiff to an isolation cell...Deputy Muth fell below Plaintiff...[holding by district court blaming inmate for Muth's fall] her physical resistance caused them to go to the floor" *Harris v. city of Portland et. al., (case no. 3:15-cv-00853-HZ)*. What was interesting about that last one is that it shows Defendant Muth has a history of flopping and blaming inmates for it.

How could it be that over so many years so many different people continue to expose strikingly similar behavior by MCSO employees? As an inmate I learned that the turnover at MCDC is quite high, so it is not the case of the same people working at MCDC the entire time. A few have, but not many, so it is not due to any specific employee or small group of employees. It is because despite nearly two decades of misconduct against inmates and their own people resulting in excessive force, deliberate indifference, assaults, batteries, harassment, stalking, sexual assaults, and murders, the culture at MCSO still has not changed. Multnomah "County may be found liable where there is persistent, widespread practice of

county officials or employees, which, although not official policy, is so common and well settled as to constitute custom that fairly represents county policy," *Coon v. Ledbetter, 780 F.2d 1158 (5th Cir. 1986)*.

### Deliberate Indifference to Serious Medical Needs

In *Lolli* the Ninth Circuit described what I must prove to establish deliberate indifference to my serious medical needs by Multnomah County, MCSO, MCHD, Dr. Michael Seale, Dr. Angelina Platas, Dr. Brooke Holter, and Halcyon Dodd, "under traditional Eighth Amendment standards used in Fourteenth Amendment claims such as this one, Lolli must show that he was (1) 'confined under conditions posing a risk of "objectively, sufficiently, serious" harm' and (2) 'that the officials had a "sufficiently culpable state of mind in" in denying the proper medical care.' *Clement v. Gomez, 298 F.3d 898, 904 (9th Cir. 2002)*. 'A defendant is liable for denying needed medical care only if he "knows of and disregards an excessive risk to inmate health and safety."' *Gibson, 290 F.3d at 1187*. "In order to know of the risk, it is not enough that the person merely 'be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, [] he must also draw that inference."...But if a person is aware of a substantial risk of serious harm, a person may be liable for neglecting a prisoner's serious medical needs on the basis of either his action or his inaction.' *Id. at 1188* (alteration in original). 'Prison officials are deliberately indifferent to a prisoner's serious medical needs when they deny, delay, or intentionally interfere with medical treatment.' *Hallett v. Morgan, 286 F.3d 732 (9th Cir. 2002)*. (internal quotation marks omitted)." Defendants were deliberately indifferent to me in several ways. First, upon my return from OHSU on June 28, 2017 I suffered bodily injury when my pain medication was reduced in accordance with Multnomah County, MCSO, and MCHD policy; Second, I was denied a raised bed despite several requests and was eventually injured in a fall that would not have happened had I had a raised bed; Third, Defendants failed

to take me back to OHSU for a follow up appointment within seven days of the incident and as a result I

suffered permanent injury; Fourth, Dr. Brooke Holter failed to provide me with a new sling on July 12,

2017 and had she done so my arm may have healed better; Fifth, Defendants allowed deputies to overrule

the orthopedic surgeon at OHSU and make her give me a sling instead of a brace on August 3, 2017; and

Sixth, Halcyon Dodd terminated my Norco on August 3, 2017 even though OHSU said only to "augment"

my pain meds with ibuprofen and not replace them.

First, Multnomah County has a policy at MCDC that it administers though MCHD, MCHD's doctors

Michael Seal and Angelina Platas, and the medical technicians that pass out pills. That policy is not to give

inmates any pain medication that is stronger than Norco. That is what the staff told me repeatedly when

I pointed out that two Norco's three times a day is nowhere near as good as oxycodone every six hours.

