EXHIBIT 1

 **Multnomah County**
Health Department

| MC MEDICAL RECORDS | Sullivan, Cyrus Andrew |
| 426 SW Stark, 7th Floor | MRN: 4311164 |
| PORTLAND OR 97204 | |

---

**Progress Notes by Gwendolyn Lucas, NP at 8/11/2017 1:13 PM (continued)**

T14.8 Nerve injury
- increasing gabapentin from 600 mg TID to 1200 mg TID

OA Orders:
Meds - changes in Sapphire as follows - d/c ibuprofen and tylenol and add in Naproxen 500 mg BID, d/c gabapentin 600 mg TID and replace with gabapentin 1200 mg TID
RN - ice packs TID, please encourage use of capzacin cream TID before PT exercises and ice after
F/u with me in clinic in 2 weeks

## Notes

### Patient Demographics

| Patient Name | MRN | Sex | DOB |
| --- | --- | --- | --- |
| Sullivan, Cyrus Andrew | 4311164 | Male | 6/26/1983 |

### Encounter Information

| | Provider | Department | Encounter # | Center |
| --- | --- | --- | --- | --- |
| 8/21/2017 12:40 PM | Carol Scalpone, RN | Mc Detention Ctr Ch | 299643633 | MC CORRECTIO |

### Progress Notes by Carol Scalpone, RN at 8/21/2017 12:41 PM

| Author: Carol Scalpone, RN | Service: (none) | Author Type: Community Health Nurse |
| --- | --- | --- |
| Filed: 8/21/2017 4:28 PM | Encounter Date: 8/21/2017 | Status: Signed |
| Editor: Carol Scalpone, RN (Community Health Nurse) | | |

Cyrus Andrew Sullivan is a 34 year old client seen in cell at MC Detention Center for medication follow up.

**Reason for Visit:**

Health Assessment (PsyRN f/u)

**Chart Review:**
Per CIMS, client placed back in segregtation 8/12/17 for spitting on deputy
Per KEMHC 03/02/17 client's PO informed her that client "obsesses about staff and will post information about them online...client has also been assaultive with corrections staff and others...use caution around him."

- This is the client's ▓▓▓▓ me in custody, current incarceration intake was 2/24/17 and projected release date is unknown

- Client has a **past** ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
**disorder** – per ▓▓▓▓ 6/22/17

- Client's last ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ and formulation and plan as follows:

---

*Assessment:*
1. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓ *Sleep disruption and irritability are responding well* ▓▓▓▓

EXHIBIT 2

**Multnomah County**
Health Department
CORRECTIONS HEALTH

Date/Time
Received in Medical

## MEDICAL REQUEST FORM (MRF)
## FORMA PARA PEDIR SERVICIO MEDICO (MRF)

ID # 677564   MRN #    Dorm # 7212
(Numero de Identificación)    (Ubicación)

Name  Sullivan    Cyrus    A.
Last (Apellido)    First (Nombre)    M.I. (Inicial)

Date of Birth  6/26/83    Today's Date  3/22/17
(Fecha de Nacimiento)    (Fecha de hoy)

Do you have any allergies to medications? If yes, list ▓▓▓▓▓▓
(¿Tiene algunas alergias a medicamentos? Por favor diga a cuales medicamentos)

Tell us about your health problem:
(Describa su problema de salud) _Angela Lee! You gave me your
name and that is all I need to ruin you, As I write
steps are in motion to add you to COPBLASTER.Com, This
Will start with your name and the truth of your incompetence, followed
by your address for your other victims to find, OR
You can just give me my full 300 mg dose of ▓▓▓▓_

How long have you had this problem?  A MONTH
(¿Por cuanto tiempo ha tenido este problema?)

Do you have health insurance?  ☐ No  ☑ Yes  Insurance # ▓▓▓▓▓
(¿Tiene seguro médico?)    (Si)  (Número de seguro médico)

This is my permission to get psychiatric, medical or dental exams and treatment from jail staff.
(Este documento representa mi permiso para recibir exámenes médicos, tratamiento psiquiátrico o dental por parte del personal de salud de la cárcel.)

I understand that the jail may charge me for some of these services and deduct it from my account, during the current or future stays in jail. The fees are posted. I will get health care even if I am unable to pay.
Yo entiendo que la cárcel puede cobrarme por algunos de estos servicios médicos y deducirlos de mi cuenta, durante la presente o futuras estadías en la cárcel. El impuesto esta senalado en un papel. Yo puedo recibir cuidado medico incluso si no pudiera pagar.

Signature ▓▓▓▓▓  founder of Cop Blaster
(Nombre)

| **If you have an emergency, tell the jail staff right away!** |
| :---: |
| **¡Si usted tiene una emergencia medica avise a los oficiales pronto!** |

COR-202  Rev. 07/22/13

1353

000256

EXHIBIT 3

| Multnomah County Sheriff's Office | **INFORMATION REPORT** | Case Number |
| --- | --- | --- |

☐ Corrections Facilities Division
☐ Corrections Programs Division
☐ Law Enforcement Division

| 1. Incident  Threats to staff | 2. Occurred Date / Time  3-23-17  1400 |
| --- | --- |

| 3. Location  MCDC | 4. | ☐ Citizen ☒ Inmate ☐ Staff |
| --- | --- | --- |

| 5. Involved Person LAST, FIRST MIDDLE  Sullivan, Cyrus | 6. ID#  677564 |
| --- | --- |

| 7. Sex  Male | 8. Race  White | 9. DOB  6-20-83 | 10. Housing/Address |
| --- | --- | --- | --- |

| 11. I. SUMMARY | II. MENTIONED | III. NARRATIVE | IV. ACTION PENDING | V. SUPERVISOR'S REVIEW |
| --- | --- | --- | --- | --- |

Inmate submitted medical request form threatning specific medical staff member and staff member's family if he did not receive a specific dose of his medication

.On 032417 at approximately 1100 I was informed by Nurse Halie that she was writing an Inm [illegible] Sullivan for [illegible] threatening MRF form (attached). At approximately 1300 I spoke to Inmate [illegible] who was being [illegible] for "abuse of medical process, [illegible] and [illegible] disrespect/harrass[illegible]. I then showed Sullivan the [illegible] and asked if he submitted it to medical, Sullivan replied [illegible] Sullivan [illegible] statement of his [illegible] and asked again, "Are you threatening to place [illegible] on your child page?" Sullivan replied "yes". [illegible] Sullivan was placed on level three pre hearing [illegible] prior threat to staff as well as [illegible] charges and placed in [illegible].

SGT T Jacobs

032417  1355

| 2. PRINT  Halcyon Dodd | 13. SIGN  RN | 14. DATE/TIME PREPARED  3/24 17 1300 | 15. SUPERVISOR'S APPROVAL |
| --- | --- | --- | --- |
| REPORTING STAFF/ID# | REPORTING STAFF SIGNATURE | | |

PS FORM 875A

☐ Over Pg 2

Produced Pursuant to Protective Order

2

EXHIBIT 3

On 032417 at approximately 1100 I was informed by Nurse Hallie that she was writing up Inmate Sullivan for submitting a threatening MRF form (attached). At approximately 1300 I spoke to Inmate Sullivan in 7A regarding the incident. I served Sullivan with a photo copy of the misconduct and informed him he was being written up for "abuse of medical process, Extortion, blackmail and Disrespect/harassment. I then showed Sullivan the MRF and asked if he submitted it to medical. Sullivan stated that he did submit it and that he has a first amendment right to post information to the internet. I replied that although he may have that right it doesn't give him the right to threaten staff with it. Sullivan reiterated the statement of his rights and added "and this won't make it any better for her, or you." I asked Sullivan if he was threatening me and he stated that he has a first amendment right to do so. I asked again, "Are you threatening to place me on your web page?" Sullivan replied "yes". Inmate Sullivan was placed on level three pre hearing lockdown for threats to staff as well as the other charges and placed in 5B.

Produced Pursuant to Protective Order

CAS_0000003

EXHIBIT 4

---

| From: | ODIL Kevin <kevin.odil@mcso.us> |
|---|---|
| Sent: | Monday, April 10, 2017 11:30 AM |
| To: | Eileen_Groshong@orp.uscourts.gov |
| Subject: | FW: Message from "mcdc103p-OIC-RICOHMPC5502A" |
| Attachments: | 201704101027.pdf |

Afternoon

Here is the report I just talked to you about.

Detective Kevin Odil
Multnomah County Sheriffs Office
Phone 503-988-4356
Kevin.odil@mcso.us

-----Original Message-----
From: PINA Stephen
Sent: Monday, April 10, 2017 10:29 AM
To: ODIL Kevin <kevin.odil@mcso.us>
Cc: PETERSON Derrick <derrick.peterson@mcso.us>
Subject: FW: Message from "mcdc103p-OIC-RICOHMPC5502A"

Hello, more Cyber terrorism from inmate Sullivan, Cyrus. # 677564.  FYI

-----Original Message-----
From: copier@mcso.us [mailto:copier@mcso.us]
Sent: Monday, April 10, 2017 10:28 AM
To: PINA Stephen
Subject: Message from "mcdc103p-OIC-RICOHMPC5502A"

This E-mail was sent from "mcdc103p-OIC-RICOHMPC5502A" (Aficio MP C5502A).

Scan Date: 04.10.2017 10:27:39 (-0700)
Queries to: copier@mcso.us

1

000165

EXHIBIT 5

| | |
|---|---|
| **From:** | UNDERHILL Rod <Rod.UNDERHILL@mcda.us> |
| **Sent:** | Friday, April 28, 2017 9:28 PM |
| **To:** | DEMER Kevin |
| **Cc:** | SHANKS Todd M; REESE Mike W; REES Donald; DAVIDSON Brian |
| **Subject:** | Re: Cyrus Sullivan |

Thanks Kevin.

Sent from my iPhone

On Apr 28, 2017, at 7:35 PM, DEMER Kevin <Kevin.DEMER@mcda.us> wrote:

> Todd, per this evening's conversation, thank you for your patience as we see what happens in federal court on Tuesday, May 2. The AUSA is completely aware of this particular violation and hopefully he will be able to get as much as 11 months custody time and revoke his release. I agree with your assessment that perhaps attending this hearing would just cause more heartache later by agitating Sullivan even more. Since we might not be able to get the website taken down, we should avoid providing him more fodder.
>
> Meanwhile, as discussed, here are two resources you should consider.
> https://www.vinelink.com/#/home
>
> Vine is a link where you can register to be auto-computer-informed where there is a hearing on a defendant. I have done this personally for several people, including Sullivan. Here is what the notice looks like:
>
> Re:    United States v. Defendant(s) Cyrus Andrew Sullivan
> Case Number 2012R00739 and Court Docket Number 13-CR-00064
>
> A status hearing is scheduled before Judge Marco Hernandez for May 2, 2017, 02:00 PM at Mark O Hatfield Courthouse, Courtroom 14B, 1000 SW Third Avenue, Portland, OR for defendant(s) Cyrus Andrew Sullivan. The purpose of this hearing is to determine if there are issues that the Court needs to address and to schedule any necessary future court dates.
>
> You can also call U.S. Attorney Victim Advocate Ella Santellano (503-727-1172) and ask her to keep you informed. Often court dates change at the last minute. AUSA Greg Nyhus (503-727-1015) is assigned Sullivan. I spoke to him for 20 minutes today and he is on it 100%.
>
> I will keep you apprised as issues develop.
>
> Kevin
>
>
> Kevin Demer
> Deputy District Attorney
> Multnomah County Courthouse
> 1021 SW 4th Avenue
> Suite 600

1

000195

Portland, Oregon, 97204-1912
Desk: 503-988-3922

**From:** SHANKS Todd M
**Sent:** Wednesday, April 26, 2017 12:45 PM
**To:** DEMER Kevin <Kevin.DEMER@mcda.us>; REESE Mike W <mike.reese@mcso.us>
**Cc:** UNDERHILL Rod <Rod.UNDERHILL@mcda.us>; REES Donald <Donald.REES@mcda.us>; DAVIDSON
Brian <Brian.DAVIDSON@mcda.us>
**Subject:** RE: Cyrus Sullivan

Thanks Kevin

**From:** DEMER Kevin
**Sent:** Tuesday, April 25, 2017 8:33 PM
**To:** REESE Mike W <mike.reese@mcso.us>; SHANKS Todd M <todd.shanks@mcso.us>
**Cc:** UNDERHILL Rod <Rod.UNDERHILL@mcda.us>; REES Donald <Donald.REES@mcda.us>; DAVIDSON
Brian <Brian.DAVIDSON@mcda.us>
**Subject:** RE: Cyrus Sullivan

Todd, I am sorry this issue is coming up again. I have been in trial for a few days. My schedule should
clear toward the end of the week. I will look into this issue and get back to you. Sullivan is in custody
pending yet another federal probation hearing. He came into custody 2/24/17.

Kevin

Kevin Demer
Deputy District Attorney
Multnomah County Courthouse
1021 SW 4th Avenue
Suite 600
Portland, Oregon, 97204-1912
Desk: 503-988-3922

**From:** REESE Mike W
**Sent:** Tuesday, April 25, 2017 7:09 PM
**To:** SHANKS Todd M <todd.shanks@mcso.us>
**Cc:** UNDERHILL Rod <Rod.UNDERHILL@mcda.us>; DEMER Kevin <Kevin.DEMER@mcda.us>
**Subject:** Re: Cyrus Sullivan

Todd
I'll review the website info and ask the County Attorney for options. Has this person made any threats or
engaged in any threatening behavior (other than posting personal info)?

Mike

2

000196

EXHIBIT 5


On Apr 24, 2017, at 3:43 PM, SHANKS Todd M <todd.shanks@mcso.us> wrote:

Rod, Mike, and Kevin,

I hope you guys are all doing well. I am writing you this email to request your guidance and assistance in dealing with a recent post made by Cyrus Sullivan on COPBLAST attacking my credibility and integrity, and causing alarm to my family.

I am quite certain Kevin remembers Mr. Sullivan from approximately six years ago. At that time I was assigned to the Warrant Strike Team working out of an office in the Courthouse. Deputy Reiter and I were called into Gary Meabe's office and a request was made by Gary that we assist in locating and arresting Mr. Sullivan for an outstanding warrant. Of course we agreed and began looking for Mr. Sullivan and he ultimately turned himself in to authorities.

I will not go into all of the details, but this is the second time Mr. Sullivan has Cyber Bullied me by posting something on the internet. This recent post was discovered by my daughter at school during a computer class. The post was made in February of this year and has my picture, address, and refers to me as a "River Shark" and a stalker. My family and I are very troubled by this false and inaccurate information being on the internet. I was just doing my job as a peace officer and don't feel I deserve this negative, untrue, and damaging jacket after 29 years of committed and dedicated service to the citizens of Multnomah County. To make matters worse I recently retired on March 1, 2017, and am actively seeking employment opportunities besides my part time work with the Sheriff's Office. If any potential employers look me up on google they will see this post which is on the first page of a google search for my name. I will be harmed and injured because of this post, and it may cost me any future job opportunities.

I am asking for your assistance in this matter.


Thank you,

Todd Shanks  Cell- ███████████

000197

## EXHIBIT 6



## Multnomah County Sheriff's Office

### INCIDENT REPORT #26346
(Dep Benjamin Eide #53829)



| | |
|---|---|
| INCIDENT: Disciplinary - Major Misconduct | Occurred: 03/31/2017 1010 hrs |
| LOCATION: MCDC - 5C (5C dayroom) | Submitted: 03/31/2017 1032 hrs |
| PACKET #: N/A | Finalized: 03/31/2017 1057 hrs |

**SUMMARY:** On the above date Inmate Sullivan was disruptive by being loud on the phone and arguing with my orders to talk more quietly, he failed to do as ordered by refusing to return to his cell and insisting that he make a phone call after being ordered to go to his cell, and threatened me by saying he was going to put my name all over his website "cop blaster".

**SUBJECT:** #677564 Sullivan, Cyrus    M/W    06/26/1983    MCDC - 5C - 11

**NARRATIVE:** On the above date and time Inmate Sullivan was speaking very loud on the phone to the point that it became a safety concern because I had difficulty hearing my phone and radio. I walked over to Inmate Sullivan and asked him to keep his voice down and he responded by yelling at me, slamming the phone down, and swearing. I then told Inmate Sullivan to return to his cell because he was being too disruptive. Inmate Sullivan refused to return to his cell and said he had an important phone call to make. After ordering Inmate Sullivan to return to his cell a few more times, I told all the other Inmates to return to their cells, which disrupted their walk time, so I could deal with Inmate Sullivan. I then turned the phones off because Inmate Sullivan refused to get off the phone. Inmate Sullivan stood up and yelled "what the fuck" and began to walk towards me. Inmate Sullivan stopped and stared at me, then spelled my name out and threatened to put my information all over his website "cop blaster". It was only after the phones were off and all the other inmates returned to their cells that Inmate Sullivan finally returned to his cell.

**ACTION PENDING:** Forward to Sergeant for review.

**REVIEWS:** 03/31/2017 1057 hrs - Inmate told me that he was mad because he wasn't done on the phone. I explained that he needs to talk on the phone in a normal voice and not yell. When he refused to stop and started arguing with the deputy he was told to cell in and didn't at first. The disruption he caused warranted Dep. Eide to issue this MMC. I had actually done a Level Review on Sullivan earlier in the morning and lowered him to a Level 2. For this MMC he will return to a Level 3 Pre-Hearing L/D awaiting a hearing. (Sgt Steve Billesbach)

**MISCONDUCT:**

| Sullivan, Cyrus |
|---|
| Rule Violations: **Failure To Do As Ordered** |
| **Disruptive Behavior** |
| **Assaulting, Fighting and/or Threatening A Person/Staff** |

000168

EXHIBIT 6




## Multnomah County Sheriff's Office
### MISCONDUCT HEARINGS REPORT
(Report ID: #26346)

*14614243*

677564 Sullivan, Cyrus                    Facility _DC_  Dorm _SC_  Cell/Bunk _11_

**HEARING:** On _4/3/17_ at _0824_ hours, a hearing was held for the herein named inmate. After being advised of his rights to the hearing process and informed of the reported allegation, the inmate (ADMITTED / DENIED) the violation. The inmate made the following statements during the hearing:

I had no discussion w/ a Sgt. I did not assault, fight, or threaten anyone physically or sexually. I am not guilty of that. I did lose my temper + argued on the phone. Deputy tried to get me to put phone down. I did slam receiver down. I was stressed out. Basically I lost my temper. I did cell in eventually - maybe not right away. I'll take all this off the website if you dismiss it.

**FINDINGS:** It is the finding of this hearing that the inmate: ☒ IS GUILTY ☒ NOT GUILTY ☐ OTHER

**BASED ON:** Inmate/Officer Facts, Safety/Security. No Witnesses Identified or Called by Sullivan. Loud + Arguing on Phone. Slam Phone - Upset. Not Cell in Timely. Cell All SC inmates in - Disturb others walks. Currently on L/D Status.

X Inconclusive. Not Physical or Sexual Threat.

**SANCTION:**
Failed To Do As Ordered - 7 days LD, CS
Disruptive Behavior - 10 days LD, CS
X Threaten - Not Guilty

Fee: # 5   Fine: # 15   Off Segregation: _4/21/17_

Signature of Hearings Officer: _Murray_                    Date: _4/3/17_

Commander's Review: _____

Date: _____

000170

EXHIBIT 7



## Multnomah County Sheriff's Office
### MISCONDUCT HEARINGS REPORT
(Report ID: #26803)



*14614243*

677564 Sullivan, Cyrus

Facility _DC_  Dorm _4E_  Cell/Bunk _12_

**HEARING:** On _5/7/17_ at _1015_ hours, a hearing was held for the herein named inmate. After being advised of his rights to the hearing process and informed of the reported allegation, the inmate (ADMITTED / ~~DENIED~~) the violation. The inmate made the following statements during the hearing:

I never made physical threats to kill or rape, anyone. He's making that up. We did get in an argument and I did cuss, at him. But never made threats - he made that up.

**FINDINGS:** It is the finding of this hearing that the inmate: [X] IS GUILTY [ ] NOT GUILTY [ ] OTHER

**BASED ON:** Inmate/Officer testimony, Safety/Security, serious threats. Officer witness statement. History of threatening behavior during inmate movement. Currently on L/D status.

**SANCTION:** Threaten Staff 20 days LD.CS
Disrespect 10 days LD.CS

Fee: _$5-_  Fine: _$25-_  Off Segregation: _6/20/17_

Signature of Hearings Officer: _Murray_    Date: _5/10/17_

* recess for witness Statements. 5/7/17, 1025hrs.

Commander's Review: _AD  ___ 1948_    Date: _05/17/17_

Read and reviewed by LSO Morrison 38352, 05/18/17,

EXHIBIT 7

 

# Multnomah County Sheriff's Office

## MISCONDUCT ISSUANCE
(Report ID: #26803)

Incident Locaton: MCDC, 4E

Notice is hereby given that on 05/02/17 at approximately 1600 hrs, inmate #677564 Sullivan, Cyrus violated the following **Major Rules of Conduct:**

- Assaulting, Fighting and/or Threatening A Person/Staff
- Disrespect Or Harassment

**In the following manner:**

> On 05-02-17 at 1600 Sullivan disrespected me by calling me a "Fucking asshole." He threatened my family and me stating, "I am coming to your house and I'm going to rape your wife and kids then kill all of you!"

Evidence: None

| | |
|---|---|
| **Reported By:** | #31532 Dep J. Harrington |
| **Investigated By:** | #38974 Sgt A. Banta |
| **Disciplinary Level:** | 5 |

**Comments:** *Inmate Sullivan disrespected staff by swearing at the deputy. He threatened and harassed the deputy making comments about harming the deputy and his family. Inmate Sullivan behaved in a menacing way by getting into the deputy's face while threatening him.*

**ISSUANCE:**  I, #38974 **Sgt A. Banta**, certify that at approximately **1804** hrs on **05/02/17**, I ensured a copy of this Misconduct Report was issued to the herein named person in accordance with the Inmate Manual.

---

**NOTICE TO INMATE:** You are hereby notified that the above listed employee has cited you for the described violation(s). You are further advised that a hearing shall be held to review the allegation(s) within **96 hours, excluding holidays and weekends.** Prior to the hearing you should review the Inmate Manual.

**24 HOUR NOTICE WAIVER:** After being advised of my rights with regard to receiving 24 hour notice prior to my hearing, I hereby waive that right and wish to proceed with my hearing.

Date: _____ Time: _____ Signature _____

---

000266

 

# Multnomah County Sheriff's Office

**INCIDENT REPORT #26803**
(Dep James Harrington #31532)

| | | |
|---|---|---|
| **INCIDENT:** Disciplinary - Major Misconduct | | Occurred: **05/02/2017 1600** hrs |
| **LOCATION:** MCDC - 4E (4E-12) | | Submitted: **05/02/2017 1731** hrs |
| **PACKET #:** N/A | | Finalized: **05/05/2017 1623** hrs |

**SUMMARY:** *On 05-02-17 at 1600 Sullivan disrespected me by calling me a "Fucking asshole." He threatened my family stating, "I am coming to your house and I'm going to rape your kids then kill all of you!"*

**SUBJECT:**

| #677564 Sullivan, Cyrus | M/W | 06/26/1983 | MCDC - 4E - 2 |
|---|---|---|---|

**MENTIONED:**

| #25781 Dep Bledsoe, Bruce | 4 escort |
|---|---|
| #26345 Dep Rosa, Gretchen | 4A |

**NARRATIVE:** *On 05-02-17 at 1600 myself and Deputy Bledsoe escorted Sullivan from transfer to 4E-12. As we approached 4E-12 with Sullivan Deputy Rosa began sliding his door open. Stuck to the inside of the cell door window was a sign that read "COPBLASTER.com". I pulled the sign off the window as the door opened and asked him what it meant. He stated that it was his website to turn cops in on for misconduct. "And if you take my sign asshole your going on the site and my people will be coming to your house!" Sullivan was standing in the threshold of the door at this point facing the cell and I just to his right slightly out of the cell. Deputy Bledsoe ordered him to step in the cell. Instead he turned to his right and stepped up right in my face and started saying that he was going to kill my family. I put my left hand on his left shoulder and turned him back towards his cell. From there he walked to his bunk and knelt down without being instructed to do so. Deputy Bledsoe placed a hobble strap between Sullivan' cuffs and started walking him backwards towards the door. As he walked Sullivan stated, "I'm coming to your house Harrington. I'm going to rape your kids and wife then I'm going to kill all of you! I will also be posting your address on the web for everyone to see and have my people show up at your house too!" Deputy Rosa closed the cell door. Deputy Bledsoe and I un-cuffed Sullivan and exited 4E.*

**ACTION PENDING:** *Forwarded to Sgt Banta for review.*

**REVIEWS:** *05/05/2017 1623 hrs - Inmate Sullivan stated that he had nothing to say about what occurred with Deputy Harrington. When I went to interview him he had replaced the sign in his window that was taken by Harrington with another that he made. The sign read CopBusters.com and "Don't tread on me". Sullivan was a level 4 disciplinary at the time of the incident. He was placed on a level 5 pending a hearing. (Sgt Amie Banta)*

**MISCONDUCT:**

**Sullivan, Cyrus**

Rule Violations: **Assaulting, Fighting and/or Threatening A Person/Staff**
**Disrespect Or Harassment**

*On 05-02-17 at 1600 Sullivan disrespected me by calling me a "Fucking asshole." He threatened my family and me stating, "I am coming to your house and I'm going to rape your wife and kids then kill all of you!"*

000267

## EXHIBIT 8

I heard he assaulted someone and is in the hospital for a fractured arm. Is there a report that can be forwarded to me?


Matthew K Preuitt
United States Probation Office
340 U.S. Courthouse
1000 SW Third Avenue
Portland, OR 97204
(503) 326-8658


From:     MURRAY Erika J <erika.murray@mcso.us>
To:       "Matt_Preuitt@orp.uscourts.gov" <Matt_Preuitt@orp.uscourts.gov>.
Cc:       KOVACHEVICH Tressa <tressa.kovachevich@mcso.us>
Date:     06/29/2017 10:27 AM
Subject:  RE: Cyrus Sullivan

---

An incident happened last night with him.  I have not seen any paperwork
as of yet.
I have cc'd Tressa, as she will be doing hearings at MCDC for July.   And
she will be conducting Sullivan's hearing.

Tressa, can you follow up with Matt next week after you conduct Sullivan's
hearing?

Thanks.
Erika

-----Original Message-----
From: Matt_Preuitt@orp.uscourts.gov [mailto:Matt_Preuitt@orp.uscourts.gov]
Sent: Thursday, June 29, 2017 9:46 AM
To: MURRAY Erika J
Subject: Cyrus Sullivan


Erika,
Hello! How is Cyrus Sullivan doing? Any more write-ups? Is he being
charged criminally for his threats to the officer on the last write-up you
sent me?
Thanks,
Matt Preuitt

2

EXHIBIT 9

Letter to Theresa Fuchs, USPO
November 8, 2018
Page 2 of 7

nasal spray, etc.)  Even under the relaxed standards for including information in the PSR, there is not enough objective proof that this ever occurred to insert it here; it was not part of the indictment; it was not considered by the grand jury; Mr. Sullivan has always denied it; we object; it should be stricken.

The justification section states that "the defendant's elbow made contact with T.B. in the neck and shoulder area." Mr. Sullivan objects, denies this allegation, denies that it could have happened intentionally, and there is no proof of the bruising one would expect to see if T.B. had been elbowed in the neck and shoulder by an adult man, alleged to be agitated and swinging his arms vigorously. T.B. and other named victims had ample opportunity to take photos, or otherwise document bruises in the days following this incident. They never did. We object.

The justification section states, "in the course of the instant offense, the defendant sustained a broken left arm." The phrase "in the course of the instant offense" suggests that the fracture occurred during the events described by T.B. as an assault and as a consequence of those actions. That is not true. Mr. Sullivan's left humerus was broken *after* he had been escorted to "the hole," was isolated from the general population, and was pinned face down to a mattress by sheriff's deputies. Once Mr. Sullivan was face down, with deputies pressing on his upper back and limbs, T.B removed Mr. Sullivan's left hand from handcuffs, immobilized Mr. Sullivan's elbow on the mattress with one hand, and then wrenched Mr. Sullivan's hand away from the small of his back with the other. This fulcrum-like and purposeful action--undertaken long after the alleged scuffle upstairs--produced an acute, oblique (through-and-through) fracture of Mr. Sullivan's left humerus (the second largest bone in the human body). A biomechanics expert and former professor of radiology (who reviewed the x-ray films and incident reports) would have testified, under oath, that the fracture occurred in this manner. His detailed report, disclosed in advance of trial, is attached for your review and should be appended to the PSR. In light of this information, we ask that the report state, "sheriff's deputies escorted Mr. Sullivan to the disciplinary housing unit, pinned him face down to a mattress, and broke his arm in retaliation for his refusal to follow commands."

**"Justification" section, page 2, second paragraph:** Mr. Sullivan has been treated by ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ He has not been treated regularly since that time. Further, he has never been in regular, ongoing treatment with a provider knowledgeable about or specializing in ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ The agreed upon conditions of supervision, set forth in the plea agreement, are designed to address the lack of regular, specialized ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉



**OREGON HEALTH & SCIENCE UNIVERSITY**

| | |
|---|---|
| 3181 S W Sam Jackson Park Road<br>Mailcode: OP17A<br>University Hospital South<br>Portland OR 97239-3011 | SULLIVAN,CYRUS<br>MRN: 01939430<br>DOB: 6/26/1983, Sex: M |

## Patient Demographics

| Name<br>Sullivan, Cyrus | Patient ID<br>01939430 | SSN<br>xxx-xx- | Sex<br>Male | Birth Date<br>06/26/83 (34 yrs) |
|---|---|---|---|---|

| Address<br>1120 SW 3rd Ave<br>4th Floor<br>PORTLAND OR 97204 | Phone<br>503-988-2283 (H) | Email | Employer<br>NONE |
|---|---|---|---|

| Reg Status<br>Verified | PCP<br>Angelina A Platas,<br>MD503-988-0290 | Date Last Verified<br>08/03/17 | Next Review Date<br>09/02/17 |
|---|---|---|---|

## Patient Ethnicity & Race

| Ethnic Group<br>Non-Hispanic | Patient Race<br>White |
|---|---|

Fully Reviewed On: 8/3/2017 By: Jennifer Paul, MA

## Allergies as of 8/29/2017

| | Noted | Reaction Type | Reactions |
|---|---|---|---|
| Sulfa (Sulfonamide Antibiotics)<br>Unknown reaction in childhood. | 10/18/2012 | | Unknown |

## Outpatient Medications

| | Quantity | Refills | Start | End |
|---|---|---|---|---|
| acetaminophen (MAPAP) 325 mg oral tablet | | | 6/12/2017 | 9/9/2017 |
| gabapentin 600 mg oral tablet | | | 6/20/2017 | 9/17/2017 |
| oxyCODONE (immediate release) 5 mg oral tablet | 15 tablet | 0 | 6/28/2017 | |

## Immunizations

None

## Problem List

(None)

## All Notes

ED Provider Notes by Jennifer K Rossi, MD at 06/28/17 2153                          Version 1 of 1

| Author: Jennifer K Rossi, MD<br>Filed: 06/30/17 1935<br>Editor: Jennifer K Rossi, MD (Physician) | Service: Emergency<br>Date of Service: 06/28/17 2153 | Author Type: Physician<br>Status: Signed |
|---|---|---|

### ED Individual Provider Note, Jennifer K Rossi, MD:

HPI 33 y.o. Male bib sheriffs with c/o arm pain. PAtient had bee handcuffed with hands behind back, he was agitated and during police handling he felt his R arm pulled backwards and felt a pop in his upper arm with pain. No prior injuries to that arm. No numbness in his hand.

He is R handed.

PCP: Angelina Platas, MD



EXHIBIT 10

**OREGON HEALTH & SCIENCE UNIVERSITY**

3181 S W Sam Jackson Park Road
Mailcode: OP17A
University Hospital South
Portland OR 97239-3011
Pertinent Record

SULLIVAN,CYRUS
MRN: 01939480
DOB: 6/26/1983, Sex: M
Adm: 6/28/2017, D/C: 6/29/2017

---

### All Notes (continued)

ED Provider Notes by Jennifer K Rossi, MD at 06/28/17 2153 (continued)                                      Version 1 of 1

There are no active problems to display for this patient.

History reviewed. No pertinent past medical history.
History reviewed. No pertinent past surgical history.

### Medications

**Prior to Admission Medications**

| Prescriptions | Last Dose | Informant | Patient Reported? | Taking? |
|---|---|---|---|---|
| Capsaicin (CAPZASIN-HP) 0.1 % topical cream | | | Yes | Yes |
| Sig: APPLY CREAM TOPICALLY ONCE DAILY ONE TUBE TO LAST 14 DAYS. | | | | |
| Minocycline HCl 100 mg oral tablet | | | Yes | Yes |
| Sig: TAKE 1 TABLET(S) ORALLY TWICE DAILY | | | | |
| ~~●●●●●●●●●~~ mg oral tablet | | | Yes | Yes |
| Sig: TAKE 1 TABLET(S) ORALLY AT BEDTIME | | | | |
| acetaminophen (MAPAP) 325 mg oral tablet | | | Yes | Yes |
| Sig: TAKE 3 TABLET(S) ORALLY THREE TIMES DAILY | | | | |
| albuterol (VENTOLIN HFA) 90 mcg/actuation inhalation HFA aerosol inhaler | | | Yes | Yes |
| Sig: INHALE 2 SPRAY(S) ORALLY FOUR TIMES DAILY AS NEEDED FOR SHORTNESS OF BREATH | | | | |
| ~~●●●●●●●●●~~ mg oral tablet | | | Yes | Yes |
| Sig: TAKE 2 TABLET(S) ORALLY ONCE DAILY 150MG | | | | |
| gabapentin 600 mg oral tablet | | | Yes | Yes |
| Sig: TAKE 1 TABLET(S) ORALLY THREE TIMES DAILY | | | | |
| ~~●●●●●●●~~ 100 mg oral tablet | | | Yes | Yes |
| Sig: TAKE 1 1/2 TABLET(S) ORALLY ONCE DAILY | | | | |

Facility-Administered Medications: None

### Allergies

Allergen                                                          Reactions
●  ~~●●●●●●●●●●●●●~~                                 Unknown
   *Unknown reaction in childhood.*

### Social History
reports that he does not currently drink alcohol or use drugs.

### Family History
noncontributory

### Review of Systems

| ED Triage Vitals | | | | | |
|---|---|---|---|---|---|
| BP | Temp | Pulse | Pulse - Plethysmograph | Resp | SpO2 |
| 06/28/17 2312 | 06/28/17 2152 | -- | 06/28/17 2312 | 06/28/17 2312 | -- |
| 151/96 | 37.1 °C | | 80 pulses/min | 16 | |

### Physical Exam

---



3181 S W Sam Jackson Park Road
Mailcode: OP17A
University Hospital South
Portland OR 97239-3011
Pertinent Record

SULLIVAN,CYRUS
MRN: 01939430
DOB: 6/26/1983, Sex: M
Adm: 6/28/2017, D/C: 6/29/2017

## All Notes (continued)

ED Provider Notes by Jennifer K Rossi, MD at 06/28/17 2153 (continued)          Version 1 of 1

Constitutional: He is oriented to person, place, and time.
**Very alert male lying on gurney, holding R arm in 90degrees on chest.**
HENT:
Head: Normocephalic and atraumatic.
Eyes: Conjunctivae are normal. Pupils are equal, round, and reactive to light.
Neck: Normal range of motion. Neck supple.
Cardiovascular: Normal rate and regular rhythm.
Pulmonary/Chest: Effort normal and breath sounds normal. No respiratory distress.
Abdominal: Soft. There is no tenderness.
Musculoskeletal: He exhibits tenderness and deformity.
**R arm with swelling and deformity about 2/3 way down upper arm. No elbow joint tenderness or effusion. No shoulder tenderness. No wrist tenderness. Good grip and normal sensation in R hand. No abrasions or skin defects**
Neurological: He is alert and oriented to person, place, and time.
Skin: Skin is warm. No rash noted.

## ED COURSE AND MEDICAL DECISION MAKING:
33 y.o. male with R upper arm pain
ddx - fracture, contusion.

His elbow and shoulder exam are unremarkable.

Will order humerus xray for better evaluation and dilaudid for pain control.

Humerus xray - 2 view (my impression) - mildly displaced midshaft humerus fracture.

I consult orthopedic surgery who came and evaluated the patient.
They placed him in sling and swathe and wish to see him in their clinic within 1 week.

Discharge instructions to wear sling at all time were given to patient and told to the sheriffs.
I provided a Rx for oxycodone for pain.

### ED Medication Administration from 06/28/2017 2141 to 06/30/2017 1930

| Date/Time | Order | Dose | Route | Action |
|-----------|-------|------|-------|--------|
| 06/28/2017 2308 | HYDROmorphone (DILAUDID) injection 0.5 mg | 0.5 mg | intrav enous | Given |

Cyrus Sullivan did not require hospitalization and was discharged at the completion of ED care.

## IMPRESSION:
S42.322A Closed displaced transverse fracture of shaft of left humerus, initial encounter



3181 S W Sam Jackson Park Road
Mailcode: OP17A
University Hospital South
Portland OR 97239-3011
Pertinent Record

SULLIVAN,CYRUS
MRN: 01939430
DOB: 6/26/1983, Sex: M
Adm: 6/28/2017, D/C: 6/29/2017

---

### All Notes (continued)

ED Provider Notes by Jennifer K Rossi, MD at 06/28/17 2153 (continued)                    Version 1 of 1

## PLAN, DISPOSITION AND FOLLOW-UP:

### Discharge Medication List as of 6/28/2017 11:15 PM

### START taking these medications

| | Details |
|---|---|
| oxyCODONE (immediate release) 5 mg oral tablet | Take 1 tablet by mouth every six hours as needed., Disp-15 tablet, R-0Schedule IIPrint Prescription |

Jennifer K Rossi, MD
Dept of Emergency Medicine
Adjunct Assistant Professor

Signed by Jennifer K Rossi, MD on 06/30/17 1935

# EXHIBIT 11



## Multnomah County Sheriff's Office

### INCIDENT REPORT #27633
(Dep Uwe Pemberton #20600)



| | |
|---|---|
| **INCIDENT:** Disciplinary - Major Misconduct | Occurred: 06/28/2017 2032 hrs |
| **LOCATION:** MCDC - 5D (officers station) | Submitted: 06/28/2017 2239 hrs |
| **PACKET #:** N/A | Finalized: 06/29/2017 1635 hrs |

**SUMMARY:** On 6/28/2017 at 2032 hrs Inmate Sullivan was ordered to return medical Gatorade to Med-Tech Erika, He refused and then was ordered to go into the sally port which he did not do, Inmate Sullivan ran to his room making verbal threats against the Med-Tech, and then refusing to come out of his room resulting in him having to be physically removed by staff.

**MENTIONED:**

| #677564 | Sullivan, Cyrus | M/W | 06/26/1983 | MCDC - 5D - 23 |
|---|---|---|---|---|
| #754255 | WORTHINGTON, STEPHEN | M/W | 10/10/1992 | MCDC - 5D - 23 |
| #35798 | Dep Barker, Tim | A\Sgt 741 | | |
| #0 | barker, Erika | Med-Tech | | |
| #24102 | Dep Dilger, Matt | 717 | | |
| #31450 | Dep Hubert, Philip | 715 | | |
| #34887 | Sgt Ingram, Matthew | Sgt 761 | | |
| #42885 | Dep Muth, Wendy | 718 | | |
| #31638 | Dep Simpson, Paul | 720 rec 2 | | |

**NARRATIVE:** On 6282017 at 2025 hrs while working 5D I had Med-Tech Erika enter the module to preform medication rounds.

During med rounds Inmate Sullivan was in line with Inmate Worthington behind him, Inmate Worthington gave Sullivan a red plastic cup and I heard Sullivan state wow Gatorade.

Med-Tech Erika asked Sullivan several times to give her the Gatorade explaining it was only for medical use in the facility. Sullivan refused to give it to her so I then ordered him to give it to her at which time he mixed it in his water cup and attempted to drink it.

I then ordered him to step into the sally port, but rather then do as directed he threw his cup into the Med-Techs garbage and ran up the stairs to the top tier.

Once on the top tier he stopped in front of 5D30 and yelled down at Erika stating I am going to put your name on the internet and put a hit out on you.

At 2032 hrs I called on the radio for escorts to come to 5D to remove Inmate Sullivan, I again ordered him to come down and step into the sally port but he ran to his room 5D23 and closed the door.

Staff arrived including ASgt Barker and Sgt Ingram, both Sgts attempted to get Sullivan to cuff up thru the food port but he refused.

Both Barker and Ingram along with escorts Simpson, Dilger, Muth, and Hubert took up positions outside room and prepared to enter. I was given the ok and I opened the door from the officers station, I observed something fly out of the room into the faces of staff, it was later determined Sullivan had crumbled up spicy Sarachi chips and attempted to hit staff in the face using it like pepper spray.

Staff entered the room and I could hear staff but could not see them from my vantage point. staff were ordering Sullivan to put his hands behind his back and to stop resisting and it was probably a minute or so before they were able to subdue Sullivan and remove him handcuffed.

000273

*Sullivan continued to struggle and resist all the way out of the module, attempting several times to go limp forcing staff to hold him up until would walk again on his own.*

*Sullivan as removed from 5D to 4F.*

**ACTION PENDING:** *misconducts issued for Failure to do as ordered, disruptive behavior and threatening staff*

**REVIEWS:** 06/29/2017 1635 hrs - *Inmate Sullivan was seen by two staff members taking the Gatorade and would not follow orders to enter the sally port that was within 10 feet of ware he was standing in the med line, This was very disruptive to the med line stopping the distribution of medication to the other inmates. Other staff was needed to respond to 5D to remove the inmate to disciplinary Housing. Once I arrived to the module the inmate was still in the cell and would not comply to orders and had been threatening staff. I asked him to cuff up thru the food port he said no but indicated he would cuff up if we came in. As the door opened and myself and Sgt. Ingram stepped in to the cell inmate Sullivan throw spicy sarachi chips that was in now powder form that the inmate had planned to use as a weapon, and would have been affective had myself and Sat Ingram not had are eye glasses on. This resulted in a use of force and the inmate being removed to 4F.* (**Dep Tim Barker**)

**MISCONDUCT:**

| Sullivan, Cyrus |
|---|
| Rule Violations: Failure To Do As Ordered |
| Disruptive Behavior |
| Assaulting, Fighting and/or Threatening A Person/Staff |

Read Notice that anything he said could be used against him in a subsequent criminal proceeding. Testismony had already begun. Inmate said he was aware of his rights.

000274

# EXHIBIT 12



## Multnomah County Sheriff's Office

### INCIDENT REPORT #27647

(Sgt Matthew Ingram #34887)



| | |
|---|---|
| **INCIDENT:** Disciplinary - Major Misconduct | Occurred: 06/29/2017 2033 hrs |
| **LOCATION:** MCDC - SD (Cell 23) | Submitted: 06/30/2017 0042 hrs |
| **PACKET #:** N/A | Finalized: 06/30/2017 0111 hrs |

**SUMMARY:** On the date and time mentioned inmate Sullivan violated the following rules:
-Assault on staff by physically attacking staff
-Disruptive Behavior by interfering with the safe, orderly and secure operations of the facility
-Failure to do as ordered by not following staff orders when given in a clear and concise manner
-Possession of Contraband by altering a food item in order to make a weapon to throw at staff

**SUBJECT:** #677564  Sullivan, Cyrus                    M/W    06/26/1983    MCDC - SD - 23

**MENTIONED:** #35798   Dep Barker, Tim                             741

**NARRATIVE:** On the date and time mentioned inmate Sullivan did violate several major rules of conduct. The rule violation are as follows:
Inmate Sullivan assaulted staff when he elbowed Deputy Barker in the face and threw a powder substance in the face of staff. This powder was found to be "scorchin' chips" sold on commissary. As a result of Sullivan crushing up the chips into a powder and using as a weapon this constitutes possession of contraband. (altering an item from its intended purpose). Sullivan failed to do as order when staff gave clear and concise orders to stop resisting against them and place his hands behind his back. (he refused to do so) Sullivan's actions led to multiple staff responding to his unruly behavior thereby causing a disruption to the safe and orderly jail operations. (staff were pulled away from their posts)

**ACTION PENDING:** fwd

**REVIEWS:** 06/30/2017 0111 hrs - Inmate Sullivan was not interviewed regarding this incident due to pending Law Enforcement Investigation. Though written notice of this disciplinary misconduct was issued just over 4 hours beyond the required 24 hour time frame required in the disciplinary process. I recommend Inmate Sullivan be held accountable to the fullest extent for his actions detailed in this misconduct. Reports and service of the misconduct were delayed due to required Law Enforcement interviews and staff injury reports. (**Sgt Nicholas Carter**)

**MISCONDUCT:**

| Sullivan, Cyrus |
|---|
| Rule Violations: **Failure To Do As Ordered** |
| **Disruptive Behavior** |
| **Assaulting, Fighting and/or Threatening A Person/Staff** |
| **Possessing Contraband** |

Report #27647 (Ingram)                                                                    1 of 1

EXHIBIT 13

SIMPLE ASSAULT-MISD

# Multnomah County Sheriff's Office

CASE NUMBER
GO 40 2017-30485

## MENTIONED OFFICERS

| AUTHOR | DATE/TIME |
|---|---|
| BYBEE, KEITH A (37934) | 06/28/2017 2135 |

SUBJECT
SULLIVAN CYRUS ANDREW

Sgt Ingram/34887/MCSO MCDC
Deputy Barker/35798/MCSO MCDC
Deputy Simpson/31638/MCSO MCDC
Deputy Hubert/31850/MCSO MCDC
Deputy Muth/42885/ MCSO MCDC

## CASE SUMMARY

| AUTHOR | DATE/TIME |
|---|---|
| BYBEE, KEITH A (37934) | 06/28/2017 2135 |

SUBJECT
SULLIVAN CYRUS ANDREW

Sullivan fought with Deputies after being ordered to maximum security for a rule violation.

## NARRATIVE

| AUTHOR | DATE/TIME |
|---|---|
| BYBEE, KEITH A (37934) | 06/28/2017 2135 |

SUBJECT
SULLIVAN CYRUS ANDREW

On 6/28/17 I was dispatched to MCDC regarding an assault by an inmate on staff. I arrived and contacted the OIC.

My investigation revealed Sullivan had refused to obey commands from Deputy Pemberton and was told he was going to maximum security, 4F, also known as the hole.

Sullivan was in line to get his daily medication. Medical Technician Barker was dispensing the medication. Another inmate handed Sullivan some Gatorade. This is not allowed. Gatorade is only given to those detoxing off drugs to stay hydrated. Barker told him he couldn't have it and to give it to her. He looked at her and poured it in his water cup he was holding. Deputy Pemberton heard and saw the interaction between Barker and Sullivan and ordered Sullivan to give her the cup. Sullivan raised the cup to start drinking it and Pemberton told him to cell in the sally port, that he was going to the "hole".

Sullivan threw the cup in the trash next to Barker and ran toward his cell on the second tier. Once at the top of the stairs he yelled to Barker that he was going to put her personal information online and order a "hit" on her. Sullivan then ran into his cell and closed the door.

Pemberton called for two escort Deputies. Deputy Simpson, Hurburt and Muth arrived.

Simpson ordered Sullivan to put his hands in the food port so they could handcuff him. Sullivan refused. At this point Simpson requested a supervisor.

000016

EXHIBIT 13

SIMPLE ASSAULT-MISD

## Multnomah County Sheriff's Office

CASE NUMBER
GO 40 2017-30485

While they were waiting for a supervisor Hurburt observed Sullivan grinding some Sriracha Doritos into powder.

Sgt Ingram arrived and ordered Sullivan to put his hands through the food port to be handcuffed. Again he refused.

Deputy Barker arrived. He was the Acting Sgt for this dorm. He also ordered Sullivan to put his hands through the food port for cuffing. Sullivan refused but told Barker that he would agree to be cuffed if they came in. He then turned his back to the door and put his hands behind his back.

They entered the cell with a Taser and handcuffs out. When they were about to grab his hands to cuff him, Sullivan reached up to the top bunk, grabbing a handful of the ground Doritos and threw it in the face of the Deputies. He then threw a punch at Sgt Ingram which he was able to deflect. It is unclear if he threw one or two handfuls of Doritos at the Deputies.

Deputy Barker and Sgt Ingram were the closest to Sullivan and attempted to grab his arms. Deputy Barker was elbowed on the side of his face and neck and again on his shoulder. He was able to control his left arm after being elbowed twice.

Sgt Ingram grabbed Sullivan's right arm and Sullivan pulled it into his belly area and pinned Ingram's arm with his against his body. Sgt Ingram had to pry Sullivan's elbow away from his body to free his arm.

At the same time Barker and Ingram were attempting to control his arms, Simpson and Muth were attempting to control his legs. Sullivan kicked Muth in the upper stomach/ lower chest area. Muth fell back and injured her back and hip.

Ingram got his right hand behind his back and the cuff on. He waited for Barker to bring the left arm behind his back. As Barker was bringing the left arm behind he heard a pop. They got his left arm in handcuffs. Once they got Sullivan handcuffed he was escorted out of his cell.

Sullivan continued to fight using his shoulders. Once outside his cell he went limp. He was picked up by Barker and told to walk. The stairs from the second tier are narrow and Ingram had to go first. As they were descending the stairs Sullivan was pushing on Ingram in an effort to make him fall. Barker had to hold him up to prevent Sullivan from pushing Ingram down the stairs.

The entire way to 4F Sullivan continued to struggle and several times went limp forcing the Deputies to pick him up.

Once in the cell they decided to cut Sullivan's clothes off because he was still resisting/struggling. When inmates are housed in this section of the jail they are given different color clothing. After they had cut his clothing off they discovered his arm was broken.

Barker called for medical to check him. They arrived and informed him it was probably broken and he needed to go to the hospital.

000017

SIMPLE ASSAULT-MISD

## Multnomah County Sheriff's Office

CASE NUMBER
GO 40 2017-30485

Barker arranged for a medical transport for Sullivan to OHSU.

I was told Sullivan ran a "Cop Watch" internet site which was very anti-police. He made numerous threats to the Corrections Deputies and the Medical Technician to post their personal information online with the intent of putting their families at risk.

Pemberton:
Pemberton told me Sullivan was in line to get his medication. Medical Technician Barker was handing out the medication. Another inmate gave Sullivan some Gatorade. This is not allowed. Gatorade is given to inmates who are detoxing from drugs to keep them hydrated.

Sullivan was told by Barker he could not have it and to give it to her. He refused and poured it in a cup of water he had.

Pemberton, who was working the dorm, saw and heard the exchange between Barker and Sullivan. He ordered Sullivan to give the Gatorade to Barker. Sullivan started to drink the Gatorade and Pemberton told him to cell in the sally port because he was going to the "hole" which is another name for the maximum security section of MCDC.

When Sullivan heard this he threw the cup in the trash beside Barker and ran toward his cell. His cell was on the 2nd level. When he got to the top of the stairs he yelled down that he was going to post Barker's name on the internet and order a "hit" on her. Sullivan then ran to his cell and closed the door.

Pemberton called for an escort to take an inmate to the hole. Sullivan, Muth, and Hurburt arrived followed a few minutes later by Sgt Ingram and then Deputy Barker.

Pemberton could hear Sgt Ingram trying to reason with Sullivan and get him to put his hands in the food port so they could be cuffed.

Deputy Barker arrived and tried to reason with Sullivan. Sullivan again refused.

Deputy Barker called for Pemberton to open the door. He said he saw them go in and saw something fly out the door. This was later determined to be the powdered Doritos.

He heard they were fighting with him and a few minutes later they brought him out of the cell. He saw Sullivan go limp while they were walking him out, forcing them to pick him up.

Simpson:
Simpson told me he arrived at Sullivan's cell and saw him back toward the bunks. He opened the food port and told him to put his hands through to be handcuffed. Sullivan said he wasn't going to put his hands through the food port. If they came in he would agree to be handcuffed. Simpson said he waited for a supervisor and Sgt Ingram arrived shortly after.

He said Sgt Ingram tried to reason with Sullivan and told him to put his hands through the food port. He continued to refuse.

000018

EXHIBIT 13

SIMPLE ASSAULT-MISD

## Multnomah County Sheriff's Office

CASE NUMBER
GO 40 2017-30485

Deputy Barker arrived and tried to reason with him also. Sullivan told Barker he would allow them to handcuff him if they came in but, was not going to put his hands in the food port.

They made a quick plan with Ingram and Barker going in first and Simpson would have his Taser if needed.

As they approached Sullivan, Simpson saw Sullivan grab something from the top bunk and throw it at them. He said some went into his eye. His eye was burning when I spoke to him several hours later. On a scale of 1-10 he said the burn was about a 2. He found out later it was ground up sriracha Doritos.

Simpson saw Barker get elbowed in the face. They were trying to control his arms so he holstered his Taser and grabbed his left leg. He said there was no room to use the Taser.

Eventually they got control of his arms to get him cuffed. Once cuffed, they led him out of the cell. Simpson saw Sullivan go limp while he was being escorted.

He accompanied Barker and Ingram to 4F with Sullivan. He said Sullivan was fighting/resisting the entire way to 4F. He said he was trying to use his shoulders to break free of their grasp.

He was outside the cell when they cut his clothes and discovered the broken arm.

Hubert:
Hubert told me he heard Pemberton call for an escort. He arrived after Muth and Simpson. He said Simpson called for a supervisor because Sullivan refused to be handcuffed.

While they were waiting for the supervisor Hubert observed Sullivan crushing up Doritos.

Once Sgt Ingram and Deputy Barker arrived and he told both of them he wasn't going to be handcuffed through the food port they decided to go in. When they went in Hubert saw Sullivan throw the ground chips at them. He felt it hit his face and chest but did not go in his eyes.

He was the last one in and could not see much of what was happening. He did see Barker and Ingram struggling to get Sullivan's hands behind his back. He also saw Simpson and Muth each grab a leg. Sullivan was kicking back at Muth and Simpson with his feet.

When the struggle started the cuffs were dropped to the floor. Hubert grabbed the cuffs and handed them to Ingram once he had his hand behind his back.

He assisted getting Sullivan to 4F. He said Sullivan went limp on several occasions before they got him in a cell.

He was in the cell when they cut his clothes off and found the injury to

SIMPLE ASSAULT-MISD                  Multnomah County Sheriff's Office                  CASE NUMBER
                                                                                        GO 40 2017-30485

.his arm.

Muth:
Muth told me she responded when Pemberton asked for an escort. She arrived
second after Simpson.

Sullivan refused to be handcuffed through the food port. After both Sgt's
tried to reason with him a plan was made to go in. Sgt Ingram was first,
Barker was second, Simpson was third with a Taser, and Muth was fourth.

Muth said she couldn't see all that was happening. She did see Sullivan
throw the ground up Doritos. She saw that Sullivan was fighting and she
grabbed his right foot to help secure him. Sullivan pulled back and kicked
Muth in the upper stomach/lower breast area. This caused her to fall back
injuring her hip and back. She told me the pain was a 4-5 on a 1-10 scale.

Once they got Sullivan handcuffed he continued to fight and resist. He went
limp once they were out of the cell causing them to lift him so he would
walk.

She did not go down to 4F with Sullivan.

Ingram:
Ingram told me he arrived about 5 minutes after Pemberton requested the
escorts. He talked to Sullivan through the food port trying to get him to
cooperate allowing them to handcuff him.  He refused and said he wasn't
going to get cuffed through the food port.

Barker arrived and attempted to reason with him. He refused Barkers
attempts also but said he would allow them to handcuff him if they came in.

Ingram formulated a plan with Barker and Simpson prior to opening the door.
They had Simpson with a Taser coming in behind Barker and him.

They had Pemberton open the door and Ingram went in first followed by
Barker and Simpson. Ingram had his handcuffs out and was just about to grab
his arm when Sullivan reached up to his top bunk, grabbed some powder and
threw it in his face. He later determined it was the ground Doritos. Ingram
was wearing glasses so the powder did not get in his eyes.

Immediately after throwing the powder he tried to hit Ingram. Ingram was
able to deflect the punch and grabbed his arm to control it.  He and Barker
pushed Sullivan forward over a counter. Sullivan pulled Ingram's arm under
this belly and pinned it to his side with his arm. Ingram said he pried his
arm away from his body to remove his.  Ingram was able to force Sullivan's
right arm around to his back and called for handcuffs. They were handed to
him and he placed them on Sullivan's right wrist. He took hold of the other
cuff and waited for Barker to bring his left arm around to be cuffed.

As Barker was bringing Sullivan's left arm around, Ingram heard a "pop".
They got his left wrist cuffed and Sullivan continued to fight and resist.

At this point they brought him out of the cell. Once out of the cell he
went limp several times on the way to 4F.

PRINTED ON: 08/13/2017   PRINTED BY: 40171          Page 7/11          VERSION: 161114.1

000020

EXHIBIT 13

SIMPLE ASSAULT-MISD

## Multnomah County Sheriff's Office

CASE NUMBER
GO 40 2017-30485

Once inside the cell in 4F they decided for safety of the staff and Sullivan to cut his clothes off. Once his clothes were cut off they noticed his arm was injured.

Ingram told me he was giving commands to stop resisting, stop fighting and put your hands behind your back, repeatedly throughout the struggle with Sullivan.

Barker:
Barker told me he was the last one to arrive. He was the acting Sgt for this dorm that evening.

When Barker arrived he tried to reason with Sullivan. Sullivan refused to be handcuffed through the food port. He told Barker that he would allow them to handcuff him inside the cell and turned his back to them with his hands behind his back.

Once they had made a plan they called for the door to be opened and they went in. Ingram was first, Barker was second and Simpson, with the Taser, was third.

Barker said when Ingram was about to grab Sullivan's hand he reached to his top bunk, grabbing some powder, and threw it at their faces. Barker was wearing glasses so none of it got into his eyes. Some did get in his nose, which was burning several hours later.

Barker and Ingram pushed Sullivan forward over a counter in the cell. Sullivan was throwing elbows at Barker and hit him once on the side of the face/neck area. He hit him once in the shoulder. Sullivan threw another elbow at Barker which he was able stop. He reached over and grabbed his wrist and with his other hand reached under and grabbed the same wrist. Sullivan continued to fight and resist. While Barker was forcing his hand behind his back he heard a pop. He continued to bring his arm behind his back and got it in handcuffs.

Once handcuffed, Sullivan continued to fight and resist being taken out of his cell. Barker said he was using his shoulders to knock into people and to break free. Once outside the cell Sullivan went limp. Barker said he had to pick him up and force him to walk. As they were descending the stairs from the second tier, Ingram went first down the stairs because they are so narrow. Sullivan was trying to push against Ingram to cause him to fall down the stairs. Barker told me he grabbed Sullivan and held him back so he couldn't push Ingram down the stairs. Sullivan went limp several more times on the way to 4F.

Once in the cell Sullivan continued to fight. It was determined by Barker and Ingram that they would cut his clothes off rather than take the cuffs off. This was due to Sullivan's continued fighting and resisting.

They laid Sullivan on his stomach. Barker was on his back. When they removed the clothing they noticed the injury to his arm.

They called for medical to check him out. The examined Sullivan and determined it was probably broken. Sullivan was taken to OHSU for treatment.

SIMPLE ASSAULT-MISD

EXHIBIT 13

# Multnomah County Sheriff's Office

CASE NUMBER
GO 40 2017-30485

Barker was giving commands during the entire struggle with Sullivan.

Barker said Sullivan never complained about pain in his arm.

## ACTION RECOMMENDED

| AUTHOR | DATE/TIME |
|---|---|
| BYBEE, KEITH A (37934) | 06/28/2017 2135 |

SUBJECT
SULLIVAN CYRUS ANDREW

Forward to the District Attorney for prosecution.

## STATEMENT

| AUTHOR | DATE/TIME |
|---|---|
| ODIL, KEVIN E (49890) | 07/05/2017 1023 |

SUBJECT
(SUSPECT #1) SULLIVAN, CYRUS A

ON 07/05/17 at about 1000 hours I conducted an interview with Cyrus Sullivan.

Prior to asking any questions I read him Miranda and when asked if he understood Sullivan said "yes."

I asked him about the incident that took place on the 28th and he told me he didn't do anything. He said that he knew he was going to the hole and wanted to eat his chips before going. He said that the deputies came into his room and assaulted him. I asked him if he ground up the chips and threw them at the deputies and he told me no. Sullivan went on to say that the deputies assaulted him and that he didn't do anything wrong.

000022

EXHIBIT 13

SIMPLE ASSAULT-MISD

## Multnomah County Sheriff's Office

CASE NUMBER
GO 40 2017-30485

| FOLLOWUP REPORT #1 | | | | |
|---|---|---|---|---|
| ASSIGNED TO<br>ODIL, KEVIN E (49890) | | RANK<br>DETECTIVES | | |
| ORG UNIT<br>DETECTIVES | | CAPACITY<br>1-INVESTIGATOR, LEAD | | |
| ASSIGNED ON<br>07/07/2017 | ASSIGNED BY<br>KRAFVE, KEITH J | SUBMITTED ON | APPROVED ON | APPROVED BY |

000023

 **Multnomah County** Health Department

MC MEDICAL RECORDS
426 SW Stark, 7th Floor
PORTLAND OR 97204

Sullivan, Cyrus Andrew
MRN: 4311164

---

Progress Notes by Kristyn Smith, RN at 6/28/2017 9:25 PM (continued)

shows client received dilaudid 0.5mg at 2308.

**Assessment:**
Impaired comfort

**Plan:**
1. Reassured
2. SHF extra blanket for positioning/immobilizer
3. Ice TID x 3 days
4. Chart routed to APMD for review
5. Will contact on call in AM regarding pain medication orders.

**Education:**
1. Educated to use blankets for positioning

## Notes

### Patient Demographics

| Patient Name | MRN | Sex | DOB |
|---|---|---|---|
| Sullivan, Cyrus Andrew | 4311164 | Male | 6/26/1983 |

### Encounter Information

| | Provider | Department | Encounter # | Center |
|---|---|---|---|---|
| 6/29/2017 11:08 AM | Lori Woods, RN | Mc Detention Ctr Ch | 295925559 | MC CORRECTIO |

### Progress Notes by Lori Woods, RN at 6/29/2017 11:08 AM

| Author: Lori Woods, RN | Service: (none) | Author Type: Community Health Nurse |
|---|---|---|
| Filed: 6/29/2017 2:28 PM | Encounter Date: 6/29/2017 | Status: Signed |
| Editor: Lori Woods, RN (Community Health Nurse) | | |

Cyrus Andrew Sullivan is a 34 year old client seen in cell at MC Detention Center.

**Subjective:**
MRfF asking for pain medication for arm fracture, requesting a high bed as it Makes the arm fracture More painful when he tries to sit    "low" And c/o of "fingers twitching" that began after arm was fractured

At 1300 pass Cl stated  the norco is managing his pain & the twitching stopped

**Objective:**
There were no vitals filed for this visit.
A/OX4 skin dry appears well perfused
Standing at cell door w/ steady stance
Wearing sling on L arm



| | | |
|---|---|---|
| **Multnomah County** Health Department | MC MEDICAL RECORDS<br>426 SW Stark, 7th Floor<br>PORTLAND OR 97204 | Sullivan, Cyrus Andrew<br>MRN: 4311164 |

### Progress Notes by Lori Woods, RN at 6/29/2017 11:08 AM (continued)

Speaking in full sentences w/clear speech
CMS is intact
Chart review of Sapphire indicates CI has norco 5/325 2 tabs TID may refuse through 07/09/17

Assessment:
At risk for pain
Hx of L humerus fracture

Plan:
1. Ice TID thru 06/30/17
2. Norco 2 tab TID may refuse thru 07/09/17
3. SHF reprinted at CI request for 2 extra blankets
4. MRF PRN
5. CI agrees

Education:
1. Swelling & possible nerve pain will be the worst on days 2-3 after injury; S/sx of a worsening or persisting condition that requires medical attention

## Notes
### Patient Demographics

| Patient Name | MRN | Sex | DOB |
|---|---|---|---|
| Sullivan, Cyrus Andrew | 4311164 | Male | 6/26/1983 |

### Encounter Information

| | Provider | Department | Encounter # | Center |
|---|---|---|---|---|
| 7/7/2017 11:48 AM | Lori Woods, RN | Mc Detention Ctr Ch | 296382702 | MC CORRECTIO |

### Progress Notes by Lori Woods, RN at 7/7/2017 11:48 AM

| | | |
|---|---|---|
| Author: Lori Woods, RN | Service: (none) | Author Type: Community Health Nurse |
| Filed: 7/7/2017 12:16 PM | Encounter Date: 7/7/2017 | Status: Signed |
| Editor: Lori Woods, RN (Community Health Nurse) | | |

Late entry for 0745 assessment

### Segregation/Disciplinary Lock Down Rounds:

Location: Dorm: 4F   Cell: 13
Alert, Oriented, Ambulated over to cell door with ease

CI submitted a MRF stating he fell & hit his broken arm, has increased pain /swelling

 **Multnomah County** Health Department

MC MEDICAL RECORDS
426 SW Stark, 7th Floor
PORTLAND OR 97204

Sullivan, Cyrus Andrew
MRN: 4311164

---

**Progress Notes by Lori Woods, RN at 7/7/2017 11:48 AM (continued)**

CI vague about when & how he fell; he did deny hitting his head or LOC

Able to wiggle fingers on L hand & CMS is intact
CI has swelling In L arm; worse in dependent area near the elbow/AC
Wearing immobilizer on L arm
Yellowish bruising on lateral L bicep ; reddish/ purple bruising in present on medial portion of bicep & forearm
Primary concern is to be able to continue his Norco until he is seen by OSHU ortho for f/u

CI was due to be seen at OHSU Ortho today but was RS to 07/10/17 d/t appearance in federal court this am

APMD consulted VO to extend CI Norco 2 tabs TID through 07/10/17 ( current Rx d/t to expire 07/09/17) & to reorder ice packs TID x 3 days
Extended HOLD tylenol 975 mg PO TID thru 07/10/17 d/t Norco order being extended

## Notes

### Patient Demographics

| Patient Name | MRN | Sex | DOB |
|---|---|---|---|
| Sullivan, Cyrus Andrew | 4311164 | Male | 6/26/1983 |

### Encounter Information

| | Provider | Department | Encounter # | Center |
|---|---|---|---|---|
| 7/12/2017 4:52 PM | Brook Holter, PA-C | Mc Inverness Jail Ch | 296890870 | MC CORRECTIO |

**Progress Notes by Brook Holter, PA-C at 7/12/2017 4:52 PM**

| | | |
|---|---|---|
| Author: Brook Holter, PA-C | Service: (none) | Author Type: Physician Assistant |
| Filed: 7/12/2017 5:09 PM | Encounter Date: 7/12/2017 | Status: Signed |
| Editor: Brook Holter, PA-C (Physician Assistant) | | |

S: C/O left arm pain since and incident that occurred 2 weeks ago. Pt states that the deputies were trying to hand cuff him and inadvertantly broke his humerus. He went to OHSU that evening and was treated with a sling and swath. Pt is RHD and is an IT person for occupation.
Pt denies numbness or pain in radial nerve distribution.
O: In sling and swath, Intact to radial, median, ulnar, and anterior interosseous sensation and strength. Radial pulse intact.
Xray: Oblique distal third shaft fracture of left humerus. 1CM of diastasis and slight varus angulation.
A: Left humerus fracture.
P: Pt needs to go back to OHSU orthopedics for further recommendations within 2 weeks. May remove swath but leave sling on. Start fist pumps for circulation and to diminish swelling. Please continue pain medication for 2 more weeks. Provide one more blanket for positioning.

## Notes

### Patient Demographics

| Patient Name | MRN | Sex | DOB |
|---|---|---|---|

 **Multnomah County**
Health Department

MC MEDICAL RECORDS
425 SW Stark, 7th Floor
PORTLAND OR 97204

Sullivan, Cyrus Andrew
MRN: 4311164

## Patient Demographics (continued)

| Sullivan, Cyrus Andrew | 4311164 | Male | 6/26/1983 |

## Encounter Information

| | Provider | Department | Encounter # | Center |
|---|---|---|---|---|
| 7/13/2017 8:40 AM | Michael Seale, MD | Mc Detention Ctr Ch | 296930937 | MC CORRECTIO |

### Progress Notes by Michael Seale, MD at 7/13/2017 8:40 AM

| | | |
|---|---|---|
| Author: Michael Seale, MD | Service: (none) | Author Type: Physician |
| Filed: 7/13/2017 8:47 AM | Encounter Date: 7/13/2017 | Status: Signed |
| Editor: Michael Seale, MD (Physician) | | |

Patient evaluated by on-site orthopedic specialist yesterday:

*Xray: Oblique distal third shaft fracture of left humerus. 1CM of diastasis and slight varus angulation.*
*A: Left humerus fracture.*
*P: Pt needs to go back to OHSU orthopedics for further recommendations within 2 weeks. May remove swath but leave sling on. Start fist pumps for circulation and to diminish swelling. Please continue pain medication for 2 more weeks. Provide one more blanket for positioning.*

Plan:    Norco 5/325 renewed for two weeks in Sapphire
         Tylenol order discontinued in Sapphire given Norco renewal
         RN please provide SPECIAL HANDLING FORM for one extra blanket
         Will confirm with scheduler OHSU Orthopedic follow up within two weeks

## Notes
### Patient Demographics

| Patient Name | MRN | Sex | DOB |
|---|---|---|---|
| Sullivan, Cyrus Andrew | 4311164 | Male | 6/26/1983 |

### Encounter Information

| | Provider | Department | Encounter # | Center |
|---|---|---|---|---|
| 7/24/2017 12:07 PM | Halcyon Dodd, RN | Mc Detention Ctr Ch | 297640127 | MC CORRECTIO |

### Progress Notes by Halcyon Dodd, RN at 7/24/2017 12:07 PM

| | | |
|---|---|---|
| Author: Halcyon Dodd, RN | Service: (none) | Author Type: Community Health Nurse |
| Filed: 7/24/2017 1:26 PM | Encounter Date: 7/24/2017 | Status: Addendum |
| Editor: Halcyon Dodd, RN (Community Health Nurse) | | |
| Related Notes: Original Note by Halcyon Dodd, RN (Community Health Nurse) filed at 7/24/2017 12:45 PM | | |

Cyrus Andrew Sullivan is a 34 year old male at MC Detention Center.

Cl submitted MRF requesting information as to when he will be having OHSU referral visit for L humerus fx. Reports was informed he was suppose to have outside visit wk of 7/17/17, but states did not have exam.

*CR documents cl was scheduled for OHSU referral apt 7/19/17, however, d/t Federal court unable to attend apt, so MSMD consulted and OHSU for resched of apt to wk of 7/31/17.*



**Multnomah County**
**Health Department**

MC MEDICAL RECORDS
426 SW Stark, 7th Floor
PORTLAND OR 97204

Sullivan, Cyrus Andrew
MRN: 4311164

**Progress Notes by Halcyon Dodd, RN at 7/24/2017 12:07 PM (continued)**

Assessment:
Health maintenance r/t LUE fx a/e/b care coordination

Plan:
1. Rec'd MRF
2. CR'd records
3. Consulted MSMD
4. Cl memo

**Notes**

**Patient Demographics**

| Patient Name | MRN | Sex | DOB |
|---|---|---|---|
| Sullivan, Cyrus Andrew | 4311164 | Male | 6/26/1983 |

**Encounter Information**

| | Provider | Department | Encounter # | Center |
|---|---|---|---|---|
| 8/3/2017 11:37 AM | Halcyon Dodd, RN | Mc Detention Ctr Ch | 298496328 | MC CORRECTIO |

**Progress Notes by Halcyon Dodd, RN at 8/3/2017 11:38 AM**

| Author: Halcyon Dodd, RN | Service: (none) | Author Type: Community Health Nurse |
|---|---|---|
| Filed: 8/3/2017 12:23 PM | Encounter Date: 8/3/2017 | Status: Signed |
| Editor: Halcyon Dodd, RN (Community Health Nurse) | | |

Cyrus Andrew Sullivan is a 34 year old male at MC Detention Center; and scheduled for RN list f/u CR'ing outside visit.

*CR document cl Dx LUE Humerus Fx, assessed by in house ORTHO, but referred per BH.PA and MSMD to OHSU Ortho for further evaluation and exam.*

Returned w/documented orders, f/u:
*"Evaluated L distal humerus, films show early signs of healing. Ok for gentle ROM as tolerated at elbow and shoulder, pt instructed in such. Tried Sarmiento (brace) but not ok per Deputies, sling ok, to remove when sitting. F/U in 6 wks w/repeat films, ok for Ibuprofen to augment Narcotics"*

Consulted APMD, cl currently ordered Norco 5/325 mg 2 tab tid PRN till 8/8/17 and Gabapentin 600 mg tid. Will cont Norco 2 tid till this evening 8/3/17 then start Norco taper off 8/4/17 (see below) as well as add Ibuprofen per recommendation from outside Ortho visit; and ensure outside referral dept schedules f/u visit w/n 6 wks. Cl already instructed on ROM exercises from visit and ensured has sling provided by visit & give form to authorized use KOP while incarcerated.

Assessment:
Health maintenance r/t LUE Fx a/e/b care coordination


**Multnomah County**
Health Department

MC MEDICAL RECORDS
426 SW Stark, 7th Floor
PORTLAND OR 97204

Sullivan, Cyrus Andrew
MRN: 4311164

---

**Progress Notes by Halcyon Dodd, RN at 8/3/2017 11:38 AM (continued)**

Plan:
1. CR'd orders
2. CE downloaded
3. Consulted APMD
4. Rx's ordered
   1. Ibuprofen 600 mg tid PRN x 30 days
   2. Norco taper
      1. 2 tab tid till tonight 8/3/17 then
         1. 2 tab bid x 3 days then
            1. 1 tab bid x 3 days then
               1. 1 tab qhs x 3 days
5. SHF: allow Sling KOP
6. Notified/CC'd MSMD
7. Provider signoff
8. Verbal to referral dept: sched f/u visit

## Notes

### Patient Demographics

| Patient Name | MRN | Sex | DOB |
|---|---|---|---|
| Sullivan, Cyrus Andrew | 4311164 | Male | 6/26/1983 |

### Encounter Information

| | Provider | Department | Encounter # | Center |
|---|---|---|---|---|
| 8/8/2017 9:14 AM | Angelina Platas, MD | Mc Detention Ctr Ch | 298758950 | MC CORRECTIO |

### Progress Notes by Angelina Platas, MD at 8/8/2017 9:15 AM

| | | |
|---|---|---|
| Author: Angelina Platas, MD | Service: (none) | Author Type: Physician |
| Filed: 8/8/2017 9:32 AM | Encounter Date: 8/8/2017 | Status: Signed |
| Editor: Angelina Platas, MD (Physician) | | |

Chart Review for medications.

Pt sustained a L humerus fracture on 6/28/17, he was felt to need non-surgical management of this fracture. He was seen at OHSU and had follow up with in house Ortho on 7/12/17 and FU with OHSU Orthopedics on 8/03/17, when fracture was said to be healing appropriately and ongoing conservative care was recommended.

Pt is currently being tapered off of norco with the addition of ibuprofen for pain control. His last date of norco is 8/12/17.

**EXHIBIT 14**

 **Multnomah County**
Health Department

MC MEDICAL RECORDS
426 SW Stark, 7th Floor
PORTLAND OR 97204

Sullivan, Cyrus Andrew
MRN: 4311164

Progress Notes by Angelina Platas, MD at 8/8/2017  9:15 AM (continued)

| Medication ▲ | Directions | Prescriber | Start | End | CP |
|---|---|---|---|---|---|
| ▨▨▨▨75MG TABLET | TAKE 2 TAB QD | HOOD, ANNIE B | 06/22/2017 | 08/20/2017 | 97.9% |
| CAPZASIN-HP 0.1% CREAM | APPLY CREAM QD | PLATAS, ANGELINA | 07/17/2017 | 08/30/2017 | NA |
| GABAPENTIN 600MG TABLET | TAKE 1 TAB TID | PLATAS, ANGELINA | 06/20/2017 | 09/17/2017 | 97.9% |
| HYDROCOD/APAP 5/325MG TAB (NORCO) | SEE EXPANDED | PLATAS, ANGELINA | 08/04/2017 | 08/12/2017 | 88.9% |

| Medication | Directions | Prescriber | Start | End | |
|---|---|---|---|---|---|
| HYDROCOD/APAP 5/325MG TAB (NORCO) | TAKE 2 TABLET(S) ORALLY TWICE DAILY | | 08/04/2017 | 08/06/2017 | |
| HYDROCOD/APAP 5/325MG TAB (NORCO) | TAKE 1 TABLET(S) ORALLY TWICE DAILY | | 08/07/2017 | 08/09/2017 | |
| HYDROCOD/APAP 5/325MG TAB (NORCO) | TAKE 1 TABLET(S) ORALLY AT BEDTIME | | 08/10/2017 | 08/12/2017 | |

| Medication | Directions | Prescriber | Start | End | CP |
|---|---|---|---|---|---|
| IBUPROFEN 600MG TABLET | TAKE 1 TAB TID | PLATAS, ANGELINA | 08/03/2017 | 09/02/2017 | 86.7% |
| MINOCYCLINE 100MG TAB | TAKE 1 TAB BID | PLATAS, ANGELINA | 05/30/2017 | 08/27/2017 | 98.6% |
| ▨▨▨▨200MG TABLET | TAKE 1 TAB HS | HOOD, ANNIE B | 06/22/2017 | 08/20/2017 | 97.9% |
| ▨▨▨▨100MG TABLET | TAKE 1 1/2 TAB HS | HOOD, ANNIE B | 06/22/2017 | 08/20/2017 | 97.9% |
| ▨▨▨▨ | INHALE 2 SPRAY(S) QID | PLATAS, ANGELINA | 08/03/2017 | 10/31/2017 | NA |

AP - 49 days out from L humerus fracture healing appropriately with non-surgical management. Pt being tapered off of narcotics with complaint of persistent pain.
- complete norco taper on 8/12/17 as ordered
- add acetaminophen 975 tid now (total dose acetaminophen less than 4 grams per day)
- continue ibuprofen as ordered
- continue gabapentin as ordered previously for chronic neuropathic neck pain

OA - med change in Sapphire (acetaminophen)

## EXHIBIT 14

 **Multnomah County**
Health Department

| | |
|---|---|
| MC MEDICAL RECORDS | Sullivan, Cyrus Andrew |
| 426 SW Stark, 7th Floor | MRN: 4311164 |
| PORTLAND OR 97204 | |

---

**Progress Notes by Angelina Platas, MD at 8/8/2017 9:15 AM (continued)**

### Notes

#### Patient Demographics

| Patient Name | MRN | Sex | DOB |
|---|---|---|---|
| Sullivan, Cyrus Andrew | 4311164 | Male | 6/26/1983 |

#### Encounter Information

| | Provider | Department | Encounter # | Center |
|---|---|---|---|---|
| 8/11/2017 1:13 PM | Gwendolyn Lucas, NP | Mc Detention Ctr Ch | 299073480 | MC CORRECTIO |

---

**Progress Notes by Gwendolyn Lucas, NP at 8/11/2017 1:13 PM**

| | | |
|---|---|---|
| Author: Gwendolyn Lucas, NP | Service: (none) | Author Type: Nurse Practitioner |
| Filed: 8/11/2017 3:03 PM | Encounter Date: 8/11/2017 | Status: Signed |
| Editor: Gwendolyn Lucas, NP (Nurse Practitioner) | | |

SUBJECTIVE: "i'm angry with my arm pain and they are taking away my pain meds."

Cyrus Andrew Sullivan is a 34 year old male here today for LUE pain issues. He sustained a L humerus fracture on 6/28/17. He was seen at OHSU and had follow up with in house Ortho on 7/12/17 and FU with OHSU Orthopedics on 8/03/17, when fracture was said to be healing appropriately and ongoing conservative care was recommended. Has since them been put on a weaning taper of his pain medication which he is frustrated with. Today, I have spent more than 30 minutes with inmate reviewing his pain management options with him. Instruct will not change the pain med order, and that taper off this drug is necessary. Today he states that he understands this but feels his nerve pain is worsening. Since he does not feel the IBU is effective for his pain needs, will stop this as well as the tylenol and replace with Naproxen 500 mg BID as he reports this Naproxen has been effective for him int he past. Review with him use of the capzacin cream, and encourage him to use this as prescribed daily for the next two weeks. He agrees. Ask him to show me his PT exercises and we go thur each exercise and he tells me which ones cause him the most pain. Instruct on deconditioning while immobilized and how best to work thru this pain as he rebuilds his UE muscles. He will perform his PT exercises daily and he will then apply ice to UE TID for next two weeks after he completes exercises. Inmate verbalizes his apologies for the MRF he has recently sent which he feels was offensive. I request that he return to see me in 2 weeks. Inmate agrees. Call to attorney, Tiffany Harris 503.758.5027 to advise of POC today after her phone call and concerns were relayed to M.Seale MD last night.

Chief Complaint
Patient presents with
• Arm Pain

Patient Active Problem List

| Diagnosis | Date Noted |
|---|---|
| • ▓▓▓▓▓▓▓ | 06/12/2017 |
| • ▓▓▓▓▓▓▓▓▓▓ | 05/30/2017 |
|    Minocycline and benzoyl peroxide | |
| • Mixed▓▓▓▓▓▓▓▓ | 04/27/2017 |

   4/27/17 - Framingham 10 yr CV risk is 5.13%. No lipid lowering medication recommended.
   Lab Results

## EXHIBIT 14

 **Multnomah County**
Health Department

MC MEDICAL RECORDS
426 SW Stark, 7th Floor
PORTLAND OR 97204

Sullivan, Cyrus Andrew
MRN: 4311164

---

Progress Notes by Gwendolyn Lucas, NP at 8/11/2017 1:13 PM (continued)

| Component | Value | Date |
|---|---|---|
| TRIGLYC | 332* | 03/29/2017 |
| CHOL | 242* | 03/29/2017 |
| HDL | 31* | 03/29/2017 |
| LDL | 145* | 03/29/2017 |
| CHOLHDL | 7.8* | 03/29/2017 |
| NONHDL | 211* | 03/29/2017 |

- ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ 03/22/2017
  2013: per pt hx and hard chart. Presentation at MCDC in 2013 is not consistent with this dx. -Todd Karakashian PMHNP
- ▓▓▓▓▓▓▓▓▓▓ 03/22/2017
  Mild, in sustained remission, in controlled environment
  03/22/17: ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
- ▓▓▓▓▓▓▓▓▓ 05/13/2014
- ▓▓▓▓▓▓▓▓▓ 03/05/2013
  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
- Mild ▓▓▓▓▓▓▓▓▓ 03/05/2013
  ▓▓▓▓▓▓▓▓▓▓▓▓. In remission.
- Environmental allergies 03/05/2013
  ▓▓▓▓▓▓▓▓▓▓
- H/O tobacco use, presenting hazards to health   03/05/2013
  Hookah tobacco-2 x week x 2 years. Quit 2008.
  Never regular tobacco user outside of hookah, a couple of cigs in prison.
- ▓▓▓▓▓▓▓▓▓▓▓▓ 02/13/2013
- ▓▓▓▓▓▓▓ 01/15/2013
  ▓▓▓▓ and info from provider he was seeing prior to incarceration.
- ▓▓▓▓▓▓▓▓▓ 10/16/2012

Length of stay "maybe another month or so."

Medications are reviewed and updated with patient.

| Medication ⌄ | Directions | Prescriber | Start | End | Status | CP |
|---|---|---|---|---|---|---|
| ▓▓▓▓▓▓▓ 75MG TABLET (WELLBUTRIN) | TAKE 2 TABLET(S) ORALLY ONCE DAILY | HOOD, ANNIE B | 06/22/2017 | 08/20/2017 | Active (Refillable) 78350180 | 100% |
| CAPZASIN-HP | APPLY | PLATAS, | 07/17/2017 | 08/30/2017 | Active | NA |

EXHIBIT 14

 **Multnomah County**
Health Department

MC MEDICAL RECORDS
426 SW Stark, 7th Floor
PORTLAND OR 97204

Sullivan, Cyrus Andrew
MRN: 4311164

Progress Notes by Gwendolyn Lucas, NP at 8/11/2017  1:13 PM (continued)

| Medication | Directions | Prescriber | Start | End | Status | CP |
|---|---|---|---|---|---|---|
| 0.1% CREAM (CAPSAICIN) | CREAM TOPICALLY ONCE DAILY | ANGELINA | 17 | 017 | (Refillable) 78872531 | |
| HYDROCOD/APAP 5/325MG TAB (NORCO) | SEE EXPANDED | PLATAS, ANGELINA | 08/04/2017 | 08/12/2017 | NON-PHARMACY 21562005 | 100% |
| MINOCYCLINE 100MG TAB (MINOCIN) | TAKE 1 TABLET(S) ORALLY TWICE DAILY | PLATAS, ANGELINA | 05/30/2017 | 08/27/2017 | Active (Refillable) 77830685 | 99.3% |
| | TAKE 1 TABLET(S) ORALLY AT BEDTIME | HOOD, ANNIE B | 06/22/2017 | 08/20/2017 | Active (Refillable) 78350182 | 98% |
| | TAKE 1 1/2 TABLET(S) ORALLY ONCE DAILY | HOOD, ANNIE B | 06/22/2017 | 08/20/2017 | Active (Refillable) 78350184 | 100% |
| | INHALE 2 SPRAY(S) ORALLY FOUR TIMES DAILY | PLATAS, ANGELINA | 08/03/2017 | 10/31/2017 | Active (Refillable) 79267415 | NA |

OBJECTIVE:
BP 126/90 | Pulse 60 | Temp(Src) 98.2 °F (36.8 °C) (Oral) | Resp 15 | Ht 5' 11" (1.803 m) | Weight 230 lbs | SpO2 100

General NAD, alert, oriented
HEENT: TMs B benign with normal light reflex and bony structure. Nasopharynx clear, posterior oropharynx clear. Neck with good ROM, no LND
CV RRR, no murmurs, rubs or gallops
Lungs CTA B with good air movement, no wheeze or rale
MS LUE immobilized.  Minimal ROM s/t chained. Pain with ROM in L elbow and L shoulder.
Skin no major rashes

ASSESSMENT/PLAN:

M79.602 Pain of left upper extremity  (primary encounter diagnosis)
- reassure patient
- give ice packs TID
-naproxen 500 mg PO BID pain
- capzasin TID to elbow and bicep before preforming PT exercises

## EXHIBIT 14



**Multnomah County**
Health Department

MC MEDICAL RECORDS
426 SW Stark, 7th Floor
PORTLAND OR 97204

Sullivan, Cyrus Andrew
MRN: 4311164

---

**Progress Notes by Gwendolyn Lucas, NP at 8/11/2017  1:13 PM (continued)**

---

T14.8 Nerve injury
- increasing gabapentin from 600 mg TID to 1200 mg TID


OA Orders:
Meds - changes in Sapphire as follows - d/c ibuprofen and tylenol and add in Naproxen 500 mg BID, d/c gabapentin 600 mg TID and replace with gabapentin 1200 mg TID
RN - ice packs TID, please encourage use of capzacin cream TID before PT exercises and ice after
F/u with me in clinic in 2 weeks


## Notes
### Patient Demographics

| Patient Name | MRN | Sex | DOB |
|---|---|---|---|
| Sullivan, Cyrus Andrew | 4311164 | Male | 6/26/1983 |

### Encounter Information

| | Provider | Department | Encounter # | Center |
|---|---|---|---|---|
| 8/21/2017 12:40 PM | Carol Scalpone, RN | Mc Detention Ctr Ch | 299643633 | MC CORRECTIO |

---

**Progress Notes by Carol Scalpone, RN at 8/21/2017 12:41 PM**

---

| Author:  Carol Scalpone, RN | Service:  (none) | Author Type:  Community Health Nurse |
|---|---|---|
| Filed:  8/21/2017  4:28 PM | Encounter Date:  8/21/2017 | Status:  Signed |
| Editor:  Carol Scalpone, RN (Community Health Nurse) | | |

Cyrus Andrew Sullivan is a 34 year old client seen in cell at MC Detention Center for medication follow up.

**Reason for Visit:**

Health Assessment (PsyRN f/u)

**Chart Review:**
Per CIMS, client placed back in segregtation 8/12/17 for spitting on deputy
Per KEMHC 03/02/17 client's PO informed her that client "obsesses about staff and will post information about them online...client has also been assaultive with corrections staff and others...use caution around him."

- This is the client's ███ time in custody, current incarceration intake was 2/24/17 and projected release date is unknown

- Client has a **past diagnosis of** ██████████████████████████████
**disorder** – pe████████6/22/17

- Client's **last MH visit was 6/22/17 with**██████ and formulation and plan as follows:

---
*Assessment:*
1. ████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████



**Multnomah County**
Health Department

MC MEDICAL RECORDS
426 SW Stark, 7th Floor
PORTLAND OR 97204

Sullivan, Cyrus Andrew
MRN: 4311164

---

Progress Notes by Carol Scalpone, RN at 8/21/2017 12:41 PM (continued)

*risk of CVD is low, and is being followed by APMD.*

2. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ *threats and aggression* ▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓ *Has now been two months since any disciplinary write up. Anger and irritability are improved with first line* ▓▓▓▓▓▓

3. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓ *able to read and enjoy books.*

4. ▓▓▓▓▓▓▓▓▓▓▓

*by history. Certainly presents as egocentric, grandiose, professorial. Could also be the etiology of a number of symptoms resulting in functional impairment, including a lack of emotional reciprocity. Would need more complete history and assessment to confirm this report.*

*Plan:*
1. *Patient verbalized agreement and understanding.*
2. *Continue all medications as prescribed x 60 days*
3. *Agrees to notify corrections health for release medications and follow up with his community provider, if released.*
4. *Follow up with* ▓▓▓▓▓ *in 6 weeks or sooner PRN.*

----------

- **Current medications** include:


▓▓▓▓▓▓▓▓▓▓▓ -- 88%
▓▓▓▓▓▓▓▓▓▓ - 100%
▓▓▓▓▓▓▓▓▓ -- 88%
Gabapentin 1200mg TID -- 93% -- prescribed by GLMD for nerve pain


**Subjective:**
Short interview through food port in 4F, as corrections staffing prevented client from being brought to clinic: Client reports "My mood is OK...sure I have a lot of anxiety, due to circumstances." Reports main concern is that is has been waking up 3-4am since Norco ended, has trouble returning to sleep. Naps throughout day, does feel mostly rested but would prefer not to awaken during night. Asks fo▓▓▓▓▓ not to be crushed "it goes into my system all at once, knocks me out but then wears off". When told non-crushed▓▓▓▓▓not possible in this facilty, client requests an increase in dose. Normal appetite. Reading and sleeping to cope. Denies ▓▓▓▓▓▓▓▓▓▓ concerns.

**Objective:**
There were no vitals filed for this visit.
Client standing at cell window, calm with flat affect with some hostility. Reports nocturnal awakening since Norco ended as only MH concern. Appears stable on ▓▓▓▓▓▓▓

**Labs:**
Client's most recent labs:

| Component | Latest Ref Rng & Units | 6/8/2017 |
| --- | --- | --- |
| CHOLESTEROL TOTAL | 125 - 200 mg/dL | 161 |
| HDL | > OR = 40 mg/dL | 28 (L) |
| TRIGLYCERIDES | <150 mg/dL | 388 (H) |


## Multnomah County
### Health Department

MC MEDICAL RECORDS
426 SW Stark, 7th Floor
PORTLAND OR 97204

Sullivan, Cyrus Andrew
MRN: 4311164

---

Encounter-Level Encounter/Order Scanned Documents: (continued)

There are no encounter-level encounter/order scanned documents.

Order-Level Encounter/Order Scanned Documents - 06/29/2017:

Scan on 6/29/2017 12:00 AM : MRF (below)

## Multnomah County
Health Department
CORRECTIONS HEALTH

Date/Time
Received In Medical

### MEDICAL REQUEST FORM (MRF)
### FORMA PARA PEDIR SERVICIO MEDICO (MRF)

ID # 677564      MRN # 4311164      Dorm # 4F/3
(Numero de Identificación)                    (Ubicación)

Name Sullivan           Cyrus           A
     Last (Apellido)    First (Nombre)   M.I. (Inicial)

Date of Birth 6/26/83      Today's Date 6/29/17
(Fecha de Nacimiento)       (Fecha de hoy)

Do you have any allergies to medications? If yes, list ▓▓▓▓▓
(¿Tiene algunas alergias a medicamentos? Por favor diga a cuales medicamentos)

Tell us about your health problem: Was prescribed a pain killer every
(Describa su problema de salud)
6 hrs, by OHSU ER last night for broken arm,
Please activate it ASAP, I also need a high
bed, plus some more nerve pain meds wouldn't
hurt, OHSU also wants an appointment in less than a week,
my fingers have started twitching,
How long have you had this problem? 1 day
(¿Por cuanto tiempo ha tenido este problema?)

Do you have health insurance?   ☐ No  ☒ Yes   Insurance # ▓▓▓▓
(¿Tiene seguro médico?)              (Si)   (Número de seguro médico)

This is my permission to get psychiatric, medical or dental exams and treatment from jail staff.
(Este documento representa mi permiso para recibir exámenes médicos, tratamiento psiquiátrico o dental por parte del
personal de salud de la cárcel.)

I understand that the jail may charge me for some of these services and deduct it from my account, during the
current or future stays in jail. The fees are posted. I will get health care even if I am unable to pay.
Yo entiendo que la cárcel puede cobrarme por algunos de estos servicios médicos y deducirlos de mi cuenta, durante la
presente o futuras estadías en la cárcel. El impuesto esta señalado en un papel. Yo puedo recibir cuidado médico
incluso si no pudiera pagar.

Signature ▓▓▓▓▓
(Nombre)

---
**If you have an emergency, tell the jail staff right away!**
**¡Si usted tiene una emergencia medica avise a los oficiales pronto!**
---

CDR-232  Rev. 07/22/13                                              1353

Patient Demographics

| Patient Name | MRN | Sex | DOB |
|---|---|---|---|



## Multnomah County
### Health Department

MC MEDICAL RECORDS
426 SW Stark, 7th Floor
PORTLAND OR 97204

Sullivan, Cyrus Andrew
MRN: 4311164

Patient Demographics (continued)

| | | | |
|---|---|---|---|
| Sullivan, Cyrus Andrew | 4311164 | Male | 6/26/1983 |

## Scanned Documents

### Encounter-Level Encounter/Order Scanned Documents:

There are no encounter-level encounter/order scanned documents.

### Order-Level Encounter/Order Scanned Documents - 07/02/2017:

Scan on 7/2/2017 12:00 AM : MRF (below)

## Multnomah County
### Health Department
### CORRECTIONS HEALTH

Date/Time
Received in Medical

### MEDICAL REQUEST FORM (MRF)
### FORMA PARA PEDIR SERVICIO MEDICO (MRF)

ID # 677564     MRN # 4311164     Dorm # 4F13
(Numero de Identificación)     (Ubicación)

Name Sullivan     Cyrus     A
Last (Apellido)     First (Nombre)     M.I. (Inicial)

Date of Birth 6/26/83     Today's Date 7/2/17
(Fecha de Nacimiento)     (Fecha de hoy)

Do you have any allergies to medications? If yes, list _____
(¿Tiene algunas alergias a medicamentos? Por favor diga a cuales medicamentos)

Tell us about your health problem: Had ER visit on 6/28 for
(Describa su problema de salud) broken arm. Told to schedule follow-up with
i week, that should be no later than
7/5. Has an appointment been scheduled
with OHSU?

How long have you had this problem? 4 days
(¿Por cuanto tiempo ha tenido este problema?)

Do you have health insurance?   ☐ No   ☑ Yes   Insurance # _____
(¿Tiene seguro médico?)     (Sí)   (Número de seguro médico)

This is my permission to get psychiatric, medical or dental exams and treatment from jail staff.
(Este documento representa mi permiso para recibir exámenes médicos, tratamiento psiquiátrico o dental por parte del personal de salud de la cárcel.)

I understand that the jail may charge me for some of these services and deduct it from my account, during the current or future stays in jail. The fees are posted. I will get health care even if I am unable to pay.
Yo entiendo que la cárcel puede cobrarme por algunos de estos servicios médicos y deducirlos de mi cuenta, durante la presente o futuras estadías en la cárcel. El impuesto esta señalado en un papel. Yo puedo recibir cuidado medico incluso si no pudiera pagar.

Signature _____
(Nombre)

**If you have an emergency, tell the jail staff right away!**
**¡Si usted tiene una emergencia medica avise a los oficiales pronto!**

COR-252  Rev. 07/22/13     1253



**Multnomah County**
Health Department

MC MEDICAL RECORDS
426 SW Stark, 7th Floor
PORTLAND OR 97204

Sullivan, Cyrus Andrew
MRN: 4311164

Order-Level Encounter/Order Scanned Documents - 07/02/2017: (continued)

**Multnomah County**
Health Department
CORRECTIONS HEALTH

Date/Time
Received In Medical

**MEDICAL REQUEST FORM (MRF)**
**FORMA PARA PEDIR SERVICIO MEDICO (MRF)**

ID # 67784   MRN # 4311164   Dorm # 4R/5
(Numero de Identificación)                    (Ubicación)

Name  Sullivan       Cyrus        A
       Last (Apellido)   First (Nombre)   M.I. (Inicial)

Date of Birth 6/26/83   Today's Date 7/2/17
(Fecha de Nacimiento)   (Fecha de hoy)

Do you have any allergies to medications? If yes, list ▓▓▓▓▓
(¿Tiene algunas alergias a medicamentos? Por favor diga a cuales medicamentos)

Tell us about your health problem:
(Describa su problema de salud)  Ice Please, I Stopped
getting ice for my broken arm today,
but it is still Very swollen, aches
constantly, and when I move, Please
give me ice 3 times a day. Thx.

How long have you had this problem? 1 day
(¿Por cuanto tiempo ha tenido este problema?)

Do you have health insurance?   ☐ No   ☑ Yes  Insurance # ▓▓▓▓
(¿Tiene seguro médico?)              (Si)   (Número de seguro médico)

This is my permission to get psychiatric, medical or dental exams and treatment from jail staff.
(Este documento representa mi permiso para recibir exámenes médicos, tratamiento psiquiátrico o dental por parte del personal de salud de la cárcel.)

I understand that the jail may charge me for some of these services and deduct it from my account, during the current or future stays in jail. The fees are posted. I will get health care even if I am unable to pay.
Yo entiendo que la cárcel puede cobrarme por algunos de estos servicios médicos y deducirlos de mi cuenta, durante la presente o futuras estadías en la cárcel. El impuesto está señalado en un papel. Yo puedo recibir cuidado médico incluso si no pudiera pagar.

Signature ▓▓▓▓▓▓
(Nombre)

**If you have an emergency, tell the jail staff right away!**
**¡Si usted tiene una emergencia medica avise a los oficiales pronto!**

COR-202  Rev. 07/22/13                                                        1350

**Patient Demographics**

| Patient Name | MRN | Sex | DOB |
|---|---|---|---|
| Sullivan, Cyrus Andrew | 4311164 | Male | 6/26/1983 |

**Scanned Documents**

Encounter-Level Encounter/Order Scanned Documents:

EXHIBIT 14

 **Multnomah County**

Health Department

MC MEDICAL RECORDS
426 SW Stark, 7th Floor
PORTLAND OR 97204

Sullivan, Cyrus Andrew
MRN: 4311164

---

## Patient Demographics (continued)

| Sullivan, Cyrus Andrew | 4311164 | Male | 6/26/1983 |

## Scanned Documents

### Encounter-Level Encounter/Order Scanned Documents:

There are no encounter-level encounter/order scanned documents.

### Order-Level Encounter/Order Scanned Documents - 07/06/2017:

Scan on 7/6/2017 12:00 AM : MRF (below)

---

**Multnomah County**
Health Department
CORRECTIONS HEALTH

Date/Time
Received in Medical

### MEDICAL REQUEST FORM (MRF)
### FORMA PARA PEDIR SERVICIO MEDICO (MRF)

ID # 677564    MRN # _____    Dorm # _____
(Numero de identificación)    (Ubicación)

Name  Sullivan    Cyrus    A.
Last (Apellido)    First (Nombre)    M.I. (Inicial)

Date of Birth 6/26/83    Today's Date 7/6/17
(Fecha de Nacimiento)    (Fecha de hoy)

Do you have any allergies to medications? If yes, list _____
(¿Tiene algunas alergias a medicamentos? Por favor diga a cuales medicamentos)

Tell us about your health problem:
(Describa su problema de salud) My arm is not healing right, broken arm a week ago and swelling has not gone down. I still feel the bone moving sometimes, OHSU wanted to see me again after 1 week. Please get me in there.

How long have you had this problem? 1 week
(¿Por cuanto tiempo ha tenido este problema?)

Do you have health insurance?  ☐ No  ☑ Yes  Insurance # _____
(¿Tiene seguro médico?)    (Si)  (Número de seguro médico)

This is my permission to get psychiatric, medical or dental exams and treatment from jail staff.
(Este documento representa mi permiso para recibir exámenes médicos, tratamiento psiquiátrico o dental por parte del personal de salud de la cárcel.)

I understand that the jail may charge me for some of these services and deduct it from my account, during the current or future stays in jail. The fees are posted. I will get health care even if I am unable to pay.
Yo entiendo que la cárcel puede cobrarme por algunos de estos servicios médicos y deducirlos de mi cuenta, durante la presente o futuras estadías en la cárcel. El impuesto esta senalado en un papel. Yo puedo recibir cuidado medico incluso si no pudiera pagar.

Signature _____
(Nombre)

| **If you have an emergency, tell the jail staff right away!** |
| **¡Si usted tiene una emergencia medica avise a los oficiales pronto!** |

COR-302  Rev. 07/23/12

EXHIBIT 14



**Multnomah County**
Health Department

MC MEDICAL RECORDS
426 SW Stark, 7th Floor
PORTLAND OR 97204

Sullivan, Cyrus Andrew
MRN: 4311164

---

Order-Level Encounter/Order Scanned Documents - 07/06/2017: (continued)

---

**Multnomah County**
Health Department
CORRECTIONS HEALTH

```
                                         Date/Time
                                         Received In Medical
```

MEDICAL REQUEST FORM (MRF)
FORMA PARA PEDIR SERVICIO MEDICO (MRF)
JUL 6 2017 10:25

ID # 677564    MRN # 4311164    Dorm # 4 F 3
(Numero de Identificación)                (Ubicación)

Name Sullivan    Cyrus    A
      Last (Apellido)    First (Nombre)    M.I. (Inicial)

Date of Birth 6/26/83    Today's Date 7/6/17
(Fecha de Nacimiento)    (Fecha de hoy)

Do you have any allergies to medications? If yes, list _____
(¿Tiene algunas alergias a medicamentos? Por favor diga a cuales medicamentos)

Tell us about your health problem:
(Describe su problema de salud) I think my pain meds expire
on 7/9, but I have not had my OHSU
follow up. Please make sure that my meds are
renewed at least until I see OHSU again. My
broken arm is not healing right and I am in a
lot of pain.

How long have you had this problem? 1 week
(¿Por cuanto tiempo ha tenido este problema?)

Do you have health insurance?    ☐ No    ☑ Yes    Insurance # _____
(¿Tiene seguro médico?)    (Si)    (Número de seguro médico)

This is my permission to get psychiatric, medical or dental exams and treatment from jail staff.
(Este documento representa mi permiso para recibir exámenes médicos, tratamiento psiquiátrico o dental por parte del personal de salud de la cárcel.)

I understand that the jail may charge me for some of these services and deduct it from my account, during the current or future stays in jail. The fees are posted. I will get health care even if I am unable to pay.
Yo entiendo que la cárcel puede cobrarme por algunos de estos servicios médicos y deducirlos de mi cuenta, durante la presente o futuras estadías en la cárcel. El impuesto esta señalado en un papel. Yo puedo recibir cuidado medico incluso si no pudiera pagar.

Signature _____
(Nombre)

---
**If you have an emergency, tell the jail staff right away!**
**¡Si usted tiene una emergencia medica avise a los oficiales pronto!**
---

COR-202  Rev. 07/22/12                                    1350

---

**Patient Demographics**

| Patient Name | MRN | Sex | DOB |
|---|---|---|---|
| Sullivan, Cyrus Andrew | 4311164 | Male | 6/26/1983 |

**Scanned Documents**

Encounter-Level Encounter/Order Scanned Documents:

---

 **Multnomah County**
Health Department

MC MEDICAL RECORDS
426 SW Stark, 7th Floor
PORTLAND OR 97204

Sullivan, Cyrus Andrew
MRN: 4311164

---

Encounter-Level Encounter/Order Scanned Documents: (continued)

    There are no encounter-level encounter/order scanned documents.

---

Order-Level Encounter/Order Scanned Documents - 07/06/2017:

    Scan on 7/6/2017 12:00 AM : MRF (below)

---

**Multnomah County**
Health Department
CORRECTIONS HEALTH

| | |
|---|---|
| | Date/Time Received in Medical |

### MEDICAL REQUEST FORM (MRF)
### FORMA PARA PEDIR SERVICIO MEDICO (MRF)

ID # 677564    MRN # 4311164    Dorm # 4F13
(Numero de Identificación)                 (Ubicación)

Name Sullivan     Cyrus     A.
     Last (Apellido)        First (Nombre)        M.I. (Inicial)

Date of Birth 6/26/83     Today's Date 7/6/17
(Fecha de Nacimiento)        (Fecha de hoy)

Do you have any allergies to medications? If yes, list ▓▓▓▓
(¿Tiene algunas alergias a medicamentos? Por favor diga a cuales medicamentos)

Tell us about your health problem: Fell and hit broken arm on
(Describa su problema de salud) toilet. Now hurts worse than it did 4
week ago and is more swolen then ever,
felt bone move. Need new x-rays and
my OHSU follow up needs to happen now.

How long have you had this problem? in week?
(¿Por cuanto tiempo ha tenido este problema?)

Do you have health insurance? ☐ No ☑ Yes   Insurance # ▓▓▓▓
(¿Tiene seguro médico?)        (Si)   (Número de seguro médico)

This is my permission to get psychiatric, medical or dental exams and treatment from jail staff.
(Este documento representa mi permiso para recibir exámenes médicos, tratamiento psiquiátrico o dental por parte del personal de salud de la cárcel.)

I understand that the jail may charge me for some of these services and deduct it from my account, during the current or future stays in jail. The fees are posted. I will get health care even if I am unable to pay.
Yo entiendo que la cárcel puede cobrarme por algunos de estos servicios médicos y deducirlos de mi cuenta, durante la presente o futuras estadías en la cárcel. Si impuesto esta senalado en un papel. Yo puedo recibir cuidado medico incluso si no pudiera pagar.

Signature ▓▓▓▓
(Nombre)

---

**If you have an emergency, tell the jail staff right away!**
**¡Si usted tiene una emergencia medica avise a los oficiales pronto!**

---

COR-202  Rev. 07/22/13                    1253

---

Patient Demographics

| Patient Name | MRN | Sex | DOB |
|---|---|---|---|



**Multnomah County**
**Health Department**

MC MEDICAL RECORDS
426 SW Stark, 7th Floor
PORTLAND OR 97204

Sullivan, Cyrus Andrew
MRN: 4311164

---

Patient Demographics (continued)
___

| Sullivan, Cyrus Andrew | 4311164 | Male | 6/26/1983 |

## Scanned Documents

Encounter-Level Encounter/Order Scanned Documents:

There are no encounter-level encounter/order scanned documents.

Order-Level Encounter/Order Scanned Documents - 07/09/2017:

Scan on 7/9/2017 12:00 AM : MRF (below)

---

**Multnomah County**
Health Department
CORRECTIONS HEALTH

| | Date/Time Received in Medical |

MEDICAL REQUEST FORM (MRF)
FORMA PARA PEDIR SERVICIO MEDICO (MRF)    JUL 9 PM 2:03

ID # G 775 64    MRN # 4311164    Dorm # 4 / 1 S
(Numero de Identificación)                (Ubicación)

Name  Sullivan        Cyrus          A.
      Last (Apellido)   First (Nombre)   M.I. (Inicial)

Date of Birth  6/26/83  Today's Date  7/9/17
(Fecha de Nacimiento)   (Fecha de hoy)

Do you have any allergies to medications? If yes, list ____
(¿Tiene algunas alergias a medicamentos? Por favor diga a cuales medicamentos)

Tell us about your health problem:  Nurse on Friday said she
(Describa su problema de salud)
would talk to Doctor about renewing my pain
meds, I still have not gone to OHSU for my
follow up, arm worse than last week, fell Thursday,
not healing right, Please renew until my follow up.
script expires today
How long have you had this problem?  @ 2 weeks
(¿Por cuanto tiempo ha tenido este problema?)

Do you have health insurance?  ☐ No  ☒ Yes  Insurance # ____
(¿Tiene seguro médico?)         (Si)   (Número de seguro médico)

This is my permission to get psychiatric, medical or dental exams and treatment from jail staff.
(Este documento representa mi permiso para recibir exámenes médicos, tratamiento psiquiátrico o dental por parte del personal de salud de la cárcel.)

I understand that the jail may charge me for some of these services and deduct it from my account, during the current or future stays in jail. The fees are posted. I will get health care even if I am unable to pay.
Yo entiendo que la cárcel puede cobrarme por algunos de estos servicios médicos y deducirlos de mi cuenta, durante la presente o futuras estadías en la cárcel. El impuesto esta senalado en un papel. Yo puedo recibir cuidado medico incluso si no pudiera pagar.

Signature ____
(Nombre)

**It you have an emergency, tell the jail staff right away!**
¡Si usted tiene una emergencia medica avise a los oficiales pronto!

## EXHIBIT 14



**Multnomah County**
Health Department

MC MEDICAL RECORDS
426 SW Stark, 7th Floor
PORTLAND OR 97204

Sullivan, Cyrus Andrew
MRN: 4311164

---

Order-Level Encounter/Order Scanned Documents - 07/11/2017: (continued)

---

**Multnomah County**
Health Department
CORRECTIONS HEALTH

Date/Time
Received in Medical

**MEDICAL REQUEST FORM (MRF)**     JUL 12 PM6:12
**FORMA PARA PEDIR SERVICIO MEDICO (MRF)**

ID # 677564     MRN # 4311164     Dorm # 4F13
(Numero de Identificación)                (Ubicación)

Name Sullivan          Cyrus          A
     Last (Apellido)        First (Nombre)      M.I. (Inicial)

Date of Birth 6/26/83     Today's Date 7/11/17
(Fecha de Nacimiento)     (Fecha de hoy)

Do you have any allergies to medications? If yes, list ▓▓▓▓
(¿Tiene algunas alergias a medicamentos? Por favor diga a cuales medicamentos)

Tell us about your health problem: Since my OHSU appointment
(Describe su problema de salud) did not happen today, please make sure
that my pain meds are /rhebed until I am
taken TO OHSU as the court ordered,
using in hose doctors is no substitute,

How long have you had this problem? 2 weeks
(¿Por cuanto tiempo ha tenido este problema?)

Do you have health insurance?   ☐ No   ☑ Yes   insurance # ▓▓▓▓
(¿Tiene seguro médico?)          (Si)   (Número de seguro médico)

This is my permission to get psychiatric, medical or dental exams and treatment from jail staff.
(Este documento representa mi permiso para recibir exámenes médicos, tratamiento psiquiátrico o dental por parte del personal de salud de la cárcel.)

I understand that the jail may charge me for some of these services and deduct it from my account, during the current or future stays in jail. The fees are posted. I will get health care even if I am unable to pay.
Yo entiendo que la cárcel puede cobrarme por algunos de estos servicios médicos y deducirlos de mi cuenta, durante la presente o futuras estadías en la cárcel. El impuesto esta señalado en un papel. Yo puedo recibir cuidado medico incluso si no pudiera pagar.

Signature ▓▓▓▓
(Nombre)

---

**If you have an emergency, tell the jail staff right away!**
**¡Si usted tiene una emergencia medica avise a los oficiales pronto!**

---

COR-202 Rev. 07/22/13                                                        1350

---

## Patient Demographics

| Patient Name | MRN | Sex | DOB |
|---|---|---|---|
| Sullivan, Cyrus Andrew | 4311164 | Male | 6/26/1983 |

## Scanned Documents

Encounter-Level Encounter/Order Scanned Documents:

---



## Multnomah County
### Health Department

MC MEDICAL RECORDS
426 SW Stark, 7th Floor
PORTLAND OR 97204

Sullivan, Cyrus Andrew
MRN: 4311164

---

Encounter-Level Encounter/Order Scanned Documents: (continued)

There are no encounter-level encounter/order scanned documents.

---

Order-Level Encounter/Order Scanned Documents - 07/11/2017:

Scan on 7/11/2017 12:00 AM : MRF (below)

---

**Multnomah County**
Health Department
CORRECTIONS HEALTH

Date/Time
Received in Medical
JUL 12 PM 10:15

### MEDICAL REQUEST FORM (MRF)
### FORMA PARA PEDIR SERVICIO MEDICO (MRF)

ID # 677564      MRN # 4311164      Dorm # 4F13
*(Numero de Identificación)*                    *(Ubicación)*

Name  Sullivan        Cyrus        A.
     Last *(Apellido)*      First *(Nombre)*      M.i. *(Inicial)*

Date of Birth 6/26/83    Today's Date 7/11/17
*(Fecha de Nacimiento)*    *(Fecha de hoy)*

Do you have any allergies to medications? If yes, list ▮▮▮▮▮▮
*(¿Tiene algunas alergias a medicamentos? Por favor diga a cuales medicamentos)*

Tell us about your health problem:
*(Describa su problema de salud)*  Now that your own Ortho-
doctor recomends that I go back to
OHSU can I please go to the appointment
that should have happened last week?
Also. She said she renewed my meds for a
couple weeks, please make sure that works out.
How long have you had this problem? 2 weeks
*(¿Por cuanto tiempo ha tenido este problema?)*

Do you have health insurance?    ☐ No    ☑ Yes    insurance # ▮▮▮▮▮
*(¿Tiene seguro médico?)*              *(Si)*    *(Número de seguro médico)*

This is my permission to get psychiatric, medical or dental exams and treatment from jail staff.
*(Este documento representa mi permiso para recibir exámenes médicos, tratamiento psiquiátrico o dental por parte del personal de salud de la cárcel.)*

I understand that the jail may charge me for some of these services and deduct it from my account, during the current or future stays in jail. The fees are posted. I will get health care even if I am unable to pay.
*Yo entiendo que la cárcel puede cobrarme por algunos de estos servicios médicos y deducirlos de mi cuenta, durante la presente o futuras estadías en la cárcel. El impuesto esta senalado en un papel. Yo puedo recibir cuidado medico incluso si no pudiera pagar.*

Signature ▮▮▮▮▮▮▮▮
*(Nombre)*

| If you have an emergency, tell the jail staff right away! |
| ¡Si usted tiene una emergencia medica avise a los oficiales pronto! |

CDR-207  Rev. 07/22/13                                         1253

---

### Patient Demographics

| Patient Name | MRN | Sex | DOB |
|---|---|---|---|

EXHIBIT 14



MC MEDICAL RECORDS
426 SW Stark, 7th Floor
PORTLAND OR 97204

Sullivan, Cyrus Andrew
MRN: 4311164

## Multnomah County Health Department

### Patient Demographics (continued)

| Sullivan, Cyrus Andrew | 4311164 | Male | 6/26/1983 |

### Scanned Documents

#### Encounter-Level Encounter/Order Scanned Documents:

There are no encounter-level encounter/order scanned documents.

#### Order-Level Encounter/Order Scanned Documents - 07/12/2017:

Scan on 7/12/2017 12:00 AM : MRF (below)

---

**Multnomah County**
Health Department
CORRECTIONS HEALTH

Date/Time
Received In Medical

#### MEDICAL REQUEST FORM (MRF)
#### FORMA PARA PEDIR SERVICIO MEDICO (MRF)

ID # 677564   (Numero de Identificacion)
MRN # 4311164
Dorm # 4F13   (Ubicacion)

Name Sullivan   (Last (Apellido))   Cyrus   (First (Nombre))   A.   (M.i. (Inicial))

Date of Birth 6/26/83   (Fecha de Nacimiento)   Today's Date 7/12/17   (Fecha de hoy)

Do you have any allergies to medications? If yes, list ▓▓▓▓
(¿Tiene algunas alergias a medicamentos? Por favor diga a cuales medicamentos)

Tell us about your health problem:
(Describa su problema de salud) OHSU was very clear on 6/28 that I needed to be brought back in one week to see the bone surgeon, and Judge Hernandez was very clear on 7/7 and 7/11 that JSM was to make that disposition to do something with my hand x-rays and doctors

How long have you had this problem? 2 years
(¿Por cuanto tiempo ha tenido este problema?)

Do you have health insurance?  ☐ No  ☑ Yes   Insurance # ▓▓▓
(¿Tiene seguro médico?)  (Si)  (Número de seguro médico)

This is my permission to get psychiatric, medical or dental exams and treatment from jail staff.
(Este documento representa mi permiso para recibir exámenes médicos, tratamiento psiquiátrico o dental por parte del personal de salud de la cárcel.)

I understand that the jail may charge me for some of these services and deduct it from my account, during the current or future stays in jail. The fees are posted. I will get health care even if I am unable to pay.
Yo entiendo que la cárcel puede cobrarme por algunos de estos servicios médicos y deducirlos de mi cuenta, durante la presente o futuras estadias en la cárcel. El impuesto esta señalado en un papel. Yo puedo recibir cuidado medico incluso si no pudiera pagar.

Signature ▓▓▓▓▓
(Nombre)

UNACCEPTABLE

| If you have an emergency, tell the jail staff right away! |
| ¡Si usted tiene una emergencia medica avise a los oficiales pronto! |

COR-202 Rev 07/22/13

1355



**Multnomah County**
**Health Department**

MC MEDICAL RECORDS
426 SW Stark, 7th Floor
PORTLAND OR 97204

Sullivan, Cyrus Andrew
MRN: 4311164

Order-Level Encounter/Order Scanned Documents - 07/22/2017: (continued)

---

**Multnomah County**
Health Department
CORRECTIONS HEALTH

Date/Time
Received in Medical

## MEDICAL REQUEST FORM (MRF)
### FORMA PARA PEDIR SERVICIO MEDICO (MRF)

ID # 677564 (Numero de Identificación)    MRN # 4311164    Dorm # 4F13 (Ubicación)

Name Sullivan (Last (Apellido))    Cyrus (First (Nombre))    A. (M.I. (Inicial))

Date of Birth 6/26/83 (Fecha de Nacimiento)    Today's Date 7/22/17 (Fecha de hoy)

Do you have any allergies to medications? If yes, list ▓▓▓▓▓
(¿Tiene algunas alergias a medicamentos? Por favor diga a cuales medicamentos)

Tell us about your health problem: Why was I not taken to my
(Describa su problema de salud) OHSU medical appointment last week? Dr. Seu
promised my lawyer, Tiffany Harris, that I would
have own ortho person reschedule it. OHSU said to
come back after 1 week 4 weeks ago, and Judge Herrndez
ordered USM to take me there.

How long have you had this problem? 4 weeks
(¿Por cuanto tiempo ha tenido este problema?)

Do you have health insurance?  ☐ No  ☑ Yes  Insurance # ▓▓▓▓
(¿Tiene seguro médico?)         (Sí)  (Número de seguro médico)

This is my permission to get psychiatric, medical or dental exams and treatment from jail staff.
(Este documento representa mi permiso para recibir exámenes médicos, tratamiento psiquiátrico o dental por parte del personal de salud de la cárcel.)

I understand that the jail may charge me for some of these services and deduct it from my account, during the current or future stays in jail. The fees are posted. I will get health care even if I am unable to pay.
Yo entiendo que la cárcel puede cobrarme por algunos de estos servicios médicos y deducirlos de mi cuenta, durante la presente o futuras estadías en la cárcel. El impuesto esta señalado en un papel. Yo puedo recibir cuidado médico incluso si no pudiera pagar.

Signature ▓▓▓▓▓▓▓▓
(Nombre)

---
**If you have an emergency, tell the jail staff right away!**
**¡Si usted tiene una emergencia médica avise a los oficiales pronto!**
---

CDR-202  Rev 07/22/13    1350

## Patient Demographics

| Patient Name | MRN | Sex | DOB |
|---|---|---|---|
| Sullivan, Cyrus Andrew | 4311164 | Male | 6/26/1983 |

## Scanned Documents
### Encounter-Level Encounter/Order Scanned Documents:

**EXHIBIT 14**



**Multnomah County**
**Health Department**

MC MEDICAL RECORDS
426 SW Stark, 7th Floor
PORTLAND OR 97204

Sullivan, Cyrus Andrew
MRN: 4311164

---

Encounter-Level Encounter/Order Scanned Documents: (continued)

There are no encounter-level encounter/order scanned documents.

Order-Level Encounter/Order Scanned Documents - 07/25/2017:

Scan on 7/25/2017 12:00 AM : MRF (below)

**Multnomah County**
Health Department
CORRECTIONS HEALTH

*Path Medication renewal request*

Date/Time Received in Medical

**MEDICAL REQUEST FORM (MRF)**
**FORMA PARA PEDIR SERVICIO MEDICO (MRF)**

ID # 677564    MRN # 4311164    Dorm # 4F/3
(Numero de identificación)    (Ubicación)

Name Sullivan    Cyrus    A.
    Last/(Apellido)    First/(Nombre)    M.I. (Inicial)

Date of Birth 10/26/83    Today's Date 7/25/17
(Fecha de Nacimiento)    (Fecha de hoy)

Do you have any allergies to medications? If yes, list ▮▮▮
(¿Tiene algunas alergias a medicamentos? Por favor diga a cuales medicamentos)

Tell us about your health problem: DR Michael Seull Since I have not
(Describa su problema de salud) been to my OHSU follow-up, please make
sure that my Pcth meds are renewed until
I got there. Just going to Court yesterday
was grueling and I would hate to find out
what court is like without them.

How long have you had this problem? 4 weeks
(¿Por cuanto tiempo ha tenido este problema?)

Do you have health insurance?    ☐ No    ☑ Yes    Insurance # ▮▮▮
(¿Tiene seguro médico?)    (Si)    (Número de seguro médico)

This is my permission to get psychiatric, medical or dental exams and treatment from jail staff
(Este documento representa mi permiso para recibir exámenes médicos, tratamiento psiquiátrico o dental por parte del personal de salud de la cárcel.)

I understand that the jail may charge me for some of these services and deduct it from my account, during the current or future stays in jail. The fees are posted. I will get health care even if I am unable to pay!
Yo entiendo que la cárcel puede cobrarme por algunos de estos servicios médicos y deducirlos de mi cuenta, durante la presente o futuras estadías en la cárcel. El impuesto esta señalado en un papel. Yo puedo recibir cuidado medico incluso si no pudiera pagar.

Signature ▮▮▮
(Nombre)

**If you have an emergency, tell the jail staff right away!**
**¡Si usted tiene una emergencia medica avise a los oficiales pronto!**

---

Patient Demographics

| Patient Name | MRN | Sex | DOB |
|---|---|---|---|



**Multnomah County**

Health Department

| MC MEDICAL RECORDS | Sullivan, Cyrus Andrew |
|---|---|
| 426 SW Stark, 7th Floor | MRN: 4311164 |
| PORTLAND OR 97204 | |

## Patient Demographics (continued)

| Sullivan, Cyrus Andrew | 4311164 | Male | 6/26/1983 |
|---|---|---|---|

## Scanned Documents

### Encounter-Level Encounter/Order Scanned Documents:

There are no encounter-level encounter/order scanned documents.

### Order-Level Encounter/Order Scanned Documents - 08/01/2017:

Scan on 8/1/2017 12:00 AM : MRF (below)

---

**Multnomah County**

Health Department
CORRECTIONS HEALTH

Date/Time
Received In Medical

### MEDICAL REQUEST FORM (MRF)
### FORMA PARA PEDIR SERVICIO MEDICO (MRF)

ID # _677584_    MRN # _4311164_    Dorm # _4/01_
(Numero de Identificación)                         (Ubicación)

Name _Sullivan_    _Cyrus_    _A._
     Last (Apellido)          First (Nombre)          M.I. (Inicial)

Date of Birth _6/26/83_    Today's Date _8/1/17_
(Fecha de Nacimiento)         (Fecha de hoy)

Do you have any allergies to medications? If yes, list ▓▓▓▓▓
(¿Tiene algunas alergias a medicamentos? Por favor diga a cuales ▓▓▓)

Tell us about your health problem: _If by chance I don't get_
(Describa su problema de salud)
_taken to my OHSU follow up for my_
_broken arm this week can + have_
_STRONGER pain meds? I can't sit up_
_or stand up for more than a few minutes_
_without having to lay down due to pain,_
How long have you had this problem? _Since_
(¿Por cuanto tiempo ha tenido este problema?)

Do you have health insurance?    ☐ No    ☒ Yes    Insurance # ▓▓▓▓
(¿Tiene seguro médico?)                (Si)    (Número de seguro ▓▓▓)

This is my permission to get psychiatric, medical or dental exams and treatment from jail staff.
(Este documento representa mi permiso para recibir exámenes médicos, tratamiento psiquiátrico o dental por parte del personal de salud de la cárcel.)

I understand that the jail may charge me for some of these services and deduct it from my account, during the current or future stays in jail. The fees are posted. I will get health care even if I am unable to pay.
Yo entiendo que la cárcel puede cobrarme por algunos de estos servicios médicos y deducirlos de mi cuenta, durante la presente o futuras estadías en la cárcel. El impuesto esta senalado en un papel. Yo puedo recibir cuidado medico incluso si no pudiera pagar.

Signature ▓▓▓▓▓▓▓
(Nombre)

| **If you have an emergency, tell the jail staff right away!** |
|---|
| ¡Si usted tiene una emergencia medica avise a los oficiales pronto! |

COR-203   Rev. 01/22/13                                    1250

---



## Multnomah County
### Health Department

MC MEDICAL RECORDS
426 SW Stark, 7th Floor
PORTLAND OR 97204

Sullivan, Cyrus Andrew
MRN: 4311164

---

Order-Level Encounter/Order Scanned Documents - 08/07/2017: (continued)

---

**Multnomah County**
Health Department
CORRECTIONS HEALTH

# URGENT

Date/Time
Received in Medical

### MEDICAL REQUEST FORM (MRF)
### FORMA PARA PEDIR SERVICIO MÉDICO (MRF)

ID # _672564_    MRN # _4311164_    Dorm # _4101_
(Numero de Identificación)                    (Ubicación)

Name _Sullivan_    _Cyrus_    _A._
　　　Last (Apellido)    First (Nombre)    M.I. (Inicial)

Date of Birth _6/26/83_    Today's Date _8/7/17_
(Fecha de Nacimiento)    (Fecha de hoy)

Do you have any allergies to medications? If yes, list ▨▨▨▨
(¿Tiene algunas alergias a medicamentos? Por favor diga a cuales medicamentos)

Tell us about your health problem: On 8/3/17 OHSU said
(Describa su problema de salud) that they would make sure that I was
Not cut off my pain medication, but Today
I only received one Norco and was told
that I only get it until the 9th, As I
Told OHSU even 2 norco is not enough for the pain,

How long have you had this problem? 6 weeks
(¿Por cuanto tiempo ha tenido este problema?)

Do you have health insurance?   ☐ No   ☒ Yes   Insurance # ▨▨▨▨
(¿Tiene seguro médico?)          (Sí)   (Número de seguro médico)

This is my permission to get psychiatric, medical or dental exams and treatment from jail staff.
(Este documento representa mi permiso para recibir exámenes médicos, tratamiento psiquiátrico o dental por parte del personal de salud de la cárcel.)

I understand that the jail may charge me for some of these services and deduct it from my account, during the current or future stays in jail. The fees are posted. I will get health care even if I am unable to pay.
Yo entiendo que la cárcel puede cobrarme por algunos de estos servicios médicos y deducirlos de mi cuenta, durante la presente o futuras estadías en la cárcel. El impuesto esta señalado en un papel. Yo puedo recibir cuidado medico incluso si no pudiera pagar.

Signature ▨▨▨▨
(Nombre)

| If you have an emergency, tell the jail staff right away! |
| ¡Si usted tiene una emergencia medica avise a los oficiales pronto! |

COR-293 Rev. 07/22/13    1353

---

## Patient Demographics

| Patient Name | MRN | Sex | DOB |
|---|---|---|---|
| Sullivan, Cyrus Andrew | 4311164 | Male | 6/26/1983 |

## Scanned Documents

Encounter-Level Encounter/Order Scanned Documents:



**Multnomah County**
**Health Department**

MC MEDICAL RECORDS
426 SW Stark, 7th Floor
PORTLAND OR 97204

Sullivan, Cyrus Andrew
MRN: 4311164

---

## Encounter-Level Encounter/Order Scanned Documents: (continued)

There are no encounter-level encounter/order scanned documents.

## Order-Level Encounter/Order Scanned Documents - 08/07/2017:

Scan on 8/7/2017 12:00 AM : MRF (below)

---

**Multnomah County**
**Health Department**
**CORRECTIONS HEALTH**

Date/Time
Received in Medical

### MEDICAL REQUEST FORM (MRF)
### FORMA PARA PEDIR SERVICIO MÉDICO (MRF)

ID # 677564    MRN # 431164    Dorm # 4101
(Numero de identificación)                        (Ubicación)

Name Sullivan    Cyrus    A.
Last (Apellido)    First (Nombre)    M.I. (Inicial)

Date of Birth 6/26/83    Today's Date 8/7/17
(Fecha de Nacimiento)    (Fecha de hoy)

Do you have any allergies to medications? If yes, list _____
(¿Tiene algunas alergias a medicamentos? Por favor diga a cual...)

Tell us about your health problem:
(Describa su problema de salud) When is my next OHSU follow
up? On 8/3/17 they told me
to come back in 2-3 weeks, I
don't remember exactly which, It's for
my broken arm.

How long have you had this problem? 6 weeks
(¿Por cuanto tiempo ha tenido este problema?)

Do you have health insurance?  ☐ No  ☑ Yes    Insurance # _____
(¿Tiene seguro médico?)         (Si)    (Número de seguro médico)

This is my permission to get psychiatric, medical or dental exams and treatment from jail staff.
(Este documento representa mi permiso para recibir exámenes médicos, tratamiento psiquiátrico o dental por parte del personal de salud de la cárcel.)

I understand that the jail may charge me for some of these services and deduct it from my account, during the current or future stays in jail. The fees are posted. I will get health care even if I am unable to pay.
Yo entiendo que la cárcel puede cobrarme por algunos de estos servicios médicos y deducirlos de mi cuenta, durante la presente o futuras estadias en la cárcel. El impuesto esta señalado en un papel. Yo puedo recibir cuidado medico incluso si no pudiera pagar.

Signature _____
(Nombre)

| **If you have an emergency, tell the jail staff right away!** |
| **¡Si usted tiene una emergencia medica avise a los oficiales pronto!** |

COR-202  Rev. 07/22/13                                           1250

---

## Patient Demographics

| Patient Name | MRN | Sex | DOB |
|---|---|---|---|

EXHIBIT 14

 **Multnomah County**

Health Department

MC MEDICAL RECORDS
426 SW Stark, 7th Floor
PORTLAND OR 97204

Sullivan, Cyrus Andrew
MRN: 4311164

## Patient Demographics (continued)

| Sullivan, Cyrus Andrew | 4311164 | Male | 6/26/1983 |

## Scanned Documents

Encounter-Level Encounter/Order Scanned Documents:

There are no encounter-level encounter/order scanned documents.

Order-Level Encounter/Order Scanned Documents - 08/08/2017:

Scan on 8/8/2017 12:00 AM : MRF (below)

**Multnomah County**
Health Department
CORRECTIONS HEALTH

Date/Time
AUG 8    Received in Medical

**MEDICAL REQUEST FORM (MRF)**
**FORMA PARA PEDIR SERVICIO MEDICO (MRF)**

AUG 8 8:52

ID # 677564   MRN # 4311164   Dorm # 4101
(Numero de identificación)        (Ubicación)

Name  Sullivan        Cyrus        A.
     Last (Apellido)   First (Nombre)   M.I. (Inicial)

Date of Birth 6/26/83   Today's Date 8/8/17
(Fecha de Nacimiento)   (Fecha de hoy)

Do you have any allergies to medications? If yes, list _____
(¿Tiene algunas alergias a medicamentos? Por favor diga a cuales medicamentos)

Tell us about your health problem: Pain medication still cut
(Describa su problema de salud)
by over half. My arm hurts and even the
normal dose was not enough. Look at my latest
x-rays, it is at a bad angle. I can't sit or stand
for too long without chronic pain. OHSU said not to
cut me off.

How long have you had this problem? 6 weeks-injury 2 days-low meds
(¿Por cuanto tiempo ha tenido este problema?)

Do you have health insurance?  ☐ No  ☑ Yes   Insurance # _____
(¿Tiene seguro médico?)         (Si)   (Número de seguro médico)

This is my permission to get psychiatric, medical or dental exams and treatment from jail staff.
(Este documento representa mi permiso para recibir exámenes médicos, tratamiento psiquiátrico o dental por parte del personal de salud de la cárcel.)

I understand that the jail may charge me for some of these services and deduct it from my account, during the current or future stays in jail. The fees are posted. I will get health care even if I am unable to pay.
Yo entiendo que la cárcel puede cobrarme por algunos de estos servicios médicos y deducirlos de mi cuenta, durante la presente o futuras estadías en la cárcel. El impuesto esta senalado en un papel. Yo puedo recibir cuidado medico incluso si no pudiera pagar.

Signature _____
(Nombre)

┌────────────────────────────────────────────────┐
│  **If you have an emergency, tell the jail staff right away!**  │
│  ¡Si usted tiene una emergencia medica avise a los oficiales pronto!  │
└────────────────────────────────────────────────┘

CDR-203  Rev. 07/2013                                        1253



**Multnomah County**
**Health Department**

MC MEDICAL RECORDS
426 SW Stark, 7th Floor
PORTLAND OR 97204

Sullivan, Cyrus Andrew
MRN: 4311164

---

Order-Level Encounter/Order Scanned Documents - 08/09/2017: (continued)

---

**Multnomah County**
Health Department
CORRECTIONS HEALTH

Date/Time
Received In Medical

MEDICAL REQUEST FORM (MRF)
FORMA PARA PEDIR SERVICIO MEDICO (MRF)

ID # 672564    MRN # 4311164    Dorm # 4E/.01
(Numero de Identificación)                (Ubicación)

Name  Sullivan                    Cyrus        A.
        Last (Apellido)            First (Nombre)    M.I. (Inicial)

Date of Birth 6/26/83    Today's Date  8/9/17
(Fecha de Nacimiento)    (Fecha de hoy)

Do you have any allergies to medications? If yes, list ████████
(¿Tiene algunas alergias a medicamentos? Por favor diga a cuales medicamentos)

Tell us about your health problem:
(Describa su problema de salud)  The order from OHSU was
for Ibuprofen on top of my already
existing Norco, Not Ibuprofen and Tylenol,
I have shooting pain from my elbow to fingers and
it ached just to make a phone call, I still jump when
the bone moves, The arm is still swollen and you can see
How long have you had this problem? 2 days - 6 weeks for broken arm
(¿Por cuanto tiempo ha tenido este problema?)

Do you have health insurance?   ☐ No   ☑ Yes   Insurance # ████████
(¿Tiene seguro médico?)          (Si)    (Número de seguro médico)

This is my permission to get psychiatric, medical or dental exams and treatment from jail staff.
(Este documento representa mi permiso para recibir exámenes médicos, tratamiento psiquiátrico o dental por parte del personal de salud de la cárcel.)

I understand that the jail may charge me for some of these services and deduct it from my account, during the current or future stays in jail. The fees are posted. I will get health care even if I am unable to pay.
Yo entiendo que la cárcel puede cobrarme por algunos de estos servicios médicos y deducirlos de mi cuenta, durante la presente o futuras estadías en la cárcel. El impuesto esta senalado en un papel. Yo puedo recibir cuidado medico incluso si no pudiera pagar.

Signature ████████
(Nombre)

| If you have an emergency, tell the jail staff right away! |
| ¡Si usted tiene una emergencia medica avise a los oficiales pronto! |

→ Woke up before 5AM in pain, can't sleep

COR-282 Rev. 07/22/13                                                            1253

---

**Patient Demographics**

| Patient Name | MRN | Sex | DOB |
|---|---|---|---|
| Sullivan, Cyrus Andrew | 4311164 | Male | 6/26/1983 |

**Scanned Documents**
Encounter-Level Encounter/Order Scanned Documents:

EXHIBIT 14



## Multnomah County
### Health Department

MC MEDICAL RECORDS
426 SW Stark. 7th Floor
PORTLAND OR 97204

Sullivan, Cyrus Andrew
MRN: 4311164

---

## Patient Demographics (continued)

| Sullivan, Cyrus Andrew | 4311164 | Male | 6/26/1983 |

## Scanned Documents

### Encounter-Level Encounter/Order Scanned Documents:

There are no encounter-level encounter/order scanned documents.

### Order-Level Encounter/Order Scanned Documents - 08/16/2017:

Scan on 8/16/2017 12:00 AM : MRF (below)

AUG 16 PM 11:06

### Multnomah County
#### Health Department
CORRECTIONS HEALTH

Date/Time
Received In Medical

## MEDICAL REQUEST FORM (MRF)
## FORMA PARA PEDIR SERVICIO MEDICO (MRF)

ID # 677564 (Número de identificación)　　MRN # 4311164　　Dorm # 4F/4 (Ubicación)

Name Sullivan (Last/Apellido)　　Cyrus (First/Nombre)　　A. (M.I. (Inicial))

Date of Birth 6/26/83 (Fecha de Nacimiento)　　Today's Date 8/16/17 (Fecha de hoy)

Do you have any allergies to medications? If yes, list ▓▓▓▓
(¿Tiene algunas alergias a medicamentos? Por favor diga a ▓▓▓▓ amentos)

Tell us about your health problem:
(Describa su problema de salud) I keep waking up in pain around the crack of dawn. Could you change my evening Klonopin to the crush? They might make it last longer. Also, is there any way I can see the in-house Orthopedic PA? In addition to the onsite outsource.

How long have you had this problem? 4 days
(¿Por cuanto tiempo ha tenido este problema?)

Do you have health insurance? ☒ No　☐ Yes　Insurance # _____
(¿Tiene seguro médico?)　(Si)　(Número de seguro médico)

This is my permission to get psychiatric, medical or dental exams and treatment from jail staff.
(Este documento representa mi permiso para recibir exámenes médicos, tratamiento psiquiátrico o dental por parte del personal de salud de la cárcel.)

I understand that the jail may charge me for some of these services and deduct it from my account, during the current or future stays in jail. The fees are posted. I will get health care even if I am unable to pay.
Yo entiendo que la cárcel puede cobrarme por algunos de estos servicios médicos y deducirlos de mi cuenta, durante la presente o futuras estadías en la cárcel. El impuesto esta señalado en un papel. Yo puedo recibir cuidado medico incluso si no pudiera pagar.

Signature ▓▓▓▓
(Nombre)

**If you have an emergency, tell the jail staff right away!**
**¡Si usted tiene una emergencia medica avise a los oficiales pronto!**

* If possible I would like my ▓▓▓▓ to crush also, That way it won't knock me out all at once and when I do go to sleep I'll sleep longer.

CDF-200 Rev. 07/2013

1350

---



**Multnomah County**
Health Department

MC MEDICAL RECORDS
426 SW Stark, 7th Floor
PORTLAND OR 97204

Sullivan, Cyrus Andrew
MRN: 4311164

Order-Level Encounter/Order Scanned Documents - 08/17/2017: (continued)

**Multnomah County**
Health Department
CORRECTIONS HEALTH

Date/Time
Received in Medical

### MEDICAL REQUEST FORM (MRF)
### FORMA PARA PEDIR SERVICIO MEDICO (MRF)

ID # 677564    MRN # 4311164    Dorm # 4F14
(Numero de identificación)                        (Ubicación)

Name Sullivan    Cyrus    A.
Last (Apellido)    First (Nombre)    M.I. (Inicial)

Date of Birth 6/26/83    Today's Date 8/17/17
(Fecha de Nacimiento)    (Fecha de hoy)

Do you have any allergies to medications? If yes, list ▓▓▓
(¿Tiene algunas alergias a medicamentos? Por favor diga a cuales medicamentos)

Tell us about your health problem: Please double my Casodein
(Describa su problema de salud) cream. Pain specialist has me using it on
my arm on top of my wic. Also, my ice
bags are getting really small what's up
with that?

How long have you had this problem? 1 yr
(¿Por cuanto tiempo ha tenido este problema?)

Do you have health insurance? ☒ No    ☐ Yes    Insurance # _____
(¿Tiene seguro médico?)    (Sí)    (Número de seguro médico)

This is my permission to get psychiatric, medical or dental exams and treatment from jail staff.
(Este documento representa mi permiso para recibir exámenes médicos, tratamiento psiquiátrico o dental por parte del personal de salud de la cárcel.)

I understand that the jail may charge me for some of these services and deduct it from my account, during the current or future stays in jail. The fees are posted. I will get health care even if I am unable to pay.
Yo entiendo que la cárcel puede cobrarme por algunos de estos servicios médicos y deducirlos de mi cuenta, durante la presente o futuras estadías en la cárcel. El impuesto esta señalado en un papel. Yo puedo recibir cuidado médico incluso si no pudiera pagar.

Signature ▓▓▓
(Nombre)

> **If you have an emergency, tell the jail staff right away!**
> **¡Si usted tiene una emergencia medica avise a los oficiales pronto!**

COR-202  Rev. 07/22/13    1350

### Patient Demographics

| Patient Name | MRN | Sex | DOB |
|---|---|---|---|
| Sullivan, Cyrus Andrew | 4311164 | Male | 6/26/1983 |

### Scanned Documents
Encounter-Level Encounter/Order Scanned Documents:



**Multnomah County**
Health Department

| MC MEDICAL RECORDS<br>426 SW Stark, 7th Floor<br>PORTLAND OR 97204 | Sullivan, Cyrus Andrew<br>MRN: 4311164 |
|---|---|

---

## Order-Level Encounter/Order Scanned Documents - 08/30/2017: (continued)

**Multnomah County**
Health Department
CORRECTIONS HEALTH

Date/Time
Received in Medical

## PRIORITY

### MEDICAL REQUEST FORM (MRF)
### FORMA PARA PEDIR SERVICIO MEDICO (MRF)

AUG 31 @7:04

ID # 677564   MRN # 4311 164   Dorm # 4 F 14
(Numero de identificación)   (Ubicación)

Name Sullivan   (Jm)   A.
Last (Apellido)   First (Nombre)   M.I. (Inicial)

Date of Birth 6/26/83   Today's Date 8/30/17
(Fecha de Nacimiento)   (Fecha de hoy)

Do you have any allergies to medications? If yes, list ▓▓▓▓▓
(¿Tiene algunas alergias a medicamentos? Por favor diga a cuales medicamentos)
Dr Plates.

Tell us about your health problem:
(Describa su problema de salud;)
Giant bruise on my broken arm,
started and gets larger with my range
of motion exercises which I was told to
increase and spend more time not wearing the s/ly,
Increased pain in break area also. What
shall I do? Is it normal?,

How long have you had this problem? 2 days
(¿Por cuanto tiempo ha tenido este problema?)

Do you have health insurance?   ☑ No   ☐ Yes   Insurance #
(¿Tiene seguro médico?)   (Si)   (Número de seguro médico)

This is my permission to get psychiatric, medical or dental exams and treatment from jail staff.
(Este documento representa mi permiso para recibir exámenes médicos, tratamiento psiquiátrico o dental por parte del personal de salud de la cárcel.)

I understand that the jail may charge me for some of these services and deduct it from my account, during the current or future stays in jail. The fees are posted. I will get health care even if I am unable to pay.
Yo entiendo que la cárcel puede cobrarme por algunos de estos servicios médicos y deducirlos de mi cuenta, durante la presente o futuras estadias en la cárcel. El impuesto esta señalado en un papel. Yo puedo recibir cuidado medico incluso si no pudiera pagar.

Signature ▓▓▓▓▓▓▓
(Nombre)

**If you have an emergency, tell the jail staff right away!**
**¡Si usted tiene una emergencia medica avise a los oficiales pronto!**

COR-202  Rev. 07/22/13

---

## Patient Demographics

| Patient Name | MRN | Sex | DOB |
|---|---|---|---|
| Sullivan, Cyrus Andrew | 4311164 | Male | 6/26/1983 |

## Scanned Documents

### Encounter-Level Encounter/Order Scanned Documents:

EXHIBIT 14

 **Multnomah County** Health Department

MC MEDICAL RECORDS
426 SW Stark, 7th Floor
PORTLAND OR 97204

Sullivan, Cyrus Andrew
MRN: 4311164

## Problem List

### Patient Demographics

| Patient Name | MRN | Sex | DOB |
|---|---|---|---|
| Sullivan, Cyrus Andrew | 4311164 | Male | 6/26/1983 |

Problem List as of 9/14/2017                                    Date Reviewed: 6/22/2017

| | Codes | Priority | Class | Noted - Resolved |
|---|---|---|---|---|
| Left supracondylar humerus fracture, sequela | ICD-9-CM: 905.2 ICD-10-CM: S42.412S | | | 8/28/2017 - Present |

Overview Signed 8/28/2017 10:05 AM by Angelina Platas, MD

6/28/17 at MCDC in custody. FU Ortho 8/3/17 OHSU, appropriate healing by xray. Non-operative management.

| | | | | |
|---|---|---|---|---|
| Gingivitis | ICD-9-CM: 523.10 ICD-10-CM: K05.10 | | | 6/12/2017 - Present |
| Cystic acne vulgaris | ICD-9-CM: 706.1 ICD-10-CM: L70.0 | | | 5/30/2017 - Present |

Overview Signed 5/30/2017 11:11 AM by Angelina Platas, MD

Minocycline and benzoyl peroxide

| | | | | |
|---|---|---|---|---|
| Mixed hyperlipidemia | ICD-9-CM: 272.2 ICD-10-CM: E78.2 | | | 4/27/2017 - Present |

Overview Signed 4/27/2017 11:35 AM by Angelina Platas, MD

4/27/17 - Framingham 10 yr CV risk is 5.13%. No lipid lowering medication recommended.

Lab Results

| Component | Value | | Date |
|---|---|---|---|
| TRIGLYC | 332* | | 03/29/2017 |
| CHOL | 242* | | 03/29/2017 |
| HDL | 31* | | 03/29/2017 |
| LDL | 145* | | 03/29/2017 |
| CHOLHDL | 7.8* | | 03/29/2017 |
| NONHDL | 211* | | 03/29/2017 |

 

3/22/2017 - Present

Overview Addendum 3/22/2017 6:51 AM by Angela Lee, FNP, PMHNP



2013: per pt hx and hard chart. Presentation at MCDC in 2013 is not consistent with this dx. -Todd Karakashian PMHNP

 

3/22/2017 - Present

Overview Signed 3/22/2017 10:12 AM by Angela Lee, FNP, PMHNP

Mild, in sustained remission, in controlled environment

03/22/17:

5/13/2014 - Present
3/5/2013 - Present

Overview Addendum 5/14/2014 1:15 PM by Filza Akhtar, DO



## Multnomah County Health Department

MC MEDICAL RECORDS
426 SW Stark, 7th Floor
PORTLAND OR 97204

Sullivan, Cyrus Andrew
MRN: 4311164

Problem List (continued) as of 9/14/2017                          Date Reviewed: 6/22/2017

| | Codes | Priority | Class | Noted - Resolved |
|---|---|---|---|---|
| Mild persistent asthma | ICD-9-CM: 493.90 ICD-10-CM: J45.30 | | | 3/5/2013 - Present |
| Overview Addendum 3/5/2013 2:55 PM by Heather Nations | | | | |
| Environmental allergies | ICD-9-CM: V15.09 ICD-10-CM: Z91.09 | | | 3/5/2013 - Present |
| Overview Addendum 6/12/2017 10:45 AM by Heather Nations | | | | |
| health | ICD-9-CM: V15.82 ICD-10-CM: Z87.891 | | | 3/5/2013 - Present |
| Overview Addendum 4/27/2017 11:34 AM by Angelina Platas, MD | | | | |
| | | | | 2/13/2013 - Present 1/15/2013 - Present |
| Overview Signed 1/15/2013 11:49 AM by Todd Karakashian, PMHNP | | | | |

Per pt hx and info from provider he was seeing prior to incarceration.

| | | | | 10/16/2012 - Present |
|---|---|---|---|---|
| Overview Signed 3/22/2017 8:52 AM by Angela Lee, FNP, PMHNP | | | | |
| RESOLVED: | | | | 1/30/2013 - 3/22/2017 |
| RESOLVED: | | | | 1/15/2013 - 3/22/2017 |
| Overview Addendum 2/13/2013 3:39 PM by Todd Karakashian, PMHNP | | | | |

Per pt hx and hard chart. Presentation at MCDC in 2013 is not consistent with this dx. -Todd Karakashian PMHNP

## Notes
### Patient Demographics

| Patient Name | MRN | Sex | DOB |
|---|---|---|---|
| Sullivan, Cyrus Andrew | 4311164 | Male | 6/26/1983 |

### Encounter Information

EXHIBIT 14



**Multnomah County**
Health Department

MC MEDICAL RECORDS
426 SW Stark, 7th Floor
PORTLAND OR 97204

Sullivan, Cyrus Andrew
MRN: 4311164

## Patient Demographics (continued)

| Sullivan, Cyrus Andrew | 4311164 | Male | 6/26/1983 |
|---|---|---|---|

## Scanned Documents

### Encounter-Level Encounter/Order Scanned Documents:

There are no encounter-level encounter/order scanned documents.

### Order-Level Encounter/Order Scanned Documents - 09/04/2017:

Scan on 9/4/2017 12:00 AM : MRF (below)

---

**Multnomah County**
Health Department
CORRECTIONS HEALTH

Date/Time
Received in Medical

**MEDICAL REQUEST FORM (MRF)**
**FORMA PARA PEDIR SERVICIO MEDICO (MRF)**    SEP 4 '02:02

ID # 677564    MRN # 4311164    Dorm # 4F14
*(Numero de identificación)*    *(Ubicación)*

Name  Sullivan    Cyrus    A.
Last (Apellido)    First (Nombre)    M.I. (Inicial)

Date of Birth 6/17/1983    Today's Date 9/3/17
*(Fecha de Nacimiento)*    *(Fecha de hoy)*

Do you have any allergies to medications? If yes, list ▓▓▓▓
*(¿Tiene algunas alergias a medicamentos? Por favor diga a cuales medicamentos)*

Tell us about your health problem:
*(Describa su problema de salud)* Dr. Plates said to say something if my arm did not improve in a couple days and that was on Thursday or Friday. It has not improved, in fact the bruise has grown and is so purple that it looks like something out of The Walking Dead. and there is more pain around the break that I can't escape, even by holding my arm.
How long have you had this problem? 5 days
*(¿Por cuanto tiempo ha tenido este problema?)*

Do you have health insurance? ☒ No    ☐ Yes    Insurance # _____
*(¿Tiene seguro médico?)*    (Si)    *(Número de seguro médico)*

This is my permission to get psychiatric, medical or dental exams and treatment from jail staff.
*(Este documento representa mi permiso para recibir exámenes médicos, tratamiento psiquiátrico o dental por parte del personal de salud de la cárcel.)*

I understand that the jail may charge me for some of these services and deduct it from my account, during the current or future stays in jail. The fees are posted. I will get health care even if I am unable to pay.
*Yo entiendo que la cárcel puede cobrarme por algunos de estos servicios médicos y deducirlos de mi cuenta, durante la presente o futuras estadías en la cárcel. El impuesto esta señalado en un papel. Yo puedo recibir cuidado medico incluso si no pudiera pagar.*

Signature ▓▓▓▓▓▓▓▓
*(Nombre)*

---

**If you have an emergency, tell the jail staff right away!**
**¡Si usted tiene una emergencia medica avise a los oficiales pronto!**

COR-202 Rev. 07/2012    1350

107

them all.  Are there any that I have missed?

(The defendant and his counsel confer off the record.)

MS. HARRIS:  No objection, a couple of clarifying questions only.

THE COURT:  Of course.

MS. HARRIS:  Obviously these will take effect upon release.

THE COURT:  Yes.

MS. HARRIS:  If the -- I haven't done the math, but you've been in almost five months.

It's going to be, I think, another month.

THE DEFENDANT:  A month and a half.

MS. HARRIS:  A month and a half.  I would ask the Court to order temporary release for the limited purpose of transport to OHSU to make this follow-up appointment so that the arm evaluation that they recommended at the time of intake can be conducted.  That's all.

THE COURT:  Let me communicate with the marshals service about what that takes in order to do that.  If there's an appointment already set up and he, as a matter of his health, needs to get there and back, we'll figure out a way to do that.

MS. HARRIS:  It's not set up yet because the jail -- well, for whatever reason, they haven't scheduled the

appointment. But the clinical notes from appointment No. 1 would show that he was supposed to be scheduling an appointment -- I keep doing this (indicating) -- to take place a week after admission to the ER.

THE COURT: So an appointment needs to be set up. I will be checking with the marshals service. If he needs to get to an appointment, their responsibility is to get him to an appointment, period. That's the way it works. He may be housed over at Multnomah County; he's in the marshals' custody.

Do you have anything else?

MS. HARRIS: No, Your Honor. Thank you.

THE COURT: Good luck to you, Mr. Sullivan. We are in recess.

MR. NYHUS: Thank you, Your Honor.

THE COURT: You're welcome.

(Proceedings concluded.)

EXHIBIT 16

**DAS**
DEPARTMENT OF
ADMINISTRATIVE
S E R V I C E S

Risk Management | EGS
PO Box 12009
Salem, OR 97309-0009
503-373-7475
503-373-7337 fax

IMPORTANT: Must be completed
in Acrobat Reader.


Download Reader Here

E-mail: risk.management@oregon.gov
Website: State of Oregon: Risk Management

Find this form on the Web at:
http://www.oregon.gov/das/Risk/Documents/Form_AllClaimsNonAuto.pdf

## OREGON STANDARD TORT CLAIM FORM

**Claimant Information**

1. Claimant name: Sullivan          Cyrus        Andrew    06/26/1983
   Last Name          First        Middle    Date of Birth (mm/dd/yyyy)

2. Current residential address: ~~[redacted]~~

3. Mailing address (if different): P.O. Box 86653, Portland, OR 97286

4. Claimant's telephone number: Home  none          Alternate  none

5. Claimant's email address: ~~[redacted]~~

**Incident Information**

6. Date of Incident: 06/28/2017    Time: 8:30    ☐ a.m. ☒ p.m.

7. Location of incident: 1120 SW 3rd Ave, Portland, OR 97204

8. Description of incident: Was assaulted by multiple MCSO deputies resulting in broken left humerus. Timothy Barker intentionally broke it after I had been taken to disciplinary cell and was cooperative while in prone position with restraints. Barker twisted my left arm and put his weight on it until it broke. Then he lied about it.

9. Police report? ☒ yes ☐ no  If yes, please provide the report number and the police agency name (City, County or State)

Report Number: CP#0 2017-30465  Police Agency Name: Multnomah County Sheriff's office

**State Agency**

10. Name of State agency involved and why you believe they are responsible for your damage/injury.

Multnomah County Sheriff's office
501 SE Hawthorne Blvd, Suite 350
Portland, OR 97214

11. Name of employee (if applicable): Timothy Barker

**Damages**

12. If injuries occurred, please complete the bodily injury questionnaire.

13. If property damage occurred, describe it below and list and provide photographs and 2 estimates.

None

**Witnesses**

14. Witness name, address, phone number and relationship:

Revised 03/16/16
Form No. DAS-RM Standard form

**DAS**
DEPARTMENT OF
ADMINISTRATIVE
S E R V I C E S

Risk Management | EGS
PO Box 12009
Salem, OR 97309-0009
503-373-7475
503-373-7337 fax

E-mail: risk.management@oregon.gov
Website: State of Oregon: Risk Management
Find this form on the Web at:
http://www.oregon.gov/das/Risk/Documents/Form_AllClaimsNonAuto.pdf

## OREGON STANDARD TORT CLAIM FORM

Bodily Injury Questionnaire: IMPORTANT: We are required by federal law to obtain the information in questions 15 through 17. Failure to provide this information will result in delays in resolving your claim. You can find further information at Centers for Medicare and Medicaid Services - Home Website.

**Bodily Injury Questionnaire**

**15.** Last Name  Sullivan    First name  Cyrus    Middle initial  A

**16.** Date of Birth (mm/dd/yyyy)  06/26/1983    **17.** Gender  ☒M ☐F

**18.** Is this related to an auto accident? (If no, skip to question 22)  NO

**19.** If yes, where were you seated in vehicle?

☐Driver ☐Front right passenger ☐Rear right passenger ☐Rear left passenger ☐Other _____

**20.** Seatbelt used? ☐Yes ☐No    What kind? ☐Lap ☐Shoulder ☐None

**21.** Did the airbag deploy? ☐Yes ☐No

**22.** Describe your injury:  Broken left Humerus - Snapped into 2 pieces - will never be the Same.

**23.** When did you first notice you were injured?  When it happened (between 8:30 and 8:45) Worse Pain ever.

**24.** Have you sought medical treatment? ☒Yes ☐No    **25.** If yes, list the medical providers you have seen:  University Hospital South, Dr. Jennifer Ross, MD 3181 SW Sam Jackson Park Road, Portland, OR 97239

**26.** Approximate amount of medical costs incurred to date:  $0 - All bills Paid by United States Marshal

**27.** Is future treatment expected? ☒Yes ☐No    **28.** If yes, explain:  Range of motion still limited, physical therapy recommended, PTSD likely, therapy likely,

**29.** Do you have any prior injuries to the injured body part(s)? ☐Yes ☒No    **30.** If yes, explain:

**31.** Any other information you would like to provide us:  I am seeking $4,000,000 in Compensation for assault, battery, excessive force/8th Amendment violations, and psychological trauma, plus libel resulting in false imprisonment; I also want punitive damages of $4,000,000.

Revised 03/16/16
Form No. DAS-RM Standard form

**DAS**

DEPARTMENT OF
ADMINISTRATIVE
S E R V I C E S

Risk Management | EGS
PO Box 12009
Salem, OR 97309-0009
503-373-7475
503-373-7337 fax

E-mail: risk.management@oregon.gov

Website: State of Oregon: Risk Management

Find this form on the Web at:
http://www.oregon.gov/das/Risk/Documents/Form_AllClaimsNonAuto.pdf

## OREGON STANDARD TORT CLAIM FORM

Additional information:

The conduct of the MCSO deputies involved violated my right under state law to be free from assault and battery, my federal right to due process under the 14th Amendment, and will be the subject of a federal lawsuit under 42 USC 1983 or Bivens if a settlement cannot be reached. This case is also the subject of a federal criminal matter (Case No. 3:17-CR-00336-HZ) information regarding that can be obtained from my attorney, Tiffany Harris at 503-782-4788

**Per ORS 30.275, Risk Management must receive your claim within 180 days from the date of loss.**
I declare the foregoing is true and correct to the best of my knowledge.

Signature of claimant  _____ Date 11/19/2017 _____

 

Revised 03/16/16
Form No. DAS-RM Standard form

FILED15 AUG '17 14:35USDC-ORP

## EXHIBIT 17

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

UNITED STATES OF AMERICA

v.

CYRUS ANDREW SULLIVAN,

Defendant

3:17-CR-_OO306_-MO

INDICTMENT

18 U.S.C. §§ 111(a)(1), (b)

THE GRAND JURY CHARGES:

### COUNT 1
### (Impeding Federal Officer)
### (18 U.S.C. § 111(a)(1))

On or about June 28, 2017, within the District of Oregon, defendant **CYRUS ANDREW SULLIVAN** unlawfully and knowingly did forcibly assault, resist, oppose, impede, intimidate and interfere with M.I., a Multnomah County Deputy Sheriff, while M.I. was engaged in his official duties assisting the United States Marshal for the District of Oregon in the performance of the United States Marshal's official duties as custodian of federal prisoners, and in so doing, defendant **CYRUS ANDREW SULLIVAN** attempted to engage in physical contact with M.I., namely, defendant willfully attempted to punch M.I.;

In violation of Title 18, United States Code, Section 111(a)(1).

EXHIBIT 17

## COUNT 2
### (Impeding Federal Officer)
### (18 U.S.C. §§ 111(a)(1), (b))

On or about June 28, 2017, within the District of Oregon, defendant CYRUS ANDREW SULLIVAN, unlawfully and knowingly did forcibly assault, resist, oppose, impede, intimidate and interfere with T.B., a Multnomah County Deputy Sheriff, while T.B. was engaged in his official duties assisting the United States Marshal for the District of Oregon in the performance of the United States Marshal's official duties as custodian of federal prisoners, and in so doing, defendant CYRUS ANDREW SULLIVAN engaged in physical contact with, and willfully caused physical injury to, T.B. by elbowing T.B. about the face and neck;

In violation of Title 18, United States Code, Sections 111(a)(1) and (b).

## COUNT 3
### (Impeding Federal Officer)
### (18 U.S.C. §§ 111(a)(1), (b))

On or about June 28, 2017, within the District of Oregon, defendant CYRUS ANDREW SULLIVAN unlawfully and knowingly did forcibly assault, resist, oppose, impede, intimidate and interfere with W.M., a Multnomah County Deputy Sheriff, while W.M. was engaged in her official duties assisting the United States Marshal for the District of Oregon in the performance of the United States Marshal's official duties as custodian of federal prisoners, and in so doing, defendant CYRUS ANDREW SULLIVAN engaged in physical contact with, and willfully caused physical injury to, W.M. by kicking W.M. in the chest;

In violation of Title 18, United States Code, Sections 111(a)(1) and (b).

**Sullivan Indictment**                                                   **Page 2**

## EXHIBIT 17

### COUNT 4
### (Impeding Federal Officer)
### (18 U.S.C. § 111(a)(1))

On or about June 28, 2017, within the District of Oregon, defendant **CYRUS ANDREW SULLIVAN** unlawfully and knowingly did forcibly assault, resist, oppose, impede, intimidate and interfere with P.S., a Multnomah County Deputy Sheriff, while P.S. was engaged in his official duties assisting the United States Marshal for the District of Oregon in the performance of the United States Marshal's official duties as custodian of federal prisoners, and in so doing, defendant **CYRUS ANDREW SULLIVAN** attempted to engage in physical contact with P.S., namely, defendant willfully attempted to kick P.S.;

In violation of Title 18, United States Code, Section 111(a)(1).

### COUNT 5
### (Impeding Federal Officer)
### (18 U.S.C. § 111(a)(1))

On or about June 28, 2017, within the District of Oregon, defendant **CYRUS ANDREW SULLIVAN** unlawfully and knowingly did forcibly assault, resist, oppose, impede, intimidate and interfere with P.H., a Multnomah County Deputy Sheriff, while P.H. was engaged in his official duties assisting the United States Marshal for the District of Oregon in the performance of the United States Marshal's official duties as custodian of federal prisoners, and in so doing, defendant **CYRUS ANDREW SULLIVAN**

/////

/////

**Sullivan Indictment**                                                    Page 3

## EXHIBIT 17

attempted to engage in physical contact with P.H., namely, defendant willfully attempted to kick P.H.;

In violation of Title 18, United States Code, Section 111(a)(1).

DATED this __15__ day of August 2017.

A TRUE BILL

OFFICIATING FOREPERSON

Presented by:

BILLY J. WILLIAMS
United States Attorney
District of Oregon

GREGORY R. NYHUS, OSB #913841
Assistant United States Attorney

## EXHIBIT 18



## Multnomah County Sheriff's Office

### INCIDENT REPORT #27682
(Dep Tim Barker #35798)



| | | |
|---|---|---|
| **INCIDENT:** | Use Of Force - Inmate | Occurred: 06/28/2017 2032 **hrs** |
| **LOCATION:** | MCDC - 5D (cell 5D23) | Submitted: 07/15/2017 1141 **hrs** |
| **PACKET #:** | 2258 | |

**SUMMARY:** On 062817 Force was used to move Inmate Sullivan to disciplinary housing.

**SUBJECT:** 

| #677564 Sullivan, Cyrus | M/W | 06/26/1983 | MCDC - 4F - 1 |
|---|---|---|---|

**MENTIONED:**

| #31450 | Dep Hubert, Philip | 715 |
|---|---|---|
| #34887 | Sgt Ingram, Matthew | 6-10 Sergeant |
| #42885 | Dep Muth, Wendy | 718 |
| #31638 | Dep Simpson, Paul | 720 REC 2 |

**INJURIES:** **Sullivan, Cyrus** - Visible (Not Hospitalized)       Medical Care: Offered
- Was sent out to Hospital for broken arm. (Examined: **06/28/2017 2040 hrs**)

**NARRATIVE:** On 062817, at approximately 2030 hour, a radio call came out for escorts to respond to 5D. As I was 741 Act. Sgt. it was in my area of responsibility so I started to head that way. Before I was able to get to the elevators a second call was made asking for 741 to come to 5D as the inmate was refusing to be handcuffed. At this time I responded by radio, I was in route to the area of 5D. When I walked into 5D Deputy Pemberton informed me that inmate Sullivan was not following orders, he was ordered to enter the sally port, but ran up to his cell and closed the door. He was refusing to be handcuff thru the food port. Deputy Pemberton also reported to me that this issue started over some Gatorade that he was not supposed to have. After speaking with Deputy Pemberton I started up the stairs where the rest of the staff had gather just outside of the cell 5D23.

I walked up to the cell door ware Sgt. Ingram was standing; he asked to see if I could get Sullivan to comply. I looked in the cell and recognized Inmate Sullivan from the fourth floor where all my interactions were cordial. I keyed open the food port to speak to him to try and deescalate the inmate into compliance. I asked inmate Sullivan to turn around and place his hands out to be handcuffed. He replied "no I'm not going to be hand cuffed thru the door, just come in." I took that as if he was going to comply. At this time the inmate did not present as a threat. It should be noted that I have used this technique in the past when presented with complying inmates with no issues to mention. I told inmate Sullivan we are going to come in and place him in handcuffs. I allowed time to pass for acknowledgment from him. He nodded. I told him to turn around and place his hands behind him. Inmate Sullivan turned toward the bunks as if acknowledging me and started to put his arms behind him, as if to be handcuffed. At this time I spoke to Sgt. Ingram if he was ready and if he wanted OC or Taser as a precautionary in case inmate Sullivan became unexpectedly aggressive. He pointed to Deputy Simpson whom had his Taser out at the low ready position. I looked again at the Sgt. Ingram and said ok let's go in.

I asked for the door to be opened. As the door opened inmate Sullivan looked over his left shoulder as we entered the cell. Sgt. Ingram was just in front of me in the cell maybe two steps when inmate Sullivan suddenly attacked by spinning around and throwing a hand full of red powder into the Sgt. Ingram's face. This powder also hit the left side of my face. The inmate reached up on top of the bunk and grabbed what I believe to be a second hand full of the red powder. He then threw it towards us as Sgt. Ingram made contact with inmate Sullivan. This powder did not directly hit me in the face but landed on my left shoulder and going past me. At this time I was able to make contact with the inmate. Sgt. Ingram and I were trying to turn Sullivan around to gain control; the inmate was swinging his fist but missed me. I was able to push him around enough where he was facing away from me. This was when I saw the inmate look back over his left shoulder and start throwing elbows. His elbow hit me on the left side of my face and neck and another hit me on the left upper arm. I tried to grab his left arm with my left hand below his left elbow; Inmate Sullivan was still trying to pull away. I was yelling for the inmate to stop resisting. I repeated this order over and over. I told Sullivan to give me his arm and put your hand behind you. I was able to get my right hand under his left arm and grab

*Sullivan's left wrist this is when I was trying to pull his left arm behind his back. He kept pulling up and away from me and this is when I heard, what I thought was a pop. I waited for a reaction indicating an injury and there was no indication of this. I was able to get his arm behind him. Sgt. Ingram was able to place the left wrist in the cuff. Once the restraints were secured the level of force deescalated. I called out that he was cuffed and asked if we were ready to move; someone said yes. This was when we stood up and told the inmate to turn and walk out the door. As we were walking out and towards the stairs, inmate Sullivan started to go passive resisting by slumping down and trying to sit down and not walk.*

*He was told to stand up at least four times by me and by others. When we reached the stairs we again ordered him to stand informing him we did not want to fall down the stairs. We waited for compliance and continued down the stairs and out of the unit. The entire time we were escorting inmate Sullivan he keep trying to pull away and then sit down. We had to keep lifting him up and telling him to walk. As we entered 4F13 I gave the order for inmate Sullivan to kneel down on the gray mattress. He complied. After he knelt down I told Inmate Sullivan to lay down face first while I helped him down. I held on to the front of his shoulder and lowered him down. He kept trying to pull away. Due to his unruly behavior, Sgt. Ingram asked for the cutters and we started to cut the clothes off of him. First the shirt was removed then the pants. After it was determined he had no contraband on his person. We told him that we were going to remove the restraints and follow our directions. I then removed the right handcuff and told to place his right hand under belly. Inmate Sullivan would not comply with simple directions and he had to be helped with this task by rolling him to the left a few inches. This move helped place his hand under him. I told him that I was going to remove the left side for him to do the same with his left hand. As I removed the handcuff and laid his left arm down beside him, he was told to place it under himself. This was the first time Inmate Sullivan complained about his arm. He said he couldn't move his arm. I asked him again to place his hand under himself and he stated "I think my arm is broke." We then asked for someone to call and have medical to come and exam his arm. At this time the inmate stopped fighting with us as he was more worried about the arm then fighting us. At this time I started first aid to prevent any further injury to his arm. Why we were waiting for the ambulance and medical Sgt. Ingram asked for a sheet to cover inmate Sullivan to help keep him warm and to cover him, as not to expose him to the responding staff. I told Inmate Sullivan I would help sit him up and we did, so he could support his arm. After the nurses determined that he needed to go to the hospital Sgt. Ingram radio for master control to call for the ambulance. So inmate Sullivan could be taken to a hospital. After Inmate Sullivan was taken to the hospital. I had no further contact with inmate Sullivan.*

**ACTION PENDING:**  *Forwarded for review.*

---

**REVIEWS:**  **07/15/2017 2109 hrs** - *I have been assigned the review of packet #2258 involving Inmate Sullivan, C. #677564, which occurred in 5D on 6-28-17. All reports are included and complete in content. (there is no video of this incident). This incident began when Inmate Sullivan took some Gatorade (which he was not supposed to have taken) from the med tech, ran to his cell and disobeyed the orders from the module deputy. Staff were called to respond to escort Inmate Sullivan to disciplinary housing for the rule violations he committed. According to reports, once staff arrived in 5D Inmate Sullivan was given multiple orders by multiple staff members to be handcuffed through the food port, all of which he refused. Staff also noted that Sullivan used obscene language toward staff and made threats against their well-being. Staff noted that Sullivan finally agreed to be handcuffed but not through the food port and advised staff to come in and get him. Sgt. Ingram noted in his report that, "It appeared to me he [Sullivan] posed no threat and was ready to be handcuffed." However, Inmate Sullivan had deceived staff members and once staff entered the cell Sullivan instantly became combative. He attempted to punch Sgt. Ingram in the face, elbow several staff members and mule kicked Deputy Muth, knocking her to the ground. Most unusual though, was the fact that Inmate Sullivan had crafted a weapon out of ground up super spicy chips and threw it in the faces of responding staff as a way to disable them as they entered. The apparent motive of Sullivan with the chips was to use the ground up substance as a kind of pepper spray towards staff members. Staff at that point had governmental interest to use force to restrain and move Inmate Sullivan to disciplinary housing. Staff noted in their reports that Sullivan, "Resisted furiously," and "Struggled the entire way," as well as pushed a deputy off of him with his legs. Staff noted that throughout the move to disciplinary housing they ordered Inmate Sullivan to stop resisting and stop fighting them. Once they arrived in 4F, Sgt. Ingram made the decision to cut Inmate Sullivan's clothes off to be changed into a white suit for disciplinary level 4. Sullivan had been non-compliant the entire process and there was no reason for Sgt. Ingram to believe Sullivan would have been compliant with the strip search and clothing exchange. I conclude that the decision to cut Sullivan's clothes off while he was already restrained and at a position of disadvantage was the best decision to minimize the possibility of furthering the use of force.*

*After the clothing was removed, Sullivan was quoted in reports as saying he wasn't going to fight or resist anymore and staff were able to facilitate the nurse entering the cell to examine him. As a means to provide after care, Sgt. Ingram noted that he turned Inmate Sullivan on his side so he could breathe easier and covered him in a white jumpsuit to act like a blanket and keep him warm. Sullivan was soon transferred to the*

EXHIBIT 18

*hospital where he was treated for the injury to his arm he sustained during his resistance in the use of force. After reviewing this use of force and gaining an understanding of how the entire incident unfolded, I believe staff acted with the goal in mind of preventing further assault from Inmate Sullivan and to get him safely contained in a disciplinary cell. This use of force appears to have been conducted in accordance with MCSO Use of Force Policy.* (**Sgt Gary Glaze**)

*08/01/2017 2248 hrs - I have read the attached reports. There is no video footage of this event. All reports appear consistent in their description of the event, however there are some variations due to individual perspective and recall. Staff reports indicate that Inmate Sullivan was initially hostile and challenging to staff that arrived first on the scene. Staff responded appropriately by requesting a sergeant to assist with the matter. Sergeant Ingram arrived and attempted to de-escalation techniques in hopes of resolving the situation by gaining cooperation from Inmate Sullivan. This was unsuccessful. Acting Sergeant Barker arrived and began a dialogue with the Inmate and also attempted to deescalate the situation. Deputy Muth's report indicates that Inmate Sullivan was verbally hostile and challenging to Sergeant Ingram and Acting Sergeant Baker. This is inconsistent with the information provided by Sergeant Ingram and Acting Sergeant Barker. All other staff reports seem to support the perception of the Sergeant and Acting Sergeant and indicate that Inmate Sullivan was not displaying hostility and anger as he was interacting with Sergeant Ingram and Acting Sergeant Barker.*

*After interacting with Inmate Sullivan and attempting to gain cooperation, both Sergeant Ingram and Acting Sergeant Barker felt that it was safe to enter the Inmate's cell and secure him in handcuffs. They both indicated that Inmate Sullivan appeared to be willing to submit to handcuffing and they did not perceive him to be a threat based on his behavior and interaction at the time. They ensured that staff were ready with other force options (Taser) before entering the cell as a safety precaution. After Inmate Sullivan turned around and placed his hands behind his back as directed, the cell door was opened and staff entered in anticipation of applying handcuffs to a compliant Inmate. Reports indicate that as they entered the cell they were suddenly and unexpectedly assaulted as Inmate Sullivan spun around and threw handfuls of crushed corn chips covered with powdered hot peppers in the faces of staff and then began to throw closed fist punches at them. Staff responded by attempting to gain control of the Inmate's arms and pin him against the wall and desk area in the cell. Acting Sergeant Barker noted in his report that Inmate Sullivan delivered several targeted elbow strikes to his head/upper body. Acting Sergeant Barker stated that Inmate Sullivan was looking over his shoulder in order to direct his elbow strikes.*

*Based on staff reports Inmate Sullivan fought violently and even once he was pinned against the cell wall/desk he began to "mule kick" staff. Deputy Muth documented that Inmate Sullivan kicked her in the upper abdomen causing her to lose her balance and fall to the floor. Sergeant Ingram also stated that the Inmate kicked him in the leg and then took hold of his arm which was under the Inmate and would not let go. Sergeant Ingram ordered the Inmate to let his arm go and the Inmate failed to comply. At this point Sergeant Ingram delivered several focused blows to the back of the Inmate's arm stating that he was hopeful that he would strike a nerve and cause the Inmate to loosen his grip. It appears that this was successful as Sergeant Ingram was finally able to pull the Inmate's arm free, place it behind his back and secure it in a handcuff. Acting Sergeant Barker was also struggling to pull the Inmate's other arm behind his back and documented that the Inmate continued to pull and struggle against his attempts to control the arm. Acting Sergeant Barker noted that as the Inmate continued to resist, he pulled on the Inmate's arm and heard a "pop". Staff note that the Inmate did not react but that they were finally able to move his other arm behind his back and secure it in restraints.*

*Once the Inmate was restrained, staff escorted him out of the cell where they document that he continued to struggle, "go limp" and resist their efforts to move him to disciplinary housing. Staff note that Inmate Sullivan actively resisted their efforts during the entire escort to the forth floor and into the 4F13 cell. According to reports, Inmate Sullivan did not stop resisting until his clothing was removed and he verbalized that his arm was injured. After being notified of possible injury staff contacted medical and requested that the Inmate be assessed. Staff also note that they covered Inmate Sullivan with a white jumpsuit and a sheet to keep him warm and to ensure some privacy.*

*Based on the information provided in the attached reports, it appears that staff used a reasonable level of force in order to stop Inmate Sullivan's assaultive behavior, secure him in restraints and move him to disciplinary housing. Staff only escalated force in response to the actions and behavior demonstrated by Inmate Sullivan. Staff gave multiple verbal commands to the Inmate and allowed opportunity for compliance. Staff deescalated force appropriately once Inmate Sullivan was controlled. Medical staff were notified of the event as per policy.*

*It should be noted that I requested reports from Deputy Pemberton and Deputy Dilger after I received this packet for review. I did not send the packet back to previous reviewers as I do not believe that any of the*

000046

4

EXHIBIT 18

*information provided by either writer would alter the conclusion of any previous reviewers.* (**Lt Kurtiss Morrison**)

**HAZARD:**

| Sullivan, Cyrus Controlled | | |
|---|---|---|
| Reason for Contact: **Inmate was being moved to disciplinary housing** | | |
| Reasons for Force: Defend Self | | Physical Resistance or Intent |
| Assault (Deputy) | | |
| Resist Conditions: Combative | | |
| Physical Control: Digital Control | | |
| *Physical Force Effective:* **Yes** | | |
| Last Method of Control that Contained the Threat: **Inmate Sullivan was taken an placed in handcuffs with digital control** | | |

000047

# EXHIBIT 19




## Multnomah County Sheriff's Office

**INCIDENT REPORT #27637**

(Sgt Matthew Ingram #34887)

---

**INCIDENT:** Use Of Force - Inmate
**LOCATION:** MCDC - 5D (Cell 23)
**PACKET #:** 2258

Occurred: **06/28/2017 2030 hrs**
Submitted: **07/13/2017 2113 hrs**

---

**SUMMARY:** *On date and time mentioned force was used on inmate Sullivan due to a staff assault.*

| SUBJECT: | #677564 Sullivan, Cyrus | | M/W | 06/26/1983 | MCDC - 5D - 23 |
|---|---|---|---|---|---|

**MENTIONED:**

| #35798 | Dep Barker, Tim | 741 |
|---|---|---|
| #31450 | Dep Hubert, Philip | Escort |
| #31638 | Dep Simpson, Paul | Escort |

**INJURIES:** **Sullivan, Cyrus** - Visible (Not Hospitalized)        Medical Care: Offered
        - *Broken Left Arm* (Examined: **06/28/2017 2039 hrs**)

**NARRATIVE:** *On June 28, 2017 I was working as the 6-10 sergeant (761). On that day at about 2030 hours, I responded to a radio call for assistance in housing unit 5D. Staff radioed for the 3-5 sergeant (741) to respond to the unit as they had an inmate refusing to move. I arrived on scene a short time after the radio call to see if I could assist in some fashion. Upon arriving into the unit I spoke with Deputy Pemberton, who was the staff member assigned to the unit. He informed me that inmate Sullivan refused to return Gatorade he took from the med aid. He went on to tell me he ordered inmate Sullivan into the unit sally port, however Sullivan told him no and ran up to his cell 23 and closed the door. Pemberton went on to say before closing the cell door Sullivan stated I am putting you on my website and will have a hit put on you. (Referring to the med aid) I looked in the direction of cell 23 and noticed several deputies standing outside the cell in an apparent attempt to communicate with Sullivan. I decided to make my way to cell #23. Once arriving at Sullivan's cell I allowed staff to continue to talk with Sullivan. My hope was staff would be able to build rapport, allow time to pass thereby defusing the situation and perhaps convince Sullivan to move to disciplinary housing. However staff attempts failed and the communication ceased.*

*I decided to re-establish communications with Sullivan. My hope was to de-escalate the incident seeking compliance by will not force. In my initial contact I introduced myself and explained I wanted to help with the matter at hand. We spoke about the incident in some detail. This discussion allowed for more time to pass which I felt could help in diffusing the issue and allow for cooperation from Sullivan. I offered Sullivan a few options during our conversation. I asked him to move with me out of the unit so we could chat about the incident. He stated no. I asked him why and he had no reply. I directed him to place his hands through the food port and allow me to place him in handcuffs for the move. He told me no, he would not put his hands through the food port. It should be noted that while talking with Sullivan he appeared calm and did not present with any indications of hostility. Based on my experience Sullivan posed no threat to staff or himself based on his presentation at the time.*

*Shortly after his refusal to place his hands through the food port, 741 acting sergeant Barker arrived on scene. I decided to cease my attempt of verbal de-escalation and allow 741 to try to gain compliance through communication. I backed away from Sullivan's cell and Barker began communication with him. It appeared to me after a short while Barker (741) was building some rapport. I heard him mention "we never have had any issues, c'mon handcuff up so we can move you." Sullivan replied he could not be handcuffed through the food port stating "I can't do it that way." Sullivan stated "just come in here and handcuff me." This statement was not aggressive in nature but rather seemed matter of fact. At this point I thought it best to stay vigilant therefore I asked Deputy Simpson to stand ready with his Taser. Barker replied to Sullivan by repeating "you want us to come in and place you in handcuffs." Sullivan stated "yes." Acting sergeant Barker said "we can do that, I need you to turn around and place your hands behind you back." I peered into the cell and saw Sullivan turn his back toward the cell door and put his hands behind him. It appeared to me he posed no threat and was ready to be handcuffed. He seemed to be fully ready to cooperate. It should be noted that the technique of entering a cell to place an inmate in handcuffs is not an unusual approach considering the type of situation (non-aggression). Barker told Sullivan we are coming in and allowed for acknowledgement from Sullivan, who*

nodded his head yes. Barker then asked for the cell door to be opened. During this time I staged my handcuffs expecting a routine handcuffing.

Once the cell door opened I took 1 step and entered the cell. Immediately I was met with an unprovoked attack from Sullivan. He took a powdered substance and threw it in my face. This took me by surprise and there were no indications given by Sullivan of a threat. I was wearing glasses at the time and the powder had little effect on my eyes. Sullivan quickly followed up with a closed fist strike in the direction of my face. I was able to redirect the strike and grabbed his right forearm and used his momentum to turn him away from me. I ordered him to stop fighting. I place my left hand on his right shoulder and pushed him downward we landed on the counter inside the cell. During this initial struggle my handcuffs had fallen to the cell floor. Once on the counter Sullivan somehow had a hold of my right arm which was now located under his abdomen. I ordered him to let go of my arm and stop resisting. He did not let up with his grip and fighting/resisting. Sullivan started mule kicking at staff and struck me in the leg. At this point using my left hand I delivered 3 closed fist focused blows to the back of Sullivan's right tricep area. My intent was to strike a nerve in his arm thereby weakening his grip of my arm. Next I gabbed his right arm just above his elbow with my left hand and pulled his arm out away from his body. This move broke his grasp of my arm. I was able to gain control of his right wrist. I ordered him to place his hands behind his back. He continued to struggle against my attempts to place him in handcuffs. I was able to get his right wrist to the small of his back just above his buttocks. I asked for my handcuffs from staff. Once I regained my handcuffs I placed his right wrist in the cuff. Once secured; I told Sullivan to give us his left hand and place it behind his back. It was at this point I noticed Barker was trying to control his left arm. I continued to give verbal commands to stop resisting and allow us to handcuff him. I could hear other staff telling him to do the same. He continued to resist against Barker not allowing his left hand to be placed behind him. I again told him "just stop fighting and put your hand to your back". Soon thereafter I heard a pop noise and his left wrist appeared to the small of his back. I placed his left wrist in the handcuff.

Now that Sullivan was secure we attempted to move him out of the unit. As we exited the cell he decided to twist and turn in what appeared to be an attempt to break free from our escort. Barker and I were performing the escort, with me in his right side and Barker to his left. For the escort I placed my left arm under his right arm and helped support his movement. Once we reached the stairs in the unit Sullivan went limp in an apparent attempt to oppose our movement. I stopped the escort and explained we did not want any harm to come to him or staff during our decent down the stairs. We paused and I ordered him to walk down the stairs. He stated "ok." We continued down the stairs and escorted him out of the 5d unit. Once outside the unit I called for an elevator to be staged on the 5th floor for movement of inmate to 4F. We arrived at the elevators to find the one waiting for us with the doors opened. We entered the cell and started the decent to the fourth floor. Once we arrived on the fourth floor the elevators doors opened and we continued our escort to 4F. We were met on the floor by Deputy Kovachevich. It should be noted that during this escort Sullivan struggled against the escort. He twisted his hips from side to side. I gave clear and concise orders to walk and stop his struggling to no avail. We entered 4F13 Sullivan continued to twist and toss his hips from side to side. I ordered Sullivan to lay down on the mattress in 4F. My order was met with a no. Therefore I and Barker slowly lowered him to the mattress face down. Once on the ground I again ordered Sullivan to stop resisting. I allowed him the opportunity to comply but he did not. I decided for safety reasons, based on how the incident unfolded, it would be best to cut off his jail clothing. I asked staff to retrieve me the clothing cutters and a white jump suit. While waiting for the items to arrive Sullivan stated he could not breathe. I was located next to his upper body at this point. I grabbed his left side and rolled him slightly to one side to assist/aid him. It should be noted that it did not appear to me that he had any issues breathing as he was now yelling and I could hear him exhaling and inhaling. Staff retrieved both items and I handed the clothing cutter to Barker who cut off Sullivan's jail clothing. Once the clothing was removed I gave clear directions to Sullivan about the removal of his hand cuffs. I ensured he understood the commands given by asking him to repeat them. He complied with the commands while Baker removed the handcuffs. I placed the white jump suit over his body to help cover him, keeping him warm. At this point all staff exited the cell. I made the decision to immediately seek medical attention and called for the medical staff. Medical staff arrived on scene and evaluated Sullivan's vitals. Medical noted his left arm appeared to be broken. I had master control call for an ambulance. I spoke with the shift lieutenant informing him of the situation and asked him to arrange for a transport. As we waited for the ambulance to arrive I ensured Sullivan was covered with a sheet. The measure helped to keep him warm and ensure his privacy. AMR transported Sullivan to the hospital. I had no further contact.

**ACTION PENDING:** *forward*

---

**REVIEWS:** **07/15/2017 2109 hrs** - *I have been assigned the review of packet #2258 involving Inmate Sullivan, C. #677564, which occurred in 5D on 6-28-17. All reports are included and complete in content, (there is no video of this incident). This incident began when Inmate Sullivan took some Gatorade (which he was not supposed to have taken) from the med tech, ran to his cell and disobeyed the orders from the module deputy.*

EXHIBIT 20



# Multnomah County Sheriff's Office

**INCIDENT REPORT #27634**
(Dep Wendy Muth #42885)



**INCIDENT:**  Use Of Force -
**LOCATION:**  MCDC - 5D (5d23)
**PACKET #:**  2258

Occurred: **06/28/2017 2035 hrs**
Submitted: **07/13/2017 1824 hrs**

**SUMMARY:**  *Force was used to move Inmate Sullivan to a disciplinary unit.*

**MENTIONED:**

| #677564 Sullivan, Cyrus | M/W | 06/26/1983 | MCDC - 4A - 1 |
|---|---|---|---|
| #35798   Dep Barker, Tim | 741 Housing Sgt. | | |
| #31450   Dep Hubert, Philip | 5 Escort | | |
| #34887   Sgt Ingram, Matthew | 761 Housing Sgt. | | |

**NARRATIVE:**  *On the above listed date and time I was working the 8-Escort post at MCDC. A Call for additional escorts to 5D came over the radio. I quickly made my way to 5D to assist. When I arrived in 5D the Med Tech was there, all of the Inmates were celled in and Deputies Simpson and Hubert were on the top tier at cell 23. I went up to cell 23. Deputy Simpson had the food port open and was ordering Inmate Sullivan to cuff up through the food port. Inmate Sullivan was insulting Deputy Simpson, threatening to "put his personal information, including his address, online" and refusing to cuff up. Deputy Simpson closed the food port and called for 741 Acting Sgt. Barker to Respond.*

*Just then 761 Sgt. Ingram arrived to 5D23. Sgt. Ingram opened the food port and ordered Inmate Sullivan to cuff up several times. Inmate Sullivan told Sgt. Ingram to "go fuck himself" and threatened to "put his personal information online and order a "Hit" on him." Sgt. Ingram closed the food port. A/Sgt. Barker arrived to 5D23, opened the food port and ordered Inmate Sullivan to cuff up. Inmate Sullivan continued to yell threats and insults and refused to cuff up.*

*A/Sgt. Barker closed the food port and stated "OK, we are coming in." Someone popped the door open, Barker opened the door and Sgt. Ingram moved to enter the cell. As soon as we began to move in to the cell Inmate Sullivan threw something in Sgt. Ingram's face. I could hear it hit the cell walls and floor. I later became aware it was 'Flaming hot tortilla chips' Inmate Sullivan had thrown. Sgt. Ingram, A/Sgt. Barker, Deputy Hubert, Deputy Simpson and myself all moved in to the cell. Deputy Simpson has his tazer out and at the low ready but because he was behind the others he was unable to get a good shot. Ingram and Barker Pushed Inmate Sullivan up against the cell wall and were trying to get handcuffs on him. Inmate Sullivan was yelling, trying to turn around and pulling away. I took a hold of Inmate Sullivan's left leg and tried to help control him. Inmate Sullivan was screaming and kicking with both of his feet. I heard someone yell for Inmate Sullivan to "stop fighting." Then I got kicked high in the stomach by Inmate Sullivan's foot. It put me off balance and as I stumbled to regain my footing I slipped on the broken up chips on the cell floor and fell backwards on to my bottom. As I tried to get back up I continued to slip on the chips. Someone gave me a hand up. Inmate Sullivan was handcuffed by this time and they were pulling him out of the cell. Inmate Sullivan was still yelling, making threats and had gone limp so they had to pull him out.*

*There were several Deputies there and they seemed to have Inmate Sullivan under control so I stayed behind to gather up his property.*

*A short time later as I moved Inmate Sullivan's property to the 4th floor disciplinary unit I became aware that he had been injured and was going to the hospital via ambulance.*

**ACTION PENDING:**  *Report Corrected and resubmitted as directed.*

**REVIEWS:**  **07/15/2017 2109 hrs** - *I have been assigned the review of packet #2258 involving Inmate Sullivan, C. #677564, which occurred in 5D on 6-28-17. All reports are included and complete in content, (there is no video of this incident). This incident began when Inmate Sullivan took some Gatorade (which he was not supposed to have taken) from the med tech, ran to his cell and disobeyed the orders from the module deputy. Staff were called to respond to escort Inmate Sullivan to disciplinary housing for the rule violations he committed. According to reports, once staff arrived in 5D Inmate Sullivan was given multiple orders by multiple staff members to be handcuffed through the food port, all of which he refused. Staff also noted that Sullivan used obscene language toward staff and made threats against their well-being. Staff noted that*

000025

EXHIBIT 21



## Multnomah County Sheriff's Office

**INCIDENT REPORT #27668**

(Dep Philip Hubert #31450)



| | | |
|---|---|---|
| **INCIDENT:** Use Of Force - Inmate | | Occurred: **06/28/2017 2032 hrs** |
| **LOCATION:** MCDC - 5D (5D23) | | Submitted: **07/03/2017 1652 hrs** |
| **PACKET #:** 2258 | | |

**SUMMARY:** *Use of force on Inmate Sullivan*

| **SUBJECT:** | #677564 Sullivan, Cyrus | M/W | 06/26/1983 | MCDC - 5D - 23 |
|---|---|---|---|---|

| **MENTIONED:** | #35798 | Dep Barker, Tim | Housing Sgt |
|---|---|---|---|
| | #34887 | Sgt Ingram, Matthew | Housing Sgt |
| | #42885 | Dep Muth, Wendy | 8 Escort |
| | #31638 | Dep Simpson, Paul | Escort |

**INJURIES:** **Sullivan, Cyrus** - Major (Hospitalized)          Medical Care: **NOT OFFERED**
        *- Broken Arm (Examined: **06/28/2017 2100 hrs**)*

**NARRATIVE:** *On 28 June 17 at 2032 I was assigned as the 5th floor escort. I heard Deputy Pemberton call on the radio requesting a couple escorts to respond to 5D to take someone to the Disciplinary Unit. Myself and Deputy Simpson responded to5 d. When we arrived in 5D Deputy Pemberton told us the person to go was Inmate Sullivan who was housed in 5D23. When we arrived at the cell I asked Inmate Sullivan to roll up he stated "No come in and get me". He then stated do you know who cop blaster is because your on there. Deputy Simpson then opened the food port and asked ,advised and ordered Inmate Sullivan to cuff up he refused to do. Deputy Simpson then called the Sgt to respond to 5D. While waiting for the Sgt to arrive I observed Inmate Sullivan crunching up some spicy chips that are sold on commissary. A/Sgt Barker and Sgt Ingram arrived in the module and attempted to talk to Inmate Sullivan but he would not comply. Eventually Inmate Sullivan agreed to cuff up but not thru the food port to A/sgt Barker. I then told Deputy Pemberton to pop open 5D23. When the cell door opened Inmate Sullivan turned and faced us and threw powdered chips at us attempting to get them in our eyes. We entered the cell and ASgt Barker was on his left and Sgt Ingram was on his right. They then pushed Inmate Sullivan towards the wall and bent him over at the waist at the counter. Inmate Sullivan had his arms underneath him and despite several focused blows by Sgt Ingram to Inmate Sullivan's right arm he still refused to put his arms behind his back.I was standing behind Sgt Ingram with my right hand on his back bracing him and providing support. Inmate Sullivan was actively resisting by refusing to place his arms behind his back and struggling to get out of Sgt Ingram and A/Sgt Barkers grasp. Inmate then started kicking his left foot towards myself, Deputy Muth and Deputy Simpson who were also in the cell attempting to strike us. While Inmate Sullivan was trying kick at us he was still refusing to put his arms behind his back despite repeated orders by Sgt Ingram and A/sgt Barker. I was able to get a grasp on Inmate Sullivan's foot after taking my hand off of Sgt Ingram's back. At this point they were able to place Inmate Sullivan's arms behind his back and the handcuffs were applied. We began to back out of the cell and once we exited the cell and began to walk Inmate Sullivan down the tier he went deadweight and refused to stand up. This caused Asgt Barker and Sgt Ingram to have to pick him up and half walk Inmate down the tier to the stairs. When we got to the stairs Inmate Sullivan was ordered to stand up which he did and he was escorted down the stairs and exited the module. . I called for an elevator to meet us on the Fifth Floor and take us to the Fourth floor. Once we got on the elevator Inmate Sullivan was placed in the corner facing the wall. We arrived on the fourth floor and proceeded to 4F13.Once we arrived in 4F13 Inmate Sullivan was lowered to the mattress on his belly. Asgt Barker was closest to the window and Sgt Ingram was at the head and I was kneeling on his back. The cutters were retrieved and his clothes were cut off and the handcuffs were removed. Inmate Sullivan was complaining that his arm was broken. Medical responded and determined it was broken and an Ambulance was called. I accompanied Inmate Sullivan to transfer and while in the Ambulance he stated you didn't have to break my arm.*

**ACTION PENDING:** *Forwarded to Supervisor*

# EXHIBIT 22



## Multnomah County Sheriff's Office

### INCIDENT REPORT #27635
(Dep Paul Simpson #31638)



| | | |
|---|---|---|
| **INCIDENT:** Use Of Force - Inmate | | Occurred: **06/28/2017 2032 hrs** |
| **LOCATION:** MCDC - 5D (5d23) | | Submitted: **06/29/2017 1746 hrs** |
| **PACKET #:** 2258 | | |

**SUMMARY:** *Inmate Sullivan was ask, advised and ordered to cuff up through the food port. He refused each time. Sullivan said to me " Fuck you come in and get me". My Housing Sgt. Was then called and took over.*

**SUBJECT:**

| #677564 | Sullivan, Cyrus | M/W | 06/26/1983 | MCDC - 4F - 3 |
|---|---|---|---|---|

**MENTIONED:**

| #35798 | Dep Barker, Tim | 761 housing Sgt. |
|---|---|---|
| #31450 | Dep Hubert, Philip | 5th floor escort |
| #34887 | Sgt Ingram, Matthew | 4-5 housing Sgt. |
| #42885 | Dep Muth, Wendy | 8th floor escort |
| #20600 | Dep Pemberton, Uwe | 5D module Deputy |

**INJURIES:** **Sullivan, Cyrus** - Major (Hospitalized)    Medical Care: Offered
- *Was sent to hospital. Per medical possible broken left arm. (Examined: 06/28/2017 2100 hrs)*

**NARRATIVE:** *I was recreation deputy until 1930 when I was told to close down recreation due to a staff shortage, and moved to 5B/C to do security and welfare checks. At 2032 I was outside 5th floor control with the 5th floor escort Deputy Hubert. Deputy Pemberton called on his radio at that time and said he needed two escorts to come into module 5D. We both responded to 5D module. I was the first one in and ask Pemberton what`s wrong. He said the inmate running to his cell in room 5D23 needed to go. The inmate closed his door before I got there. I opened the food-port and ask him to cuff up. Sullivan refused. I advised him. He refused. I ordered him. Sullivan said " Fuck you come in and get me". I then closed the food-port and called the housing Sergeant Barker. Sullivan then look straight at me from the cell window and told me I am going to find your home address and put it on my web site cop blaster. He told me that will teach you to mess with me. I took that as a direct threat to my family and me. I then gave him a verbal warning to him if I saw him at my home I would use force including deadly if necessary to protect my family. Sergeant Ingram arrived first. He opened the food-port and ask Sullivan to cuff up. He refused. Barker arrived and ask Sullivan to cuff up. Sullivan said to Barker " I don't cuff like that". Sullivan then told Barker if he opened the cell door he would comply too being handcuff. Ingram and Barker step away from the cell and told Muth, Hubert and I that they would go in first. I was told by Barker to have my Taser ready. Barker opened the door with Ingram next to him on his right side. I was behind them in the middle when he opened the door. Barker opened the door I felt something hit my chest and a powder substance engulf my right eye. I saw Barker get hit with an elbow to his head. Barker and Ingram place Sullivan on the cell counter face down and ordered him to place his arms behind his back to be handcuff. Sullivan was resisting. I couldn't use the Taser, because Ingram and Barkers body`s covered Sullivan back. Sullivan was trying to kick Muth and I. Muth told me forget the Taser and secure his left leg. I holstered my Taser and secured his left leg from kicking us by using my body weight to pin his leg and left foot to the floor. Hubert secured his right leg. Barker and Ingram then applied handcuffs on Sullivan. Sullivan was then taken out of the cell by Barker and Ingram. Sullivan outside his cell then refused to walk and went to dead weight. I help Barker and Ingram lift Sullivan back to his feet. Sullivan per his inmate card weight 230 pounds. Barker ordered him to walk. Hubert at this time ask if I was alright. He could tell I was played out. I am 55 years old and have a documented lower back injury from my time at the corrections academy. I was played out both mentally and physically from Sullivan verbal and physical attack on me. Hubert took over for me and help escort Sullivan down to module 4F. I was told to run the panel to open and closed Sullivan`s cell door. I had no more contact with Sullivan. I found out later that the substance that went into my eye and cause some pain and discomfort was Scorchin chips he crush into a powder and threw at us. This item is from the commissary at Multnomah county detention center.*

**ACTION PENDING:** *To Housing Sgt.*

## WHITE Brandon

| | |
|---|---|
| **From:** | MELLIGH John J |
| **Sent:** | Tuesday, August 15, 2017 2:12 PM |
| **To:** | WHITE Brandon |
| **Subject:** | Section #7 - Sullivan Case |

Per the Sullivan case records request #7 – No staff member listed under #7 went to the hospital or had sick leave in relation to this incident. Deputy Muth took a sick day two days after the incident, but she usually has that day off as a time exchange off, or a leave day, so it was unrelated.

John

## Sgt. John Melligh
Multnomah County Sheriff's Office
Corrections Administrative Sergeant
Office Phone: (503)988-4318
Cell Phone: (503)793-4602
Fax: (503)988-6227
Bldg: 503/350
john.melligh@mcso.us



1

000013

## EXHIBIT 24

Tiffany A. Harris  OSB02318
Attorney at Law
333 SW Taylor Street, Suite 300
Portland, OR 97204
t. 503.782.4788  f. 503.217.5510
tiff@harrisdefense.com

Attorney for Cyrus Sullivan

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No.: 3:17-CR-00306-JGZ |
| Plaintiff, | EXPERT WITNESS REPORT |
| vs. | WILSON C. "TOBY" HAYES, PH.D. |
| CYRUS SULLIVAN, | |
| Defendant | |

INTRODUCTION

1)  My name is Wilson C. "Toby" Hayes, Ph.D. I have been retained as an independent expert witness by Tiffany A. Harris, Attorney at Law, on behalf of Cyrus Sullivan in the above-captioned case to provide my opinions with respect to the injuries sustained by Mr. Sullivan.

2)  I have reviewed the following materials in connection with my work in this case: Multnomah County Sheriff's Office Incident Reports (6/28/17), Nine Separate Reports; Motion for Leave to Serve Subpoenas Under Rule 17(c)(3) (5/02/18); Medical Records; Radiograph CD: 6/28/17, Left Humerus, 8/3/17, Left Humerus; and Indictment (8/15/17).

3)  Based on the materials I have reviewed, I understand that Mr. Cyrus Sullivan is charged with five counts of assaulting a Federal Officer related to a series of interactions with correction deputies at the Multnomah County Detention Center (MCDC) on June 28, 2017. As a consequence of these events, Mr. Sullivan was treated by paramedics at the MCDC, transported to Oregon Health & Science University Emergency Department and diagnosed by Bryan M. Wolf, M.D. with "...*an oblique fracture through the distal humeral diaphysis, with one half shaft width posterior displacement of the distal component and minimal anterior apex angulation.*" Dr. Wolf's impression was "*mildly displaced humeral diaphyseal fracture.*"

4)  Two versions of how the humeral fracture occurred are reflected in the records. The Patient Care Report from the paramedics indicates that Mr. Sullivan was in "*an altercation with officers*", and stated that "*He sustained the injury when he was forced down to the ground and had his arm twisted behind his back*" and that he "*felt pain when his arm was twisted behind his back.*" Mr. Sullivan further stated that he thought "*his arm was broken after officers left his cell.*" Mr. Sullivan's version of the events was described as occurring in a cell on the fourth floor disciplinary unit (what I understand to be commonly known as "the hole"), after he had been forcefully escorted from his cell on the fifth floor in the general population area of the jail and had been pinned, face-down, by deputies to a mattress on the floor of a cell in the detention center on the fourth floor. This is when Mr. Sullivan asserts that his arm was twisted behind his back and broken.

5)  The versions of these events provided by Deputy Barker and Deputy Ingram differ substantially from that of Mr. Sullivan. In his Incident Report, Deputy Barker (Incident Report, 07.15.17, MCSO) indicated that while he was "*trying to pull [Mr. Sullivan's] left arm behind his back*" [in order to handcuff him], he "*heard what [he] thought was a pop.*" He then waited for a

EXPERT WITNESS REPORT

WILSON C. "TOBY" HAYES; PH.D. - 2

## EXHIBIT 24

reaction indicating an injury and saw *"no indication of this."* Similarly, Deputy Matthew Ingram (Incident Report, 07.13.17, MCSO) described Mr. Sullivan's resistance to having his left hand be placed behind him, hearing a "pop" noise as his left wrist *"appeared to the small of his back "*. It is my understanding that the government may argue that Mr. Sullivan's fracture occurred at the time they heard this "pop."

6)   I submit this Expert Report in compliance with Rule 16(b)(1)(c) of the Federal Rules of Criminal Procedure. I expect to testify at trial regarding the matters expressed in this Expert Report and any supplemental reports or declarations that I may prepare for this matter. I may also prepare and rely on audiovisual aids, anatomic models and physical demonstrations to provide bases and reasons for various aspects of my trial testimony. I may also testify at trial with respect to any matters related to the fields of injury biomechanics or anatomy addressed by any expert testifying on behalf of the United States, if asked by the Court or by counsel.

EXPERT QUALIFICATIONS

7)   Here, I provide a brief summary of my qualifications. My qualifications are stated more fully in my most recent *curriculum vitae* ("CV"), which is attached to this Expert Report as Exhibit 1.

8)   I am over the age of eighteen and I am a citizen of the United States.

9)   I am currently Emeritus Professor in the College of Health and Human Sciences at Oregon State University in Corvallis, Oregon.  I am also President of Hayes+Associates, Inc., 2390 NW Kings Blvd., Corvallis, OR, 97330.

10) I graduated with a B.S. in Mechanical Engineering in 1964 and then an M.S. in

EXHIBIT 24

Mechanical Engineering (Design) in 1966 from Stanford University. As an undergraduate and graduate student at Stanford University I took courses in engineering mechanics, dynamics and kinematics and thus I am familiar with the fundamental engineering principles that are used in the reconstruction and simulation of a variety of events that can cause injuries. I received a Ph.D. in Theoretical and Applied Mechanics (Biomedical Engineering) in 1970 from Northwestern University, where my course of study involved both medical and engineering courses, the latter again including advanced training in engineering dynamics and kinematics, and the former in anatomy, physiology and biomechanics. I then completed two post-doctoral fellowships, the first at the Laboratory for Experimental Surgery in Davos, Switzerland in 1970, and the second at the Department of Orthopaedics at the Karolinska Institute in Stockholm, Sweden in 1971.

11) From 1971 to 1976, I was Assistant Professor of Mechanical Engineering and Surgery (Orthopaedics) at Stanford University. From 1976 to 1979, I was Associate Professor of Orthopaedics and Bioengineering at the University of Pennsylvania. In 1979, I was named Director of the Orthopaedic Biomechanics Laboratory at Harvard's Beth Israel Hospital and Associate Professor of Orthopaedic Surgery at Harvard Medical School. In 1983, I was named Associate Professor of Orthopaedic Surgery at the Harvard-MIT Division of Health Sciences and Technology. In 1985, I was named Full Professor at both Harvard Medical School and MIT; and then in 1988, the first incumbent of the Maurice E. Mueller Endowed Professorship of Biomechanics at Harvard Medical School, a position I held until 1998, when I joined the faculty at both Oregon State University and Oregon Health & Science University. I served as Vice Provost for Research at Oregon State from May 1998 through June 2001, when I resigned that administrative position in order to focus more fully on Hayes+Associates, Inc.

EXPERT WITNESS REPORT

WILSON C. "TOBY" HAYES, PH.D. - 4

## EXHIBIT 24

12) I have more than 40 years of teaching, research and consulting experience in fields ranging across mechanical engineering, experimental mechanics, accident reconstruction, occupant dynamics, injury biomechanics, human functional anatomy, and clinical orthopaedics. I have taught undergraduate, graduate, and post-graduate students in both engineering and medical school settings. I have lectured on the subject of injury biomechanics in a wide variety of post-graduate courses for engineers, medical students, residents, clinical orthopaedists, forensic scientists, and accident reconstructionists. At Stanford, I taught courses in engineering mechanics, experimental mechanics and biomechanics, often using examples related to injury reconstruction and injury dynamics. From 1985 to 1998 I was one of the three Course Directors of Human Functional Anatomy at Harvard Medical School. In this role, I was responsible for lectures, prosection demonstrations, and laboratory dissections, primarily related to the functional anatomy of the musculoskeletal system, including the upper extremity and elbow. I routinely made use of radiographs, MRI's, and CT's in the course of my teaching.

13) I have served as Principal or Co-Principal Investigator on 61 research grants from federal, foundation or industrial sources, all of them involving the biomechanics of the musculoskeletal system. Many of these grants directly involved injury biomechanics. Research results from my laboratory have appeared in the peer-reviewed literature and are widely cited by scientists and experts in the field. I have authored or co-authored 204 peer-reviewed publications, over 60 chapters, and two books. One of these books went through two editions. I was the founding editor of the Journal of Orthopaedic Research and served as its Co-Editor-in-Chief from 1983 to 1995. The Journal is now the preeminent research journal in orthopaedics.

14) Although I am not a licensed physician and do not treat patients, I have had considerable

EXHIBIT 24

experience in clinical orthopaedics. As Vice Chairman for Research in the Department of Orthopaedic Surgery at Beth Israel Deaconess Medical Center, I attended x-ray rounds, often on a daily basis, offering advice to residents and house staff on the mechanisms and treatment of musculoskeletal injuries. I served as Acting Chairman of the Department from 1992-1993 while the Department searched for a new Chief. I routinely qualify in both state and federal court in both civil and criminal proceedings to testify, to a reasonable degree of engineering and biomechanical certainty, on injury biomechanics, routinely making use of and interpreting medical histories, radiographs and anatomy as the basis for my opinions.

WITNESS'S OPINIONS

15) Based on my review and analysis of the materials provided and my background, training and experience in anatomy and injury biomechanics, it is my opinion, to a reasonable degree of engineering and biomechanical certainty, that Mr. Sullivan's humeral fracture occurred in cell 4F13 of the fourth floor detention center when he was pinned to the mattress on the cell floor by Deputies Barker & Ingram and when his arm was *twisted behind his back.* The analysis indicates that the level of force necessary to produce such fractures are consistent with those reported in the literature as associated with motor vehicle collisions[4,20], high-intensity arm wrestling[26], and fractures known to occur during high-velocity throwing motions[31]. Moreover, it is my opinion, to a reasonable degree of engineering and biomechanical certainty, that the facts of the case rule out the version of the events provided by the Deputies, asserting that the fracture occurred in Mr. Sullivan's cell 5D23 on the fifth floor as deputies were trying to handcuff Mr. Sullivan. The fundamental bases for these opinions include: 1) The spiral configuration and twist direction of the humeral fracture itself, including its mild angulation and

EXPERT WITNESS REPORT

WILSON C. "TOBY" HAYES, PH.D. - 6

## EXHIBIT 24

displacement; 2) Peer-reviewed literature on the torsional strength of the humerus; 3) Mr. Sullivan's height and weight (and thus anthropometry); 4) Incident Reports that indicate the details of the escort process by which Mr. Sullivan was transferred from the fifth to the fourth floor; 5) My review and interpretation of the radiographs taken on June 28, 2017; and 6) My calculations, using the fundamental laws of engineering physics, that the twisting forces applied to Mr. Sullivan's forearm were both substantial and violent, applied in a manner that would be expected to cause injury, well within the capabilities of males similar to Deputies Barker and Ingram [1,5,25], and well above the reported torsional fracture strength of the humerus. These facts and analyses thus both comport with and *rule in* the assertions on injury causation provided by Mr. Sullivan and *rule out* the version of events described by the involved Deputies.

BASES AND REASONS FOR EXPERT OPINIONS

16) The reasons and bases for my expert opinions in this case are based on my background, training and experience in the biomechanics of injury reconstruction and causation, specifically as it applies to the forces and loading mechanisms necessary to cause fractures to bone.

17) In any event involving injuries, such as the humeral fracture sustained by Cyrus Sullivan, in which the facts are in dispute, the participant and eyewitness testimony are in conflict, and no dispositive contemporaneous recording (e.g. video surveillance) is available, the injuries themselves can be used to reconstruct the mechanism of injury, help resolve factual disputes and conflicts in testimony, and thereby assist the trier of fact in the determination of responsibility. The scientific field for interpreting such injury-producing events is called *injury biomechanics* [3,7,13,17,22,28-30]; the process by which injury biomechanics is applied to particular events is called *injury reconstruction*. For an injury reconstruction to be considered scientifically reliable,

EXPERT WITNESS REPORT

WILSON C. "TOBY" HAYES, PH.D. - 7

## EXHIBIT 24

it must comport with the fundamental laws of engineering and physics (including those that apply to the human body), it must produce the injuries that were actually sustained (and not injuries that did not occur), and it must comport with the facts of the case (including, to the extent possible, eyewitness testimony). If the reconstruction meets these criteria, it can then be used to work back from the injuries, through the reconstruction, to what initiated the event and thus help determine who was at fault. Such methods are routinely used both in and outside the context of litigation and criminal proceedings to address injuries from motor vehicle collisions, falls, work-related activities, assault and abuse, and many other events.

18) Individual injury causation addresses whether a certain event produced a particular injury. Approaches to determining specific causation for the evaluation of medical conditions have been developed by organizations such as the National Institute for Occupational Safety and Health (NIOSH), the American Medical Association (AMA), the Federal Judicial Center and others [3,7,17,22] using the following steps. First, a medical diagnosis of injury must be established. Second, there must be a consistent temporal relationship between the exposure and the injury or medical condition. The third step is to compare the general knowledge to the specific circumstances of the event in question, with the focus on comparing the specific levels of exposure (as determined by a reconstruction based on engineering principles and the laws of physics) to those required to cause bodily damage. In other words, for a certain event, it must be determined whether the event produced sufficient loading to cause the injury (i.e. a scientifically reliable biomechanical mechanism). The final step is to consider modifying factors and alternative causes of the injury or condition.

19) In keeping with the above, and in particular, the causation criterion that there be an

## EXHIBIT 24

injury diagnosis, there is no dispute as to whether Mr. Sullivan sustained a closed, displaced fracture of the distal third of the left humerus associated with the events of June 28, 2017. Direct examination of the radiographs themselves (06.28.17 and 08.03.17) further indicates that Mr. Sullivan's specific fracture is spiral in configuration, a pattern well known to occur in brittle materials such as chalk, as well as in the shafts of long bones (which are composed of cortical bone tissue, which is also a brittle material). Such fractures are known to be caused by twisting (also known as *torsion*) of long, approximately cylindrical structures such as bones. The spiral configuration of such fractures was described by Yamada (1970) as, *"The rupture starts as a spiral around the shaft and terminates as a straight line between the ends of the spiral."* [33]. This is exactly the configuration demonstrated in Mr. Sullivan's radiographs, taken on the evening of June 28, 2017. Yamada further noted that there was a difference in the direction of the spiral, depending on whether the twist was in a clockwise or a counterclockwise direction, and that, as with Mr. Sullivan, the center of the broken part was roughly one-third of the length of the shaft, from its lower end, for the human humerus. These findings were confirmed by Klenerman (1969) [21]. I have reflected this understanding of the biomechanical mechanisms and fracture patterns associated with torsional fractures of human bone in numerous publications [2,8-12,14,15,18,19]. This long-standing understanding of the biomechanical mechanisms for torsional fractures thus allows, by direct examination of Mr. Sullivan's x-rays, taken on June 28, 2017, that his fracture was produced by twisting of his left humerus about the long axis of the bone, in a direction consistent with internal rotation of the humerus. Internal rotation is often demonstrated anatomically with the left arm, bent 90° at the elbow, with the fingers pointed forward, and the forearm rotated inward toward the belly button. In Mr. Sullivan's case, this is equivalent to the left arm, again being bent at the elbow and placed behind the back such that the

EXPERT WITNESS REPORT

WILSON C. "TOBY" HAYES, PH.D. - 9

## EXHIBIT 24

forearm is rotated clockwise (looking down from above the left shoulder) and *away* from the back. Thus, the facts of the case not only satisfy the causation criterion that a medical diagnosis be established, but also indicate that the fracture must have occurred as just described.

20) The second criterion to establish injury causation is that there must be a consistent temporal relationship between the events in question (i.e. the incidents at MCDC) and the injury or medical condition (i.e. the fracture that Mr. Sullivan sustained). This criterion is clearly in dispute, with Deputies Barker and Ingram apparently alleging that it occurred while Mr. Sullivan was standing and being handcuffed in his fifth floor cell and Mr. Sullivan asserting that it instead occurred while he was pinned to the mattress on the floor of the fourth floor cell in the detention center. Here, the configuration of the fracture fragments in the radiographs, taken shortly after the fractures were sustained, are again telling. Given the various descriptions in the Incident Reports provided by the officers involved, there was a considerable struggle as Mr. Sullivan was escorted from the fifth floor cell to the fourth floor detention center. Mr. Sullivan was variously described as "go[ing] passive", "resisting by slumping down", "resisting furiously", with Deputies Barker and Ingram performing the escort. Such a "furious struggle", which more likely than not involved the application of forces to restrain and lift Mr. Sullivan's "dead weight", is biomechanically and anatomically inconsistent with what is characterized in the medical records as a "*minimal anterior apex angulation,*" "*Alignment is normal*", and an impression of "*Mildly displaced humeral diaphyseal fracture.*" (Radiology Report, 6/28/17). While I would leave it to other experts to comment on whether or not Mr. Sullivan could, in the presence of a fractured humerus, mount such a violent struggle over the course of his transfer from one floor to another, his subsequent passivity just after he reported that "*I think my arm is broke*" and his "inability to rise" certainly belies the assertion that his fracture was sustained in his fifth floor cell.

## EXHIBIT 24

21) The third criterion in a scientifically reliable injury causation opinion is to determine whether the event in question (or, in this case, which of the two events in question) produced both an appropriate mechanism and sufficient loading to cause the injury sustained (i.e. a scientifically reliable biomechanical mechanism). The simplest, and most intuitively obvious approach to predicting injury risk, makes use of the ratio between the loads imposed on an anatomic structure (in this case, Mr. Sullivan's left humerus) and the load-carrying capacity of that structure (called the *tolerance limit* or *injury threshold*). This approach to injury risk prediction can be formalized by defining a factor of risk, $\Phi$, as the ratio of the applied torque (defined as the *twisting* effect of a force and equal to force x distance) divided by the torque necessary to cause a spiral humeral fracture. Hayes et al. [16] used this approach in describing those factors that are important to age-related fractures of the hip. For a factor of risk exceeding 1, injury to the anatomic region is more likely than not. For a factor of risk well under 1, fracture is considered unlikely. For a skeletal structure such as the humerus, determinations of the factor of risk require information both on the torques to which the humerus is subjected during loading and on the forces necessary to cause torsional fracture of the humerus. The factor of risk is a powerful and widely used approach to injury risk prediction that has been used and tested repeatedly by researchers in academia, industry and governmental agencies, and is accepted and relied upon by experts in the fields of ergonomics and injury biomechanics [6,23,24,27].

22) To implement the factor of risk in an injury causation opinion, data are required on the strength of the humerus under the loading conditions known by inspection of the radiographs to have caused the injury, in Mr. Sullivan's case, torsion. Research studies providing data on the torsional strength of the human humerus have appeared in the peer-reviewed literature since at least the late 1960's. Yamada reported the torsional fracture moment for hydrated adult long

## EXHIBIT 24

bones as 526 in-lb, with an ultimate angle of twist of about 6° [33]. Klenerman (1969) reported the average torque at failure for fourteen humeri broken in torsion as 488 in-lb (range 195-815 in-lb)[21]. Schopfer et al. (1994) reported in seventeen intact human cadaveric humeri, torsional fracture at an average torque of 470 in-lb (range 185-885 in-lb), with an average angular rotation at failure of 26.6° (range 17.1°-38.4°)[32]. These values are in close agreement with the early data from Klenerman [21]. Lin et al. (1998) reported fracture torques of $404 \pm 134$ (Standard Deviation, SD) in-lb, with a failure angle of $23.7° \pm 4.5°$. Strothman et al. (2000) provided data on eighteen fresh frozen cadaver humeri of $467 \pm 181$ (SD) in-lb.

23) The data on torsional strength are used in the denominator of the factor of risk. To determine the torque actually applied in the incident involving Mr. Sullivan, we must know the length of the lever arm that can be used to apply a torque about the long axis of the humerus. Put another way, with the elbow bent at 90° and the forearm placed behind the back, the distance from the center of the elbow to the center of the wrist, represents the maximum length of the lever arm when the wrist is grasped and used to twist the humerus. Differing torques would, of course, be applied if the forearm is grasped closer to the elbow, with the most efficient application of force being at the wrist and the least efficient as the forearm is grasped closer to the elbow. Based on anthropometry (defined as the science of human size and shape) and on his height of 5'11.5", Mr. Sullivan's forearm length is approximately 10.4 inches (Exhibit 2) (AnthroCalc, 2001). Thus, for every pound of force applied at the wrist so as to twist the humerus, 10.4 in-lb of torque is applied to the humerus. Thus, to fracture the humerus in torsion, a force of between 40 and 50 pounds must be applied to the wrist and used to pull the forearm up and away from the back. These values are obviously well within the single-handed lifting capabilities for male subjects. Such forces are, of course, minimum and conservative values since

## EXHIBIT 24

they are based on testing of cadaver bones, usually from middle-aged and elderly subjects. To fracture the left humerus of a 34-year old, 80th percentile male such as Mr. Sullivan, the applied forces were likely substantially higher (but still well within the physical capabilities of the Deputies involved.) As such, these findings demonstrate that the requirement for a scientifically reliable biomechanical mechanism is clearly met.

24) The fourth and final step to be addressed in a scientifically reliable injury causation opinion is to consider modifying factors and alternative causes of the injury, in this case the fracture to Mr. Sullivan's left humerus. Here, in the case at hand, the two alternative causal mechanisms are the fundamental questions that I have been asked to addressed, i.e. did the fracture occur as apparently being asserted by the Deputies while they were attempting to handcuff Mr. Sullivan in his fifth floor cell *before* transporting him to the detention center, or, as asserted by Mr. Sullivan, did the fracture occur *after* being escorted, while he was pinned to a mattress on the floor of a cell on the fourth floor detention center? As part of my analysis of the second criterion, i.e. objective evidence of injury, I have already noted that the aligned nature and modest displacement of the fracture fragments do not comport with the "fierce struggle" and forceful nature of the escort process as described by the Deputies. Given the lack of structural connection between the fracture fragments and the testimony that it was necessary to support Mr. Sullivan as he went limp (a process that almost certainly would have involved, at least in substantial part, the upper extremities, it would be highly unlikely for a through and through fracture of the humerus to maintain its alignment and mild displacement. In fact, the use of splints and air casts for trauma victims with serious fractures is for the very purpose of eliminating or at least reducing the relative motion and angulation of such fractures. I have also noted, although will defer to other experts on this issue, that Mr. Sullivan would likely be unable

## EXHIBIT 24

to struggle fiercely, simply because of pain, with this serious fracture. I have already noted that Mr. Sullivan did not report that *"I think my arm is broke"* until *after* the events on the mattress in the fourth floor detention center. Finally, Deputy Barker's Incident Report (Incident Report 07.15.17, MCSO) also comports with a fracture mechanism that occurred on the mattress of the fourth floor cell and not in the fifth floor cell. Deputy Barker's description of the fourth floor incident is that he had *"removed the right handcuff and told [Mr. Sullivan] to place his right hand under [his] belly."* According to the Deputy, *"Inmate Sullivan would not comply with simple directions,"* and *"he had to be helped with this task by rolling him to the left a few inches."* For Deputy Barker to use the left hand and wrist of Mr. Sullivan to roll him to his left would require that the left wrist and forearm be lifted up and away from its position at the small of Mr. Sullivan's back. This is precisely the mechanism of torque application necessary to produce the spiral fracture of the left humerus that Mr. Sullivan sustained. Moreover, in describing the events on the fifth floor, Deputy Barker indicated that he was attempting to *pull* [Mr. Sullivan's] left arm behind his back, and that Mr. Sullivan *"kept pulling up and away from [him]"* and that this is when he thought he heard a *"pop."* Such pulling actions would not apply torque to the humerus of sufficient magnitude and appropriate orientation to cause Mr. Sullivan's fracture. Thus, on the basis of the displacement and alignment of the fracture fragments, the consistent descriptions among all parties that Mr. Sullivan's complaints that his arm had been fractured occurred on the fourth floor, and the fact that Incident Report descriptions of the application of torque would produce a fracture on the mattress, rather than in the fifth floor cell, the facts and my analysis of the case lead me to conclude that the fracture occurred as Mr. Sullivan described.

## EXHIBIT 24

Dated this 17th of August, 2018

Wilson C. "Toby" Hayes, Ph.D.

EXHIBIT 24

References

[1]   Badi TH, Boushaala AA. Effect of one-handed pushing and pulling strength at different handle heights in vertical direction. World Academy of Science, Engineering and Technology 2008; 47 425-8

[2]   Bouxsein ML, Myers ER, Hayes WC. Biomechanics of age-related fractures. In: Marcus R, Feldman D, Kelsey J. Osteoporosis. San Diego, CA: Academic Press 1996

[3]   Cocchiarella L, Lord SJ. Appendix A:  Judging causation. In: Cocchiarella L, Lord SJ. Master the AMA Guides Fifth:  A Medical and Legal Transition to the Guides to the Evaluation of Permanent Impairment, Fifth Edition. AMA Press 2001

[4]   Ekholm R, Adami J, Tidermark J, et al. Fractures of the shaft of the humerus. An epidemiological study of 401 fractures. J Bone Joint Surg Br 2006; 88 1469-73

[5]   Garg A, Beller D. One-handed dynamic pulling strength with special reference to speed, handle height and angles of pulling. Int J Ind Eng 1990; 6 231-40

[6]   Genaidy AM, Waly SM, Khalil TM, Hidalgo J. Spinal compression tolerance limits for the design of manual material handling operations in the workplace. Ergon 1993; 36 415-34

EXHIBIT 24

[7]   Guzelian PS, Victoroff MS, Halmes NC, et al. Evidence-based toxicology: A comprehensive framework for causation. Hum Exp Toxicol 2005; 24 161-201

[8]   Hayes WC. Chapter 15:  Bone biomechanics:  From tissue mechanical properties to an assessment of structural behavior. In: Woo SLY. Frontiers in Biomechanics. New York, NY: Springer-Verlag 1986

[9]   Hayes WC. Chapter 10:  Bone biomechanics - Material properties. In: Lane JM. Fracture Healing. Proceedings of the Bristol-Myers/Zimmer Fracture Symposium. New York, NY: Churchill Livingstone, Inc. 1987

[10]  Hayes WC. Chapter 3:  Biomechanics of cortical and trabecular bone:  Implications for assessment of fracture risk. In: Mow VC, Hayes WC. Basic Orthopaedic Biomechanics. New York, NY: Raven Press, Ltd. 1991

[11]  Hayes WC, Bouxsein ML. Chapter 3:  Biomechanics of cortical and trabecular bone:  Implications for assessment of fracture risk. In: Mow VC, Hayes WC. Basic Orthopaedic Biomechanics. 2nd ed. Philadelphia, PA: Raven Publishers 1997

[12]  Hayes WC, Carter DR. Chapter 13:  Biomechanics of bone. In: Heppenstall RB. Skeletal Research:  An Experimental Approach. New York, NY: Academic Press 1979

EXHIBIT 24

[13]  Hayes WC, Erickson MS, Power ED. Forensic injury biomechanics. In: Yarmush ML, Diller KR, Toner M. Annual Review of Biomedical Engineering. Palo Alto, CA: Annual Reviews 2007

[14]  Hayes WC, Gerhart TN. Chapter 9: Biomechanics of bone: Applications for assessment of bone strength. In: Peck WA. Bone and Mineral Research, Annual III. Amsterdam: Elsevier Science Publishers 1985

[15]  Hayes WC, Myers ER. Chapter 4: Biomechanics of fractures. In: Riggs BL, Melton LJ. Osteoporosis: Etiology, Diagnosis and Management. 2nd ed. Philadelphia: PA 1995

[16]  Hayes WC, Myers ER, Robinovitch SN, et al. Etiology and prevention of age-related hip fractures. Bone 1996; 18 77S-86S

[17]  Henifin MS, Kipen HM, Poulter SR. Reference guide on medical testimony. Reference Manual on Scientific Evidence. Washington, DC, Federal Judicial Center: 2000

[18]  Hipp JA, Hayes WC. Chapter 4: Biomechanics of fractures. In: Browner BD, Levine AM, Jupiter JB. Skeletal Trauma. 2nd ed. New York, NY: W.B. Saunders 1997

[19]  Keaveny TM, Hayes WC. Chapter 10: Mechanical properties of cortical and trabecular bone. In: Hall BK. Bone Volume VII: Bone Growth. Boca Raton: CRC Press 1992

EXHIBIT 24

[20]  Kim SH, Szabo RM, Marder RA. Epidemiology of humerus fractures in the United States: nationwide emergency department sample, 2008. Arthritis Care Res (Hoboken ) 2012; 64 407-14

[21]  Klenerman L. Experimental fractures of the adult humerus. Med Biol Eng 1969; 7 357-64

[22]  Kusnetz S, Hutchison MK. A guide to the work-relatedness of disease. Publication No. 79-116 ed. Washington, D.C.: National Institute of Safety and Health (NIOSH) 1979

[23]  Marras WS. Chapter 10: Occupational biomechanics. In: Karwowski W, Marras WS. The Occupational Ergonomics Handbook. Boca Raton, FL: CRC Press 1999

[24]  McGill SM. The biomechanics of low back injury: Implications on current practice in industry and the clinic. J Biomech 1997; 30 465-75

[25]  Mital A, Kopardekar P, Motorwala A. Isokinetic pull strengths in the vertical plane: effects of speed and arm angle. Clin Biomech (Bristol , Avon ) 1995; 10 110-2

[26]  Ogawa K, Ui M. Humeral shaft fracture sustained during arm wrestling: report on 30 cases and review of the literature. J Trauma 1997; 42 243-6

[27]  Page GB, McMahan PB. An ergonomic investigation of hand switch operation. R-715 ed. Washington, DC: Association of American Railroads Safety Research Division 1990

5/21/2018

11. Hayes, W.C., Snyder, B., Ruff, C.B., Ramaswamy, S., and White, A.A.: Some mechanics of bone architecture. In: Osteoporosis: Recent advances in pathogenesis and treatment (eds., H.F. DeLuca, H.M. Frost, S.S. Jee, C.C. Johnson, Jr., and A.M. Parfitt), pp. 161-173, 1980.

12. Carter, D.R. and Hayes, W.C.: Material/Mechanical properties of bone. Basic Science Resources III. Syllabus for A.A.O.S. Continuing Education Course, pp. 31-50, 1981.

13. Hayes, W.C. and Swenson, L.W.: Finite element stress analysis of the human knee. In: Orthopaedic Mechanics: Procedures and Devices (ed., D.N. Ghista). Academic Press, London, pp. 29-78, 1981.

14. Hayes, W.C. and Snyder, B.: Toward a quantitative formulation of Wolff's Law in trabecular bone. Proc. ASME Symposium on the Mechanical Properties of Bone, Boulder, Colorado, 43-68, 1981.

15. White, A.A., Edwards, W.T., Liberman, D., Hayes, W.C. and Lewinnek, G.E.: Biomechanics of lumbar spine and sacroiliac articulation: Relevance to idiopathic low back pain. In: Symposium on Idiopathic Low Back Pain, (eds., A.A. White and S.L. Gordon). C.V. Mosby, pp. 296-322, 1982.

16. Hayes, W.C., Snyder, B., Levine, B.M. and Ramaswamy, S.: Stress-morphology relationships in trabecular bone of the patella. In: Finite Elements in Biomechanics, (ed. B.R. Simon), pp. 223-268, 1982.

17. White, A.A., Panjabi, M.M., Posner, I., Edwards, W.T., and Hayes, W.C.: Spinal stability: Evaluation and treatment. In: Instructional Course Lectures (ed., D.G. Murray). C.V. Mosby, St. Louis, pp. 457-483, 1982.

18. Huberti, H.H. and Hayes, W.C.: Determination of patello-femoral contact pressures. In: AAOS Symposium on Sports Medicine: The Knee (ed., G. Finerman), C.V. Mosby, St. Louis, pp. 45-53, 1982.

19. Hayes, W.C. and Gerhart, T.N.: Biomechanics of bone: Applications for assessment of bone strength. In: Bone and Mineral Research, Annual III (ed., W.A. Peck). Elsevier Science Publishers, Amsterdam, pp. 259-294, 1985.

20. Hayes, W.C. and Jedrey, D.P.: Research management in biomechanics. In: Proceedings of the Fourth Meeting of the European Society of Biomechanics (eds., S.M. Perren and E. Schneider). Martinus Nijhoff Publishers, Dordrecht, The Netherlands pp. 3-14, 1985.

21. Hayes, W.C.: Bone Mechanics: From tissue mechanical properties to an assessment of structural behavior. In: Frontiers in Biomechanics (ed., S.L.Y. Woo). Springer-Verlag, New York, pp. 196-209, 1986.

22. Hayes, W.C., Esses, S.I. and Goldberg, R.P.: Fracture risk of the proximal femur by quantitative computed tomography. In: Twelfth Annual Applied Basic Sciences Course (eds., H.K. Uhthoff and Z.F.G. Jaworski). University of Ottawa, Canada, 1986.

23. Hayes, W.C.: Basic biomechanics of the skeleton. In: Twelfth Annual Applied Basic Sciences Course (eds., H.K. Uhthoff and Z.F.G. Jaworski). University of Ottawa, Canada, pp. 3-18, 1986.

24. Hayes, W.C. and Ruff, C.B.: Biomechanical compensatory mechanisms for age-related changes in cortical bone. In: Twelfth Annual Applied Basic Sciences Course (eds., H.K. Uhthoff and Z.F.G. Jaworski). University of Ottawa, Canada, pp. 371-377, 1986.

25. Hayes, W.C., et al.: Symposium: Fracture healing. In: Contemporary Orthopaedics 12(4): 69-112, 1986.

26. Cheal, E.J., and Hayes, W.C.: Finite element analysis of prosthetic ACL attachment. Pfizer Hospital Products Group. August 6, 1986.

27. Hayes, W.C.: Bone mechanics - Material properties. In: Fracture Healing. Proceedings of the Bristol-Myers/Zimmer Fracture Symposium (ed., J.M. Lane). Churchill Livingstone, Inc., New York, pp. 97-104, 1987.

28. Hayes, W.C., Nachemson, A.L., and White, A.A.: Forces in the lumbar spine. In: The Lumbar Spine (eds., M.B. Camins and P.F. O'Leary). Raven Press, New York pp. 1-21, 1987.

29. Rohlmann, A., Cheal, E.J., and Hayes, W.C.: Influence of porous coating thickness and elastic modulus on stress distribution in hip prostheses. In: Biomechanics: Basic and Applied Research (eds., G. Bergmann, R. Kolbel, and A. Rohlmann). Nijhoff Publishers, Dortrecht, Netherlands, pp. 347-352, 1987.

EXHIBIT 24

[28]  Pierce MC, Bertocci GE, Berger R, Vogeley E. Injury biomechanics for aiding in the diagnosis of abusive head trauma. Neurosurg Clin N Am 2002; 13 155-68

[29]  Pierce MC, Bertocci GE, Janosky JE, et al. Femur fractures resulting from stair falls among children: An injury plausibility model. Pediatrics 2005; 115 1712-22

[30]  Robertson CR, Moalli JF, Black DL. Reference guide on engineering. Reference Manual on Scientific Evidence. 3rd ed. Washington, DC: The National Academies 2011

[31]  Sabick MB, Torry MR, Kim YK, Hawkins RJ. Humeral torque in professional baseball pitchers. Am J Sports Med 2004; 32 892-8

[32]  Schopfer A, Hearn TC, Malisano L, et al. Comparison of torsional strength of humeral intramedullary nailing: a cadaveric study. J Orthop Trauma 1994; 8 414-21

[33]  Yamada H. Chapter 3: Mechanical properties of locomotor organs and tissues. In: Yamada H. Strength of Biological Materials. Baltimore, MD: Williams & Wilkins Company 1970

## EXHIBIT 24

5/21/2018

WILSON C. HAYES, Ph.D.
President/CEO
Hayes & Associates, Inc.
2390 NW Kings Blvd.
Corvallis, OR 97333
(541) 754-9645
Fax: (541) 754-9949
Email: wch@hayesassoc.com
Web: www.hayesassoc.com

| | |
|---|---|
| Date of Birth: | January 15, 1943 |
| Place of Birth: | San Diego, California |
| Child: | Molly Weigent Hayes |

**Education**

| | |
|---|---|
| B.S., Mechanical Engineering, Stanford University | 1964 |
| M.S., Mechanical Engineering, Stanford University | 1966 |
| Ph.D., Theoretical and Applied Mechanics, Northwestern University | 1970 |

**Postdoctoral Training**

| | |
|---|---|
| Research Fellow, Laboratory for Experimental Surgery, Davos, Switzerland (Chief, S. Perren, M.D.) | 1969-1970 |
| NIH Special Research Fellow, Department of Orthopaedic Surgery, Karolinska Institute, Stockholm, Sweden (Chief, C. Hirsch, M.D.) | 1970-1971 |

**Faculty Appointments**

| | |
|---|---|
| Instructor, Department of Orthopaedic Surgery, Northwestern University | |
| Assistant Professor, Department of Mechanical Engineering and (by courtesy) Department of Surgery (Orthopaedics), Stanford University | 1967-1969 |
| Associate Professor, Department of Orthopaedic Surgery, University of Pennsylvania | 1971-1976 |
| Associate Professor, Department of Orthopaedic Surgery, Harvard Medical School, Beth Israel Hospital | 1976-1979 |
| Associate Professor of Orthopaedic Surgery, Harvard-MIT Division of Health Sciences and Technology, Massachusetts Institute of Technology | 1979-1985 |
| Professor of Biomechanics, Department of Orthopaedic Surgery, Harvard Medical School, Beth Israel Hospital | 1979-1985 |
| Professor of Biomechanics, Harvard-MIT Division of Health Sciences and Technology, Massachusetts Institute of Technology | 1985-1998 |
| Maurice Edmond Mueller Professor of Biomechanics, Harvard Medical School Hospital and Administrative Appointments | 1985-1998 |
| Vice Provost for Research, Oregon State University | 1998-2001 |
| Professor of Nutrition and Exercise Science, Oregon State University | 1998-2001 |
| Adjunct Professor of Mechanical Engineering, Oregon State University | 1998-2010 |
| Professor of Orthopaedics and Rehabilitation and Vice Chair for Research, Oregon Health Sciences University | 1998-2004 |
| Emeritus Professor of Nutrition and Exercise Sciences (NES), College of Health and Human Sciences, Oregon State University | 2007- |

EXHIBIT 24

5/21/2018

**Hospital and Administrative Appointments**

| | |
|---|---|
| Chief, Biomechanics Unit, Department of Orthopaedic Surgery, University of Pennsylvania | 1976-1979 |
| Director, Orthopaedic Biomechanics Laboratory, Dept. of Orthopaedic Surgery, Beth Israel Hospital | 1979 |
| Member, Admissions Committee, Harvard-MIT Division of Health Sciences and Technology | 1984-1988 |
| Member, Committee of Professors, Harvard Medical School | 1985-1989 |
| Member, Promotions and Appointments Committee, Harvard-MIT Division of Health Sciences and Technology | 1986-1998 |
| Member, Standing Committee on Promotions, Reappointments, and Appointments, Harvard Faculty of Medicine | 1987-1990 |
| Member, Orthopaedic Executive Committee, Harvard Combined Orthopaedic Program, Harvard Medical School | 1990-1998 |
| Member, Conference of Department Heads, Harvard Medical School | 1990 |
| Member, Subcommittee of Professors, Harvard Medical School Faculty of Medicine | 1991-1994 |
| Associate Chief, Department of Orthopedic Surgery, Beth Israel Hospital | 1992-1993 |
| Vice Chairman Research, Department of Orthopedic Surgery, Beth Israel Hospital | 1993 |

**Honors and Awards**

| | |
|---|---|
| Industrial Design Society Student Merit Award | 1966 |
| Engineering Research Initiation Award, National Science Foundation | 1972 |
| Research Career Development Award, National Institutes of Health | 1978-1983 |
| Kappa Delta Award, American Academy of Orthopaedic Surgeon's Award for Orthopaedic Research | 1981 |
| American Academy of Orthopaedic Sports Medicine Research Award | 1983 |
| Research Career Award, Schweizerische Arbeitsgemeinschaft fur Osteosynthesefragen | 1983-1986 |
| Founding Fellow, American Institute of Medical and Biological Engineering | 1993 |
| American Society of Biomechanics Giovanni Borelli Award | 1995 |
| Bristol-Myers Squibb/Zimmer Institutional Grant for Excellence in Research in Orthopaedic Treatment | 1996 |
| Profiles in Ethical Integrity Award, The Program for Ethics, Science and the Environment, Department of Philosophy, Oregon State University | 2000 |

**Membership in Professional Societies**

| | |
|---|---|
| Orthopaedic Research Society | 1972- |
| American Society of Mechanical Engineers | 1975- |
| American Academy of Orthopaedic Surgeons, Associate Member | 1985- |
| Society of Automotive Engineers | 1998- |
| American Institute for Medical and Biological Engineering | 2000- |
| International Society of Biomechanics | 2002- |
| Association for the Advancement of Automotive Medicine | 2003- |
| Human Factors and Ergonomics Society | 2005- |

**Professional Activities**

| | |
|---|---|
| Member, Bioengineering and Orthopaedic Sciences Travel Group to the People's Republic of China | 1979 |
| Chairman, Program Committee, Orthopaedic Research Society | 1980 |
| Organizing Committee and Panel Member, NIH Consensus Development Conference on Total Hip Joint Replacement | 1982 |
| Member, NIH Study Section, Orthopaedics and Musculoskeletal | 1985-1989 |
| Chairperson, Special Ad Hoc Committee, National Institutes of Health Study Section | 1986 |
| Chairperson, Injury Prevention Working Group of the Surgeon General's Workshop on Health Promotion and Aging, Washington, DC | 1988 |
| Member, NIH NIAMSD National Plan Task Force, Co-Chair Musculoskeletal | 1990-1991 |

## EXHIBIT 24

| | |
|---|---|
| Diseases Panel, Bethesda, MD | |
| Member, American Academy of Orthopaedic Surgeon's Council on Research | 1990-1993 |
| Scientific Member, AO Switzerland | 1991 |
| Member, CDC Injury Research Grant Review Committee Study Section, Atlanta, GA | 1993 |
| Co-Chairman, AAOS Workshop on Fall Prevention in the Elderly,   Rosemont, IL | 1993 |
| Member, NIH Study Section, Orthopedics and Musculoskeletal | 1993-1997 |
| Participant, CDC Biomechanics Research Planning Workshop, Atlanta, GA | 1994 |
| Acting Director, AO/ASIF Research Institute, Davos, Switzerland | 1996-1997 |
| Member, National Space Biomedical Research Institute Reviewer's Reserve | 1999- |
| Member, Scientific Advisory Board, Harborview Injury Prevention & Research Center, Seattle, WA | 2005-2006 |
| Biomechanics Research Review Panel, Biomechanics Research Portfolio Review, Centers for Disease Control and Prevention, Atlanta, GA | 2009 |

### Grants Awarded

| | |
|---|---|
| National Science Foundation Engineering Research Initiation Award, "Stress-remodeling relationships in compact bone" Principal Investigator | 1972-1973 |
| National Science Foundation Center for Materials Research, Stanford University, "Fracture of compact bone" Principal Investigator | 1972-1976 |
| National Institutes of Health, "Mechanics of normal, arthritic and prosthetic knees" Principal Investigator | 1975-1983 |
| President's Fund, California Institute of Technology, "Mechanics of the knee joint" Principal Investigator | 1975-1976 |
| Orthopaedic Research and Education Foundation, "Flow independent viscoelastic properties of cartilage matrix" Principal Investigator | 1977-1978 |
| National Institutes of Health Research Career Development Award, "Material and structural properties of the knee" Principal Investigator | 1978-1983 |
| Veterans Administration Research Grant, "Analysis of fracture healing with internal fixation" Co-Principal Investigator | 1978-1983 |
| MIT Whitaker Health Sciences Fund, "Biomechanical studies of healing after spinal dislocation" Co-Principal Investigator | 1979-1980 |
| Laboratory for Experimental Surgery, "Mechanics of compression plate fixation" Principal Investigator | 1980-1981 |
| Zimmer USA, "Finite element and experimental studies of the Miller porous coated multi-radius tibial component" Co-Principal Investigator | 1980-1981 |
| Air Force Office of Scientific Research, "Fracture and viscoelastic characteristics of the human cervical spine" Principal Investigator | 1981-1983 |
| Howmedica, Inc., Orthopaedics Division, "Geometrical characterization of the proximal femur" Principal Investigator | 1981-1982 |
| Howmedica, Inc., Orthopaedics Division, "Effects of proximal femoral geometry on femoral component stem design" Principal Investigator | 1982-1983 |
| William F. Milton Fund, "Skeletal Aging and Exercise" Co-Principal Investigator | 1982-1983 |
| National Institutes of Health, "Stress morphology relations for trabecular bone in-vivo" Principal Investigator | 1982-1983 |
| Cintor Orthopaedic Division, Johnson & Johnson Products, Inc., "Geometrical Characterization of the distal femur" Principal Investigator | 1982-1983 |
| Cintor Orthopaedic Division, Johnson & Johnson Products, Inc., "Optimized Total Joint Replacement Designs" Principal Investigator | 1982-1984 |
| National Institutes of Health, "Bone/Gelatin Particulate Composite for Fracture Fixation" Co-Principal Investigator | 1982-1984 |
| National Institutes of Health, "Biochemistry of the Intervertebral Disc" Co-Investigator | 1982-1985 |
| Howmedica, Inc., Orthopaedic Division, "Biomechanics of the Asnis Screw System" Principal Investigator | 1983-1984 |
| National Science Foundation/Wenner Gren Foundation for Anthropological | 1983-1984 |

5/21/2018

Research, Inc., "Biomechanical Characterization of the Primate Femur and Tibia Using CT Scanning" Co-Investigator

| | |
|---|---|
| Electro-Biology, Inc., Medical Systems Division, "The Use of Pulsing Electromagnetic Fields in the Prevention of Disuse Osteoporosis" Principal Investigator` | 1983-1984 |
| General Motors Research Laboratories, "Biomechanical Studies of the Human Cervical Spine" Co-Principal Investigator | 1984-1984 |
| Johnson & Johnson, Inc. Orthopaedics, "Failure Analysis and Design Studies for a Porous-Coated Patellar Total Knee Component" Principal Investigator | 1984-1985 |
| Howmedica, Inc., "Design Parameters for Proximal Femoral Prosthetic Stems" Principal Investigator | 1984-1985 |
| Fiber Materials, Inc., "In-Vivo Testing of Carbon/Carbon Rods for Bone Ingrowth" Principal Investigator | 1985-1986 |
| National Cancer Institute, "Biomechanics of Metastatic Defects in Bone" Principal Investigator | 1985-1999 |
| Pfizer Hospital Products Group, "Finite Element Analysis of Prosthetic ACL Attachment" Principal Investigator | 1985-1986 |
| National Institutes of Health, "Hip Fracture Risk Prediction by X-ray Computed Tomography" Principal Investigator | 1986-1995 |
| General Motors Research Laboratories, "Mechanical Response and Strength of the Human Cervical Spine" Co-Principal Investigator | 1986-1987 |
| Johnson & Johnson, Inc. Orthopaedics, "Finite Element Design Analysis of a Carbon Fiber Femoral Prosthesis" Co-Principal Investigator | 1987-1988 |
| Protek, "Prosthetic Shoulder Design" Principal Investigator | 1987-1988 |
| Centers for Disease Control, "Biomechanics, Epidemiology, and Treatment of Hip Fractures" Principal Investigator | 1987-1990 |
| AO-Stiftung/ASIF-Foundation, "Fatigue Characteristics of Posterior-Lumbar Fixations" Co-Principal Investigator | 1988-1989 |
| National Institutes of Health, "Multiscan Photon Absorptiometry and Osteoporotic Fracture Risk" Principal Investigator | 1989-1992 |
| Centers for Disease Control, "Biomechanics of Hip Fracture Risk" Principal Investigator | 1990-1993 |
| National Institute of Dental Research "Mechanics and bone remodeling in an osteoporotic mandible" Co-Principal Investigator | 1990-1995 |
| Whitaker Foundation, "Magnetic Resonance Imaging of Bone Structure with Metastatic Defects in Bone" Co-Principal Investigator | 1991-1994 |
| AO-Stiftung/ASIF-Foundation, "Biodegradable Particulate Composites for Orthopaedic Applications" Principal Investigator | 1991-1992 |
| Genetics Institute, "Geometric, densitometric, and torsional properties of healing segmental defects in rat femoral tested with recombinant human BMP" Co-Principal Investigator | 1991-1993 |
| Howard Hughes Medical Institute Medical Student Research Training Co-Principal Investigator | 1991-1993 |
| National Institute on Aging, "Neuromotor changes with exercise in elderly women" Co-Principal Investigator | 1991-1994 |
| National Institutes of Health, "Hip fracture risk prediction by QDR" Principal Investigator | 1991-2001 |
| Norwich Eaton Pharmaceuticals "Effects of disphosphonates on biomechanical and morphological properties of bone in dogs" Co-Principal Investigator | 1991-1992 |
| Norwich Eaton Pharmaceuticals "Effects of NE-58095 on the biomechanical and morphological properties of bone from dogs treated for two years" Co-Principal Investigator | 1992-1993 |
| Osteonics, "Predicted effects of surface treatment on the long-term performance of cementless hip implants" Co-Principal Investigator | 1992-1993 |
| National Center for Research Resources, Shared Instrumentation Grant Principal Investigator | 1992-1993 |

## EXHIBIT 24

| | |
|---|---|
| Merck, Sharp & Dohme Research Laboratories, "Evaluation of the effects of MK-217 treatment on bone biomechanics" Co-Principal Investigator | 1992-1995 |
| National Institutes of Health, "Structural consequences of post-yield behavior of bone" Co-Principal Investigator | 1992-1998 |
| DynaGen, Inc., "PPF-based biodegradable particulate composites for orthopaedic applications" Principal Investigator | 1992-1993 |
| Massachusetts General Hospital "Effects of PTH on biomechanical and morphological properties of bone in rats" Co-Principal Investigator | 1992-1993 |
| National Institutes of Health "DXA based bone geometry and osteoporotic fracture risk" Principal Investigator | 1993-1998 |
| Centers for Disease Control and Prevention, Program Project Grant "Hip fracture prevention from falls in the elderly" Principal Investigator | 1993-1998 |
| Orthopaedic Research and Education Foundation, Bristol-Myers Squibb/Zimmer Institutional Award, "Clinical biomechanics of the patellofemoral joint" Principal Investigator | 1996-2001 |
| ClinTrials BioResearch Ltd., "Bone biomechanical procedures for a long-term efficacy study of risedronate as a treatment in the osteopenic, ovariectomized rat model" Principal Investigator | 1997-1998 |
| ClinTrials BioResearch Ltd., "Bone biomechanical procedures for a long-term efficacy study of risedronate as a preventative treatment in the osteopenic, ovariectomized rat model" Principal Investigator | 1997-1998 |
| ClinTrials BioResearch Ltd., "Bone biomechanical procedures for a 26-week oral (capsule) comparative efficacy study of NE-58095 and NE-10503 in the female beagle dog" Principal Investigator | 1997-1998 |
| ClinTrials BioResearch Ltd., "A 26-week oral (capsule) fracture healing study with risedronate (NE-58095) in male and female beagle dogs" Principal Investigator | 1997-1998 |
| National Institutes of Health, "Fall Biomechanics and Hip Fracture Risk," Principal Investigator | 1990-2007 |
| National Institutes of Health "The effects of jumping on growing bones" Co-Investigator | 1998- |
| Nike, Inc. "Functional Biomechanics of Protective Systems for Soccer: Design Criteria for Goalkeeper Gloves and Shin Guards" | 2006-2007 |

### Editorial and Review

| | |
|---|---|
| Journal of Orthopaedic Research, Founding Co-Editor-in-Chief | 1983-1995 |
| Journal of Biomechanical Engineering, Associate Editor | 1981-1985 |
| Journal of Biomechanics, Editorial Advisory Board | 1981-1983 |
| Annals of Biomedical Engineering, Editorial Board | 1980-1982 |
| Clinical Orthopaedics and Related Research | |
| Critical Reviews in Bioengineering, CRC Press | |
| Journal of Applied Mechanics | |
| Journal of Bioengineering | |
| Journal of Biomedical Materials Research | |
| Journal of Bone and Joint Surgery | |
| National Science Foundation | |
| National Aeronautics and Space Administration | |

### Doctoral Theses Supervised

Subrata Saha, Ph.D.: Tensile impact properties of bone and their relation to microstructure, Department of Applied Mechanics, Stanford University, 1973. (Professor and Director, Orthopaedic Biomechanics Lab, Department of Orthopedic Surgery, Loma Linda University Medical Center, Loma Linda, CA)

Timothy M. Wright, Ph.D.: Tensile properties and fracture mechanics of bone, Department of Materials Science, Stanford University, 1976. (Professor and Director, Department of Biomechanics, Hospital for Special Surgery, New York, NY; Past President, Orthopaedic Research Society)

## EXHIBIT 24

5/21/2018

Dennis R. Carter, Ph.D: The fatigue behavior of compact bone, Department of Biomedical Engineering, Stanford University, 1976. (Professor, Department of Mechanical Engineering and Director, Biomechanics Lab, Stanford University, Stanford, CA; past-President, Orthopaedic Research Society)

Eric E. Sabelman, Ph.D: An organ culture method for study of fetal mouse bone under stress, Department of Mechanical Engineering, Stanford University, 1976. (Senior Research Associate, VA Medical Center, Palo Alto, CA)

Christopher B. Ruff, Ph.D.: Structural remodeling of the femur and tibia with aging: An automated digital analysis of the Pecos skeletal sample, Department of Anthropology, University of Pennsylvania, August 1981. (Associate Professor, Department of Cell Biology and Anatomy, Johns Hopkins School of Medicine, Baltimore, MD)

Carol A. Oatis, Ph.D.: The use of a mechanical model to predict the motion of the knee in normal locomotion: A study of healthy younger and older adult males, Department of Anatomy, University of Pennsylvania, 1982. (Associate Professor, Department of Physical Therapy, Beaver College, Philadelphia, PA)

W. Thomas Edwards, Ph.D.: A biomechanical analysis of the lumbar and lumbo-sacral spine in the sagittal plane. Interdepartmental Program in Biomedical Engineering, Massachusetts Institute of Technology, May, 1983. (Visiting Associate Professor, Department of Bioengineering, Mechanical Aerospace Manufacturing Engineering, Syracuse University, Syracuse, NY)

Anthony M. DiGioia III, M.D.: The role of interfragmentary strain in fracture healing. Harvard Medical School, Honors Thesis, March 1986. (Assistant Professor, Department of Orthopaedic Surgery, University of Pittsburgh, Pittsburgh, PA)

Edward J. Cheal, Ph.D.: Trabecular bone remodeling around implants. Massachusetts Institute of Technology, June 1986. (Director of Applied Research, Johnson & Johnson Orthopaedics, Raynham, MA)

Cheryl L. Riegger, Sc.D.: Tibiofemoral contact pressure, area and force in neutral, varus, valgus, and post-osteotomy loadings. Boston University, July 1986. (Assistant Professor, University of Colorado, Morrison, CO)

Jeffrey C. Lotz, Ph.D.: Fracture risk predictions for the human femoral neck. Massachusetts Institute of Technology, August, 1988. (Assistant Professor of Orthopaedic Surgery and Director, Orthopaedic Biomechanics Laboratory, University of California at San Francisco School of Medicine, San Francisco, CA).

Brian D. Snyder, M.D., Ph.D.: Anisotropic structure property relations for trabecular bone. University of Pennsylvania, February, 1991. (Instructor, Dept. of Orthopaedic Surg, Harvard Medical School, Boston, MA)

Dr.med. Ralf H. Wittenberg: Biomechanische und Klinische Untersuchungen dorsaler lumbaler und lumbosakraler Fusions techniken. St. Josef Hospital, Assistant Professor, Bochum University, Germany, 1991.

Xiang-Dong Edward Guo, Ph.D.: Fatigue of trabecular bone. Harvard/M.I.T. Division of Health Sciences and Technology, October, 1993. (Assistant Professor, Department of Mechanical Engineering, Columbia University, New York, NY)

Jeffrey A. Guy, M.D.: The long term effects of the bisphosphonate alendronate on the mechanical and physical properties of bone in the estrogen-deficient rat. Harvard Medical School, Honors Thesis, February, 1994. (Orthopaedic Resident, Harvard Combined Orthopaedic Program, Boston, MA)

Amy C. Courtney, Ph.D.: Mechanical properties of the proximal femur: Changes with age. Harvard-Massachusetts Institute of Technology Division of Health Sciences and Technology, May, 1994. (Staff Scientist, Department of Biomedical Engineering, Cleveland Clinic Foundation, Cleveland, OH)

Rebecca Elovic, D.M.D., Sc.D.: The effect of ovariectomy on the rat mandible. Harvard University, May, 1994. (Private practice, Brookline, MA)

5/21/2018

Philippe K. Zysset, Ph.D.: A constitutive law for trabecular bone. Ecole Polytechnique Federale de Lausanne, Switzerland. June, 1994. (Assistant Professor, ETH, University of Lausanne, Lausanne, Switzerland)

Stephen N. Robinovitch, Ph.D.: Hip fracture and fall impact biomechanics. Harvard-Massachusetts Institute of Technology Division of Health Sciences and Technology, September, 1994. (Associate Professor and Director of the Injury Prevention and Mobility Laboratory, School of Kinesiology, Simon Fraser University, Burnaby, British Columbia)

Aya van den Kroonenberg, Ph.D.: Dynamic models of human falls for prediction of hip fracture risk. Massachusetts Institute of Technology, January, 1995. (Staff Scientist, TNO Road Vehicle Institute, Crash Safety Research Center, Delft, The Netherlands)

J. Douglas Patterson, M.D.: Parathyroid hormone (PTH 1-84) increases bone morphologic and biomechanical properties in estrogen-deficient rats: Promise for the treatment of established osteoporosis. Harvard Medical School, Honor's Thesis, February, 1995. (Orthopaedic Resident, Duke University, Durham, NC)

Michael J. Yaszemski, M.D., Ph.D.: The design, synthesis, characterization, and mechanical testing of a novel degradable polymeric biomaterial for use as a bone substitute. Massachusetts Institute of Technology, June, 1995. (Assistant Professor, Department of Orthopedics, Mayo Clinic, Rochester, MN)

Matthew J. Silva, Ph.D.: Predicting the failure behavior of the human vertebral body. Massachusetts Institute of Technology, February, 1996. (Director, Biomechanics Laboratory, Department of Orthopedic Surgery, Washington University School of Medicine, St. Louis, MO)

Catherine M. Ford Corrigan, Ph.D.: Failure of the human proximal femur: Material and structural properties. Massachusetts Institute of Technology, September, 1996. (Vice President and Principal Engineer, Exponent, Philadelphia, PA)

Steven M. Bowman, Ph.D.: Creep of trabecular bone. Harvard-Massachusetts Institute of Technology Division of Health Sciences and Technology, May, 1997. (Senior Engineer, Mitek Products, Westwood, MA)

Conrad Wang, M.D.: Densitometric and mechanical testing in an animal model of tumor-induced osteolysis in long bones. Harvard Medical School, M.D. Thesis, February, 1998. (Orthopaedic Resident, Harvard Medical School, Boston, MA)

Sara E. Wilson, Ph.D.: Analysis of the forces on the spine during a fall with application towards predicting vertebral fracture risk. Harvard-MIT Division of Health Sciences and Technology, June, 1999. (Assistant Professor, Department of Mechanical Engineering, University of Kansas, Lawrence, KS)

Cecile N. Smeesters, Ph.D.: Fall biomechanics and hip fracture risk. Division of Applied Sciences, Harvard University, June, 1999. (Professeure Adjointe, Départment de Génie Mécanique University of Sherbrook, Sherbrook, Quebec)

Jeremy J. Bauer, Ph.D.: Defining intensity of skeletal loading in children. Oregon State University Department of Nutrition and Exercise Sciences, June, 2006. (Associate, Hayes + Associates, Corvallis, OR)

**Publications**

**A. Refereed Articles**

1.  Hayes, W.C. and Mockros, L.F.: Viscoelastic properties of human articular cartilage. J. Appl. Physiol., 31: 562-568, 1971.

2.  Hayes, W.C.: Some viscoelastic properties of human articular cartilage. Acta Orthop. Belg., 38: 23-32, 1972.

3.  Hayes, W.C., Keer, L.M., Herrmann, G., and Mockros, L.F.: A mathematical analysis for indentation tests of articular cartilage. J. Biomech., 5: 541-551, 1972.

5/21/2018

4.   Hayes, W.C. and Perren, S.M.: Plate-bone friction in the compression fixation of fractures. Clin. Orthop., 89: 236-240, 1972.

5.   Saha, S. and Hayes, W.C.: Instrumented tensile-impact tests of bone. Exper. Mech., 14: 473-478, 1974.

6.   Perren, S.M. and Hayes, W.C.: Biomechanik der plattenosteosynthese. Medizinish-Orthop.Technik, 2: 56-61, 1974.

7.   Carter, D.R. and Hayes, W.C.: Fatigue life of compact bone. 1. Effects of stress amplitude, temperature and density. J. Biomech., 9: 27-34, 1976.

8.   Carter, D.R., Hayes, W.C., and Schurman, D.J.: Fatigue life of compact bone. II. Effects on microstructure and density. J. Biomech., 9: 211-218, 1976.

9.   Saha, S. and Hayes, W.C.: Tensile impact properties of human compact bone. J. Biomech., 9: 243-251, 1976.

10.   Hayes, W.C. and Carter, D.R.: Post-yield behavior of subchondral trabecular bone. J. Biomed. Mater. Res., 7: 537-544, 1976.

11.   Wright, T.M. and Hayes, W.C.: The fracture mechanics of fatigue crack propagation in compact bone. J. Biomed. Mater. Res., 7: 637-648, 1976.

12.   Carter, D.R. and Hayes, W.C.: Bone compressive strength: The influence of density and strain rate. Science, 194: 1174-1176, 1976.

13.   Wright, T.M. and Hayes, W.C.: Tensile testing of bone over a wide range of strain rate: Effects of strain rate, microstructure and density. Med. Biol. Eng., 14: 671-680, 1976.

14.   Wright, T.M. and Hayes, W.C.: Comments on "The elastic properties of compact bone tissue" by Reilly, D.T. and Burstein, A.H., J. Biomech., 9: 744, 1976.

15.   Jones, H.H., Priest, J.D., and Hayes, W.C., Tichenor, C.C. and Nagel, D.A.: Humeral hypertrophy in response to exercise. J. Bone Joint Surg. [Am], 59(2): 204-208, 1977.

16.   Carter, D.R. and Hayes, W.C.: Compact bone fatigue damage. I. Residual strength and stiffness. J. Biomech., 10: 325-337, 1977.

17.   Wright, T.M. and Hayes, W.C.: Fracture mechanics parameters for compact bone. Effects of density and specimen thickness. J. Biomech., 10: 419-430, 1977.

18.   Hayes, W.C. and Wright, T.M.: An empirical strength theory for compact bone. Fracture (Proc. 4th Int'l Conf. on Fracture), Volume III: 1173-1180, 1977.

19.   Carter, D.R. and Hayes, W.C.: Compact bone fatigue damage. II. A microscopic examination. Clin. Orthop., 127: 265-274, 1977.

20.   Saha, S. and Hayes, W.C.: Relations between tensile impact properties and microstructure of compact bone. Calcif. Tissue Res., 24: 65-72, 1977.

21.   Carter, D.R. and Hayes, W.C.: The compressive behavior of bone as a two-phase porous material. J. Bone Joint Surg. [Am], 59: 954-962, 1977.

22.   Hayes, W.C., Swenson, L.W., and Schurman, D.J.: Axisymmetric finite element analysis of the lateral tibial plateau. J. Biomech., 11: 21-33, 1978.

23.   Hayes, W.C. and Bodine, A.J.: Flow-independent viscoelastic properties of articular cartilage matrix. J. Biomech., 11: 407-419, 1978.

24.   Wright, T.M. and Hayes, W.C.: Technical note: Strain gage application on compact bone. J. Biomech., 12: 471-475, 1979.

25.   Nagurka, M.L. and Hayes, W.C.: Technical note: An interactive graphics package for calculating cross-sectional properties of complex shapes. J. Biomech., 13: 59-64, 1980.

5/21/2018

26.    Woo, S. L-Y, Kuei, S.C., Amiel, D., Gomez, M.A., Hayes, W.C., White, F.C. and Akeson, W.H.: The effect of prolonged physical training on the properties of long bone. A study of Wolff's Law. J. Bone Joint Surg. [Am], 63: 780-786, 1981.

27.    Ruff, C.B. and Hayes, W.C.: Subperiosteal expansion and cortical remodeling of the human femur and tibia with aging. Science, 217: 945-948, 1982.

28.    Posner, I., White, A.A., Edwards, W.T. and Hayes, W.C.: A biomechanical analysis of the clinical stability of the lumbar and lumbosacral spine. Spine, 7: 374-389, 1982.

29.    Ruff, C.B. and Hayes, W.C.: Cross sectional geometry of Pecos Pueblo femora and tibiae: A biomechanical investigation. I. Method and general patterns of variation. Am. J. Phys. Anthrop., 60: 359-381, 1983.

30.    Ruff, C.B. and Hayes, W.C.: Cross-sectional geometry of Pecos Pueblo femora and tibiae: A biomechanical investigation. II. Sex, age and size differences. Am. J. Phys. Anthrop., 60: 383-400, 1983.

31.    Beaupre, G.S., Hayes, W.C., Jofe, M.H. and White, A.A.: Monitoring fracture site properties with external fixation. J. Biomech. Eng., 105: 120-126, 1983.

32.    Cheal, E.J., Hayes, W.C., White, A.A., III, and Perren, S.M.: Stress analysis of a simplified compression plate fixation system for fractured bones. J. Computers and Structures, 17: 845-855, 1983.

33.    Stone, J.L., Beaupre, G.S., and Hayes, W.C.: Multiaxial strength characteristics of trabecular bone. J. Biomech., 16: 743-752, 1983.

34.    Hayes, W.C., Gran, J.D., Nagurka, M.L., Feldman, J.M., and Oatis, C.: Leg motion analysis during gait by multiaxial accelerometry: Theoretical foundations and preliminary validations. J. Biomech. Eng., 105: 283-289, 1983.

35.    Huberti, H.H. and Hayes, W.C.: Patellofemoral contact pressures: The influence of Q-angle and tendo-femoral contact. J. Bone Joint Surg. [Am], 66: 715-724, 1984.

36.    Ruff, C.B., Larsen, C.S., and Hayes, W.C.: Structural changes in the femur with the transition to agriculture on the Georgia coast. Am. J. Phys. Anthrop., 64: 125-136, 1984.

37.    Huberti, H.H., Hayes, W.C., and Stone, J.L.: Force ratios in the quadriceps tendon and ligamentum patellae. J. Orthop. Res., 2: 49-54, 1984.

38.    Ruff, C.B. and Hayes, W.C.: Bone mineral content in the lower limb: Relationship to cross-sectional geometry. J. Bone Joint Surg. [Am], 66: 1024-1031, 1984.

39.    Cheal, E.J., Hayes, W.C., White, A.A., III, and Perren, S.M.: Three-dimensional finite element analysis of a simplified compression plate fixation system. J. Biomech. Eng., 106: 295-301, 1984.

40.    Ruff, C.B. and Hayes, W.C.: Age changes in geometry and mineral content of the lower limb bones. Ann. Biomed. Eng., 12: 573-584, 1984.

41.    Cheal, E.J., Hayes, W.C., White, A.A., III, and Perren, S.M.: Stress analysis of compression plate fixation and its effects on long bone remodeling. J. Biomech., 18:141-150, 1985.

42.    McBroom, R.J., Hayes, W.C., Edwards, W.T., Goldberg, R.P., and White, A.A.: Prediction of vertebral body compressive fracture using quantitative computed tomography. J. Bone Joint Surg. [Am], 67: 1206-1214, 1985.

43.    Kaplan, S.J., Hayes, W.C., Mudan, P., Lelli, J.L., and White, A.A.: Monitoring the healing of a tibial osteotomy in the rabbit treated with external fixation. J. Orthop. Res., 3: 325-330, 1985.

44.    Kaplan, S.J., Hayes, W.C., Stone, J.L., and Beaupre, G.S.: Tensile strength of bovine trabecular bone. J. Biomech., 18: 723-727, 1985.

45.    Beaupre, G.S. and Hayes, W.C.: Finite element analysis of a three-dimensional open-celled model for trabecular bone. J. Biomech. Eng., 107: 249-256, 1985.

EXHIBIT 24

5/21/2018

46.    Cheal, E.J., Hayes, W.C., Lee, C.H., Snyder, B.D., and Miller, J.: Stress analysis of a condylar knee tibial component: Influence of metaphyseal shell properties and cement injection depth. J. Orthop. Res., 3: 424-434, 1985.

47.    Gerhart, T.N., Hayes, W.C., and Stern, S.H.: Biomechanical optimization of a model particulate composite for orthopaedic applications. J. Orthop. Res., 4: 76-85, 1986.

48.    DiGioia, A.M. III, Cheal, E.J., and Hayes, W.C.: Three-dimensional strain fields in a uniform osteotomy gap. J. Biomech. Eng., 108: 273-280, 1986.

49.    Edwards, W.T., Hayes, W.C., Posner, I., White, A.A. and Mann, R.: Variation of lumbar spine stiffness with load. J. Biomech. Eng., 109: 35-42, 1987.

50.    Cheal, E.J., Snyder, B.D., Nunamaker, D.M., and Hayes, W.C.: Trabecular bone remodeling around smooth and porous implants in an equine patellar model. J. Biomech., 20: 1121-1134, 1987.

51.    McBroom, R.J., Cheal, E.J., and Hayes, W.C.: Strength reductions from metastatic cortical defects in long bones. J. Orthop. Res., 6: 369-378, 1988.

52.    Huberti, H.H. and Hayes, W.C.: Contact pressures in chondromalacia patellae and the effects of capsular reconstructive procedures. J. Orthop. Res., 6: 499-508, 1988.

53.    Ruff, C.B., and Hayes, W.C.: Sex differences in age-related remodeling of the femur and tibia. J. Orthop. Res., 6: 886-896, 1988.

54.    Rohlmann, A., Cheal, E.J., Hayes, W.C., and Bergmann, G.: A non-linear finite element analysis of interface conditions in porous coated hip endoprostheses. J. Biomech., 21: 605-611, 1988.

55.    Gerhart, T.N., Roux, R.D., Horowitz, G., Miller, R.L., Hanff, P., and Hayes, W.C.: Antibiotic release from an experimental biodegradable bone cement. J. Orthop. Res., 6: 585-592, 1988.

56.    Snyder, B.D., Edwards, W.T., and Hayes, W.C.: Letter to the Editor: Trabecular changes with vertebral osteoporosis. N. Engl. J. Med., 319: 793-794, 1988.

57.    Gerhart, T.N., Miller, R.L., Kleshinski, S., and Hayes, W.C.: In vitro characterization and biomechanical optimization of a biodegradable particulate composite bone cement. J. Biomed. Mat. Res., 22: 1071-1082, 1988.

58.    Gerhart, T.N., Renshaw, A.A., Miller, R.L., Noecker, R.J., and Hayes W.C.: In vivo histologic and biomechanical characterization of a biodegradable particulate composite bone cement. J. Biomed. Mat. Res., 23: 1-16, 1989.

59.    Hipp, J.A., McBroom, R.J., Cheal, E.J., and Hayes, W.C.: Structural consequences of endosteal metastatic lesions in long bones. J. Orthop. Res., 7: 828-837, 1989.

60.    Esses, S.I., Lotz, J.C., and Hayes, W.C.: Biomechanical properties of the proximal femur determined in-vitro by single-energy quantitative computed tomography. J. Bone Miner. Res., 4: 715-722, 1989.

61.    Lotz, J.C., Gerhart, T.N., and Hayes, W.C.: Mechanical properties of trabecular bone from the proximal femur: A quantitative CT study. J. Comput. Assist. Tomogr., 14: 107-114, 1990.

62.    Lotz, J.C. and Hayes, W.C.: The use of QCT to estimate risk of fracture of the hip from falls. J. Bone Joint Surg. [Am], 72: 689-700, 1990.

63.    Lewallen, D.G., Riegger, C.L., Myers, E.R., and Hayes, W.C.: Effects of retinacular release and tibial tubercle elevation in patellofemoral degenerative joint disease. J. Orthop. Res., 8: 856-862, 1990.

64.    Hipp, J.A., Edgerton, B.C., An, K.-N., and Hayes, W.C.: Structural consequences of transcortical holes in long bones loaded in torsion. J. Biomech., 23: 1261-1268, 1990.

65.    Wittenberg, R.H., Moeller, J., Shea, M., White, A.A., and Hayes, W.C.: Compressive strength of autologous and allogenous bone grafts for thoraco-lumbar and cervical spine fusion. Spine, 15: 1073-1078, 1990.

EXHIBIT 24

5/21/2018

66. Witschger, P.M., Gerhart, T.N., Goldman, J.B., Edsberg, L.E., and Hayes, W.C.: Biomechanical evaluation of a biodegradable composite as an adjunct to internal fixation of fracture of the proximal femur. J. Orthop. Res., 9: 48-53, 1991.

67. Cheal, E.J., Mansmann, K.A., DiGioia, A.M. III, Hayes, W.C., and Perren, S.M.: Role of interfragmentary strain in fracture healing: Ovine model of a healing osteotomy gap. J. Orthop. Res., 9: 131-142, 1991.

68. Lotz, J.C., Gerhart, T.N., and Hayes, W.C.: Mechanical properties of metaphyseal bone in the proximal femur. J. Biomech., 24: 317-329, 1991.

69. Shea, M., Edwards, W.T., White, A.A., and Hayes, W.C.: Variations of stiffness and strength along the human cervical spine. J. Biomech., 24: 95-107, 1991.

70. Wittenberg, R.H., Shea, M., Swartz, D.E., Lee, K.S., White, A.A., and Hayes, W.C.: Importance of bone mineral density in instrumented spine fusions. Spine, 16: 647-652, 1991.

71. Hipp, J.A., Katz, G.Z., and Hayes, W.C.: Local demineralization as a model for bone strength reductions in lytic transcortical metastatic lesions. Invest. Radiol., 26: 934-938, 1991.

72. Jofe, M.H., Takeuchi, T., and Hayes, W.C.: Compressive behavior of human bone-cement composites. J. Arthroplasty, 6: 213-219, 1991.

73. Lotz, J.C., Cheal, E.J., and Hayes, W.C.: Fracture prediction for the proximal femur using finite element models. Part I: Linear analysis. J. Biomech. Eng., 113: 353-360, 1991.

74. Lotz, J.C., Cheal, E.J., and Hayes, W.C.: Fracture prediction for the proximal femur using finite element models. Part II: Nonlinear analysis. J. Biomech. Eng., 113: 361-365, 1991.

75. Myers, E.R., Sebeny, E.A., Hecker, A.T., Corcoran, T.A., Hipp, J.A., Greenspan, S.L., and Hayes, W.C.: Correlations between photon absorption properties and failure load of the distal radius in vitro. Calc. Tissue Int., 49: 292-297, 1991.

76. Robinovitch, S.N., Hayes, W.C., and McMahon, T.A.: Prediction of femoral impact forces in falls on the hip. J. Biomech. Eng., 113: 366-374, 1991.

77. Shea, M., Edwards, W.T., Clothiaux, P.L., Crowell, R.R., Nachemson, A.L., White, A.A., and Hayes, W.C.: Three-dimensional load/displacement properties of posterior lumbar fixation. J. Orthop. Trauma, 5: 420-427, 1991.

78. Swartz, D.E., Wittenberg, R.H., Shea, M., White, A.A., and Hayes, W.C.: Physical and mechanical properties of calf lumbosacral trabecular bone. J. Biomech., 24: 1059-1068, 1991.

79. Cheal. E.J., Spector, M., and Hayes, W.C.: Role of loads and prosthesis material properties on the mechanics of the proximal femur after total hip arthroplasty. J. Orthop. Res., 10: 405-422, 1992.

80. Carpenter, J.E., Hipp, J.A., Gerhart, T.N., Rudman, C.G., Hayes, W.C., and Trippel, S.J.: Failure of growth hormone to alter fracture healing in biomechanics in a rabbit. J. Bone Joint Surg. [Am], 74: 359-367, 1992.

81. Wittenberg, R.H., Shea, M., Edwards, W.T., Swartz, D.E., White, A.A., and Hayes, W.C.: A biomechanical study of the fatigue characteristics of thoracolumbar fixation implants in a calf spine model. Spine 17: S121-S128, 1992.

82. Hipp, J.A., Rosenberg, A.E., and Hayes, W.C.: Mechanical properties of trabecular bone within and adjacent to osseous metastases. J. Bone Miner. Res., 7: 1165-1171, 1992.

83. Shea, M., Wittenberg, R.H., Edwards, W.T., White, A.A., and Hayes, W.C.: In vitro hyperextension injuries in the human cadaveric cervical spine. J. Orthop. Res., 10: 911-916, 1992.

84. Toolan, B.C., Shea, M., Myers, E.R., Borchers, R.E., Seedor, J.G., Quartuccio, H., Rodan, G., and Hayes, W.C.: Effects of the 4-amino-1-hydroxybutylidene bisphosphonate on bone biomechanics in rats. J. Bone Miner. Res., 7: 1399-1406, 1992.

5/21/2018

85. Kleeman, B.C., Takeuchi T.Y., Gerhart, T.N., and Hayes, W.C.: Holding power and reinforcement of cancellous screws in human bone. Clin. Orthop., 284: 260-266, 1992.

86. Mizrahi, J., Silva, M.J., and Hayes, W.C.: Finite element stress analysis of simulated metastatic lesions in the lumbar vertebral body. J. Biomed. Eng., 14: 467-475, 1992.

87. Maitland, L.A., Hipp, J.A., Myers, E.R., Hayes, W.C., and Greenspan, S.L.: Read my hips: Measuring trochanteric soft tissue thickness. Calcif. Tissue Int., 52: 85-89, 1993.

88. Hayes, W.C., Myers, E.R., Morris, J.N., Gerhart, T.N., Yett, H.S., and Lipsitz, L.A.: Impact near the hip dominates fracture risk in elderly nursing home residents who fall. Calcif. Tissue Int., 52: 192-198, 1993.

89. Myers, E.R., Hecker, A.T., Rooks, D.S., Hipp, J.A., and Hayes, W.C.: Geometric variables from DXA of the radius predict forearm fracture load in vitro. Calcif. Tissue Int., 52: 199-204, 1993.

90. Michel, M.C., Guo, X.E., Gibson, L.J., McMahon, T.A., and Hayes, W.C.: Compressive fatigue behavior of bovine trabecular bone. J. Biomech., 26: 453-463, 1993.

91. Keaveny, T.M., Borchers, R.E., Gibson, L.J., and Hayes, W.C.: Technical Note: Theoretical analysis of the experimental artifact in trabecular bone compressive modulus. J. Biomech., 26: 599-607, 1993.

92. McGowan, D.P., Hipp, J.A., Takeuchi, T., White, A.A., and Hayes, W.C.: Strength reductions from trabecular destruction within thoracic vertebrae. J. Spinal Disorders, 6: 130-136, 1993.

93. Cheal, E.J., Hipp, J.A., and Hayes, W.C.: Evaluation of finite element analysis for prediction of the strength reduction due to metastatic lesions in the femoral neck. J. Biomech., 26: 251-264, 1993.

94. Gerhart, T.N., Roux, R.D., Hanff, P.A., Horowitz, G.L., Renshaw, A.A., and Hayes, W.C.: Antibiotic-loaded biodegradable bone cement for prophylaxis and treatment of experimental osteomyelitis in a rat model. J. Orthop. Res., 11: 250-255, 1993.

95. Laurencin, C., Gerhart, T.N., Witschger, P.M., Satcher, R.R., Domb, A.A., Rosenberg, A., Hanff, P.P., Edsberg, L.E., Hayes, W.C., and Langer, R.R.: Bioerodible poly(anhydrides) for antibiotic drug delivery: In-vivo osteomyelitis treatment in a rat model system. J. Orthop. Res., 11: 256-262, 1993.

96. Crowell, R.R., Shea, M., Edwards, W.T., Clothiaux, P.L., White, A.A., and Hayes, W.C.: Cervical injuries under flexion and compression loading. J. Spinal Disorders, 6: 175-181, 1993.

97. Holmes, C.A., Edwards, W.T., Gerhart, T.N., Lewallen, D.G., Crowell, R.R., and Hayes, W.C.: Biomechanics of pin and screw fixation of femoral neck fractures. J. Orthop. Trauma, 7: 242-247, 1993.

98. Lauritzen, D.B., Balena, R., Shea, M., Seedor, J.G., Markatos, A., Le, H.M., Toolan, B.C., Myers, E.R., Rodan, G., and Hayes, W.C.: Effects of combined prostaglandin and alendronate treatment on the histomorphometry and biomechanical properties of bone in ovariectomized rats. J. Bone Miner. Res., 8: 871-879, 1993.

99. Keaveny, T.M., Borchers, R.E., Gibson, L.J., and Hayes, W.C.: Trabecular bone modulus and strength can depend on specimen geometry. J. Biomech., 26: 991-1000, 1993.

100. Guy, J.A., Shea, M., Peter, C.P., Morrissey, R., and Hayes, W.C.: Continuous alendronate treatment throughout growth, maturation and aging in the rat results in both increased mechanical properties and bone mass. Calcif. Tissue Int., 53: 283-288, 1993.

101. Snyder, B.D., Piazza, S., Edwards, W.T., and Hayes, W.C.:Role of trabecular morphology in the etiology of age-related vertebral fractures. Calcif. Tissue Int., 53: S14-S22, 1993.

102. Wittenberg, R.H., Lee, K.S., Shea, M., White, A.A., and Hayes, W.C.: Effect of screw diameter, insertion technique and bone cement augmentation on pedicular screw fixation strength. Clin. Orthop., 296: 278-287, 1993.

103. Silva, M.J., Hipp, J.A., McGowan, D.P., Takeuchi, T., and Hayes, W.C.: Strength reductions of thoracic vertebrae in the presence of transcortical osseous defects: Effects of defect location, pedicle disruption and defect size. Euro. Spine Journal, 2: 118-125, 1993.

5/21/2018

104. Mizrahi, J., Silva, M.J., Keaveny, T.M., Edwards, W.T., and Hayes, W.C.: Finite element stress analysis of the normal and osteoporotic lumbar vertebral body. Spine, 18: 2088-2096, 1993.

105. Hecker, A.T., Shea, M., Hayhurst, J.O., Myers, E.R., Meeks, L.W., and Hayes, W.C.: Pull-out strength of suture anchors for rotator cuff and bankart lesion repair. Am. J. Sports Med., 21: 874-879, 1993.

106. Brown, C., Hecker, A.T., Hipp, J.A., Myers, E.R., and Hayes, W.C.: The biomechanics of interference screw fixation of patellar tendon ACL grafts. Am. J. Sports Med., 21: 880-886, 1993.

107. Keaveny, T.M. and Hayes, W.C.: A 20-year perspective on the mechanical properties of trabecular bone. J. Biomech. Eng., 115: 534-542, 1993.

108. Balena, R., Toolan, B.C., Shea, M., Markatos, A., Myers, E.R., Lee, S.C., Opas, E.E., Seedor, J.G., Klein, H., Frankenfield, D., Quartuccio, H., Fioravanti, C., Clair, J., Brown, E., Hayes, W.C., and Rodan, G: The effects of two-year treatment with the aminobisphosphonate Alendronate on bone metabolism, bone histomorphometry and bone strength in ovariectomized non-human primates. J. Clin. Invest., 92: 2577-2586, 1993.

109. Guo, X.-D.E., McMahon, T.A., Keaveny, T.M., Hayes, W.C., and Gibson, L.J.: Finite element modeling of damage accumulation in trabecular bone under cyclic loading. J. Biomech., 27: 145-155, 1994.

110. Greenspan, S.L., Myers, E.R., Maitland, L.A., Resnick, N.M., and Hayes, W.C.: Fall severity and bone mineral density as risk factors for hip fracture in ambulatory elderly. JAMA, 271: 128-133, 1994.

111. Bowman, S.M., Keaveny, T.M., Gibson, L.J., Hayes, W.C., and McMahon, T.A.: Compressive creep behavior of bovine trabecular bone. J. Biomech., 27: 301-310, 1994.

112. Hayes, W.C.: Reply to Letter to the Editor: Impact near the hip dominates fracture risk in elderly nursing home residents who fall. Calcif. Tissue Int., 54: 175-177, 1994.

113. Steiner, M.E., Hecker, A.T., Brown, C., and Hayes, W.C.: ACL graft fixation: Comparison of hamstring tendons and patellar tendon. Am. J. Sports Med., 22: 240-247, 1994.

114. Zysset, P.K., Sonny, M.M., and Hayes, W.C.: Morphology-mechanical property relations in trabecular bone of the osteoarthritic proximal tibia. J. Arthroplasty, 9: 203-216, 1994.

115. Blevins, F.T., Hecker, A.T., Bigler, G., Boland, A., and Hayes, W.C.: The effects of donor age and strain rate on the biomechanical properties of bone-patellar tendon-bone allografts. Am. J. Sports Med., 22: 328-333, 1994.

116. Silva, M.J., Wang, C., Keaveny, T.M., and Hayes, W.C.: Direct and computed tomography thickness measurements of the human lumbar vertebral shell and endplate. Bone, 15: 409-414, 1994.

117. Courtney, A.C., Wachtel, E.F., Myers, E.R., and Hayes, W.C.: Effects of loading rate on strength of the proximal femur. Calcif. Tissue Int., 55: 53-58, 1994.

118. Keaveny, T.M., Guo, X.E., Wachtel, E.F., McMahon, T.A., and Hayes, W.C.: Trabecular bone exhibits fully linear elastic behavior and yields at low strains. J. Biomech., 27: 1127-1136, 1994.

119. Keaveny, T.M., Wachtel, E.F., Ford, C.M., and Hayes, W.C.: Differences between tensile and compressive strengths of bovine tibial trabecular bone depend on modulus. J. Biomech., 27: 1137-1146, 1994.

120. Corcoran, T.A., Sandler, R.B., Myers, E.R., Lebowitz, H.H., and Hayes, W.C.: Calculation of the cross-sectional geometry of bone from CT images: Application to the study of the radius in postmenopausal women. J. Comput. Assist. Tomogr., 18: 626-633, 1994.

121. Shea, M.S., Takeuchi, T., Wittenberg, R.H., White, A.A., and Hayes, W.C.: A comparison of the effects of automated percutaneous discectomy and conventional discectomy on intradiscal pressure, disc geometry, and stiffness. J. Spinal Disord., 7: 317-325, 1994.

122. Keaveny, T.M., Wachtel, E.F., Guo, X.E., and Hayes, W.C.: Mechanical behavior of damaged trabecular bone. J. Biomech., 27: 1309-1318, 1994.

5/21/2018

123. Lee, S.C., Shea, M., Battle, M.A., Kozitza, K., Ron, E., Turek, T., Schaub, R.G. and Hayes, W.C.: Healing of large segmental defects in rat femurs is aided by RhBMP2 in PLGA matrix. J. Biomed. Mat. Res., 28: 1149-1156, 1994.

124. Greenspan, S.L., Myers, E.R., Maitland, L.A., Kido, T.H., Krasnow, M.B., and Hayes, W.C.: Trochanteric bone mineral density is associated with type of hip fracture in the elderly. J. Bone Miner. Res., 9: 1889-1894, 1994.

125. Elovic, R.P., Hipp, J.A., and Hayes, W.C.: Maxillary molar extraction decreases stiffness of the mandible in ovariectomized rats. J. Dent. Res., 73: 1735-1741, 1994.

126. Elovic, R.P., Hipp, J.A., and Hayes, W.C.: A method for measuring the structural properties of the rat mandible. Archives of Oral Biology, 39: 1029-1033, 1994.

127. Courtney, A.C., Wachtel, E.F., Myers, E.R., and Hayes, W.C.: Age-related reductions in the strength of the femur tested in a fall loading configuration. J. Bone Joint Surg., [Am], 77: 387-395, 1995.

128. Bouxsein, M.L., Courtney, A.C., and Hayes, W.C.: Ultrasonic and densitometric properties of the calcaneus correlate with the strength of cadaveric femurs loaded in a fall configuration. Calcif. Tissue Int., 56: 99-103, 1995.

129. Elovic, R.P., Hipp, J.A., and Hayes, W.C.: Ovariectomy decreases the bone area fraction of the rat mandible. Calcif. Tissue Int., 56: 305-310, 1995.

130. Skoff, H.D., Hecker, A.T., Hayes, W.C., Sebell-Sklar, R., and Straughn, N.: Bone suture anchors in hand surgery. Br. J. Hand Surg., 20: 245-248, 1995.

131. Borchers, R.E., Gibson, L.J., Burchardt, H., and Hayes, W.C.: Effects of selected thermal variables on the mechanical properties of trabecular bone. Biomaterials, 16: 545-551, 1995.

132. Takeuchi, T., Lathi, V.K., Khan, A.M., and Hayes, W.C.: Patellofemoral contact pressures exceed the compressive yield strength of UHMWPE in total knee replacements. J. Arthroplasty, 10: 363-368, 1995.

133. Wittenberg, R.H., Shea, M., and Hayes, W.C.: Flexibility and distraction after monosegmental and bisegmental lumbosacral fixation with angular stable fixators. Spine, 20: 1227-1232, 1995.

134. Lafage, M.H., Balena, R., Battle, M.A., Shea, M., Seedor, J.G., Klein, H., Hayes, W.C., and Rodan, G.A.: Comparison of alendronate and sodium fluoride effects on cancellous and cortical bone in minipigs: A one-year study. J. Clin. Invest, 95: 2127-2133, 1995.

135. Yaszemski, M.J., Payne, R.G., Hayes, W.C., Langer, R.S., Aufdemorte, T.B., and Mikos, A.G.: The ingrowth of new bone tissue into and initial mechanical properties of a degrading polymeric composite scaffold. Tissue Eng., 1: 41-52, 1995.

136. Elovic, R.P., Hipp, J.A., and Hayes, W.C.: Maxillary molar extraction causes increased bone loss in the mandible of ovariectomized rats. J. Bone Miner. Res., 10: 1087-1093, 1995.

137. Lotz, J.C., Cheal, E.J., and Hayes, W.C.: Stress distributions within the proximal femur during gait and falls: Implications for osteoporotic fracture. Osteoporos. Int., 5: 252-261, 1995.

138. van den Kroonenberg, A.J.., Hayes, W.C., and McMahon, T.A.: Dynamic models for sideways falls from standing height. J. Biomech. Eng., 117: 309-318, 1995.

139. Shea, M., Edwards, W.T., White, A.A., and Hayes, W.C.: Optimization technique for the calculation of in-vitro three-dimensional vertebral motion. J. Biomech. Eng., 117: 366-369, 1995.

140. Silva, M.J., Gibson, L.J., and Hayes, W.C.: The effects of non-periodic microstructural variability on the elastic properties of two-dimensional cellular solids. Int. J. of Mech. Sci., 37: 1161-1177, 1995.

141. Robinovitch, S.N., Hayes, W.C., and McMahon, T.A.: Energy-shunting hip padding system attenuates femoral impact force in a simulated fall. J. Biomech. Eng., 117: 409-413, 1995.

EXHIBIT 24

5/21/2018

142.  Robinovitch, S.N., McMahon, T.A., and Hayes, W.C.: Force attenuation in trochanteric soft tissues during impact from a fall. J. Orthop. Res., 13: 956-962, 1995.

143.  Ford, C.M., Keaveny, T.M., and Hayes W.C.: The effect of impact direction on the structural capacity of the proximal femur during falls. J. Bone Miner. Res., 11: 377-383, 1996.

144.  Peter, C.P., Guy, J., Shea, M., Bagdon, W., Kline, W.F., and Hayes, W.C.: Long-term safety of the aminobisphosphonate alendronate in adult dogs: I. General safety and biomechanical properties of bone. J. Pharm. and Exper. Therapeutics, 276: 271-276, 1996.

145.  van den Kroonenberg A.J., Hayes, W.C., and McMahon, T.A.: Hip impact velocities and body configurations for voluntary falls from standing height. J. Biomech., 29: 807-811, 1996.

146.  Pinilla, T.P., Boardman, K.C., Bouxsein, M.L., Myers, E.R., and Hayes, W.C.: Impact direction from a fall influences the failure load of the proximal femur as much as age-related bone loss. Calcif. Tissue Int., 58: 231-235, 1996.

147.  Courtney, A.C., Hayes, W.C., and Gibson, L.J.: Age-related differences in post-yield damage in human cortical bone: Experiment and model. J Biomech., 29: 1463-1471, 1996.

148.  Bowman, S.M., Zeind, J., Gibson, L.J., Hayes, W.C., and McMahon, T.A.: The tensile behavior of demineralized bovine cortical bone. J. Biomech., 29: 1497-1501, 1996.

149.  Yaszemski, M.J., Payne, R.G., Hayes, W.C., Langer, R.S., and Mikos, A.G.: The evolution of bone transplantation: Molecular, cellular and tissue strategies to engineer human bone. Biomaterials, 17: 175-185, 1996.

150.  Yaszemski MJ, Payne RG, Hayes W.C., Langer R., and Mikos A.G.: In-vitro degradation of a poly(propylene fumarate)-based composite material. Biomaterials, 17: 2127-2130, 1996.

151.  Hayes, W.C., Myers, E.R., Robinovitch, S.N., van den Kroonenberg, A.J., Courtney, A.C., and McMahon, T.A.: Etiology and prevention of age-related hip fractures. Bone, 18:77S-86S, 1996.

152.  Silva, M.J., Keaveny, T.M., and  Hayes, W.C.: Load sharing between the shell and centrum in the lumbar vertebral body. Spine, 22: 140-150, 1997.

153.  Frazier, D.D., Lathi, V.K., Gerhart, T.N., and Hayes, W.C.: Ex-vivo degradation of a poly(propylene glycol-fumarate), biodegradable particulate composite bone cement. J. Biomed. Mater. Res. 35: 383-389, 1997.

154.  Rooks, D.S., Ransil, B., and Hayes, W.C.: Self-paced exercise improves neuromotor performance in community dwelling older adults. J. Aging Phys. Act. 5: 135-149, 1997.

155.  Williams C.S., Abrahamsson S., Shea M., Seiler J.G., Hayes, W.C., and Gelberman R.H.: The biomechanical effects of operative nerve mobilization and transposition in a canine ulnar nerve model. J. Hand Surg., 22: 193-199, 1997.

156.  Robinovitch, S.N., Hayes, W.C., and McMahon, T.A.: Distribution of contact force during impact to the hip. Ann. Biomed. Eng., 25: 499-508, 1997.

157.  Robinovitch, S.N., Hayes, W.C., and McMahon, T.A.: Predicting the impact response of a nonlinear single degree of freedom shock absorbing system from the measured step response. J. Biomech. Eng., 119: 221-227, 1997.

158.  Windhagen, H.J., Hipp, J.A., Silva, M.J., Lipson, S.J., and Hayes, W.C.: Predicting failure of thoracic vertebrae with simulated and actual metastatic defects. Clin. Orthop., 344: 313-319, 1997.

159.  Rooks, D.S., Kiel, D.P., Parsons, C., and Hayes, W.C.: Self-paced resistance training and walking exercise in community dwelling older adults: Effects on neuromotor performance. J. Gerontol., 52: M161-M168, 1997.

160.  Peter, S.J., Yaszemski, M.J., Suggs, L.J., Payne, R.G., Langer, R., Hayes, W.C., Unroe, M.R., Alemany, L.B., Engel, P.S., and Mikos, A.G.: Characterization of partially saturated poly(propylene fumarate) for orthopaedic applications. J. Biomater., 8: 893-904, 1997.

5/21/2018

161. Riegger-Krugh, C.L., Gerhart, T.N., Powers, W.R., and Hayes, W.C.: Tibiofemoral contact pressures in degenerative joint disease. Clin. Orthop., 348: 233-245, 1998.

162. Oden, Z.M., Selvitelli, D.M., Hayes, W.C., and Myers, E.R.: The effect of trabecular structure on DXA-based predictions of bovine bone failure. Calcif. Tissue Int., 63: 67-73, 1998.

163. Bowman, S.M., Guo, X.E., Cheng, D.W., Keaveny, T.M., Gibson, L.J., Hayes, W.C., and McMahon, T.A.: Creep contributes to the fatigue behavior of bovine trabecular bone. J. Biomech. Eng., 120: 647-654, 1998.

164. Bruder, S.P., Kurth, A.A., Shea, M., Hayes, W.C., Jaiswal, N., and Kadiyala, S.: Bone regeneration by implantation of purified, culture-expanded human mesenchymal stem cells. J. Orthop. Res., 16: 155-162, 1998.

165. Silva, M.J., Keaveny, T.M., and Hayes, W.C.: Computed tomography-based finite element analysis predicts failure loads and fracture patterns for vertebral sections. J. Orthop. Res., 16: 300-308, 1998.

166. Muller, R., Gerber, S.C., and Hayes, W.C.: Micro-compression: A novel technique for the non-destructive assessment of local bone failure. Tech. & Health Care, 6: 433-444, 1998.

167. Lee T.C., Myers E.R., and Hayes W.C.: Fluorescence-aided detection of microdamage in compact bone. J. Anat., 193: 179-184, 1998.

168. Greenspan, S.L., Myers, E.R., Kiel, D.P., Parker, R.A., Hayes, W.C., Resnick, N.M.: Fall direction, bone mineral density, and function: Risk factors for hip fracture in nursing home elderly. Am. J. Med.,104: 539-545, 1998.

169. Colgan, S.A., Hecker, A.T., Kirker-Head, C.A., and Hayes, W.C.: A comparison of the Synthes 4.5-mm cannulated screw and the Synthes 4.5-r standard cortex screw systems in equine bone. Vet Surg., 27: 540-546, 1998.

170. Bozic, K.J., Glazer, P.A., Zurakowski, D., Simon, B.L., Lipson, S.J., and Hayes, W.C.: In vivo evaluation of coralline hydroxyapatite and direct current electrical stimulation in lumbar spinal fusion. Spine, 24: 2127-2133, 1999.

171. Kraus, K.H., Kadiyala, S., Wotton, H., Kurth, A., Shea, M., Hannan, M., Hayes, W.C., Kirker-Head, C.A., and Bruder, S.: Critically sized osteo-periosteal femoral defects: A dog model. J. Invest. Surg., 12: 115-124, 1999.

172. Wright, T.M., Buckwalter, J.A., and Hayes, W.C.: Writing for the Journal of Orthopaedic Research. J Orthop. Res., 17: 459-466, 1999.

173. Bowman, S.M., Gibson, L.J., Hayes, W.C., and McMahon, T.A. Results from demineralized bone creep tests suggest that collagen is responsible creep behavior of bone. J. Biomech. Eng., 121: 253-258, 1999.

174. Michaeli, D.A., Inoue, K., Hayes, W.C., and Hipp, J.A. Density predicts the activity-dependent failure load of proximal femora with defects. Skeletal Radiol., 28: 90-95, 1999.

175. Hamner, D.L., Brown, C.H., Steiner, M.E., Hecker, A.T., and Hayes, W.C.: Hamstring tendon grafts for reconstruction of the anterior cruciate ligament: biomechanical evaluation of the use of multiple strands and tensioning techniques. J. Bone Joint Surg., 81-A: 549-557, 1999.

176. Hayes, W.C., Shea, M.S., and Rodan, G.A.: Preclinical evidence of normal bone with alendronate. Int. J. of Clin. Pract., Suppl 101: 9:13, 1999.

177. Lee, T.C., Arthur, T.L., Gibson, L.J., and Hayes, W.C.: Sequential labeling of microdamage in bone using chelating agents. J. Orthop. Res., 18(2): 322-325, 2000.

178. Wilson, D.R., Myers, E.R., Mathis, J.M., Scribner, R.M., Conta, J.A., Reiley, M.A., Talmadge, K.D., and Hayes, W.C.: Effect of augmentation on the mechanics of vertebral wedge fractures. Spine, 25:158-165, 2000.

179. Gunter K.B., White K.N., Hayes W.C., and Snow C.M.: Functional mobility discriminates non-fallers from one-time and frequent fallers. J. Gerontol. A: Biol. Sci. Med. Sci., 55: M672-676, 2000.

180. Windhagen, H., Hipp, J.A., and Hayes, W.C.: Post-fracture instability of vertebrae with simulated defects can be predicted from computed tomography data. Spine, 24 (14): 1775-1787, 2000.

EXHIBIT 24

5/21/2018

181. Smeesters, C., Hayes, W.C., and McMahon, T.A.: Disturbance type and gait speed affect fall direction and impact location. J. Biomech., 34 (3): 309-317, 2000.

182. Cindik, E.D., Maurer, M., Hannan, M.K., Muller, R., Hayes, W.C., Hovy, L., and Kurth, A.A.: Phenotypical characterization of c-kit receptor deficient mouse femora using non-destructive, high-resolution imaging techniques and biomechanical testing. Technol. Health Care, 8(5): 267-275, 2000.

183. Kurth, A.H.A., Wang, C., Hayes, W.C., Shea, M.: The evaluation of a rat model for the analysis of densitometric and biomechanical properties of tumor-induced osteolysis. J. Orthop. Res.,19 (2): 200-205, 2001.

184. Smeesters, C., Hayes, W.C., and McMahon, T.A.: The threshold trip duration for which recovery is no longer possible is associated with strength and reaction time. J. Biomech., 34 (5): 589-595, 2001.

185. White, K.N., Gunter, K.B., Hayes, W.C., and Snow, C.M.: The quick step: A new test for measuring reaction time and lateral stepping velocity. J. Appl. Biomech., 2001.

186. Lewandrowksi, K.U., Bondre, S.P., Shea M., Untch, C.M., Hayes, W.C., Hile, D.D., Wise, D.L., and Trantolo, D.J.: Composite poly (lactide)/hydroxylapatite screws for fixation of osteochondral osteotomies: A morphometric, histologic and radiographic study in sheep. J. Biomater. Sci. Polym. Ed. 13 (11): 1241-1258, 2002.

187. Lewandrowski K. U., Bondre S.P., Shea M., Untch C.M., Hayes W.C., Hile D.D., Wise, D.L., and Trantolo, D.J.: Composite resorbable polymer/hydroxylapatite composite screws for fixation of osteochondral osteotomies. Biomed. Mater. Eng. 12(4); 423-438, 2002.

188. Gunter, K.B., De Costa, J.L., White, K.N., Hooker, K., Hayes, W.C., and Snow, C.M.: Balance self- efficacy predicts risk factors for side falls - and frequent falls in community dwelling elderly. J. Aging Phys. Act.: 11; 28-39, 2003.

189. Ferrari, D.A, Wilson, D.R., and Hayes, W. C. The effect of release of the popliteus and quadriceps force on rotation of the knee. Clin. Orthop. Relat. Res. 412: 225-233, 2003.

190. Kang K.H., White K.N., Hayes W.C., and Snow, C.M.: Agility and balance differ between older community and retirement facility residents. J. Appl. Gerontol. 23 (4): 457-467, 2004.

191. Wilson, D., Moses, J., Zilberfarb, J., and Hayes, W.C. Mechanics of coracoacromial ligament transfer for acromioclavicular joint injuries. J. Biomech. 38: 615-619, 2005.

192. Kurth A.A., Kim S.Z., Shea M., Bauss F., Hayes W.C., and Muller R.: Preventative ibandronate treatment has the most beneficial effect on the microstructure of bone in experimental tumor osteolysis. J. Bone Miner. Metab. 25 (2): 86-92, 2007.

193. Ko, S.U., Gunter K.B., Costello M., Aum H., MacDonald S., White, K.N., Snow, C.M., and Hayes W.C.: Stride width discriminates gait of side-fallers compared to other-directed fallers during overgound walking. J Aging Health. 19(2): 200-212, 2007.

194. Smeesters, C., Hayes, W.C., and McMahon, T.A.: Determining fall direction and impact location for various disturbances and gait speeds using the articulated total body model. J. Biomech. Eng.129(3): 393-399, 2007.

195. Erickson M.S. and Hayes, W.C.: Damage-based collision severity reconstruction (For use when crush measurements are only available for one vehicle). Collision: The International Compendium for Crash Research. 2(1): 34-36, 2007.

196. Bauer, J.J., Pavol, M.J., Snow, C.M., and Hayes, W.C.: MRI-derived body segment parameters of children differ between age-based estimates derived using photogrammetry. J. Biomech. 40: 2904-2910, 2007.

197. Erickson M.S. and Hayes, W.C.: The implications of active control technology for crash reconstruction. Accid. Reconstr. J.: 18(1): 19-23, 2008.

198. Erickson M.S. and Hayes, W.C.: Drag factor attenuation for rotating vehicles. Accid. Reconstr. J. 18(3): 19-23, 2008.

5/21/2018

199. Akeson, W., Buckwalter, J., Hayes, W., Wright, T.: Celebrating 25 years of advancing orthopaedic research. J. Orthop. Res. 26 (2): 141-142, 2008.

200. Erickson, M.S., Bauer, J.J., and Hayes, W.C.: The accuracy of photo-based three-dimensional scanning for Collision reconstruction using 123D catch. SAE Int., 2013-01-0784: 1-10, 2013.

201. Lee, P.J., Lee, E.L., Hayes, W.C.: The ratio of thoracic to lumbar compression force is posture dependent. Ergon. 56(5): 832-841, 2013.

202. Lee, E.L., Lee, P.J., Erickson, M.S., Hayes, W.C.: Increase in vehicle front, rear, and side stiffness coefficients in the past twenty years necessitates new representative database. SAE Int. 2014-01-0351: 1-6, 2014.

203. Lee, E.L., Lee, P.J., Hayes, W.C.: Head accelerations in out-of-position postures in low speed rear impacts: A comparison between volunteer data and GATB simulation. SAE Int 2014-01-0490: 1-7, 2014.

204. Lee, E.L., Hayes, W.C.: Occupant accelerations and injury potential during an ambulance-to-curb impact. Forensic Int. 237: e6-e10, 2014.

Submitted for Publication

Lee, P.J., Lee, E.L., Hayes, W.C.: A slip while turning can produce a forward fall and frontal injuries. Saf. Sci., 2013.

B. Chapters and Proceedings

1.  Hayes, W.C.: Strain gage applications in bone. In: Biomedical applications, carbon stress gages, pulsed excitation, and wireless data coupling. Proc. Western Regional Strain Gage Committee (ed., Paul H. Adams). Soc. for Experimental Stress Analysis, Westport, CT, pp. 22-28, 1973.

2.  Kane, T.R., Hayes, W.C., Priest, J.D.: Experimental determination of forces exerted in tennis play. In: Biomechanics IV (eds., R.C. Nelson and C.A. Morehouse). University Park Press, Baltimore, 284-290, 1974.

3.  Nagel, D.A., Perkash, I., Piziali, R.L., and Hayes, W.C.: Mechanics of dorsal-lumbar spine injuries: A preliminary report. Proc. 19th Conf. Assoc. Auto Med., 1975.

4.  Hayes, W.C.: Biomechanical measurements of bone. In: CRC Handbook of Engineering in Medicine and Biology, Section B: Instruments and Measurements (eds., A. Burstein and E. Bahniuk). CRC Press, Cleveland, Vol. 1, 333-372, 1978.

5.  Hayes, W.C.: Abnormal joint biomechanics in osteoarthritis. In: The Human Joint in Health and Disease (ed., W.H. Simon). University of Pennsylvania Press, pp. 136-141, 1978.

6.  Hayes, W.C.: Theoretical modeling and design of implant systems. Proc. Workshop on Mechanical Failure of Total Joint Replacement. Am. Acad. Orthop. Surg. Document 916-978: 159-179, 1978.

7.  Hayes, W.C. and Carter, D.R.: Biomechanics of bone. In: Skeletal Research: An Experimental Approach (eds., D.J. Simmons and A.S. Kunin). Academic Press, New York, pp. 263-300, 1979.

8.  Hayes, W.C.: Biomechanics of fracture treatment. In: Fracture Healing and Treatment, (ed., R.B. Heppenstall). W.B. Saunders, Philadelphia, pp. 124-172, 1980.

9.  Wright, T.M. and Hayes, W.C.: Mechanics of fracture and fracture propagation. In: Scientific Foundations of Orthopaedics, Chapter 31 (eds., O. Goodfellow and P. Bullough). William Heinemann Medical Books, Ltd., London, pp. 252-258, 1980.

10. Hayes, W.C.: Basic biomechanics of compression plate fixation. In: Current Concepts of Internal Fixation of Fractures (ed., H.K. Uhthoff). Springer-Verlag, New York, pp. 49-62, 1980.

5/21/2018

30. Chuch, H.C., Barnett, G.O., Hayes, W.C., and Beck, W.S.: Hemavid: A flexible computer-based interactive video resource for hematology. In: Symposium for Computer Applications in Medical Care. Washington, DC, November, 1988.

31. Cheal, E.J., Lotz, J.C., Edwards, W.T., Knopf, K.B., and Hayes, W.C.: Finite element modeling of failure processes in the skeleton. In: Computational Mechanics, 1988 (eds., S.N. Atluri and G. Yagawa). Springer-Verlag, Vol. 2, pp 61-64, 1988.

32. Rohlmann, A., Cheal, E.J., Hayes, W.C., and Bergmann, G.: A non-linear, finite element model for interface stresses in total hip replacements. In: Material Properties and Stress Analysis in Biomechanics (ed., A.L. Yettram). Brunel University, London, pp. 203-213, 1989.

33. Cheal, E.J., Gerhart, T.N., and Hayes, W.C.: Failure analysis of a porous coated patellar component. In: Computational Methods in Bioengineering - BED-Vol. 9 (eds., R.L. Spilker and B.R. Simon). The American Society of Mechanical Engineers, New York, Book No. G00458, pp. 211-221, 1989.

34. Cheal, E.J., Gerhart, T.N., and Hayes, W.C.: Trabecular bone remodeling around smooth and porous carbon-carbon implants. In: 1989 ASCE/ASME Mechanics Symposium (eds., P.A. Torzilli and M.H. Friedman). The American Society of Mechanical Engineers, New York, pp. 293-296, 1989.

35. Hayes, W.C., Huberti, H.H., Lewallen, D.G., Riegger, C.L., and Myers, E.R.: Patellofemoral contact pressures and the effects of surgical reconstructive procedures. In: Knee Arthroscopy (ed. J.W. Ewing) from the Bristol-Myers Symposium on Articular Cartilage and Knee Joint Function: Basic Science and Arthroscopy. Raven Press, New York, pp. 57-77, 1990.

36. Snyder, B.D., and Hayes, W.C.: Multiaxial structure-property relations in trabecular bone. In: Biomechanics of Diarthrodial Joints (eds., V.C. Mow, A. Ratcliffe, and S. L.-Y. Woo) Springer-Verlag, New York, Volume II, pp. 31-59, 1990.

37. Hayes, W.C., Myers, E.R., Greenspan, S.L., Robinovitch, S.N., and McMahon, T.A.: Biomechanics of hip fracture risk. Proc. CDC Symp. on Injury Prevention Through Biomechanics (ed. K. Yang). Wayne State University, Detroit MI, pp. 35-47, 1991.

38. Hayes, W.C., Piazza, S.J., and Zysset, P.K.: Biomechanics of fracture risk prediction using quantitative computed tomography. In: Radiological Clinics of North America (ed D.I. Rosenthal). W.B. Saunders, Philadelphia, 29: 1-18, 1991.

39. Hayes, W.C.: Biomechanics of cortical and trabecular bone: Implications for assessment of fracture risk. In: Basic Orthopaedic Biomechanics (eds., V.C. Mow, and W.C. Hayes) Raven Press, New York pp. 93-142, 1991.

40. Hipp, J.A., Cheal, E.J., and Hayes, W.C.: Biomechanics of fractures. In: Skeletal Trauma (eds., B.D. Browner, J.B. Jupiter, A.M. Levine, and P.G. Trafton) W.B. Saunders Company, Philadelphia, pp. 95-125, 1991.

41. Myers, E.R., Greenspan, S.L., and Hayes, W.C.: Biomechanics of hip fracture risk. Proc. Second CDC Symp. on Injury Prevention Through Biomechanics (ed. K. Yang). Wayne State University, Detroit MI, pp. 41-46, 1992.

42. Keaveny, T.M. and Hayes, W.C.: Mechanical properties of cortical and trabecular bone. In: Bone Volume VII: Bone Growth-B (ed., B.K .Hall), CRC Press, Boca Raton, pp. 285-344, 1992.

43. Hayes, W.C., Robinovitch, S.N., and McMahon, T.A.: Energy-shunting hip padding system reduces femoral impact force from a simulated fall to below fracture threshold. Proc. Third CDC Symposium on Injury Prevention Through Biomechanics (ed., K. Yang), Wayne State University, Detroit, MI, pp. 147-152, 1993.

44. Kaplan, F.S., Hayes, W.C., Keaveny, T.M., Boskey, A., Einhorn, T.A., and Iannotti, J.P.: Form and Function of Bone. In: Orthopaedic Basic Science. (ed., S.R. Simon) Am. Academy of Orthop. Surg., Rosemont, IL, pp. 127-184, 1994.

45. Hayes, W.C.: Biomechanics of falls and hip fracture prevention in the elderly. Proc. AAOS Workshop on Prevention of Falls and Hip Fractures in the Elderly (eds., D.F. Apple and W.C. Hayes), AAOS, Chicago, IL, pp. 41-65, 1994.

5/21/2018

46.  Carpenter, J.E., Myers, E.R., Gerhart, T.N., Yett, H.S., Morris, J.N., and Hayes, W.C.: Functional outcome of hip fractures in the elderly. Proc. AAOS Workshop on Prevention of Falls and Hip Fractures in the Elderly (eds., D.F. Apple and W.C. Hayes), AAOS, Chicago, IL, pp. 85-91, 1994.

47.  Robinovitch, S.N., Myers, E.R., Kiel, D.P., Greenspan, S.L., Hayes, W.C.: Hip fracture prevention from falls in the elderly. Proc. Fourth CDC Symposium on Injury Prevention Through Biomechanics (ed., K. Yang), Wayne State University, Detroit, MI, pp. 77-81, 1994.

48.  Hayes, W.C.: Age-related hip fractures: Biomechanics of fracture risk. In: Bone Formation and Repair (eds. C.T. Brighton, G. Friedlaender, J.M. Lane), Proc. AAOS Workshop on Bone Healing and Regeneration, pp. 485-498, 1994.

49.  Myers, E.R. and Hayes, W.C.: Age-related hip fractures. Current Opinion in Orthop., 5:9-15, 1994.

50.  Yaszemski, M.J., Mikos, A.G., Payne, R.G., and Hayes, W.C.:  Biodegradable polymer composites for temporary replacement of trabecular bone:  The effect of polymer molecular weight on composite strength and modulus. In: Proc. Materials Research Society Symposium on Biomaterials for Drug and Cell Delivery (eds. AG Mikos, R Murphy, H Bernstein, NA Peppas). Pittsburgh, Vol. 331, pp. 251-255, 1994.

51.  Kaplan, F.S., Hayes, W.C., Keaveny, T.M., Boskey, A., Einhorn, T.A., and Iannotti, J.P.: Form and function of bone. In: Orthopaedic Basic Science, 2nd Ed. Am. Academy of Orthop. Surg., Rosemont, IL., pp. 127-184, 1994.

52.  Hayes, W.C. and Myers, E.R.: Biomechanics of fractures. In: Osteoporosis: Etiology, Diagnosis and Management (2nd Edition), (eds. B.L. Riggs, L.J. Melton III), Lippincott-Raven Publishers, Philadelphia, pp. 93-114, 1995.

53.  Hipp, J.A., Springfield, D., and Hayes, W.C.: Predicting pathologic fracture risk in the management of metastatic bone defects. In:  Proc. Symp. on Skeletal Cancer Metastasis:  Recent expansion of orthopedic expertise (eds. Drs. Ono and Glasko), Clin. Orthop., 312:120-135, 1995.

54.  Frazier, D.D., Lathi, V.K., Gerhart, T.N., Altobelli, D.E., and Hayes, W.C.: In vivo degradation of a poly(propylene fumarate) biodegradable particulate composite bone cement. In: Proc. Material Research Society Symp. on Polymers in Medicine and Pharmacy (eds. AG Mikos, KW Leong, MJ Yaszemski, JA Tamada, ML Radomsky). Material Research Society, Pittsburgh, Vol. 394:15-19, 1995.

55.  Yaszemski MJ, Payne RG, Aufdemorte TB, Hayes WC, Langer R, Mikos AG: The in-vitro mechanical strength and in vivo bone ingrowth of a degrading polymeric composite biomaterial. In: Proc. Material Research Society Symp. on Polymers in Medicine and Pharmacy (eds. AG Mikos, KW Leong, MJ Yaszemski, JA Tamada, ML Radomsky). Material Research Society, Pittsburgh, Vol. 394:21-24, 1995.

56.  Bouxsein, M.L., Myers, E.R., and Hayes, W.C.: Biomechanics of age-related fractures: In: Osteoporosis (eds., R. Marcus, D. Feldman, J. Kelsey), Academic Press, San Diego, pp. 373-393, 1996.

57.  Goldberg VM, Buckwalter JA, Hayes WC, Koval KJ: Orthopaedic challenges in an aging population. Proc AAOS Instructional Lectures (ed. D. Springfield). AAOS, Rosemont, Vol. 46:417-422, 1997.

58.  Hayes, W.C. and Myers, E.R.: Biomechanical considerations of hip and spine fracture in osteoporotic bone. Proc AAOS Instructional Lectures (ed. D. Springfield). AAOS, Rosemont, Vol. 46:431-438, 1997.

59.  Hayes, W.C., Snow, C.M., McMahon, T.A.: Toward a definition of impact loading in exercise studies of bone. ASME Bioeng. Mtng. Sun River, OR, June, 1997.

60.  Hayes, W.C. and Bouxsein, M.L.: Biomechanics of cortical and trabecular bone: Implications for assessment of fracture risk. In: Basic Orthopaedic Biomechanics, 2nd Ed (eds., V.C. Mow and W.C. Hayes). Lippincott-Raven Publishers, Philadelphia, pp. 69-111, 1997.

61.  Hipp, J.A. and Hayes, W.C.: Biomechanics of fractures. In: Skeletal Trauma, 2nd Ed (eds., B.B. Browner, J.B. Jupiter, A.M. Levine, P.G. Trafton).  W.B. Saunders Co, Philadelphia, pp. 97-129, 1997.

5/21/2018

62.    Mueller, R.A. and Hayes, W.C.: Biomechanical competence of microstructural bone in the progress of adaptive bone remodeling. Proc. Int'l Soc. for Optical Engineering (SPIE) Annual Meeting. In: Developments in xray tomography (ed., U Bonse), SPIE, Bellingham, WA, pp. 3149:69-81, 1997.

63.    Lauritzen, J.B., Hayes, W.C.:    Chapter 25: Hip protectors.    In:    Management of Severly Osteoporotic Bone. Orthopedic and Pharmacologic Strategies    (ed. K. Obrant)    Springer-Verlag London Limited. pp. 353-361, 2000.

64.    Hipp, J.A. and Hayes, W.C.: Chapter 4:    Biomechanics of fractures.    In: Skeletal Trauma: Basic Science, Management, and Reconstruction, 3rd Ed (eds., B.B. Browner, J.B. Jupiter, A.M. Levine, P.G. Trafton).    W.B. Saunders Co., Philadelphia, PA., 2003, pp. 90-119.

65.    Brickman, D.B., Power, E. D., and Hayes, W.C.: Toy asparagus spear risk analysis.  2005 ASME International Mechanical Engineering Congress and RD&D Expo.  Orlando, FL, November 2005, pp. 1-8.

66.    Hayes W.C., Erickson, M.S., Power, E.D.:  Forensic injury biomechanics.  In:  Annual Review of Biomedical Engineering, Vol. 9:55-86, Palo Alto, CA., 2007.  [PDF]

67.    Hipp, J.A. and Hayes, W.C.:  Chapter 3:  Biomechanics of fractures.  In:  Skeletal Trauma: Basic Science, Management, and Reconstruction, 4th Ed, Vol. 1 (eds. B.D. Browner, J.B. Jupiter, A.M. Levine, P.G. Trafton, C. Krettek) Saunders Elsevier, Philadelphia, PA., 2008, pp. 51-81.

68.    Lee, P.J., Lee, E.L., and Hayes, W.C.: Biomechanical trade-offs in manual material handling:  Some tasks reduce lumbar loading but increase thoracic loading.  Proceedings of the Human Factors and Ergonomics Society 56th Annual Meeting, 2012, pp 1192-1195.


C.  Books

1.    Mow, V.C., and Hayes, W.C.: Basic Orthopaedic Biomechanics. Raven Press, New York, 1991.

2.    Apple, D.F., and Hayes, W.C.: Prevention of Falls and Hip Fractures in the Elderly. American Academy of Orthopaedic Surgeons, Chicago, 1994.

3.    Mow, V.C., and Hayes, W.C.: Basic Orthopaedic Biomechanics, Second Edition. Lippincott-Raven Publishers, New York, 1997.


D.  Patents

1.    Hayes, W.C.: Sound to light visual vocalization system. U.S. Patent 3,572,919, 1971.

2.    Hagg,  G.,  Klasson,  B.,  Ljungquist,  D.L.,  and  Hayes,  W.C.:  System  for  mini-atryriserad  elektronic handelseraknare. Swedish Patent 7410765-7, 1974.

3.    Gerhart, T.N., and Hayes, W.C.: Bioerodible implant composition. U.S. Patent 4,843,112, 1989.

4.    Gerhart,  T.N.  and  Hayes,  W.C.:  Bioerodable  implant  composition  comprising  crosslinked  biodegradable polyesters. U.S. Patent 5,085,861, 1992.

5.    Hayes, W.C.: Intramedullary nailing method and apparatus.  U.S. Patent 5,100,404, 1992.

6.    Gerhart, T.N., Laurencin, C.T., Domb, A.J., Langer, R.S., and Hayes, W.C.: Bioerodible polymers for drug delivery in bone. U.S. Patent 5,286,763, 1994.

7.    Hayes, W.C., Robinovitch, S.N., and McMahon, T.A.: Bone fracture prevention method.  U.S. Patent 5,545,128, 1996.

8.    Hayes, W.C., Robinovitch, S.N., and McMahon, T.A.: Bone fracture prevention garment and method. U.S. Patent 5,599,290, 1997.

5/21/2018

9.    McMahon, T.A., Robinovitch, S.N., and Hayes, W.C.: Tug-resistant link. U.S. Patent 5,712,011, 1998.

10.    Carter, D.R., Beaupre, G.S., and Hayes, W.C.: Increasing bone fracture resistance by repeated application of low magnitude forces resembling trauma forces. U.S. Patent 5,752,925, 1998.

Last update: 5/18/18
Last review date: 5/16/18

EXHIBIT 24

44



## EXHIBIT 25

| DA_CASE_NBR | DEFENDANT_NAME | DOB | OREGON_SID_NBR | CASE_ID_NBR | PERSON_ID_NBR | COURT_NBR | RCVD_DATE | VIOLATION_START_DATE | EARLIEST_SO_INCIDENT_NBR | ISSUED_CHRG_INDICATOR |
|---|---|---|---|---|---|---|---|---|---|---|
| 1312531-1 | WARMKE,MARVIN JOE | 02/19/38 | 05830760 | 554235 | 237143 | NULL | 01/17/03 | 09/30/02 | 02406050 | N |
| 1323043-1 | FOSTER,JAMES L | 11/18/65 | NULL | 557397 | 601376 | 030342608 | 02/25/03 | 02/23/03 | 03601306 | Y |
| 1336815-3 | DELGADO,JOSE ENRIQUE | 10/20/72 | 11694881 | 575794 | 153174 | 030550451 | 07/29/03 | 07/26/03 | 03404864 | Y |
| 1338255-3 | Cooper,Misha Diane | 02/21/78 | 12529631 | 583330 | 280768 | 030851652 | 08/13/03 | 08/12/03 | 03405241 | Y |
| 1341473-1 | CALUMPIT,LASHAWN CHRISTOPHER | 02/04/78 | 13398232 | 583765 | 286081 | 030934513 | 09/15/03 | 08/28/03 | 03405881 | Y |
| 2002704-1 | GUMBS,YVETTE RANTA | 11/25/72 | 14618724 | 584359 | 190593 | 031054617 | 10/03/03 | 09/26/03 | 03406249 | Y |
| 2004945-1 | RENNER,MICHAEL DEAN | 08/16/62 | 05907778 | 585952 | 197701 | 031135992 | 10/23/03 | 10/12/03 | 03406687 | Y |
| 2025237-1 | AXLES,Sterling Duke | 07/29/71 | 08354028 | 606889 | 19409 | 040734013 | 06/16/04 | 06/15/04 | 04404055 | Y |
| 2030484-3 | PETRY,CHANTEL ELIZABETH | 06/17/84 | 15424167 | 612336 | 625549 | 040834646 | 08/15/04 | 06/05/04 | 04-40520 | Y |
| 2034068-3 | McDaniel,Diane R | 02/16/70 | 07734342 | 615738 | 699697 | NULL | 09/30/04 | 09/20/04 | 04-406299 | N |
| 2045086-3 | JOHNSON,WILLIAM Dean | 03/30/60 | 15046557 | 425739 | 619940 | 050261507 | 02/14/05 | 02/11/05 | 05-409919 | Y |
| 2045864-1 | Velasquez Soto,Freddie | 11/08/67 | 12553999 | 627516 | 197771 | 060330282 | 02/23/05 | 02/20/05 | 05-401108 | Y |
| 2047312-1 | MAYRICK,SHANE MICHAEL | 06/12/84 | 10038262 | 572904 | 84747 | NULL | 03/11/05 | 03/08/05 | 05-401651 | N |
| 2050897-3 | HARRIS,MATTHEW THOMAS | 07/21/83 | 15390095 | 532545 | 659790 | NULL | 04/25/05 | 04/14/05 | 05-402255 | N |
| 2053455-3 | TORNBLAD,DAVID A | 08/29/69 | 08304940 | 635307 | 47987 | 050545102 | 05/02/05 | 04/29/05 | 05-402576 | Y |
| 2053604-1 | ELLIS,MARK WAYNE | 04/16/66 | 6924690 | 635256 | 264830 | 050635634 | 05/03/05 | 04/20/05 | 05-402367 | Y |
| 2055604-3 | HUNTER,TEELANE HUGH | 02/10/71 | 10384334 | 635336 | 11380 | 050633636 | 05/27/05 | 05/23/05 | 05-403073 | Y |
| 2054750-3 | SMITH,BENJAMIN Thomas | 10/31/72 | 10023981 | 636407 | 331246 | 050633632 | 06/10/05 | 06/06/05 | 05-403342 | Y |
| 2054791-1 | Richard,Amanda Rose | 09/31/83 | 15876991 | 636463 | 763150 | 050633326 | 06/10/05 | 06/06/05 | 05-403390 | Y |
| 2054922-1 | Gakre02,Danny | 05/06/80 | NULL | 636574 | 540654 | 050646724 | 06/13/05 | 04/28/05 | 05-402522 | N |
| 2061015-1 | Bubiles,Sonia | 05/04/77 | 13677173 | 647687 | 559670 | 061137212 | 08/16/05 | 07/07/05 | 05-403676 | Y |
| 2062951-3 | BROWN,Jermaine Jevon | 10/25/83 | 13377990 | 645563 | 594208 | 051036222 | 09/15/05 | 09/09/05 | 05-405309 | Y |
| 1072095-1 | KENNEDY,THOMAS EUGENE JR | 09/21/58 | 10978557 | 557745 | 65381 | 051255776 | 12/13/05 | 12/04/05 | 05-406970 | Y |
| 3061144-3 | Slipher,Travis Levi | 03/07/87 | 15549267 | 652833 | 695957 | 060854999 | 04/15/06 | 04/12/06 | 06-402129 | Y |
| 2084364-1 | BARGER,Sonnie Ralph Edward JR | 05/09/43 | 02650026 | 568070 | 41146 | 060546349 | 05/26/06 | 05/25/06 | 06-40372 | Y |
| 3086472-1 | Peters,Matthew David | 05/02/87 | 16437674 | 668123 | 923991 | 060547441 | 06/21/06 | 06/19/06 | 06-403577 | Y |
| 2092334-1 | JOHNSON,CASEY Lee | 08/26/75 | 12151379 | 674055 | 290335 | 060635052 | 08/31/06 | 08/30/06 | 06-404954 | Y |
| 2097569-1 | THOMPSON,DELWAYNE | 08/12/54 | 07406120 | 674292 | 342443 | NULL | 09/05/06 | 09/03/06 | 06-405020 | N |
| 2096063-1 | Jackson,Carl Byron | 03/15/74 | 10010156 | 677804 | 11749 | 061153905 | 10/16/06 | 10/13/06 | 06-405763 | Y |
| 2092160-3 | Brink,Daniel J | 08/06/80 | 13324863 | 678903 | 700579 | 061036289 | 10/30/06 | 10/27/06 | 06-406055 | Y |
| 2097628-1 | Rodriguez-Yanez,Benito | 05/18/76 | NULL | 679576 | 580438 | 061138454 | 11/07/06 | 11/05/06 | 06-406230 | Y |
| 2056632-3 | Schorpp,Christopher Britton | 03/03/63 | 15394485 | 580381 | 785927 | 061256279 | 11/16/06 | 11/14/06 | 06-406355 | Y |
| 2102236-3 | Pate,Samuel Gene | 05/15/83 | 16051842 | 683589 | 783711 | NULL | 01/05/07 | 12/30/06 | 06-407778 | N |
| 2503562-1 | JOHNSON,WILLIE Lee | 12/31/86 | 14982696 | 685521 | 356878 | 070130225 | 01/25/07 | 01/23/07 | 07-400043 | Y |
| 2108184-1 | STRATTON,JOSH | 05/17/86 | NULL | 689953 | 1024786 | NULL | 03/23/07 | 03/22/07 | 07-401950 | N |
| 2106411-1 | Najar,Abderrahim | 10/02/62 | 13118397 | 590179 | 92235 | 070444829 | 03/27/07 | 03/13/07 | 07-401403 | Y |
| 2106624-1 | VELASQUEZ,PRISCILLA DIANE | 08/04/88 | 16641994 | 660554 | 1016580 | 070343696 | 03/25/07 | 03/28/07 | 07-401710 | Y |
| 2108836-1 | ELIAS-SILVA,ARNULFO | 08/15/84 | 14789071 | 590708 | 605688 | 070432062 | 04/03/07 | 04/01/07 | 07-401790 | Y |
| 2109389-1 | POWERS,RONALD MICHAEL | 05/06/54 | 13701295 | 691161 | 617594 | 070431652 | 04/09/07 | 04/05/07 | 07-401667 | Y |
| 2322269-1 | Werth,Joseph JR | 03/03/57 | 04951008 | 694056 | 465547 | 070530565 | 05/11/07 | 04/21/07 | 07-401194 | Y |
| 2115903-1 | Tune,Steven Marshall | 09/25/79 | NULL | 697695 | 174021 | 070748049 | 06/26/07 | 06/25/07 | 07-403501 | Y |
| 2117378-3 | Trice,Chauncey Dean | 01/11/84 | 14717849 | 698170 | 591642 | 070834093 | 07/16/07 | 07/14/07 | 07-403864 | Y |
| 2118104-1 | IVORY,LARRY EUGENE | 11/19/54 | 04259578 | 699901 | 54722 | 070733617 | 07/24/07 | 07/23/07 | 07-404036 | Y |
| 2118479-1 | Ferrell,Jennifer Ann | 09/10/77 | 08279335 | 700178 | 1049448 | 070733579 | 07/19/07 | 07/13/07 | 07-403591 | Y |
| 2119365-1 | AVERY,RYAN ZACHARY | 01/02/87 | 16559987 | 701671 | 325839 | 070849530 | 05/14/07 | 07/14/07 | 07-403870 | Y |
| 2122253-1 | Lay,Michael Sean | 09/17/79 | 12968431 | 704673 | 1058428 | 070934622 | 09/14/07 | 09/17/07 | 07-405149 | Y |
| 2128016-2 | BOSWORTH,AMY MARIE | 02/19/76 | 17329494 | 709842 | 1038669 | 080130033 | 11/27/07 | 10/22/07 | 07-405778 | Y |
| 2128016-2 | BOSWORTH,JULIA LYNNE | 04/18/60 | 13096766 | 709243 | 85107 | 080130034 | 11/27/07 | 10/22/07 | 07-405778 | Y |
| 2529578-1 | Lawson,Evan Jefferson | 02/25/76 | 12556893 | 710411 | 182924 | 071235898 | 12/05/07 | 12/04/07 | 07-405906 | Y |
| 2229884-1 | Teeters,Gale Lee | 06/30/52 | 05342481 | 711718 | 154113 | 071255696 | 12/24/07 | 12/22/07 | 07-407375 | Y |
| 2130384-1 | BARNARD,CASEY JOHN | 13/12/81 | 13641773 | 713022 | 213168 | 050340207 | 01/11/08 | 12/28/07 | 08-400210 | Y |
| 2134552-1 | Gilbert,Monique Cheri | 08/28/86 | 17287955 | 716396 | 1112294 | 080230622 | 02/25/08 | 02/21/08 | 05-401214 | Y |
| 2135337-1 | Schatz,Noah David | 02/25/80 | 15507574 | 717242 | 761604 | 080342597 | 03/05/08 | 03/04/08 | 08-403465 | Y |
| 2157768-2 | Gonzales-Aguilera,Christopher Michael | 02/03/67 | 07341626 | 719405 | 97466 | 080431757 | 04/03/08 | 03/26/08 | 08-401955 | Y |
| 2140828-1 | Buswell,Christopher Alan | 01/30/84 | 12535034 | 722688 | 552915 | 080532204 | 05/11/08 | 05/11/08 | 08-403135 | Y |
| 2152010-1 | SWEENEY,BRANDY | 06/26/86 | 16251820 | 723875 | 3128632 | 080532216 | 05/28/08 | 05/21/08 | 08-403427 | Y |
| 2147502-1 | Nolan,Sherry Dora | 09/18/86 | 25557231 | 724768 | 960104 | 080646586 | 06/29/08 | 06/03/08 | 08-403510 | Y |
| 2143780-1 | Greeves,David Albert | 01/08/60 | 17621387 | 723653 | 3147562 | 080733312 | 06/20/08 | 05/16/08 | 08-403217 | Y |

Page 1 of 3

Case 3:17-cr-00320-JGZ    Document 76    Filed 05/02/18

## EXHIBIT 25

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 2264762-1 | Sowers,Joel Robert | 03/27/86 | 17482371 | 726645 | 1151271 | 080733194 | 07/02/08 | 07/01/08 | 08-404591 | Y |
| 2245319-1 | SHELTON,VERONICA LEE | 08/15/63 | 05441052 | 727200 | 46031 | 060733072 | 07/06/08 | 07/05/00 | 08-404190 | Y |
| 2146276-1 | DUHMANN,MATHEW JOHNATHAN | 02/18/69 | 07548094 | 728071 | 138438 | 080749183 | 07/23/03 | 07/16/08 | 08-404845 | Y |
| 2150553-1 | Weeks,Eric Michael | 07/09/74 | 16803894 | 732400 | 952494 | NULL | 09/15/08 | 09/13/08 | 08-406330 | N |
| 2376678-1 | HARRIS,CARL PAUL | 07/13/82 | 12944965 | 744531 | 521524 | 090431566 | 03/03/09 | 02/26/09 | 09-401496 | Y |
| 2166094-1 | Fasco,Jade Leni | 11/16/77 | 16183596 | 748062 | 768445 | 090443645 | 04/16/09 | 04/13/09 | 09-402680 | Y |
| 2356611-1 | DANENGER,TYLER SKY | 03/16/85 | 15712830 | 746479 | 625086 | 090431590 | 04/23/09 | 04/21/09 | 09-402858 | Y |
| 2366740-1 | RAVEN,SUN BEAR | 03/21/77 | 11864572 | 746708 | 546123 | 090444920 | 04/27/09 | 04/25/09 | 09-402556 | Y |
| 2367317-1 | Lange,Larry Clifford JR | 01/08/69 | 15821486 | 749285 | 438792 | 090531934 | 05/04/09 | 05/03/09 | 09-403153 | Y |
| 2370050-1 | Acevedo,Rufino Junior | 05/27/83 | 13552682 | 752026 | 422995 | 090951242 | 06/09/09 | 05/31/09 | 09-403787 | Y |
| 2170855-1 | Roth,Joshua Jae Selomon | 01/01/90 | 13930645 | 752814 | 384429 | 090646975 | 06/18/09 | 06/16/09 | 09-404202 | Y |
| 2174659-1 | DEP,CORWIN DELAND | 09/27/64 | 06155253 | 755540 | 44413 | 090533278 | 08/06/09 | 08/05/09 | 09-405199 | Y |
| 2376116-1 | Acevedo,Rufino Junior | 05/27/83 | 13552682 | 758103 | 422995 | 090933599 | 08/26/09 | 08/13/09 | 09-405750 | Y |
| 2376156-1 | JONENGAN,WILLIS #9 | 06/30/49 | 18112697 | 758149 | 1270042 | 090933593 | 08/26/09 | 08/23/09 | 09-405972 | Y |
| 2376219-1 | Webb,Andrew James | 01/05/81 | 17912132 | 758217 | 881927 | 090933575 | 08/27/09 | 08/25/09 | 09-406022 | Y |
| 2179875-1 | Fosey,Jared Andrew | 02/21/86 | 14930105 | 761878 | 723761 | NULL | 10/16/09 | 09/19/09 | 09-406746 | N |
| 2379877-2 | Nonnemen,Kyle Gregory | 09/29/84 | 16534211 | 761980 | 732054 | 091052870 | 10/16/09 | 09/30/09 | 09-406853 | Y |
| 2283736-1 | Vidal,Michael Elisha | 03/26/90 | 17382175 | 762745 | 1158770 | 091234917 | 11/12/09 | 11/09/09 | 09-407890 | Y |
| 2193995-1 | Stewart,Sterling Rose Camón | 05/05/85 | 15953899 | 766014 | 779572 | 091235045 | 12/17/09 | 12/16/09 | 09-409833 | Y |
| 2164446-1 | Ross,Kathy Tói | 12/21/83 | 14743563 | 766464 | 593096 | 100130160 | 12/24/09 | 12/21/09 | 09-408910 | Y |
| 2385217-1 | Hogue,Timothy Nathaniel | 06/12/90 | 18163155 | 768135 | 1281174 | 100130187 | 01/20/30 | 12/24/09 | 10-400054 | Y |
| 2191542-1 | Nonneman,Kyle Gregory | 09/29/84 | 16534211 | 773569 | 732054 | NULL | 04/06/10 | 03/27/09 | 09-406991 | N |
| 2196968-1 | HAWES,KENNETH EDWIN | 01/19/55 | 06284247 | 778209 | 236217 | 100632197 | 06/14/10 | 06/10/10 | 10-403597 | Y |
| 2198426-1 | Pribbernow,Tiler Evan | 05/30/83 | 16092382 | 780520 | 546643 | 100747296 | 07/19/10 | 07/16/10 | 10-404234 | Y |
| 2262710-1 | SIDES,RYAN MATTHEW | 02/21/81 | 16837721 | 784761 | 1571925 | 100933622 | 09/17/10 | 09/16/10 | 10-406416 | Y |
| 2204662-1 | Lehtinen,Samuel F | 07/26/86 | 16562452 | 786616 | 1357319 | 101152006 | 10/14/10 | 10/10/10 | 10-405851 | Y |
| 2209094-1 | GENER,GERARD ANTHONY | 09/20/85 | 15195361 | 791143 | 693699 | 101235064 | 11/26/10 | 11/22/10 | 10-407256 | Y |
| 2211384-1 | WASSELL,CURTIS EUGENE | 05/28/41 | 02629990 | 795450 | 431620 | NULL | 02/04/11 | 02/03/11 | 11-400660 | N |
| 2212564-1 | Nonneman,Kyle Gregory | 09/29/84 | 16534211 | 795032 | 732054 | 110431404 | 05/01/11 | 12/30/10 | 10-407429 | Y |
| 2214541-1 | GLOVER,AMRII MAMU | 03/16/71 | 07959865 | 796614 | 68501 | 110533103 | 03/24/11 | 03/23/11 | 11-401595 | Y |
| 5221875-1 | Asenge-Velasco,Umberto | 04/21/92 | 18299315 | 909525 | 1302576 | 110732562 | 07/07/11 | 07/06/11 | 11-404134 | Y |
| 2228025-1 | Eetsed,Adam Shane | 08/26/82 | 18650485 | 810120 | 1367219 | NULL | 09/30/11 | 09/15/11 | 11-405861 | N |
| 2229323-1 | Engblom,Katrina Joan | 05/23/85 | 15318063 | 811428 | 684759 | 111152034 | 10/04/11 | 10/16/11 | 11-406465 | Y |
| 2219783-1 | Dalton,Andrew Ethan | 10/16/89 | 16403234 | 811890 | 1124284 | NULL | 10/27/11 | 10/13/11 | 11-406379 | N |
| 2235676-1 | Utkey,Luke | 03/04/93 | 18403479 | 817393 | 1470587 | 120130487 | 01/24/12 | 01/22/12 | 12-400546 | Y |
| 2242070-1 | Morgan,Derick Paul | 03/04/83 | 15719399 | 824150 | 740466 | 120431753 | 04/23/12 | 04/23/12 | 12-401624 | Y |
| 2245356-1 | Pina,Andrea Leigh | 07/27/82 | 19009164 | 830514 | 3436500 | 120793040 | 07/16/12 | 07/15/12 | 12-404735 | Y |
| 2254995-1 | CRESWELL,IVAN LYNN | 11/02/62 | 07959865 | 837160 | 211017 | 121155428 | 10/11/12 | 10/02/12 | 12-406478 | Y |
| 2255227-1 | Warner,Leom Harold | 12/17/75 | 10285150 | 837385 | 71144 | 121094387 | 10/15/12 | 10/12/12 | 12-405735 | Y |
| 2260814-1 | Goldsby,Marquez Antwan | 10/16/84 | 14845619 | 842954 | 508865 | 130140310 | 01/08/13 | 12/26/12 | 12-405260 | Y |
| 2261880-1 | Marks,Dentius Lemas | 02/03/93 | 19084035 | 843558 | 512155 | 130140108 | 01/11/13 | 01/06/13 | 13-400151 | Y |
| 2261406-1 | Mark,Devon N | 06/15/94 | 19827005 | 843580 | 1593111 | NULL | 01/21/13 | 01/03/13 | 13-400047 | N |
| 2262202-1 | Shelton,Ashanca Amber | 06/04/83 | 14395278 | 844379 | 528397 | 130130431 | 01/23/13 | 01/21/13 | 13-400401 | Y |
| 2262239-1 | Engblom,Katrina Joan | 05/23/85 | 15318043 | 844517 | 684759 | 130230509 | 01/30/13 | 01/25/13 | 13-400565 | Y |
| 2264625-1 | Madison,Able James | 06/16/77 | 08696334 | 846814 | 169948 | 130444107 | 02/25/13 | 02/24/13 | 13-401222 | Y |
| 2264533-1 | Palmer,Achélis Achoria | 10/17/85 | 19049765 | 847156 | 1444136 | 130545957 | 02/28/13 | 02/25/13 | 13-401242 | Y |
| 2267124-1 | Burton,Amos Mitchell | 05/11/85 | 17004573 | 849310 | 1617828 | NULL | 03/26/13 | 02/18/13 | 13-401599 | N |
| 2266060-1 | Nonneman,Kyle Gregory | 09/29/84 | 16534211 | 850950 | 732054 | 130532238 | 04/17/13 | 04/10/13 | 13-402082 | Y |
| 2269805-1 | Thompson,Darlene L | 05/01/84 | 15538155 | 851998 | 657741 | 130545958 | 05/03/13 | 04/27/13 | 13-402436 | Y |
| 2270272-1 | Shevtsov,Eugene Ivanovich | 12/04/89 | 17266882 | 852485 | 1236059 | 130632774 | 05/09/13 | 05/05/13 | 13-402604 | Y |
| 2274407-1 | Lubbich,Tyler Bart | 02/02/86 | 19905420 | 856609 | 1604191 | 130733061 | 07/03/13 | 07/02/13 | 13-403816 | Y |
| 2276874-1 | Jared,Zechariah Rudolph | 03/21/92 | 16455332 | 859079 | 1410765 | 131052797 | 08/05/13 | 08/02/13 | 13-405432 | Y |
| 2284952-1 | Ryder,Beau James | 01/31/77 | 20386521 | 867171 | 1680617 | 131135466 | 11/21/13 | 11/13/13 | 13-406935 | Y |
| 2285774-1 | Jelsema,Abirad Annire Waltz | 11/03/93 | 19708546 | 867493 | 1571501 | 140342393 | 11/26/13 | 11/25/13 | 13-407073 | Y |
| 2285612-1 | Mendozco,Angel Jesus M | 06/12/93 | 20422535 | 867831 | 1681201 | 131255775 | 12/02/13 | 11/30/13 | 13-407155 | Y |
| 2289649-1 | Ryder,Beau James | 01/31/77 | 20386521 | 871366 | 1680617 | 140130504 | 01/30/14 | 01/27/14 | 14-400547 | Y |
| 2296123-1 | ELIAS,THOMAS MICHAEL | 03/09/82 | 10679353 | 876359 | 1343653 | 140544689 | 05/05/14 | 05/01/14 | 14-402949 | Y |
| 2299417-1 | Johnson,Isaiah Jamare | 10/16/89 | NULL | 879635 | 1715209 | 14CR07093 | 05/23/14 | 05/22/14 | 14-402992 | Y |
| 2298795-2 | Guman,Francisco | 09/01/68 | 18502802 | 880981 | 1335632 | 14CR05543 | 06/12/14 | 06/10/14 | 14-405716 | Y |

Case 3:17-cv-00306-JGZ    Document 76    Filed 05/02/18

# EXHIBIT 25

3

| 2360708-1 | League,Brendon Steven | 07/27/95 | 20742280 | 283959 | 1747980 | 14CR12976 | 07/16/14 | 07/14/14 | 14-404475 | Y |
| 2307088-1 | Traylor,Martell Darrell | 06/20/84 | 16554728 | 889551 | 955491 | 14CR16333 | 10/15/14 | 10/08/14 | 14-406584 | Y |
| 2317431-1 | FINNEY,JAMIE BASS | 12/26/89 | 18040642 | 894707 | 1264952 | 15CR03991 | 01/22/15 | 01/16/15 | 15-400379 | Y |
| 2313250-1 | GOAMES,MALEK JAMES MARCUS | 11/06/95 | 21015393 | 896556 | 1798651 | 15CR04320 | 02/02/15 | 02/01/15 | 15-400756 | Y |
| 2318746-1 | HOEHN WELLWOOD,NICKOLAS GENE | 17/01/89 | 20089614 | 899034 | 959467 | 15CR12163 | 03/27/15 | 03/26/15 | 15-401999 | Y |
| 2318149-1 | Engblom,Katrina Joan | 05/23/85 | 15318093 | 900439 | 684755 | 15CR15693 | 04/20/15 | 04/18/15 | 15-16482 | Y |
| 2323065-1 | HARVEY,RICHARD RYAN | 04/25/76 | 20270343 | 564969 | 1743122 | 15CR25471 | 06/25/15 | 06/15/15 | 15-24475 | Y |
| 2372586-1 | McClerry,Scott E | 05/20/88 | 17329248 | 904966 | 1779170 | 15CR27431 | 07/06/15 | 07/05/15 | 15-28112 | N |
| 2327795-1 | McHenry,Genie M | 09/04/96 | 20997825 | 935033 | 594892 | NULL | 07/07/15 | 06/30/15 | 15-27181 | N |
| 2323431-1 | Kelsaw,Frank Ramone JR | 04/28/76 | 10978748 | 905732 | 300867 | 15CR29685 | 07/17/15 | 07/16/15 | 15-30235 | Y |
| 2324215-1 | Kennel,Benjamin O'Connor | 01/23/72 | 20958514 | 906521 | 1794969 | 15CR31974 | 07/30/15 | 07/28/15 | 15-32802 | Y |
| 2324216-1 | Brewer,Caleb Paul | 11/11/77 | 15519218 | 907120 | 691257 | 15CR33793 | 08/10/15 | 08/08/15 | 15-34589 | Y |
| 2316615-1 | Pease,Christian Strotwel | 12/31/95 | NULL | 908121 | 1856019 | NULL | 09/09/15 | 07/30/15 | 15-40782 | N |
| 2337664-1 | BECHTOLDT,TABATHA ANN | 10/06/73 | 16545284 | 8909574 | 166666 | 15CR41858 | 09/24/15 | 09/23/15 | 15-43492 | N |
| 2330307-1 | Millsap,Nathan Ealfer | 01/31/75 | 21236918 | 912617 | 1862211 | 15CR50270 | 11/06/15 | 11/07/15 | 15-50137 | Y |
| 2353624-1 | DANIELS,DONALD HILL | 07/09/51 | 03163417 | 916145 | 58404 | 16CR02082 | 01/13/16 | 01/12/16 | 16-1559 | Y |
| 2334676-1 | Carey,Clifton Albert | 12/30/90 | 18707916 | 917199 | 1613127 | 16CR05660 | 02/01/16 | 01/24/16 | 16-4909 | Y |
| 2338744-1 | Stokes,Drew Christopher | 04/06/94 | 17227121 | 921077 | 1655657 | 16CR20629 | 04/08/16 | 04/07/16 | 16-17039 | Y |
| 2340593-1 | Stelb,Renae Lynn | 12/17/74 | 18302289 | 922925 | 1806263 | 16CR31703 | 05/10/16 | 05/05/16 | 16-22257 | Y |
| 2543131-1 | WILSON,STANLEY T II | 11/05/87 | 21160992 | 925455 | 1927985 | 16CR38920 | 06/23/16 | 06/23/16 | 16-31061 | Y |
| 2343415-1 | Kyle,Darrel Ruben | 03/21/51 | 25359309 | 927765 | 1950497 | 16CR48607 | 08/05/16 | 08/04/16 | 16-39035 | Y |
| 2349966-1 | McClerry,Jacquelbne Michelle | 10/18/51 | 21900898 | 932307 | 1941914 | 16CR67594 | 10/25/16 | 10/24/16 | 16-53714 | N |
| 2350423-1 | Guess,Andrew Carey | 11/26/89 | 17604830 | 933779 | 1178452 | NULL | 11/03/16 | 10/31/16 | 16-51804 | N |
| 2350812-1 | Gonzalez,Fernando Velasco | 05/12/94 | 20302635 | 933172 | 1515964 | 16CR71176 | 11/09/16 | 11/08/16 | 16-55108 | Y |
| 2352707-1 | Guess,Andrew Carey | 11/25/89 | 17604830 | 934433 | 1178452 | 16CR76069 | 12/01/16 | 11/29/16 | 16-59218 | Y |
| 2357713-1 | Mo-Ai,John | 01/15/94 | 21665457 | 935079 | 1215247 | 17CR05373 | 12/13/16 | 12/30/16 | 16-62118 | Y |
| 2353369-1 | Busson-Bratton,Torrie Carlos | 11/25/81 | 12886655 | 935737 | 214914 | NULL | 12/28/16 | 12/26/16 | 16-63386 | N |
| 2353677-1 | LEWIS,JAMES RAMONE | 11/15/76 | 11508291 | 936045 | 401776 | 17CR00075 | 01/09/17 | 01/05/17 | 17-125 | Y |
| 2353674-1 | Brim,Richard Lee | 01/17/87 | 21215494 | 936243 | 1903254 | 17CR09974 | 01/06/17 | 12/30/16 | 16-64017 | N |
| 2354650-1 | Thomas,Jett Avery | 06/08/94 | 17117057 | 937023 | 1544802 | 17CR04504 | 01/04/17 | 01/23/17 | 17-2956 | Y |
| 2355627-1 | Tesfamariam,Binam Yemane | 07/10/85 | 21446985 | 937954 | 1876593 | 17CR08731 | 02/10/17 | 01/16/17 | 17-2142 | Y |
| 2355727-1 | McNeely,Larae James | 12/30/90 | 18896429 | 938097 | 404024 | 17CR09114 | 02/13/17 | 02/12/17 | 17-6431 | Y |
| 2355940-1 | ALBERDING,CHARISSA J | 04/04/84 | 14968284 | 938216 | 606441 | 17CR09755 | 02/15/17 | 02/14/17 | 17-6837 | Y |
| 2355933-1 | Grammopoulos,Lauren F | 24/06/94 | 22184851 | 938309 | 1935570 | 17CR10391 | 02/16/17 | 02/16/17 | 17-7206 | N |
| 2398307-1 | MILLER,PATRICK WESLEY | 03/27/77 | 11793745 | 940434 | 205776 | 17CR19017 | 03/24/17 | 03/22/17 | 17-12377 | N |
| 2338958-1 | MILENDER,ANGELA RENE | 03/30/89 | 17798328 | 941332 | 386281 | 17CR22525 | 04/10/17 | 04/07/17 | 17-15628 | Y |
| 2359524-1 | Acosta,Gabino E | 06/08/90 | 17445328 | 942005 | 1129574 | 17CR25562 | 04/21/17 | 04/21/17 | 17-17955 | Y |
| 2360369-1 | Hutchison,Cherel | 03/19/93 | 22295303 | 942745 | 1899346 | NULL | 05/04/17 | 05/03/17 | 17-19162 | Y |
| 2360294-1 | BASS,GREGORY WARD JR | 02/24/91 | 22320565 | 943276 | 2002926 | 17CR31244 | 05/15/17 | 05/13/17 | 17-21944 | Y |
| 2361016-1 | HUTCHISON,DANIELLE LEE | 04/04/85 | 21567056 | 943400 | 1954535 | 17CR31585 | 05/16/17 | 05/15/17 | 17-21675 | Y |
| 2358650-1 | Hammer,Rachel Bea | 01/12/80 | 18615486 | 946250 | 1860839 | 17CR43740 | 07/05/17 | 07/04/17 | 17-21437 | Y |
| 2363503-1 | Salward,Cyrus Andrew | 03/26/93 | 14614243 | 946293 | 630122 | NULL | 07/05/17 | 06/30/17 | 17-30485 | N |
| 2364042-1 | HOWARD,NATHANIEL EDWARD JR | 05/05/72 | 08224362 | 946432 | 13852 | 17CR59244 | 07/07/17 | 07/06/17 | 17-32026 | Y |
| 2367616-1 | LAVERICK,SEBASTIAN ANTHONY MATTHEW | 12/11/89 | 15775687 | 950210 | 1083563 | 17CR60164 | 09/12/17 | 09/08/17 | 17-44501 | Y |
| 2368457-1 | Lopez,Kamil Smouze | 03/29/91 | 21961037 | 950846 | 2020707 | 17CR63346 | 09/25/17 | 09/22/17 | 17-47046 | Y |
| 2368883-1 | Kaufman,Jonathan Blake | 09/13/84 | 38519712 | 951213 | 1362957 | 17CR64997 | 10/02/17 | 09/30/17 | 17-48597 | Y |
| 2371079-1 | Alexander,Sean M | 01/17/96 | 22543741 | 953486 | 2038721 | 17CR75483 | 11/14/17 | 11/13/17 | 17-54864 | Y |
| 2372882-1 | Reed,Joshua Thomas | 05/20/91 | 22202157 | 955792 | 1984527 | 17CR85606 | 12/19/17 | 12/16/17 | 17-62376 | N |
| 2374335-1 | Freeman,Shaseel Sheh | 01/25/86 | 15551332 | 955748 | 789721 | 18CR03405 | 01/16/18 | 01/15/18 | 18-2536 | Y |
| 2375290-1 | Reed,Joshua Thomas | 07/20/91 | 22202157 | 958205 | 1984527 | 18CR09365 | 02/08/18 | 02/07/18 | 18-6911 | Y |
| 2375296-1 | Freeman,Shaseel Sheh | 05/25/86 | 15551332 | 958314 | 789721 | 18CR09364 | 02/08/18 | 02/07/18 | 18-6976 | Y |
| 2375896-1 | Reed,Joshua Thomas | 07/20/91 | 22202157 | 958283 | 1984527 | 18CR09965 | 02/08/18 | 02/08/18 | 18-7226 | Y |
| 2376039-1 | BARNARD,CASEY JOHN | 11/11/81 | 13641773 | 958454 | 213168 | 18CR10745 | 02/12/18 | 02/10/18 | 18-7682 | Y |
| 2376278-1 | Williams,Nathaniel Michael JR | 05/03/93 | 19639169 | 958694 | 1400631 | NULL | 02/16/18 | 02/06/18 | 17-5291 | N |

Page 3 of 3

REVIEWS: 07/15/2017 2109 hrs - *I have been assigned the review of packet #2258 involving Inmate Sullivan, C. #677564, which occurred in 5D on 6-28-17. All reports are included and complete in content, (there is no video of this incident). This incident began when Inmate Sullivan took some Gatorade (which he was not supposed to have taken) from the med tech, ran to his cell and disobeyed the orders from the module deputy. Staff were called to respond to escort Inmate Sullivan to disciplinary housing for the rule violations he committed. According to reports, once staff arrived in 5D Inmate Sullivan was given multiple orders by multiple staff members to be handcuffed through the food port, all of which he refused. Staff also noted that Sullivan used obscene language toward staff and made threats against their well-being. Staff noted that Sullivan finally agreed to be handcuffed but not through the food port and advised staff to come in and get him. Sgt. Ingram noted in his report that, "It appeared to me he [Sullivan] posed no threat and was ready to be handcuffed." However, Inmate Sullivan had deceived staff members and once staff entered the cell Sullivan instantly became combative. He attempted to punch Sgt. Ingram in the face, elbow several staff members and mule kicked Deputy Muth, knocking her to the ground. Most unusual though, was the fact that Inmate Sullivan had crafted a weapon out of ground up super spicy chips and threw it in the faces of responding staff as a way to disable them as they entered. The apparent motive of Sullivan with the chips was to use the ground up substance as a kind of pepper spray towards staff members. Staff at that point had governmental interest to use force to restrain and move Inmate Sullivan to disciplinary housing. Staff noted in their reports that Sullivan, "Resisted furiously," and "Struggled the entire way," as well as pushed a deputy off of him with his legs. Staff noted that throughout the move to disciplinary housing they ordered Inmate Sullivan to stop resisting and stop fighting them. Once they arrived in 4F, Sgt. Ingram made the decision to cut Inmate Sullivan's clothes off to be changed into a white suit for disciplinary level 4. Sullivan had been non-compliant the entire process and there was no reason for Sgt. Ingram to believe Sullivan would have been compliant with the strip search and clothing exchange. I conclude that the decision to cut Sullivan's clothes off while he was already restrained and at a position of disadvantage was the best decision to minimize the possibility of furthering the use of force.*

*After the clothing was removed, Sullivan was quoted in reports as saying he wasn't going to fight or resist anymore and staff were able to facilitate the nurse entering the cell to examine him. As a means to provide after care, Sgt. Ingram noted that he turned Inmate Sullivan on his side so he could breathe easier and covered him in a white jumpsuit to act like a blanket and keep him warm. Sullivan was soon transferred to the hospital where he was treated for the injury to his arm he sustained during his resistance in the use of force.*

*After reviewing this use of force and gaining an understanding of how the entire incident unfolded, I believe staff acted with the goal in mind of preventing further assault from Inmate Sullivan and to get him safely contained in a disciplinary cell. This use of force appears to have been conducted in accordance with MCSO Use of Force Policy.* (**Sgt Gary Glaze**)

**08/01/2017 2248 hrs** - *I have read the attached reports. There is no video footage of this event. All reports appear consistent in their description of the event, however there are some variations due to individual perspective and recall. Staff reports indicate that Inmate Sullivan was initially hostile and challenging to staff that arrived first on the scene. Staff responded appropriately by requesting a sergeant to assist with the matter. Sergeant Ingram arrived and attempted to de-escalation techniques in hopes of resolving the situation by gaining cooperation from Inmate Sullivan. This was unsuccessful. Acting Sergeant Barker arrived and began a dialogue with the Inmate and also attempted to deescalate the situation. Deputy Muth's report indicates that Inmate Sullivan was verbally hostile and challenging to Sergeant Ingram and Acting Sergeant Baker. This is inconsistent with the information provided by Sergeant Ingram and Acting Sergeant Barker. All other staff reports seem to support the perception of the Sergeant and Acting Sergeant and indicate that Inmate Sullivan was not displaying hostility and anger as he was interacting with Sergeant Ingram and Acting Sergeant Barker.*

*After interacting with Inmate Sullivan and attempting to gain cooperation, both Sergeant Ingram and Acting Sergeant Barker felt that it was safe to enter the Inmate's cell and secure him in handcuffs. They both indicated that Inmate Sullivan appeared to be willing to submit to handcuffing and they did not perceive him to be a threat based on his behavior and interaction at the time. They ensured that staff were ready with other force options (Taser) before entering the cell as a safety precaution. After Inmate Sullivan turned around and placed his hands behind his back as directed, the cell door was opened and staff entered in anticipation of applying handcuffs to a compliant Inmate. Reports indicate that as they entered the cell they were suddenly and unexpectedly assaulted as Inmate Sullivan spun around and threw handfuls of crushed corn chips covered with powdered hot peppers in the faces of staff and then began to throw closed fist punches at them. Staff responded by attempting to gain control of the Inmate's arms and pin him against the wall and desk area in the cell. Acting Sergeant Barker noted in his report that Inmate Sullivan delivered several targeted elbow strikes to his head/upper body. Acting Sergeant Barker stated that Inmate Sullivan was looking over his shoulder in order to direct his elbow strikes.*

1

## EXHIBIT 27

REVIEWS: 07/15/2017 2109 hrs - *I have been assigned the review of packet #2258 involving Inmate Sullivan, C. #677564, which occurred in 5D on 6-28-17. All reports are included and complete in content, (there is no video of this incident). This incident began when Inmate Sullivan took some Gatorade (which he was not supposed to have taken) from the med tech, ran to his cell and disobeyed the orders from the module deputy. Staff were called to respond to escort Inmate Sullivan to disciplinary housing for the rule violations he committed. According to reports, once staff arrived in 5D Inmate Sullivan was given multiple orders by multiple staff members to be handcuffed through the food port, all of which he refused. Staff also noted that Sullivan used obscene language toward staff and made threats against their well-being. Staff noted that Sullivan finally agreed to be handcuffed but not through the food port and advised staff to come in and get him. Sgt. Ingram noted in his report that, "It appeared to me he [Sullivan] posed no threat and was ready to be handcuffed." However, Inmate Sullivan had deceived staff members and once staff entered the cell Sullivan instantly became combative. He attempted to punch Sgt. Ingram in the face, elbow several staff members and mule kicked Deputy Muth, knocking her to the ground. Most unusual though, was the fact that Inmate Sullivan had crafted a weapon out of ground up super spicy chips and threw it in the faces of responding staff as a way to disable them as they entered. The apparent motive of Sullivan with the chips was to use the ground up substance as a kind of pepper spray towards staff members. Staff at that point had governmental interest to use force to restrain and move Inmate Sullivan to disciplinary housing. Staff noted in their reports that Sullivan, "Resisted furiously," and "Struggled the entire way," as well as pushed a deputy off of him with his legs. Staff noted that throughout the move to disciplinary housing they ordered Inmate Sullivan to stop resisting and stop fighting them. Once they arrived in 4F, Sgt. Ingram made the decision to cut Inmate Sullivan's clothes off to be changed into a white suit for disciplinary level 4. Sullivan had been non-compliant the entire process and there was no reason for Sgt. Ingram to believe Sullivan would have been compliant with the strip search and clothing exchange. I conclude that the decision to cut Sullivan's clothes off while he was already restrained and at a position of disadvantage was the best decision to minimize the possibility of furthering the use of force.*

*After the clothing was removed, Sullivan was quoted in reports as saying he wasn't going to fight or resist anymore and staff were able to facilitate the nurse entering the cell to examine him. As a means to provide after care, Sgt. Ingram noted that he turned Inmate Sullivan on his side so he could breathe easier and covered him in a white jumpsuit to act like a blanket and keep him warm. Sullivan was soon transferred to the hospital where he was treated for the injury to his arm he sustained during his resistance in the use of force.*

*After reviewing this use of force and gaining an understanding of how the entire incident unfolded, I believe staff acted with the goal in mind of preventing further assault from Inmate Sullivan and to get him safely contained in a disciplinary cell. This use of force appears to have been conducted in accordance with MCSO Use of Force Policy.* (**Sgt Gary Glaze**)

**08/01/2017 2248 hrs** - *I have read the attached reports. There is no video footage of this event. All reports appear consistent in their description of the event, however there are some variations due to individual perspective and recall. Staff reports indicate that Inmate Sullivan was initially hostile and challenging to staff that arrived first on the scene. Staff responded appropriately by requesting a sergeant to assist with the matter. Sergeant Ingram arrived and attempted to de-escalation techniques in hopes of resolving the situation by gaining cooperation from Inmate Sullivan. This was unsuccessful. Acting Sergeant Barker arrived and began a dialogue with the Inmate and also attempted to deescalate the situation. Deputy Muth's report indicates that Inmate Sullivan was verbally hostile and challenging to Sergeant Ingram and Acting Sergeant Baker. This is inconsistent with the information provided by Sergeant Ingram and Acting Sergeant Barker. All other staff reports seem to support the perception of the Sergeant and Acting Sergeant and indicate that Inmate Sullivan was not displaying hostility and anger as he was interacting with Sergeant Ingram and Acting Sergeant Barker.*

*After interacting with Inmate Sullivan and attempting to gain cooperation, both Sergeant Ingram and Acting Sergeant Barker felt that it was safe to enter the Inmate's cell and secure him in handcuffs. They both indicated that Inmate Sullivan appeared to be willing to submit to handcuffing and they did not perceive him to be a threat based on his behavior and interaction at the time. They ensured that staff were ready with other force options (Taser) before entering the cell as a safety precaution. After Inmate Sullivan turned around and placed his hands behind his back as directed, the cell door was opened and staff entered in anticipation of applying handcuffs to a compliant Inmate. Reports indicate that as they entered the cell they were suddenly and unexpectedly assaulted as Inmate Sullivan spun around and threw handfuls of crushed corn chips covered with powdered hot peppers in the faces of staff and then began to throw closed fist punches at them. Staff responded by attempting to gain control of the Inmate's arms and pin him against the wall and desk area in the cell. Acting Sergeant Barker noted in his report that Inmate Sullivan delivered several targeted elbow strikes to his head/upper body. Acting Sergeant Barker stated that Inmate Sullivan was looking over his shoulder in order to direct his elbow strikes.*

2

Based on staff reports Inmate Sullivan fought violently and even once he was pinned against the cell wall/desk he began to "mule kick" staff. Deputy Muth documented that Inmate Sullivan kicked her in the upper abdomen causing her to lose her balance and fall to the floor. Sergeant Ingram also stated that the Inmate kicked him in the leg and then took hold of his arm which was under the Inmate and would not let go. Sergeant Ingram ordered the Inmate to let his arm go and the Inmate failed to comply. At this point Sergeant Ingram delivered several focused blows to the back of the Inmate's arm stating that he was hopeful that he would strike a nerve and cause the Inmate to loosen his grip. It appears that this was successful as Sergeant Ingram was finally able to pull the Inmate's arm free, place it behind his back and secure it in a handcuff. Acting Sergeant Barker was also struggling to pull the Inmate's other arm behind his back and documented that the inmate continued to pull and struggle against his attempts to control the arm. Acting Sergeant Barker noted that as the Inmate continued to resist, he pulled on the Inmate's arm and heard a "pop". Staff note that the Inmate did not react but that they were finally able to move his other arm behind his back and secure it in restraints.

Once the Inmate was restrained, staff escorted him out of the cell where they document that he continued to struggle, "go limp" and resist their efforts to move him to disciplinary housing. Staff note that Inmate Sullivan actively resisted their efforts during the entire escort to the forth floor and into the 4F13 cell. According to reports, Inmate Sullivan did not stop resisting until his clothing was removed and he verbalized that his arm was injured. After being notified of possible injury staff contacted medical and requested that the Inmate be assessed. Staff also note that they covered Inmate Sullivan with a white jumpsuit and a sheet to keep him warm and to ensure some privacy.

Based on the information provided in the attached reports, it appears that staff used a reasonable level of force in order to stop Inmate Sullivan's assaultive behavior, secure him in restraints and move him to disciplinary housing. Staff only escalated force in response to the actions and behavior demonstrated by Inmate Sullivan. Staff gave multiple verbal commands to the Inmate and allowed opportunity for compliance. Staff deescalated force appropriately once Inmate Sullivan was controlled. Medical staff were notified of the event as per policy.

It should be noted that I requested reports from Deputy Pemberton and Deputy Dilger after I received this packet for review. I did not send the packet back to previous reviewers as I do not believe that any of the information provided by either writer would alter the conclusion of any previous reviewers. (**Lt Kurtiss Morrison**)

**HAZARD:**

| Sullivan, Cyrus Controlled | | |
|---|---|---|
| Reason for Contact: **Sullivan was violently resisting being moved into 4F13.** | | |
| Reasons for Force: | Defend Other Assault (Deputy) | Physical Resistance or Intent |
| Resist Conditions: | Active Defiance Threatening | Combative Mental |
| Physical Control: | Cross Leg Restraint *Physical Force Effective:* **Yes** | |
| Last Method of Control that Contained the Threat: **Cross Leg Restraint** | | |

000033

EXHIBIT 28



## Multnomah County Sheriff's Office

### INCIDENT REPORT #27669
(Dep Timothy Moore #56200)



---

**INCIDENT:**  Use Of Force - Inmate
**LOCATION:**  MCDC - 4F (4F)
**PACKET #:**  2258

Occurred: **06/28/2017 2045 hrs**
Submitted: **07/03/2017 1656 hrs**

---

**SUMMARY:**  *On June 28, 2017 at approximately 2045 hours inmate Sullivan Cyrus was escorted to 4F. Sullivan indicated he was injured after being placed in 4F-13. Medical was notified and they evaluated Sullivan at approximately 2100 hours. Medical determined that Sullivan would need to be transported to the hospital via ambulance. Sullivan remained in his cell until emergency medical services arrived at which time he was placed on a medical transport bed and moved to transfer.*

| **SUBJECT:** | #677564 | Sullivan, Cyrus | | M/W | 06/26/1983 | MCDC - 4F - 3 |
|---|---|---|---|---|---|---|
| **MENTIONED:** | #35798 | Dep Barker, Tim | | Acting Sergeant | | |
| | #31450 | Dep Hubert, Philip | | 5th floor escort | | |
| | #34887 | Sgt Ingram, Matthew | | Sergeant | | |
| | #42885 | Dep Muth, Wendy | | 8th floor escort | | |
| | #31638 | Dep Simpson, Paul | | 5 B/C deuty | | |

**INJURIES:**  **Sullivan, Cyrus** - Major (Hospitalized)        Medical Care: Offered, Requested
     *- Medical determined he may have a broken left arm (Examined: **06/28/2017 2100 hrs**)*

---

**NARRATIVE:**  *On June 28, 2017 at approximately 2045 hours inmate Sullivan, Cyrus was escorted to 4F following an incident in another module. Having been contacted prior by 4th floor control that an inmate was being moved to my area I exited 4D and opened the door to 4F. I requested power from 4th floor control and the panel outside 4F was activated. I opened the door to 4F-13 and deputies escorted Sullivan into the cell. Sullivan was placed in the prone position on the bed, I did not see who but a deputy requested a white jumpsuit due to Sullivan's pre-hearing lockdown status. I left the 4F panel and returned to 4D to retrieve a white jumpsuit.*

*Once collected I returned to 4F were I was handed the clothing cutters which had been retrieved by another deputy. Entering 4F-13 I handed the cutters to Deputy Hubert who in turn handed them to Acting Sergeant Barker. Barker used the cutters to remove Sullivan's jail issued shirt and undershirt. Following this action Sullivan stated he was done fighting and would not resist. I stepped forward and assisted with removing Sullivan's jail issued pants by grabbing the end of the cuff on the right leg and pulling it toward me. Sullivan was given the white jumpsuit and instructed to remain in the prone position until deputies exited the cell.*

*At this time Sullivan indicated he had been injured during the incident and would need medical attention. Sergeant Ingram and Acting Sergeant Barker talked with Sullivan, they asked where he was injured and if he could sit up to be examined. Sullivan stated his left arm and that he needed his glasses to see or do anything. Sullivan was assisted to a sitting position by Sergeant Ingram and Acting Sergeant Barker, both stated they would contact medical and his glasses would be retrieved.*

*All deputies exited 4F-13 and the door was secured*

*Medical was notified of the situation and responded to 4F to evaluate Sullivan, this occured at approximately 2100 hours. Medical determined Sullivan would need to be transported via ambulance to the hospital. Sullivan remained in the cell until emergency medical services arrived at which time he was placed on a medical transport bed and moved to transfer.*

**ACTION PENDING:**  *forwarded to supervisor*

---

**REVIEWS:**  *07/15/2017 2109 hrs - I have been assigned the review of packet #2258 involving Inmate Sullivan, C.*

## EXHIBIT 29

From:           KOVACHEVICH David F <david.kovachevich@mcso.us>
Sent:           Wednesday, June 28, 2017 10:26 PM
To:             INGRAM Matt P; BARKER Timothy
Subject:        narrative

On 06/28/17 I was working E Shift at MCDC as the 4th Floor Escort (714).  At xxxx I heard a radio transmission that requested an elevator on the 5th Floor to take an inmate to the 4th Floor.  The person requesting the elevator had a tone in their voice that made me think there was urgent need for the elevator and that there was possibly a fight occurring.  Within about 30 seconds an elevator arrived on the 4th Floor with Inmate Sullivan, Cyrus SWIS #677564 being escorted by Sgt. Ingram and A/Sgt. Barker.
Inmate Sullivan was resisting furiously against Ingram and Barker's efforts to guide him through the hallway.  There were several other deputies there, among them were Deputies Simpson and Hubert.

I held the sallyport door open for them and as they headed towards 4F, I followed along behind.  Inmate Sullivan was struggling/resisting the entire way.  Once in 4F, they moved Sullivan into Cell #13 and pushed him down upon the mattress belly down.  Only Sgt's Ingram and Barker were in the cell and Sullivan was still struggling so I entered the cell and took control of Sullivan's legs, crossing them behind his buttocks.  Sullivan was handcuffed behind his back, but continued to struggle; at one point he was able to push me off him with his legs, so I had to re-cross his legs behind him.

Sullivan continued to struggle during this time and I then heard Sgt. Ingram call for the "cutter" .  It was my thinking that Ingram felt we would not be able to perform a strip search at this point, so he decided to cut Sullivan's clothing to remove it.  Sullivan was yelling that he couldn't breathe and that he had asthma.  He was using full sentences however; and I could hear him inhaling and exhaling, but not wheezing, so I felt he could breathe okay.

When his shirts had been removed, Barker began cutting off Sullivan's pants and boxers; at this time Sullivan began to comply with the directives being issued by Sgt. Ingram; at this point A/Sgt. Barker began removing the handcuffs, I then let up off Sullivan's legs and pulled his blue pants off.
 Sgt. Ingram ordered Sullivan to remain belly down on the mattress until we exited the cell, which we then did, and the door was secured.
As we left 4F, Sgt's Ingram and Barker commented to each other that they needed to call Medical to have Sullivan checked out as it appeared Sullivan may have suffered a broken left arm.  Medical arrived within a few minutes and after a brief examination agreed the arm was likely broken and Sullivan would require transport to the hospital.  At this point Sullivan appeared to be in pain and stated he could not move his left arm.
The Ambulance arrived awhile later and Sullivan was transported to the hospital.

000055

## EXHIBIT 29

SIMPLE ASSAULT-MISD

# Multnomah County Sheriff's Office
### LAW ENFORCEMENT / CRIMINAL JUSTICE RELEASE

CASE NUMBER
GO 40 2017-30485



## Multnomah County Sheriff's Office
### INCIDENT REPORT #27636
(Dep David Kovachevich #20856)



| | |
|---|---|
| **INCIDENT:** Use Of Force - Inmate | Occurred: 06/28/2017 2035 hrs |
| **LOCATION:** MCDC - 4F (4F13) | Submitted: 06/29/2017 0652 hrs |
| **PACKET #:** 2258 | |

**SUMMARY:** *Inmate Sullivan refused to be moved willingly to 5B, therefore force was necessary to move him to 4F.*

| SUBJECT: | #677564 Sullivan, Cyrus | M/W 06/26/1983 MCDC - 4F - 3 |
|---|---|---|
| **MENTIONED:** | #35798 Dep Barker, Tim | A/Sgt 741 |
| | #31450 Dep Hubert, Philip | 715 |
| | #34887 Sgt Ingram, Matthew | 761 |
| | #31638 Dep Simpson, Paul | 5C |

**INJURIES:** Sullivan, Cyrus - Major (Hospitalized)        Medical Care: Offered
- Possible broken left arm. (Examined: **06/28/2017 2045 hrs**)

**NARRATIVE:** *On 06/28/17 I was working E Shift at MCDC as the 4th Floor Escort (714). At 2035 hours I heard a radio transmission that requested an elevator on the 5th Floor to take an inmate to the 4th Floor. The person requesting the elevator had a tone in their voice that made me think there was urgent need for the elevator and that there was possibly a fight occurring. Within about 30 seconds an elevator arrived on the 4th Floor with Inmate Sullivan, Cyrus SWIS #677564 being escorted by Sgt Ingram and A/Sgt Barker. Inmate Sullivan was resisting furiously against Ingram and Barker's efforts to guide him through the hallway. There were several other deputies there, among them were Deputies Simpson and Hubert.*

*I held the sallyport door open for them and as they headed towards 4F, I followed along behind. Inmate Sullivan was struggling/resisting the entire way. Once in 4F, they moved Sullivan into Cell #13. Sullivan continued to struggle and fight and therefore it became necessary for Ingram and Barker to push him down upon the mattress belly down. Only Sgt's Ingram and Barker were in the cell and Sullivan was still struggling so I entered the cell and took control of Sullivan's legs, crossing them behind his buttocks. Sullivan was handcuffed behind his back, but continued to struggle; at one point he was able to push me off him with his legs, so I had to re-cross his legs behind him.*

*Sullivan continued to struggle during this time and I then heard Sgt. Ingram call for the "cutter". It was my thinking that Ingram felt we would not be able to perform a strip search at this point, so he decided to cut Sullivan's clothing to remove it. Sullivan was yelling that he couldn't breathe and that he had asthma. He was using full sentences however, and I could hear him inhaling and exhaling, but not wheezing, so I felt he could breathe okay.*

*When his shirts had been removed, Barker began cutting off Sullivan's pants and boxers; at this time Sullivan began to comply with the directives being issued by Sgt. Ingram; at this point A/Sgt Barker began removing the handcuffs, I then let up off Sullivan's legs and pulled his blue pants off. Sgt. Ingram ordered Sullivan to remain belly down on the mattress until we exited the cell, which we then did, and the door was secured.*

*As we left 4F, Sgt's Ingram and Barker commented to each other that they needed to call Medical to have Sullivan checked out as it appeared Sullivan may have suffered a broken left arm. Medical arrived within a few minutes and after a brief examination agreed the arm was likely broken and Sullivan would require transport to the hospital. At this point Sullivan appeared to be in pain and stated he could not move his left arm.*

*The Ambulance arrived awhile later and Sullivan was transported to the hospital.*

**ACTION PENDING:** *Refer to Hearings Officer*

Tiffany A. Harris   OSB 02318
Attorney at Law
333 SW Taylor St., Suite 300
Portland, Oregon 97204
t. 503.782.4788   f. 503.217.5510
tiff@harrisdefense.com

Matthew McHenry
LEVINE & MCHENRY LLC
1001 S.W. Fifth Avenue, Suite 1414
Portland, Oregon 97204
503-546-3927
matthew@levinemchenry.com

Attorneys for Cyrus Sullivan

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | 3:17-CR-00306-JGZ |
| Plaintiff, | MOTION TO CONTINUE TRIAL DATE |
| v. | |
| CYRUS ANDREW SULLIVAN. | |
| Defendant. | |

Defendant Cyrus Sullivan, by and through counsel Tiffany Harris and Matthew McHenry, hereby moves the Court for an order continuing the trial, currently set for May 21, 2018 to a date (to be scheduled at a status conference), convenient to the Court and the parties' witnesses. This motion based on the defense's inability to secure the attendance of a subpoenaed witness with information relevant and important to Mr. Sullivan's defense.

//

//

## EXHIBIT 29

The Government opposes the motion. The defense asks that it be granted over the Government's objection for the reasons outlined in the accompanying declaration of counsel.

DATED this 10th day of May, 2018.

Respectfully submitted,

/S/    Tiffany Harris
Tiffany A. Harris
Attorney for Defendant Cyrus Sullivan

EXHIBIT 29

Tiffany A. Harris  OSB 02318
Attorney at Law
333 SW Taylor St., Suite 300
Portland, Oregon 97204
t. 503.782.4788   f. 503.217.5510
tiff@harrisdefense.com

Matthew McHenry
LEVINE & MCHENRY LLC
1001 S.W. Fifth Avenue, Suite 1414
Portland, Oregon 97204
503-546-3927
matthew@levinemchenry.com

Attorneys for Cyrus Sullivan

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | 3:17-CR-00306-JGZ |
| Plaintiff, | DECLARATION IN SUPPORT OF MOTION TO CONTINUE |
| v. | TRIAL DATE |
| CYRUS ANDREW SULLIVAN. | |
| Defendant. | |

1.     At the end of an altercation at the Multnomah County Detention Center, defendant Cyrus Sullivan was transported to a local hospital with a serious injury.  He now stands accused of assaulting five of the corrections deputies who were involved in the incident. There is no known evidence that any of them were treated for injuries.  Mr. Sullivan denies the charges and has consistently asserted that his injuries resulted from excessive force and the criminal charges against him were filed as a subterfuge.

2.    On April 20, 2018, The Hon. Jennifer Zipps of the District of Arizona was designated to preside over this case, as well as defendant Cyrus Sullivan's related cases. A status conference was scheduled for April 25, 2018.

3.    At the April 25, 2018 status conference, the Court asked whether the parties intended proceed to trial on the existing trial date of May 21, 2018. Defense counsel requested a continuance on the ground that she had been on a leave of absence for a month to care for her fiancée, who had a condition that had required brain surgery two weeks earlier, on April 12, 2018. The Government did not oppose the motion. The defense communicated Mr. Sullivan's position that he opposed a continuance longer than two weeks.

3.    The Court found good cause to continue the trial date beyond two weeks, but numerous conflicts in the parties' and the Court's schedules prevented the calendaring of a trial date within the next two to three months. Consequently, in accordance with Mr. Sullivan's preference for an earlier trial date, the defense elected to proceed to trial on the existing trial date of May 21, 2018.

4.    On May 4, 2018, the defense filed a motion for leave to serve subpoenas on the listed victims—all Multnomah County Sheriff's Deputies—seeking personal emails, text messages and phone records. (See docket no. 75.) The motion relied in large part on evidence that eyewitness deputy David Kovachevich emailed a preview of his required Use of Force Report in "cut and paste" form to two of the alleged victims, also sheriff's deputies. The defense argued that the timing and nature of the witness' communication with one another helped to develop core defense theories of bias and interest and justified service of the subpoenas. The Court concluded, "[u]pon consideration of the nature and relevancy of the information sought by Defendant, the Court finds that Defendant's request satisfies *Nixon* factors." The authorized subpoenas were served on May 9, 2018, the day after the Court's order.

5.    Deputy Kovachevich is not on the Government's witness list. Because of his role as a witness to events both during the alleged assault and the ensuing investigation, the defense

EXHIBIT 29

placed him under subpoena. Today, on May 10, 2018, the defense received an email from the Multnomah County Sheriff's Office stating,

> "Looking at Deputy Kovachevich's calendar, he will be out of the state on vacation from May 19th through June 3rd and will be unable to appear in court. In addition to that, Deputy Kovachevich is retiring at the end of his vacation and will no longer be a member of the MCSO [Multnomah County Sheriff's Office]. (See Exhibit 1)

6.      Immediately after receiving the email, defense counsel sent a letter to Deputy Kovachevich (through the Sheriff's office), informing him of the defense's intent to seek a continuance of the trial date to secure his attendance at trial and asking for his cooperation in scheduling matters. (See Exhibit 2.)

7.      In response, the MCSO advised that the letter had been forwarded to Deputy Kovachevich and that his retirement was actually scheduled to begin on May 19, 2018, "making May 18th his last day employed with the MCSO." (See Exhibit 3.)

8.      The defense has conferred with the Government. The Government opposes the requested continuance and asserts that Deputy Kovachevich is not a percipient witness and will not offer material information, if called to testify. As the discovery provided by the Government makes clear, Deputy Kovachevich was involved in escorting Mr. Sullivan from his cell to "the hole." Once in the hole, Kovachevich was present when Deputies Ingram and Barker pinned Mr. Sullivan to a mattress, face down, causing Mr. Sullivan to say that he could not breathe. Deputy Kovachevich heard Deputies Ingram and Barker discuss Mr. Sullivan's need for medical attention and he sent the aforementioned email to Barker and Ingram some three hours after the relevant events.

///

///

///

///

9.    Deputy Kovachevich is a material and important defense witness. Therefore, to the extent that he is truly unavailable, the defense requests a continuance of the trial date to secure his appearance at trial.

I declare under penalty of perjury that the foregoing is true to the best of my knowledge and belief.

DATED this 10th day of May, 2018.

Respectfully submitted,

/S/    Tiffany Harris
Tiffany A. Harris
Attorney for Defendant Cyrus Sullivan

**Subject:** FW: subp for Deputy Kovachevich

**Date:** Thursday, May 10, 2018 at 4:48:45 PM Pacific Daylight Time

**From:** Tiffany Harris

**From:** Steve Wilson <swilsn@gmail.com>
**Date:** Thursday, May 10, 2018 at 10:14 AM
**To:** Tiffany Harris <tiff@harrisdefense.com>, Matthew McHenry <matthew@levinemchenry.com>
**Subject:** Fwd: subp for Deputy Kovachevich

FYI

---------- Forwarded message ----------
**From: WHITE Brandon** <brandon.white@mcso.us>
Date: Thu, May 10, 2018 at 9:19 AM
Subject: RE: subp for Deputy Kovachevich
To: Steve Wilson <swilsn@gmail.com>

Good morning Steve,
Yes, I am the one to send general subpoenas for corrections staff.
Looking at Deputy Kovachevich's calendar, he will be out of the state on vacation from May 19th through June 3rd, and will be unable to appear at court. In addition to that. Deputy Kovachevich is retiring at the end of his vacation, and will no longer be member of MCSO.
Hope this helps,

*Sgt. Brandon White*
*Multnomah County Sheriff's Office*
*County Attorney Liaison*
*C.E.R.T.*
*503-969-3195*
*Brandon.white@mcso.us*

**Subject:** RE: Deputy Kovachevich subpoena (time sensitive)

**Date:** Thursday, May 10, 2018 at 12:32:18 PM Pacific Daylight Time

**From:** WHITE Brandon

**To:** Tiffany Harris

**CC:** Matthew McHenry, Steve Wilson, CALANDRIELLO Carlo

Good afternoon Ms. Harris,

After speaking with our HR unit, Deputy Kovachevich's retirement will go into effect on May 19th, making May 18th his last day employed with MCSO.

I forwarded you email and attachment to Deputy Kovachevich and notified him via phone of its contents.

Please let me know if you need anything else from me.

V/r,

Sgt. Brandon White
Multnomah County Sheriff's Office
County Attorney Liaison
C.E.R.T.
503-969-3195
Brandon.white@mcso.us


-----Original Message-----
From: Tiffany Harris [mailto:tiff@harrisdefense.com]
Sent: Thursday, May 10, 2018 12:13 PM
To: WHITE Brandon <brandon.white@mcso.us>
Cc: Matthew McHenry <matthew@levinemchenry.com>; Steve Wilson <swilsn@gmail.com>; CALANDRIELLO Carlo <carlo.calandriello@multco.us>
Subject: Deputy Kovachevich subpoena (time sensitive)

Dear Sgt. White:
Attached is an important letter for Deputy Kovachevich regarding the scheduling of his trial testimony in U.S. v. Sullivan. Please call / write with any questions.

Thank you.

Tiffany A. Harris | Attorney at Law
333 SW Taylor Street  Suite 300
Portland, OR 97204
P 503.782.4788
tiff@harrisdefense.com


Confidentiality: This e-mail transmission may contain confidential and/or privileged information. The information contained herein is intended for the addressee only. If you are not the addressee, please do not review, disclose, copy or distribute this transmission. If you have received this transmission in error, please contact the sender immediately.

22) "Reserve Deputy" has the same meaning as Reserve Officer per ORS 133.005 (4) and per ORS 181.610 (17). This includes all volunteer members of the MCSO Reserve Deputy Program sworn to a Reserve Deputy commission; successfully completed their probationary and training period or in FTO supervised process of doing so; and are in good standing in the program.

23) "Serious physical injury" means physical injury which creates a substantial risk of death or which causes serious and protracted impairment of health or protracted loss or impairment of the function of any bodily organ.

24) "Static resistance" is when the threat refuses to comply by balking, becoming dead weight, and/or grasping a solid structure.

25) "Sworn Member" means any Civil Deputy, Corrections Deputy, Law Enforcement Deputy, Reserve Deputy, respective Sergeant/Supervisor or Command Staff member.

26) "Threat" means any person resisting arrest or being lawfully controlled, and/or demonstrating the intent, and having the means and opportunity to inflict injury, serious physical injury, or death.

27) "Uniform Staff" means any Civil Deputy, Corrections Deputy, Facility Security Officer, Law Enforcement Deputy, Reserve Deputy, respective Sergeant/Supervisor or Command Staff member.

**12.03  Use of Force; Generally.**

1) A member who is authorized by the provisions of this chapter or otherwise justified by law to use force upon another person shall only use a degree of force, which the member reasonably believes to be necessary to reach the objective of the application of force, whether it be control, custody or both.

2) A member shall not use excessive force.

3) A member shall not, under any circumstance, use any degree of force upon another person for the purpose of punishing the person. The prohibition in this section includes, but is not limited to, the application of force in a malicious or sadistic manner for the purpose of causing them harm.

EXHIBIT 30

150

12.04 <u>Factors Used to Determine Reasonableness of Force.</u>

1) In any decision process in whether or not to use force, deciding on the force to be used and when conducting the post incident review of the uniform staff member's use of force, the following factors as outlined by *Graham v Conner,* 490 U.S. 386, 394 (1989) will be considered:

    a) Whether the subject poses an immediate threat to the safety of members or others.

    b) The severity of the crime or other governmental interest at issue.

    c) The level of the subject's resistance or attempts to flee.

    d) The objective reasonableness of the force utilized in relation to the totality of the circumstances.

2) A number of factors shall be taken into consideration in regard to the totality of the circumstances including, but not limited to:

    a) The conduct of the threat being confronted as reasonably perceived by the uniform staff member at the time of the confrontation.

    b) Uniform staff member comparisons to threat factors including, but not limited to:

        i. Age

        ii. Size

        iii. Relative strength

        iv. Relative skill level

        v. Uniform staff member injury/exhaustion

    c) Multiple threats.

    d) Influence of drugs/alcohol and/or the threat's apparent mental state at the time.

    e) Proximity of weapons.

    f) Availability of other options (i.e., what resources are available to the uniform staff member under the circumstances).

000320

g) Seriousness of the suspected offense or reason for contact with the individual.

h) Potential for injury to citizens, uniform staff members and suspects or inmates.

i) Risk of escape.

j) Sudden attack.

k) Other exigent circumstances.

**12.05  Use of Physical Force.**

1) Except as provided in Section 12.06 of this chapter, a uniform staff member is justified in using physical force upon another person only when and to the extent they reasonably believe it necessary:

   a) For sworn members only, to make an arrest as authorized or to prevent the actual or imminent escape from custody of an arrested person.

   b) For all uniform staff:

      i. Self-defense or to defend a third person from the use or imminent use of unlawful physical force by another.

      ii. To maintain the safety and security of an assigned facility to include other MCSO staff, other county employees, the general public, and/or to prevent or minimize property damage or loss.

**12.06  Use of Deadly Physical Force.**

1) Uniformed staff members may use deadly physical force if, based upon the totality of the circumstances then presented, the member reasonably believes that the use of deadly physical force is necessary to protect the member or another person from the imminent use of deadly physical force or serious bodily injury.

2) Nothing in Subsection 12.06 (1) above constitutes justification for reckless or criminally negligent conduct by a uniform staff member amounting to an offense

against or with respect to innocent persons whom the uniform staff member is not seeking to arrest or retain in custody.

**12.07  Use of Physical Force in a Correctional Facility.**

1) A sworn member in a correctional facility may use physical force upon another person when and to the extent the sworn member reasonably believes it necessary:

   a) To maintain order and security in the facility as authorized by law.

   b) For self-defense or to defend a third person from what the sworn member reasonably believes to be the use or imminent use of unlawful physical force.

2) A sworn member is justified in using physical force, when and to the extent they reasonably believe it necessary to prevent the escape of an inmate from a correctional facility while the inmate is in the facility, in transport or otherwise outside of the facility, but in continuous Corrections Division custody.

**12.08  Use of Deadly Physical Force in a Correctional Facility.**

A sworn member in a correctional facility is justified in using deadly physical force upon another person when the sworn member:

1) Reasonably believes the person is using or about to use unlawful deadly physical force against another.

2) Reasonably believes it necessary to prevent the escape of an inmate:

   a) While the inmate is in the facility, in transport or otherwise outside of the facility, but in continuous Corrections Division custody; and

   b) The inmate poses a serious threat to use deadly physical force upon the sworn member or another person during or after the escape; and/or

   c) Another person is aiding in the escape and poses a serious threat to use deadly physical force on the sworn member or another person during or after the escape.

---

EXHIBIT 30

153

**12.09   Reporting Use of Force.**

1) Any use of force, including anytime a firearm, less lethal munitions launcher, or electronic control device is pointed at a person, whether on or off duty, shall be documented completely and accurately in a MCSO Hazard Report (HR).

2) Except as provided in Section (3) below, Use of Force report packages shall be completed and submitted for review by the end of shift. Supervisors may authorize an extension not to exceed 24 hours from the time of occurrence.

3) Facility or Unit Commanders may authorize an extension beyond 24 hours based on an assessment which may include:

   a) Significance of the force used;

   b) Injuries to members or other persons;

   c) Criminal or contemplated criminal proceedings;

   d) The totality of the event, or other elements potentially impacting the quality of reports.

4) Authorized extensions shall be documented in the report package and acknowledged by the Unit or Facility Commander upon their review.

5) An involved member in a deadly physical force incident is exempt from documenting the incident in a Hazard Report as provided for in Subsection 12.09 (1) above.

**12.10   Reporting Use of Force, Witnesses.**

1) Any member of the Multnomah County Sheriff's Office, regardless of assignment, who sees, hears, or otherwise witnesses any portion of an event involving a use of force by another member shall document his/her observations in a report.

2) Witness reports shall be submitted on a "Use of Force Witness Report". Timelines for submission of a Witness Report are subject to the same provisions of Subsections 12.09 (2-4). A witness may forward a report detailing a use of force to any supervisor, regardless of the chain of command.

MCSO Agency Manual                                          February 2015

3) Upon receipt of the Witness Report(s), the supervisor shall ensure the report is included with the Hazard Report package. If no Hazard Report was submitted, the report shall be forwarded through the chain of command to the Chief Deputy for review.

**12.11   Notification to Supervisors.**

1) Supervisory notification shall be made as soon as possible following any use of force incident.

2) The notified supervisor shall ensure that the incident documentation, when applicable, to include videos of the incident, photographs of potential injuries or property damage, copies of any applicable medical records and any statements by the subject of the use of force.

3) If the use of force incident was captured on a facility video camera, patrol vehicle mounted camera, or other video camera which a supervisor may reasonably obtain control over, the supervisor will ensure that a copy of the video is obtained or secured in the video system for future use of reviewing the incident.

4) Supervisors shall ensure scene integrity and proper documentation of all evidence secured and/or collected in order to preserve the chain of custody for any potential evidence.

**12.12   Hazard Report Reviews.**

1) All HR packages shall be reviewed and forwarded consistent with applicable division policies. In general:

   a) Hazard Report (HR) packages containing all relevant reports and supporting documentation of the event shall be reviewed by an uninvolved supervisor in the involved member's chain of command. The HR package and completed supervisory review shall be forwarded to the first uninvolved Command Staff member in the supervisor's chain of command.

**2015 CORRECTIONS DIVISION OPERATIONAL POLICY AND PROCEDURES MANUAL**

    B.  Except as provided by section (10) below, the staff member initiating the use of force shall complete the Hazard Report. This shall include members acting under the authorization of a supervisor to use physical force or a defensive tool.

8.  In a single incident, one Hazard Report shall be completed for each individual on whom force was used.

9.  The Hazard Report must state:
    A.  All factors contributing to the need to use force;
    B.  Precise details of the force used; and,
    C.  Actions taken immediately after the event.

10. Supervisors authorizing the use of the restraint board/chair shall complete the Hazard Report and the Application of Protective Restraints form, whenever the use of restraints is involuntary:
    A.  If the use of the restraint chair is therapeutic and voluntary, required forms are an information report and application of protective restraint form.

11. A Use of Force Witness Report shall be written by others involved in the use of force, and by all persons who see or hear the use of force;

12. The Hazard Report and the Use of Force Witness Report shall not be used as part of an inmate disciplinary hearing; and,

13. If a Misconduct Report is issued, an Information Report shall be submitted and attached as a package for the Hearings Officer.

14. Members who witness a use of force by another agency shall complete a Use of Force Witness Report and submit it through the chain of command.

15. A sergeant shall review all Hazard Reports, Use of Force Witness Reports and any supplemental documents surrounding any use of force:
    A.  The sergeant shall investigate the circumstances surrounding the initial need for contact, the force used and any required follow-up activity;
    B.  The sergeant shall ensure all necessary supplemental documents are attached to the Hazard Report, making one complete package;
    C.  The complete package shall be given to the Officer in Charge; and, Process the Inmate Misconduct packet if one is present.

16. All Hazard Report Packages shall be reviewed by the proper chain of command:
    A.  The OIC shall initiate a Hazardous Incident Review and complete the OIC's Review;
    B.  The Facility Commander shall review all Hazard Reports initiated in the facility.

17. Facility Commanders shall forward all Hazard Report Packages to the Corrections Division Chief Deputy.

18. Facility Commanders or the Corrections Division Chief Deputy may forward a copy of a Hazard Report Package to the Training Unit Manager for assessment provided:

000339

EXHIBIT 30

## 2015 CORRECTIONS DIVISION OPERATIONAL POLICY AND PROCEDURES MANUAL

F.  Sent to all other appropriate persons/units.

**1.4.6**    **Custody Reports**

1.  A Custody Report shall be completed any time a person is taken into custody as the result of any of the following:
    A.  A warrant is served on a person inside a designated Multnomah County Facility;
    B.  An inmate is transferred from another jurisdiction by the Transport Unit;
    C.  A person is taken into custody as the result of a judicial order.

**1.4.7**    **Hazard Reports and Use of Force Witness Reports**

1.  A Hazard Report or Witness Report is required as specified in the Agency Manual and generally any time:
    A.  A member uses physical or deadly physical force;
    B.  A member witnesses others' use of physical force;
    C.  A person is involuntarily placed in "protective restraint";
    D.  A firearm is pointed at another person;
    E.  Excluding training/qualifications, a firearm is discharged;
    F.  OC is deployed;
    G.  An impact weapon is used;
    H.  A less lethal weapon is used;
    I.  In response to property damage;
    J.  Restraints are used for purposes other than routine inmate movement or transport; or,
    K.  A TASER is pointed and/or discharged at another person with or without the laser sight active.
2.  No Hazard Report is required in cases of therapeutic restraint.
3.  Members off-duty using force as described above, who either identify themselves or are likely to be identified as members of the Sheriff's Office, shall submit a Hazard Report as specified in this section.
4.  If an employee has a doubt as to whether or not a Hazard Report is necessary, he or she shall contact a supervisor for advice.
5.  Staff members shall submit all Hazard Reports and supplemental reports consistent with the provisions of the Agency Manual.
6.  All Hazard Reports and Witness Reports shall be completed within twenty-four hours of the incident:
    A.  The OIC or Unit manager may authorize extensions and must document the reason for the extension in their review;
    B.  When death or serious injury occurs, timelines for submittal of reports shall be adjusted consistent with the provisions of the Agency Manual and the direction of the Sheriff's Office Detective Sergeant conducting the investigation.
7.  Whenever a situation requires the completion of a Hazard Report:
    A.  Staff members shall immediately advise a supervisor and Corrections Health of the use of force;

000338

EXHIBIT 30

## 2015 CORRECTIONS DIVISION OPERATIONAL POLICY AND PROCEDURES MANUAL

  A. A specific element exists which may benefit either division during training;
  B. The package is not subject to pending investigation; and,
  C. If elements of the event are addressed in future training, all staff member names shall be omitted.

19. The disposition of a Hazard Report Package shall be as follows:
  A. If the use of force is determined to be justified, the staff member shall be notified in writing by the Internal Affairs Unit;
  B. If the use of force appears in violation of Agency policies and procedures, the Corrections Division Chief Deputy shall forward the package to the Internal Affairs Unit for a Pre-Investigative Assessment;
  C. Regardless of the final disposition, all Hazard Report Packages shall be kept by the Internal Affairs Unit.

### 1.4.8     Staff Injury Reports

1. For purposes of this section, the term "staff" shall include:
  A. Sworn members;
  B. Non-sworn civilian staff; and,
  C. Volunteers who are acting within the scope of the task they have been assigned.

2. An Accident/Analysis Worksheet shall be completed by a staff member any time they are injured while at work:
  A. The worksheet is to be completed no matter the extent of the injury;
  B. Staff should complete the worksheet as soon as possible;
  C. Worksheets can be found in the OIC's offices and on the Sheriff's Office Intranet site;
  D. Staff should be as accurate as possible when describing both the injury and how it occurred. When the form is complete, it shall be forwarded to the employee's Sergeant/Supervisor for review.

3. The reviewing Sergeant/Supervisor shall:
  A. Ensure the worksheet is filled out completely and sign it;
  B. Provide copies for the employee and the Life Safety Officer;
  C. Send the original worksheet to the Human Resources Unit.

4. A Report of Job Injury or Illness Form (801) shall be completed any time that a staff member is injured at work and will be seeking outside medical attention:
  A. 801 and all accident related forms shall be available for staff through a Sergeant/Supervisor;
  B. Sergeant/Supervisors can find all necessary forms in the OIC's office or on the Sheriff's Office Intranet site;
  C. The upper half of the form should be completed by the employee. If an employee is unable to complete the form, the sergeant or supervisor shall complete the form for the employee;
  D. Employees must be as accurate as possible when describing both the injury and how it occurred.

Page 46 of 565

000340

EXHIBIT 30

2015 CORRECTIONS DIVISION OPERATIONAL POLICY AND PROCEDURES MANUAL

5. The employee's Sergeant/Supervisor shall complete the lower half of the 801 form.
6. The employee shall complete the Managed Care Organization (MCO) Choice Form.
7. Sergeants/Supervisors shall ensure employees are given a complete Workers Compensation Packet to take with them to a medical provider.
8. Sergeants/Supervisors shall ensure the Human Resources Section receives copies of all 801's and MCO Choice Forms within 12 hours of the incident.
9. If a member is unable to complete the Injury packet due to the extent of their injuries or absence from the workplace, the supervisor receiving the information shall complete the 801 and forward it to the Human Resources Unit.

1.4.9    Inmate Injury Reports

1. An Accident/Analysis Worksheet shall be completed any time an inmate is injured while working:
   A. The form shall be completed by the staff member supervising the inmate worker;
   B. The inmate will sign as the worker, and the supervising staff member will sign as the supervisor;
   C. The injured inmate shall be given a copy of the worksheet;
   D. The original worksheet shall be turned into the supervising staff member's Sergeant/Supervisor;
   E. The Sergeant/Supervisor shall ensure a copy of the worksheet is sent to the Life Safety Officer and the original is sent to the Workers Compensation Section.
2. A Report of Job Injury or Illness Form (801) shall only be completed for an inmate worker at the direction of the Workers Compensation Section:
   A. The Workers Compensation Section will review all Accident/Analysis Worksheets and determine if an 801 is required.
   B. Unit managers shall direct the completion of an 801 form by an inmate;
   C. If a staff member is asked to complete an 801 for an injured inmate worker, by the Workers Compensation Section, he or she shall complete it in accordance with Section 1.4.8 above.

000341

EXHIBIT 30

8.9.3    Reference

1. ORS 161.205, 161.209, 161.215, 161.219, 161.225, 161.229, 161.236, 161.239, 161.265, 161.267, 169.076(4)

8.9.4    Using Force, Generally

1. A member who is authorized by the provisions of this section or otherwise justified by law to use force upon another person shall only use a degree of force, which the member reasonably believes to be necessary.
2. Staff members shall not use excessive force.
3. Staff members shall not, under any circumstance, use any degree of force on another person for the purpose of punishing that person.
4. When determining whether or not to apply any level of force and evaluating whether a staff member used reasonable force, a number of factors should be taken into consideration. These factors include but are not limited to the following:
   A. The conduct of the threat being confronted, as reasonably perceived by the staff member at the time;
   B. Staff member vs. threat factors (age, size, relative strength, skill level, staff member's injury/exhaustion etc.);
   C. Whether multiple threats are involved;
   D. Influence of drugs or alcohol and/or the threat's apparent mental state at the time;
   E. Proximity and availability of weapons;
   F. Availability of other options/resources to the staff member under the circumstances;
   G. Seriousness of the suspected offense or reason for contact with the threat;
   H. Potential for injury to citizens, staff members or suspects/inmates;
   I. Risk of escape;
   J. Sudden attack; and,
   K. Any other exigent circumstances.

8.9.5    **Use of Physical Force in Making an Arrest or Preventing an Escape in an Uncontrolled Environment**

1. A staff member is justified in using physical force on another person only when and to the extent he or she reasonably believes it necessary:
   A. To make a lawful warrant arrest or prevent the escape from custody of any arrested or incarcerated person; or,
   B. For self-defense or to defend a third party from what the staff member reasonably believes to be the use or imminent use of physical force, by a threat, while making or attempting to make an arrest or prevent an escape.
2. A staff member may only use physical force within the scope of their training.

**2015 CORRECTIONS DIVISION OPERATIONAL POLICY AND PROCEDURES MANUAL**

3. A staff member may use deadly physical force when he or she reasonably believes, regardless of the particular offense which is the subject of the arrest or attempted escape, that the use of deadly physical force is necessary for self-defense or to defend a third party from the use or threatened use of deadly physical force.
4. Nothing in Section 8.9.4 of this manual constitutes justification for reckless or criminally negligent conduct by a staff member toward innocent persons who he/she is not seeking to arrest or retain in custody.

**8.9.6    Use of Physical Force in a Correctional Facility**

1. A staff member in a correctional facility may use physical force on another person, including an inmate, when and to the extent the staff member reasonably believes it is necessary to maintain order and security in the facility as authorized by law.
2. A staff member in a correctional facility is justified in using physical force on another person, including an inmate, for self-defense or to defend a third party from what he or she reasonably believes to be the use or imminent use of unlawful physical force.
3. A staff member is justified in using physical force, including deadly physical force, when and to the extent he or she believes it is necessary to prevent an escape of an inmate from a correctional facility, when the staff member reasonably believes the inmate poses a serious threat to use deadly physical force on the staff member or a third party during or after the escape.
4. A staff member in a correctional facility is justified in using deadly physical force on another person, including an inmate, for self-defense or to defend a third party from what he or she reasonably believes to be the use or imminent use of unlawful deadly physical force.

**8.9.7    Reporting Use of Force**

1. Any use of physical force shall be documented completely and accurately using a Hazard Report in accordance with Section 1.4.8 of this manual. Members required to report use of force include any:
   A. On-duty member;
   B. Off-duty member who identifies himself as a member of the Sheriff's Office;
   C. Off-duty member who should reasonably conclude he or she was recognized as a member of the Sheriff's Office; or,
   D. An off-duty member who was acting under the color of authority.
2. Use of force Hazard Reports shall be completed and submitted for review within twenty four hours of the incident.

000343

EXHIBIT 30

## 2015 CORRECTIONS DIVISION OPERATIONAL POLICY AND PROCEDURES MANUAL

3. Facility or Unit Commanders may authorize an extension beyond 24 hours based on an assessment that may include:
   A. Significance of the force used;
   B. Availability of staff due to injury or incapacitation;
   C. Criminal or contemplated criminal proceedings; or,
   D. The totality of event or other elements, which may potentially impact the quality of the reports.
4. Authorized extensions shall be documented in Hazard Report Package and acknowledged by the authorizing commander upon their review.
5. An involved member in a deadly physical force incident is exempt from documenting the incident in a Hazard Report as described in Section 8.9.7(2) of this manual.

**8.9.8   Reporting Use of Force, Witnesses**

1. Any member of the Sheriff's Office, regardless of assignment who sees, hears or otherwise witnesses any portion of an event involving a use of force by another member, shall document their observations in a Use of Force Witness Report.
   A. Use of Force Witness Reports shall be provided to civilian staff members by a sergeant.
2. Timelines for submitting a Use of Force Witness Report shall be subject to the same provisions of Section 8.9.7(2)-(4) of this manual.
3. A witness may submit their Use of Force Witness Report to any supervisor, regardless of the chain of command.
4. Upon receipt of a Use of Force Witness report, the supervisor shall ensure the report is placed in the Hazard Report package. If no Hazard Report has been submitted, the Use of Force Witness Report shall be submitted through the chain of command to the Corrections Division Chief Deputy for review.

**8.9.9   Supervisor Notification**

1. Following any use of force, the staff member involved shall contact their sergeant as soon as possible to describe the event, any resulting injuries and the disposition of other staff members or the inmate involved.

**8.9.10   Hazardous Incident Reviews and Dispositions**

1. All Hazard Report Packages shall be reviewed by members of the Corrections Division Command team. as indicated in Chapter 1.4.8

**8.9.11   Medical Attention Required**

1. Any inmate involved in a use of force shall be evaluated by Corrections Health.
2. Any refusal of medical attention by a person involved in a use of force shall be documented in the Hazard Report.

000344

## EXHIBIT 31

*Nunez,* 180 F.3d 227, 233 (5th Cir. 1999). *United States v. Chapman,* 528 F.3d 1215, 1218 (9th Cir. 2008).

"In this circuit, we adhere to the common law understanding of simple assault as "assault that [does] not involve physical contact." *Chapman,* 528 F.3d at 1219 (citing *United States v. Chestaro,* 197 F.3d 600, 605-06 (2d Cir. 1999)). *See also United States v. McCulligan,* 256 F.3d 97, 104 (3d Cir. 2001) ("[P]roof of actual contact is required to sustain a conviction for any crime beyond simple assault."). Therefore, "an assault, coupled with the presence of physical contact or a similar aggravating factor, such as the intent to commit murder or a serious felony, is not simple." *Chapman,* 528 F.3d at 1219 (citing *Hathaway,* 318 F.3d., at 1009 and *Yates,* 304 F.3d at 823). *United States v. Rivera-Alonzo,* 584 F.3d 829, 834 (9th Cir. 2009).

§ 111(a) criminalizes three distinct categories of conduct: (1) assaults that do not involve physical contact, or simple assaults (punishable up to one year), (2) assaults that do involve physical contact (punishable up to eight years), and (3) assaults that involve a deadly or dangerous weapon or *bodily injury* (punishable by up to twenty years). Therefore, under this formulation, someone who punched an officer would be guilty of a felony, but someone who threw a punch and missed would be guilty of only a misdemeanor. *Chapman,* 528 F.3d at 1219 (citing *Chestaro,* 197 F.3d 600, 608). Proof of "bodily injury," therefore, enhances the statutory maximum from eight years to 20.

       2.    Intent

In *United States v. Feola,* 420 U.S. 671, 684 (1975), the Supreme Court held that there is no "requirement that an assailant be aware that his victim is a federal officer." Conviction requires proof of "criminal intent to do the acts therein specified." *Id.,* 420 U.S. 686. "All the

**Amended Government's Trial Memorandum**                              **Page 5**

## EXHIBIT 31

statute requires is an intent to assault, not an intent to assault a federal officer.  A contrary

conclusion would give insufficient protection to the agent enforcing an unpopular law, and none

to the agent acting under cover." *Id.* at 684.

      3.    "Assault"

There is a forcible assault when one person intentionally strikes another, or willfully

attempts to inflict injury on another, or intentionally threatens another coupled with an apparent

ability to inflict injury on another which causes a reasonable apprehension of immediate bodily

harm.  At common law, an assault is committed when a person willfully attempts to inflict injury

on another, or threatens to inflict injury on another, coupled with an apparent present ability to

do so, causing reasonable apprehension of immediate bodily harm.  *United States v. Dupree*,

544 F.2d 1050, 1051 (9th Cir. 1976).

      4.    "Bodily Injury"

Congress has defined "bodily injury," in many different contexts. The definition

commonly used is, "the term 'bodily injury' means--(A) a cut, abrasion, bruise, burn, or

disfigurement; (B) physical pain; (C) illness; (D) impairment of a function of a bodily member,

organ, or mental faculty; or (E) any other injury to the body, no matter how temporary." See 18

U.S.C. §§ 831(f)(4) (prohibiting transactions involving nuclear materials); 1365(g)(4) (tampering

with consumer products); 1515(a)(5) (obstruction of justice); 1864(d)(2) (hazardous or injurious

devices on federal lands).  See *United States v. Meyers*, 972 F2d 1566, 1573-4 (11th Cir.

1992)(approving jury instruction).

//

//

**Amended Government's Trial Memorandum**           **Page 6**

## EXHIBIT 32

Special Instruction 7

Bodily Injury

The term "bodily injury" has its common and ordinary meaning, and includes a cut, abrasion, bruise, burn, or disfigurement, physical pain, or any other injury to the body, no matter how temporary.

The term 'bodily injury' means--(A) a cut, abrasion, bruise, burn, or disfigurement; (B) physical pain; (C) illness; (D) impairment of a function of a bodily member, organ, or mental faculty; or (E) any other injury to the body, no matter how temporary." See 18 U.S.C. §§ 831(f)(4) (prohibiting transactions involving nuclear materials); 1365(g)(4) (tampering with consumer products); 1515(a)(5) (obstruction of justice); 1864(d)(2) (hazardous or injurious devices on federal lands). See *United States v. Meyers*, 972 F2d 1566, 1573-4 (11th Cir. 1992)(approving jury instruction)

**Government's Proposed Jury Instructions**                                    **Page 39**

EXHIBIT 33

THE JOURNAL OF BONE & JOINT SURGERY

# JBJS

*This is an enhanced PDF from The Journal of Bone and Joint Surgery*

*The PDF of the article you requested follows this cover page.*

# Functional bracing of fractures of the shaft of the humerus

A Sarmiento, PB Kinman, EG Galvin, RH Schmitt and JG Phillips
*J Bone Joint Surg Am.* 1977;59:596-601.

**This information is current as of January 22, 2009**

| | |
|---|---|
| **Reprints and Permissions** | Click here to order reprints or request permission to use material from this article, or locate the article citation on jbjs.org and click on the [Reprints and Permissions] link. |
| **Publisher Information** | The Journal of Bone and Joint Surgery<br>20 Pickering Street, Needham, MA 02492-3157<br>www.jbjs.org |

# Functional Bracing of Fractures of the Shaft of the Humerus*

BY AUGUSTO SARMIENTO, M.D.[†], PHILIP B. KINMAN, M.D.[†], EUGENE G. GALVIN, M.D.[†],
ROGER H. SCHMITT, M.D.[†], AND JAMES G. PHILLIPS, C.O.[†], MIAMI, FLORIDA

*From the Department of Orthopaedics and Rehabilitation,
University of Miami School of Medicine, Miami*

ABSTRACT: We treated fifty-one cases of fracture of the shaft of the humerus with a functional method of treatment consisting of a plastic sleeve, individually molded or prefabricated. It maintained good alignment of the fragments and permitted rapid and uninterrupted osteogenesis. The early introduction of functional activity to the entire extremity appears to provide a desirable physiological environment conducive to rapid healing. Non-unions have not been encountered in non-pathological fractures. Healing time has been rapid, and there has been consistent restoration of motion of all joints prior to the completion of healing. The morbidity was minimum.

Fractures of the shaft of the humerus are relatively infrequent and usually do not constitute a major therapeutic problem [4,7]. Non-surgical management is preferred because non-union is rare, healing time is short, and infection is uncommon [3,5,8,9,16-18]. Even some of the most ardent advocates of compression osteosynthesis recognize that "better results after conservative treatment prove that uncomplicated fractures of the humeral shaft should not be primarily approached by open reduction" [19].

However, non-surgical management of these fractures is associated with some morbidity and undesirable sequelae. Non-union is not a frequent complication but it does occur in from 1 to 12 per cent of patients [1,2,11-14,16,20,31-33]. Loss of motion of the shoulder from adhesive capsulitis or from a transient subluxation of the shoulder may cause an important disability during healing and afterward. All types of conservative therapy have disadvantages as well as advantages. Any effective device — even a hanging cast, coapta-



FIG. 1

Photographs of the functional sleeves used to stabilize fracture fragments. The one made of Orthoplast (left) resembles that made of prefabricated polypropylene (middle and right). Note the Velcro straps that permit removal and reapplication of the sleeve.

* Read at the Annual Meeting of The American Academy of Orthopaedic Surgeons, Las Vegas, Nevada, February 6, 1977.
† P.O. Box 520875, Biscayne Annex, Miami, Florida 33152.

tion u-splints, or a Velpeau bandage — limits a patient in daily activities. A long period of rehabilitation may be needed to restore motion to the immobilized joints [3,6,10,12].

The satisfactory results obtained by functional bracing of tibial, femoral, forearm, and Colles fractures developed at the University of Miami School of Medicine [20-29] stimulated us to extend this method of treatment to fractures of the shaft of the humerus.

### Technique

For all of the fifty-one fractures under review, the initial treatment was stabilization either by use of a hanging cast, sugar-tong splints, or a Velpeau bandage or by application of skeletal traction. We preferred the hanging cast or sugar-tong splints and encouraged patients to start range-of-motion exercises of the shoulder as soon as possible.

tient who is hard to fit (Fig. 1). The sleeve extends medially from 2.5 centimeters below the axilla to 1.3 centimeters above the medial epicondyle of the humerus. Laterally, it extends from a point just below the acromion to slightly above the lateral epicondyle. During application of the sleeve, minor correction in the alignment of the fragments can be carried out. The sleeve must allow a complete range of motion of the shoulder and elbow. The Velcro straps permit removal of the splint for personal hygiene and for adjustment of the compression of the soft tissues as the edema subsides.

A shoulder harness may be attached to the proximal portion of the splint and looped around the neck to pre-




FIG. 2-A          FIG. 2-B                              FIG. 2-C

Fig. 2-A: Roentgenogram of a transverse fracture of the middle third of the humerus in a fourteen-year-old boy. He was initially treated with a hanging cast for seven days.

Fig. 2-B: Anteroposterior roentgenogram of the humerus through the Orthoplast sleeve, made two weeks after the initial injury.

Anteroposterior and lateral roentgenograms demonstrating solid union and good alignment of the fragments.

When the acute pain and swelling subsided, the functional brace was applied. As our experience and confidence with this method increased, the brace was applied earlier after injury and presently most patients receive it within the first week of injury (Fig. 1). Originally Orthoplast (Johnson and Johnson) sleeves were molded individually. With experience a prefabricated polypropylene sleeve became the routine appliance we used. It is available in two sizes, and simple modifications can be made to accommodate any pa-

vent slippage of the sleeve downward. This is likely to occur in patients with large and flabby extremities.

Following the application of the custom-made or prefabricated sleeve, an arm sling was applied holding the elbow at 90 degrees of flexion. Patients were encouraged to do active and passive motion exercises for all joints of the fractured extremity. Extension of the elbow was gained gradually as the pain subsided. Within a few weeks nearly every patient could touch his face with his hand and activities of daily living could be performed with minimum difficulty. Approximately one week after the application of

598                A. SARMIENTO, P. B. KINMAN, E. G. GALVIN, R. H. SCHMITT, AND J. G. PHILLIPS

the sleeve, pendulum exercises with the elbow in extension were begun. Spontaneous correction of angulatory deformities was observed following the initiation of such exercises. When roentgenographic and clinical evidence of good callus formation was demonstrated, the splint was removed for periods of time.

### Case Material

We treated forty-nine patients with fifty-one humeral shaft fractures with the functional brace just described. Twenty-eight patients were male and twenty-one were fe-



of falls (56 per cent); eleven were gunshot wounds (22 per cent); and three were twisting injuries (4 per cent). Two fractures were pathological (metastatic carcinoma of the breast). One patient had been receiving chemotherapy at the time of the injury, and a non-union developed that required open reduction and internal fixation.

There were nine fractures of the proximal third of the humerus (18 per cent), twenty-six of the middle third (50 per cent), and sixteen of the distal third (32 per cent).

The initial method of immobilization was traction (6 per cent), a Velpeau bandage (6 per cent), a sugar-tong splint (42 per cent), or a hanging cast (46 per cent). The time of this stabilization ranged from four to ninety-seven



FIG. 3-A

Lateral and anteroposterior roentgenograms of a comminuted fracture of the distal third of the humerus.

FIG. 3-B

Roentgenograms of the humerus obtained through the Orthoplast functional sleeve ten days after the initial insult.

male. One patient had bilateral fracture and one had a second fracture below an already healed fracture. The ages of the patients ranged from fourteen to seventy-five years, with a median of thirty-eight years. Thirteen fractures were open and thirty-eight, closed. Twenty-seven fractures involved the left humerus and twenty-four, the right. The fractures occurred as a result of vehicular accidents in nine instances (18 per cent); twenty-eight were the result

days (average, eleven days). The arms remained in the sleeve until the fractures were clinically and roentgenographically healed. Healing was determined on the basis of absence of pain and motion at the fracture site and good callus formation as demonstrated roentgenographically (Figs. 2-A through 4-C). The time from injury to discontinuance of the sleeve ranged from three to 22.5 weeks, with a median of 8.5 weeks and a mode of seven weeks.



Fig. 4-A

Oblique angulated fracture of the proximal third of the humerus.



Fig. 3-C

Anteroposterior and lateral roentgenograms illustrating union of the fracture with maintenance of satisfactory alignment.



Fig. 4-B

Anteroposterior roentgenogram obtained through the Orthoplast sleeve two weeks after the initial insult. Note the correction of the angular deformity.

The only non-union occurred in a patient with metastatic carcinoma of the breast. Follow-up ranged from two to thirty months after removal of the sleeve. Minimum limitation of motion was detected at final examination — mostly a loss of the last few degrees of external rotation. All but nine of the patients had full elbow and shoulder motion at the time of removal of the sleeve. Those nine lacked 15 degrees or less of abduction or rotation of the shoulder. The average angulation of the fragments was 4 degrees, and the most common deformity was varus. Eight patients had 10 to 20 degrees of angular deformity. The remaining patients had less than 5 degrees of angulation. Six patients (12 per cent) had an associated initial radial-nerve palsy from which they recovered spontaneously.

Three patients (6 per cent) had associated vascular injuries. They were treated initially by débridement, vascular repair, and skeletal traction.

## Discussion

Our experience during the past thirteen years with functional bracing for treatment of fractures of long bones of the appendicular skeleton leads us to assert that rigid immobilization of fracture fragments, adjacent joints, or both is not a necessary prerequisite for fracture healing. It

600          A. SARMIENTO, P. B. KINMAN, E. G. GALVIN, R. H. SCHMITT, AND J. G. PHILLIPS



FIG. 4-C

Anteroposterior and lateral roentgenograms demonstrating solid union of the fracture with restoration of adequate alignment.

appears to us that the motion that inevitably takes place at the fracture site when a brace is used enhances fracture healing[21,23,27]. Firm compression of the soft tissues surrounding the fractured bone is applied by the rigid walls of the brace or sleeve and adequate alignment of the fragments is maintained with sufficient stability to permit uninterrupted osteogenesis[21,27,28]. Our own laboratory studies have also indicated that the functional activity which is maintained during the reparative process results in large periosteal callus of greater mechanical strength than the callus of similar fractures treated by restricting the activity of the extremity[30]. The bulkiness of the periosteal callus frequently found in fractures that heal in the presence of function does not interfere with joint motion and remodeling takes place in a consistently rapid fashion.

Others have shown that up to 30 per cent of angulation following a humeral fracture is cosmetically and functionally acceptable. The bulk of the muscle of the arm and the wide ranges of motion of the shoulder and elbow tend to hide the bone deformity[4,11-13,15]. The minimum rotatory deformities we found in our patients, although difficult to measure, did not result in limitation of pronation or supination of the forearm.

Just after the sleeve was applied, swelling of the arm distal to the sleeve was encountered on occasion, particularly in those patients who had the sleeve applied within a few days of the injury. In no instance, however, was the swelling a problem. The active and passive use of the extremity instituted shortly after the application of the sleeve seems to have resulted in gradual disappearance of the edema.

## References

1. CALDWELL, J. A.: Treatment of Fractures in the Cincinnati General Hospital. Ann. Surg., **97:** 161-176, 1933.
2. CALDWELL, J. A.: Treatment of Fractures of the Shaft of the Humerus by Hanging Cast. Surg., Gynec. and Obstet., **70:** 421-425, 1940.
3. CARTNER, M. J.: Immobilization of Fractures of the Shaft of the Humerus. Injury, **5:** 175-179, 1973.
4. CHARNLEY, JOHN: The Closed Treatment of Common Fractures. Ed. 3. Edinburgh and London, E. and S. Livingstone, 1968.
5. CHRISTENSEN, STEEN: Humeral Shaft Fractures, Operative and Conservative Treatment. Acta Chir. Scandinavica, **133:** 455-460, 1967.
6. COMFORT, T. H.: The Sugartong Splint in Humeral Shaft Fractures. Minnesota Med., **56:** 363-366, 1973.
7. EMMETT, J. E., and BRECK, L. W.: A Review and Analysis of 11,000 Fractures Seen in a Private Practice of Orthopaedic Surgery 1936-1956. J. Bone and Joint Surg., **40-A:** 1169-1175, Oct. 1958.
8. FENYÖ, GYÖRGY: On Fractures of the Shaft of the Humerus. A Review Covering a 12-year Period with Special Consideration of the Surgically Treated Cases. Acta Chir. Scandinavica, **137:** 221-226, 1971.
9. FISHER, D. E.: Nonunions of the Humeral Shaft. Minnesota Med., **55:** 395-403, 1972.
10. GILCHRIST, D. K.: A Stockinette-Velpeau for Immobilization of the Shoulder Girdle. J. Bone and Joint Surg., **49-A:** 750-751, June 1967.
11. HOLM, C. L.: Management of Humeral Shaft Fractures. Fundamental Nonoperative Technics. Clin. Orthop., **71:** 132-139, 1970.
12. HOSNER, W.: Fractures of the Shaft of the Humerus. An Analysis of 100 Consecutive Cases. Reconstr. Surg. Traumatol., **14:** 38-64, 1974.
13. JOHNSON, E. W., JR., and VESSER, H. H., JR.: Humeral Fractures in Adults. Am. Fam. Physician, **5:** 110-113, Jan. 1972.
14. KENNEDY, J. C., and WYATT, J. K.: An Evaluation of the Management of Fractures through the Middle Third of the Humerus. Canadian J. Surg., **1:** 26-33, 1957.
15. KLENERMAN, L.: Fractures of the Shaft of the Humerus. J. Bone and Joint Surg., **48-B:** 105-111, Feb. 1966.
16. MANN, R. J., and NEAL, E. G.: Fractures of the Shaft of the Humerus in Adults. Southern Med. J., **58:** 264-268, 1965.
17. MNAYMNEH, W. A.; SMITH-PETERSEN, MORTON; and AUFRANC, O. E.: The Treatment of Non-Union of Humeral-Shaft Fractures. *In* Proceedings of The American Academy of Orthopaedic Surgeons. J. Bone and Joint Surg., **45-A:** 1548-1549, Oct. 1963.
18. PENNSYLVANIA ORTHOPAEDIC SOCIETY, SCIENTIFIC RESEARCH COMMITTEE: Fresh Midshaft Fractures of the Humerus in Adults. Evaluation of Treatment in Pennsylvania during 1952-1956, made by the Scientific Research Committee, Pennsylvania Orthopaedic Society. Pennsylvania Med. J., **62:** 848-850, 1959.
19. RÜEDI, T.; MOSHFEGH, A.; PFEIFFER, K. M.; and ALLGOWER, M.: Fresh Fractures of the Shaft of the Humerus — Conservative or Operative Treatment? Reconstr. Surg. Traumatol., **14:** 65-74, 1974.
20. SARMIENTO, AUGUSTO: A Functional Below-the-Knee Cast for Tibial Fractures. J. Bone and Joint Surg., **49-A:** 855-875, July 1967.
21. SARMIENTO, AUGUSTO: A Functional Below-the-Knee Brace for Tibial Fractures. A Report on Its Use in One Hundred Thirty-five Cases. J. Bone and Joint Surg., **52-A:** 295-311, March 1970.
22. SARMIENTO, AUGUSTO: Functional Bracing of Tibial and Femoral Shaft Fractures. Clin. Orthop., **82:** 2-13, 1972.
23. SARMIENTO, AUGUSTO: Functional Bracing of Tibial Fractures. Clin. Orthop., **105:** 202-219, 1974.
24. SARMIENTO, AUGUSTO, and SINCLAIR, W. F.: Application of Prosthetics-Orthotics Principles to Treatment of Fractures. Artif. Limbs, **11:** 28-32, Autumn 1967.
25. SARMIENTO, AUGUSTO, and SINCLAIR, W. F.: Fracture Orthoses. *In* Atlas of Orthotics: Biomechanical Principles and Applications, pp. 245-254. The American Academy of Orthotics Surgeons. St. Louis, C. V. Mosby, 1975.
26. SARMIENTO, AUGUSTO; COOPER, J. S.; and SINCLAIR, W. F.: Forearm Fractures. Early Functional Bracing — A Preliminary Report. J. Bone and Joint Surg., **57-A:** 297-304, April 1975.
27. SARMIENTO, AUGUSTO; LATTA, LOREN; and SINCLAIR, W. F.: Functional Bracing of Fractures. *In* Instructional Course Lectures, The American Academy of Orthopaedic Surgeons. Vol. 25, pp. 184-239. St. Louis, C. V. Mosby, 1976.

FUNCTIONAL BRACING OF FRACTURES OF THE SHAFT OF THE HUMERUS                    601

28. SARMIENTO, AUGUSTO; LATTA, LOREN; ZILIOLI, ARMAND; and SINCLAIR, WILLIAM: The Role of Soft Tissues in the Stabilization of Tibial Fractures. Clin. Orthop., **105:** 116-129, 1974.
29. SARMIENTO, AUGUSTO; PRATT, G. W.; BERRY, N. C.; and SINCLAIR, W. F.: Colles' Fractures. Functional Bracing in Supination. J. Bone and Joint Surg., **57-A:** 311-317, April 1975.
30. SARMIENTO, AUGUSTO; SCHAEFFER, J. F.; BECKERMAN, LINDA; LATTA, L. L.; and ENIS, J. E.: Fracture Healing in Rat Femora as Affected by Functional Weight-Bearing. J. Bone and Joint Surg., **59-A:** 369-375, April 1977.
31. STEWART, M. J.: Fractures of the Humeral Shaft. Curr. Pract. Orthop. Surg., **2:** 140-162, 1964.
32. STEWART, M. J., and HUNDLEY, J. M.: Fractures of the Humerus. A Comparative Study in Methods of Treatment. J. Bone and Joint Surg., **37-A:** 681-692, July 1955.
33. THOMPSON, R. G.; COMPERE, E. L.; SCHNUTE, W. J.; COMPERE, C. L.; KERNAHAN, W. T.; and KEAGY, R. D.: The Treatment of Humeral Shaft Fractures by the Hanging Cast Method. J. Internat. Coll. Surg., **43:** 52-60, 1975.