Norco is weaker than oxycodone and the pill line schedule would result in a twelve-hour delay between

evening and morning doses. The result of the former caused my pain to increase significantly after the

medication OHSU gave me wore off and the latter caused me significant pain in the early morning hours

each day. This policy is deliberately indifferent to the inmates most in need of pain medication because it

categorically denies them care for reasons unrelated to the need for care. Under *Estelle* "deliberate

indifference to a prisoner's serious medical needs constituted cruel and unusual punishment under the

Eighth Amendment and gave rise to a civil rights cause of action under 42 USCS 1983, regardless of

whether the indifference was manifested by prison doctors in their response to the prisoner's needs or

by prison guards in intentionally denying or delaying access to medical care or intentionally interfering

with treatment once prescribed." I was clearly prescribed oxycodone (Exhibit 10) and staff clearly

interfered with that treatment once prescribed (Exhibit 14p.1-2). How does this result in an injury? It is

an injury because, as I found out the hard way, it is the stated position of the United States Attorney's

Office for the District of Oregon that any amount of pain no matter how fleeting or temporary constitutes

bodily injury under federal law (Exhibit 31 p.2). That definition led to this proposed jury instruction:

*The term "bodily injury" has its common and ordinary meaning, and includes a cut,*

*abrasion, bruise, burn, or disfigurement, physical pain, or any other injury to the body, no*

*matter how temporary. The term 'bodily injury' means--(A) a cut, abrasion, bruise, burn,*

*or disfigurement; (B) physical pain; (C) illness; (D) impairment of a function of a bodily*

*member, organ, or mental faculty; or (E) any other injury to the body, no matter how*

*temporary." See 18 U.S.C. §§ 831(f)(4) (prohibiting transactions involving nuclear*

*materials); 1365(g)(4) (tampering with consumer products); 1515(a)(5) (obstruction of*

*justice); 1864(d)(2) (hazardous or injurious devices on federal lands). See United States v.*

*Meyers, 972 F2d 1566, 1573-4 (11th Cir. 1992)(approving jury instruction). (Exhibit 32).*

In Meyers a former police officer was found guilty of violating the civil rights of arrestees under

18 U.S.C. 242(1992) and inflicting bodily injury by shocking them with a stun gun. In this claim the bodily

injury I suffered was the significant physical pain I felt while on Norco that I would not have felt on

oxycodone.

Second, failing to give me a raised bed caused two and possibly a third injury. The first injury was

the physical pain I felt every time I had to get up for anything. Just to go to the bathroom I would have to

sit myself up somehow, get my legs under my body weight, and push myself up like doing squat exercises,

while I could feel my arm bones moving around inside. If I had been given a raised bed, which the jail has

in ever unit except for 4E and 4F, I would have just had to swing my legs down and pull myself to a seated

position with my good arm. On July 7, 2017 (Exhibit 14 p.2-3) I fell while trying to get up and hit my left

elbow on the toilet. It was extremely painful and may have resulted in further injury. My arm never healed

straight and took longer to heal than it should have, so I can't help thinking that this incident must have

contributed to that.

Third, Defendants repeated failure to take me to OHSU for my one week follow up until five weeks had passed can be explained as the result of several policies or customs combined. First, no appointment was scheduled within the first seven days as directed by OHSU. Second, Multnomah County, MCSO, and MCHD fails to train its staff to check the court docket for scheduling conflicts before scheduling an outside medical appointment, had that been done then my appointment scheduled for July 7, 2017 would never have been scheduled on the same day of a hearing that had been on the docket since early June; Third, Multnomah County, MCSO, and MCHD have a policy or custom of cancelling outside medical appointments and taking inmates to court when there is a scheduling conflict, or they fail to train employees to take inmates to the hospital even if they have a conflicting court appearance that day. Multnomah County, MCSO, and MCHD knew that failing to treat injuries so serious that they require outside treatment for any reason risks further injury to the inmate.

Fourth, having their own in-house orthopedic PA-C Brooke Holter visit me at MCDC on July 12, 2017 was not a suitable substitute for outside care and the Defendants should have already been aware of that. If Holter were an acceptable substitute than I would never have been scheduled to return to OHSU on July 7th. In her report (Exhibit 14 p.3-4), she recommended that I go back to OHSU for a follow-up, but she did not even bring a new sling for me. What kind of orthopedic PA-C goes to visit someone with a broken arm without a sling? I would have needed at least that to let my arm hang at a better angle like she recommended. Had she brought a sling my arm may still have been able to heal straight. As a trained PA-C Holter knew of the risks I've described.

Fifth, When I was finally taken to OHSU for a follow-up on August 3, 2018 I was told that new bone was forming already, which is why I didn't feel things moving around so much, and that with the proper treatment the bone might heal at a better angle. When the doctor tried to give me a Sarmiento brace the deputies escorting me would not allow it just because there was metal in it. According to The Journal of Bone and Joint Surgery, using a brace "enhances fracture healing" (Exhibit 33 p.5). Any policy or custom

of Multnomah County, MCHD, or MCSO that gives deputies final authority over medical treatment for serious medical injuries is deliberately indifferent to all inmates that are injured in ways that require a Sarmiento brace or anything else that conflicts with what the deputies will allow. This policy allowed deputies to eliminate any remaining chance my arm had of healing properly just to keep metal out of the jail. Defendants knew that prohibiting inmates bringing braces or any type of medical equipment back from the hospital would create a significant risk of further injury. The risk is obvious and "prison officials may be held liable for failure to remedy a risk so obvious and substantial that the officials must have known about it." *Farmer v. Brennan, 511 U.S. 825 (1994).*

Sixth, upon my return to MCDC Halcyon Dodd cut me off my Norco even though OHSU specifically said to "augment" my pain medication with ibuprofen (Exhibit 14 p.5). That means to add ibuprofen to my existing treatment plan. Not to replace Norco with ibuprofen. When my lawyer complained to Dr. Michael Seale he upheld Dodd's decision. As a result, I suffered bodily injury in the form of physical pain until an outside pain specialist was able to see me on August 11, 2017 (Exhibit 14 p. 7-10). Doctors and nurses know or should know that reducing pain medication leads to an increase in pain. Dodd and Seale were deliberately indifferent to that pain.

"Subjective recklessness, as used in the criminal law, is the appropriate test for 'deliberate indifference.' Permitting a finding of recklessness only when a person has disregarded a risk of harm to which he was aware is a familiar and workable standard that is consistent with the Cruel and Unusual Punishments Clause as interpreted in this Court's cases...it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm...Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence...and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Farmer.* I do not need a smoking gun to prove intent when it is obvious to a lay person that failing to provide adequate pain medication, making

a seriously injured person sleep near the floor, and failing to make sure a patient receives recommended aftercare creates a significant risk of pain and further injury.

## Common Law Claims

I am bringing common law claims of assault and battery, medical negligence, and defamation against several Defendants as outlined in the introduction of this Complaint.

Assault is an intentional attempt to do violence to the person of another, and battery is the unlawful touching of a person. Clearly the intentional use of excessive force is unlawful touching coupled with any number of efforts to do violence to that person. When such conduct results in physical pain and mental distress I am entitled to relief. I ask that this claim be addressed in addition to my claims of excessive force and deliberate indifference filed under Section 1983. To avoid duplicity, I will not re-tell my arguments in support of excessive force and deliberate indifference as assault and battery claims because the facts of the case in support of them are basically the same.

If this court finds that Defendants were not deliberately indifferent to my medical needs, then I ask that they consider a common law claim for medical negligence. "An act or omission unaccompanied by knowledge of a significant risk of harm might well be something society wishes to discourage, and if harm does result society might well wish to assure compensation. The common law reflects such concerns when it imposes tort liability on a purely objective basis." *Farmer.* Regardless of how my arm was broken and Defendants knowledge of the risks that were disregarded when treating my injury, Defendants should have at least known the risks. When a policy, custom, or individual in their decision-making fail to recognize a substantial risk that a reasonable person should have known then they are negligent and when

that negligence occurs in the medical field it is medical negligence. The elements are basically the same as deliberate indifference but without the subjective knowledge of risk.

Defamation is any false statement made with the knowledge that the statement is in fact false or with a reckless disregard for the truth, and in a manner that a reasonable person could believe to be true. A spoken false statement is slander and a written one is libel. Defendants in this case engaged in both. I've already discussed false written statements from the incident reports written by the Defendants. It all began with Erika Barker's false accusation that "set 'in motion a series of acts by others' which [Erika Barker] knew or should have known 'would cause others to inflict the constitutional injury." *Johnson v. Duffy, 588 F.2d 740 743-744 (9th Cir. 1978)*. I will summarize the false written statements that followed as much as possible in the interest of judicial economy. Every allegation against me of threatening to put out a "hit" on Erika Barker, trying to punch Ingram, elbowing Barker, kicking Muth, grinding the chips I threw into a powder form in an effort to use it like pepper spray, and resisting in any way after leaving the cell on the fifth floor, are absolutely one hundred percent false. The same goes for identical accusations made orally to Detective Keith Bybee (Exhibit 13). If Muth had really been struck and experienced the amount of pain she described there would have been bruising or at least a mark, but there are no photos and she never sought medical attention. I myself put some Scorchin Chip seasoning in my own eye to see if it is possible to feel it hours later and I was fine in less than thirty minutes, plus I am unaware of how anyone could reduce those chips to a fine powder by hand. I think I've covered the other points already.

DAMAGES

I seek compensatory and punitive damages for all claims of excessive force and deliberate indifference, assault, battery, and defamation from all individual defendants. I am only seeking compensatory damages from government entities for all claims. I only seek compensatory damages from all named defendants for common law negligence claims if the deliberate indifference claims fail. For defamation I am seeking any remaining amount I am entitled to if the cap I imposed on myself with my tort claim notice (Exhibit 16) is not reached for other claims. Finally, I seek compensation for any and all incurred legal costs incurred while fighting this case.

**Compensatory Damages**

Compensation for physical and emotional suffering is not an exact science. In *Hendrickson v. Cooper, 589 F.3d 887 (7th Cir. 2009)* the Seventh Circuit upheld a "jury's award of $75,000 [because it] was rationally connected to Hendrickson's evidence of pain and suffering. Hendrickson described how much pain Cooper inflicted by throwing him to the ground and kneeing him in the back. Following the attack, Hendrickson continued to feel back pain that was significantly worse than before, prompting several requests for medical treatment." Following the decision in *Dustin Burnikel v. Michael Fong, et al., 886 F.3d 706 (8th Cir. 2018)* a jury in Iowa awarded Burnikel $200,000 in compensation for pain and suffering after police officers attacked him with pepper spray and beat him (https://www.apnews.com/d3ff7e1768f7469fbb57bb61188febe9). I believe that my many days of agony followed by weeks of chronic pain and months of healing somewhat deserves. I am forced to constantly

remember the incident whenever I feel my arm, look at my arm, or try to bend my arm out straight. I have

had PTSD for many years and since this incident I have been having nightmares. In *Coker v. Bakkal Foods,*

*Inc, 52 A.D.3d 765*, the value of a broken humerus for past pain and suffering was placed at $125,000 back

in 2008 with future suffering valued at $75,000, but that was a workplace accident, so the victim got to

recover at the hospital and at home where she received "orthopedic treatment and physical therapy" but

no surgery. The biggest difference in her recovery is that she was not in jail at the whim of Multnomah

County's medical staff. A staff whose incompetence can only be eclipsed by their indifference. Factor in

inflation and Coker would have received $242,649 (calculated using CPI Inflation Calculator

https://data.bls.gov/cgi-bin/cpicalc.pl). In my case add in the suffering I experienced from lack of proper

pain medication, follow-ups, falling, and not having a raised bet, and I think that $250,000 is a fair number.


### Punitive Damages


A "jury may be permitted to assess punitive damages in an action under 1983 when the

defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or

callous indifference to the federally protected rights of others." *Smith v. Wade, 461 U.S. 30 (1983)*. The

most important factor is "the degree of reprehensibility of the defendant's conduct." *State Farm Mut.*

*Auto. Ins. Co. v. Campbell, 538 U.S. 408, 419 (2003)*. Punitive damages can be awarded even if

compensatory damages awarded are small or nothing because the purpose is to punish and deter

unlawful conduct, see *Bogan v. Stroud, 958 F.2d 180 (7th Cir. 1992)*. In 2018 a man was awarded $600,000

in punitive damages for being subjected to a choke hold, *Hunter v. City of Federal Way, (WD Wash case*

*no. 2:16-cv-01445-MJP)*. Hunter's award of $600,000 was fifteen times the amount he was awarded as

compensation for his moment of difficult breathing and the fear he felt for his life. I deserve at least that

because the suffering that the Defendants willfully, sadistically, and intentionally inflicted on me over a much longer time period was worse. Fifteen times the amount I am seeking in compensation would be $9,000,000, but my tort claim notice to the county (Exhibit 16) sought just $4,000,000 in punitive damages, so that is what I am asking for because "punitive damages...are especially appropriate to redress the violation by a Government official of a citizen's constitutional rights." *Carlson v. Green, 446 U.S. 14 (1980).*

## Defamation

The basis for my selective prosecution motion in my criminal case (3:19-CR-00306-JGZ E.C.F. #76) was that other similarly situated federal inmates accused of assaults resulting in physical injury to staff at MCDC have not been charged federally for those incidents. The Court ruled against me and I had some doubts going in just because I knew of inmates elsewhere in this district that were prosecuted for similar accusations, and there were only a handful of MCDC inmates to compare myself too. Had the Defendants told the truth I don't think I would have been prosecuted at all. I have yet to hear of an inmate anywhere in the state charged federally for assault with physical contact and no injury. I believe that had I not been Defamed by the Defendants in this case, then my throwing of the chips would have been addressed as a probation violation and the sanction would have most likely kept me in custody until January of 2018 at the latest. I did not get out until November 2018. I was prosecuted and spent at least ten months in jail that I would not have if the Defendants had been honest in their written and oral statements following the incidents. I ask that if the damages from other claims have not yet reached $4,000,000 that I be awarded the difference until my total reward equals that amount.

## Legal Costs

When a plaintiff prevails in a civil action such as this one, he is entitled to be compensated for his legal costs in addition to any other award received. I ask that Defendants be ordered to reimburse me, anyone that represents me, or testifies for me when this is all over. Hopefully the promise of compensation will be enough to get a lawyer to take such a strong case. If I or an attorney win on just one claim, then the Defendants should have to pay for the costs incurred.

## INTENT TO AMEND

Earlier I mentioned that I just got my ability to use the internet back. I also need to gather evidence from my defense team from the criminal case that is discoverable in this case. I know that I am entitled to one amended complaint as a matter of course (Fed.R.Civ.P. 15) and I will most likely file one once my research is complete, but for now, due to the statute of limitations, I must file this Complaint as it.

## CONCLUSION

I am entitled to relief because my Constitutional rights were violated under Section 1983 as described and in the process several rights I have under common law were also violated. The Defendants shocked the conscience with their barbaric maliciousness, indifference, and incompetence. I deserve to

be compensated for my suffering. They must be punished in a manner that will deter them and others

from engaging in similar evils in the future.


I declare under penalty of perjury that the foregoing is true and correct.


Executed on _____ 6/25/19



_____

Cyrus Andrew Sullivan

Plaintiff-Pro Se