**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF OREGON**

**PORTLAND DIVISION**

| | |
|---|---|
| Cyrus Andrew Sullivan, | No. 3:19-cv-00995-JGZ |
| Plaintiff, | |
| v. | **ORDER** |
| Multnomah County, et al., | |
| Defendants. | |

Plaintiff Cyrus Andrew Sullivan brought this action pursuant to 42 U.S.C. § 1983 and Oregon state law. Pending before the Court is Defendants' Motion for Summary Judgment, which Plaintiff opposes.[1] (Docs. 40, 48.)[2]

I.      **Background**

In his First Amended Complaint, Plaintiff alleged (1) a § 1983 claim of unconstitutional treatment relating to his medical needs against Defendants Multnomah County, Multnomah County Sheriff's Office (MCSO), the Multnomah County Health Department, and individual Defendants Brook Holter, Michael Seale, and Angelina Platas; (2) a § 1983 excessive force claim against Defendants Multnomah County, MCSO, Sherriff Mike Reese, Timothy Barker, Matthew Ingram, Phillip Hubert, Paul Simpson, David Kovachevich, Timothy Moore, Gary Glaze, and Kurtiss Morrison; (3) state law assault and

---

[1] The Court provided notice to Plaintiff regarding the requirements of a response (Doc. 47). *See Rand v. Rowland*, 154 F.3d 952, 962 (9th Cir. 1998) (en banc).

[2] After review of the briefing, the Court finds that the decisional process will not be aided by oral argument. *See* LR 7-1(d).

battery claims against Multnomah County, MCSO, Reese, Timothy Barker, Ingram, Hubert, Simpson, Kovachevich, Moore, Glaze, and Morrison; (4) state law medical negligence claims against Defendants Multnomah County, MCSO, Reese, Timothy Barker, Ingram, Wendy Muth, Hubert, Simpson, Uwe Pemberton, Moore, Glaze, Morrison, Kovachevich, Erica Barker, and Holter; and (5) state law defamation claims against Defendants Multnomah County, MCSO, Reese, Timothy Barker, Ingram, Muth, Hubert, Simpson, Pemberton, Moore, Glaze, Morrison, Kovachevich, Erica Barker, and Holter. (Doc. 38 at 1, 31-32, 40, 44.)

Defendants seek summary judgment arguing they are entitled to qualified immunity as to the § 1983 claims, there is no evidence supporting a *Monell* theory against Multnomah County for excessive force or inadequate medical care, and, with regard to the state law claims, the officers' conduct was justified under Oregon law, the County's medical care met the standard of care, and a defamation suit is barred by the statute of limitations and because any statements made in furtherance of public duties are absolutely privileged.

**II.    Summary Judgment Standard**

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323.

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything. *Nissan Fire & Marine Ins. Co.*, *Ltd. v. Fritz Co.*, *Inc.*, 210 F.3d 1099, 1102-03 (9th Cir. 2000). But if the movant meets its initial responsibility, the burden shifts to the nonmovant to demonstrate the existence of a factual dispute and that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 248, 250

(1986); *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). The nonmovant need not establish a material issue of fact conclusively in its favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968); however, it must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal citation omitted); *see* Fed. R. Civ. P. 56(c)(1).

At summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. In its analysis, the court must believe the nonmovant's evidence and draw all inferences in the nonmovant's favor. *Id.* at 255. The court need consider only the cited materials, but it may consider any other materials in the record. Fed. R. Civ. P. 56(c)(3).

### III.   Applicable Legal Standard for § 1983 Claims

As a preliminary matter, Defendants assert that Plaintiff's § 1983 claims are properly analyzed under the Eighth Amendment. In *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015), the Supreme Court determined that the Fourteenth Amendment's Due Process Clause, and not the Eighth Amendment, applies to the use of excessive force against pretrial detainees. The Ninth Circuit has extended the holding in *Kingsley* to analysis of § 1983 medical care claims asserted by pre-trial detainees and § 1983 claims based on failure to protect, asserted by pre-trial detainees. *See Castro v. Cnty. of Los Angeles*, 833 F. 3d 1060, 1069 (9th Cir. 2016) (failure to protect); *Gordon v. Cnty. of Orange*, 888 F.3d 1118, 1124–25 (9th Cir. 2018) (medical care).

At the time of the incidents giving rise to Plaintiff's claims, Plaintiff was in the custody of the MCSO on a United States Marshal's hold associated with a probation or supervised release violation. (Doc. 41 ¶ 5.) Defendants assert that the Eighth Amendment analysis should apply to Plaintiff's § 1983 claims because Plaintiff was a convicted prisoner. In Response, Plaintiff argues that the Fourteenth Amendment should apply because he was not sentenced on his supervised release violation until July 7, 2017. (Doc. 48 at 2.)

Although there are some conflicting opinions, the majority of courts within the Ninth

Circuit that have addressed this issue have found that the Fourteenth Amendment's analysis applies to a person detained on a suspected probation or supervised released violation, and the only Ninth Circuit case to address the issue (pre-*Kingsley*) applied the Fourteenth Amendment. *See Ressy v. King Cnty.*, 520 Fed. App'x 554, 554-55 (9th Cir. May 22, 2013); *Rosenblum v. Blackstone*, No. SA CV 18-966-JVS(E), 2020 WL 1049916, at *10 (C.D. Cal. Jan. 22, 2020) (citing cases discussing whether Fourteenth Amendment or Eighth Amendment should apply to claims regarding jail conditions when person was incarcerated due to ongoing probation violation proceedings); *Davies v. Espinda*, No. CV 20-00174 DKW-RT, 2020 WL 4340939, at *2 (D. Haw. July 28, 2020) ("Because Plaintiff is awaiting a decision on the revocation of probation, the Court reviews his claims under the Fourteenth rather than the Eighth Amendment."); *McCamey v. Am. Behav. Health Sys. Inc.*, No. 219CV00812RBLJRC, 2020 WL 3848051, at *3 (W.D. Wash. May 20, 2020) ("it would appear that plaintiff's claims fall under the more protective, Fourteenth Amendment standard since at the time, plaintiff was not incarcerated but was under supervised release."), *report and recommendation adopted,* No. 219CV00812RBLJRC, 2020 WL 3839636 (W.D. Wash. July 8, 2020).

Indeed, as a practical matter, Plaintiff was detained while awaiting a resolution of a petition to revoke supervised release; he was not automatically guilty of the supervised released violation and is thus properly treated as a pretrial detainee. For the foregoing reasons, the Court will apply the Fourteenth Amendment standards when analyzing Plaintiff's § 1983 claims.

## IV.   Excessive Force and Failure to Protect

Defendants assert that they are entitled to summary judgment on Plaintiff's excessive force and failure to protect claims because there is no evidence supporting Plaintiff's *Monell* theory and the individual Defendants are entitled to qualified immunity.

//

//

### A.    Facts[3]

Prior to his incarceration, Plaintiff maintained a website that exposed "law enforcement activities that have a negative impact on people." (Doc. 38. at 1.) Plaintiff asserts that during his incarceration and prior to June 28, 2017, Plaintiff had several interactions with jail and/or prison staff, which resulted in disciplinary charges based on partially true and partially false information. (*Id.* at 4-6.)

On June 28, 2017 at 8:30 p.m., Multnomah County Sheriff's Deputy Pemberton requested that Plaintiff report to medical to take his medication. (*Id.* at 8.) While at medical, Medical Technician Erica Barker was handing out medication. (*Id.*) Another inmate handed Plaintiff a Gatorade packet to add to his water, and Barker demanded that Plaintiff give her the Gatorade, but Plaintiff refused the order and mixed the Gatorade with water and drank it anyway. (*Id.*; Doc. 44 ¶¶ 3-4.) Pursuant to MCSO policy, failure to follow an order is a major violation subject to discipline, and an inmate charged with a major rule violation can be moved out of their dorm to the disciplinary housing unit on the fourth floor pending hearing. (Doc. 44 ¶ 8; Doc. 41 at 23-24.)

Defendant Pemberton then ordered Plaintiff to report to sally port, but Plaintiff instead went to his cell on the fifth floor to dispose of contraband. (Doc. 38 at 8; Doc. 44 ¶ 7.) As he left, Plaintiff told Barker that he would be posting information about her on his website and told Pemberton "fuck you, come get me." (Doc. 38 at 8-9; Doc. 44 ¶¶ 7-8.) Pemberton radioed for assistance and Sergeants Tim Barker and Ingram and Deputies Simpson, Hubert, and Muth, and (non-Defendant) Deputy Dilger responded to Pemberton's request for assistance. (Doc. 44 ¶ 8.)

Once in his cell, Plaintiff flushed the contraband down the toilet and saw a group of guards approaching his cell. (Doc. 38 at 9.) Simpson and Hubert arrived first and ordered Plaintiff to gather his belongings and come to the door to be handcuffed through the food port. (Doc. 45 ¶¶ 3-5.) Plaintiff told them to "fuck off." (Doc. 38 at 9; Doc. 45 ¶ 5.) Plaintiff

---

[3] While some of the Parties' stated facts differ slightly, the Court only sets forth disputes of *material* fact and the facts included are materially undisputed unless otherwise noted.

then started looking around for something to throw at the guards when they entered. (Doc. 38 at 9.) Plaintiff found a bag of Cactus Annie's Scorchin Chips and began to eat as many as he could before the guards entered. (*Id.*)

Ingram arrived next and tried to establish a rapport and give Plaintiff options for moving voluntarily, but Plaintiff continued to decline. (Doc. 43 ¶¶ 4-5.) Barker told Plaintiff to turn away from the door and place his hands behind his back to show compliance and ordered the deputies out of Plaintiff's direct line of sight in an effort to minimize risks of entering the cell. (Doc. 42 ¶ 7; Doc. 43 ¶ 8.) Barker and Ingram also made sure that Simpson had a Taser ready in case Plaintiff further resisted and was able to get out of the cell unrestrained. (Doc. 42 ¶¶ 7-8; Doc. 43 ¶¶ 7-9; Doc. 45 ¶ 6.) Plaintiff told the guards he did not deserve to go to disciplinary, threatened to post information about MCSO Deputies Hubert, Simpson, and Ingram on his website, and told the Deputies to "leave." (Doc. 38 at 9.) Simpson then pulled out his Taser and debated with others, including Barker and Muth, whether to use it. (*Id.*) Barker told Plaintiff that deputies were entering the cell to handcuff him and Plaintiff responded with a nod. (Doc. 42 ¶ 5.)

Pemberton then remotely opened Plaintiff's cell door from the officer station. (Doc. 44 ¶ 10.) Ingram moved into the cell first, with Barker behind him and Muth, Hubert, and Simpson standing outside the cell. (Doc. 42 ¶¶ 7-9; Doc. 45 ¶ 6; Doc. 43 ¶ 9.) When Ingram entered the cell, Plaintiff turned and threw a red, powdered substance[4] into Ingram's face. (Doc. 43 ¶ 9; Doc. 42 ¶ 9; Doc. 45 ¶ 7; Doc. 44 ¶ 10.) Plaintiff asserts that when the deputies entered the cell, Plaintiff grabbed the biggest handful of chips that he could and threw it into Defendant Ingram's face. (Doc. 38 at 9.) Plaintiff asserts that Ingram then struck Plaintiff in the face, and when Plaintiff turned away and grabbed the bunk, the other guards slammed into Plaintiff, punched him several times, and cuffed him behind his back, while Plaintiff verbally claimed he was cooperating. (*Id.*)

Defendants assert that Ingram blocked Plaintiff's punch, spun him, and grabbed for

---

[4] Plaintiff appears to dispute the consistency of the chips he threw, but this dispute is immaterial to the resolution of the Motion before the Court.

Plaintiff's right arm while Tim Barker grabbed for Plaintiff's left arm, both men pushing Plaintiff against the low counter to the right side of the cell. (Doc. 43 ¶ 11; Doc. 42 ¶ 11.) Defendants assert that Plaintiff struggled violently, kicking back at Ingram and pulling both his arms away while ignoring repeated directions to stop resisting. (Doc. 43 ¶ 11; Doc. 42 ¶ 11.) Defendants assert that Simpson, Muth, and Hubert moved to grab Plaintiff's legs, while Plaintiff continued to resist, pulling Ingram's right arm down underneath Plaintiff's body and pinning it against the counter. (Doc. 43 ¶ 11; Doc. 45 ¶¶ 7-8; Doc. 42 ¶¶ 11-12.) Defendants assert that Ingram was able to free Plaintiff's right arm and to pull his own arm out, ordered Plaintiff to put his arm behind his back, and was ultimately able to pull Plaintiff's right arm behind him to the small of Plaintiff's back and handcuff his right wrist. (Doc. 43 ¶ 12.)

Defendants assert that while this was going on, Plaintiff struck back at Sergeant Barker with his left elbow and, once Barker got a firm grasp on Plaintiff's left arm, Plaintiff continuously strained against Barker's attempt to pull Plaintiff's arm back for cuffing. (Doc. 42 ¶ 12; Doc. 43 ¶13.) Defendants assert that during this struggle, Barker and Ingram heard a popping sound as Barker was trying to pull Plaintiff's left arm back against Plaintiff's violent resistance, though neither initially perceived Plaintiff reacting as if he had been injured. (Doc. 42 ¶ 12; Doc. 43 ¶14.) Defendants assert that after hearing the popping sound, Barker was immediately able to pull Plaintiff's arm behind his back and secure it. (Doc. 42 ¶ 12; Doc. 43 ¶14.)

As the deputies attempted to remove Plaintiff from his cell, Plaintiff deliberately "went limp" to force Ingram and Barker to carry him; Plaintiff states that he did this "as punishment." (Doc. 38 at 10; Doc. 42 ¶ 13; Doc. 43 ¶¶15-16; Doc. 44 ¶¶11-12; Doc. 45 ¶ 9.) Plaintiff asserts that when he began to get a wedgie, he stopped going "limp," but the officers continued to give Plaintiff wedgies and pushed Plaintiff's head down and verbally insulted him as they brought him to a different cell on the fourth floor. (Doc. 38 at 10.) Defendants assert that once the three reached Plaintiff's assigned cell, Sergeants Barker and Ingram walked Plaintiff into the cell and lowered him, face down onto the mattress in the middle of

his cell. (Doc. 43 ¶ 17.)

Plaintiff asserts that once in the cell, he was placed face down on the mattress and Ingram kneeled on Plaintiff's upper back while Barker got on the top of Plaintiff's middle and lower back, and Plaintiff could barely breathe and stated that he could not breathe. (Doc. 38 at 10.) Plaintiff asserts that Ingram said "if you couldn't breathe, you couldn't talk," and shoved Plaintiff's face into the mattress. (*Id.*) Plaintiff asserts that Kovachevich, Moore, and Hubert were also present. (*Id.* at 30.) Plaintiff asserts that the deputies then cut Plaintiff's clothes off and removed his handcuffs. (*Id.*)[5]

Defendants assert that Sergeant Ingram was concerned that taking handcuffs off and leaving Plaintiff's arms unsecured during this visual strip search and dressing in would create a safety risk. (Doc. 43 ¶ 19.) Defendants assert that Sergeant Ingram decided to cut Plaintiff's clothing off his body, visually strip search him while Plaintiff remained handcuffed, and remove the handcuffs at the last moment before the sergeants left the cell for Plaintiff to get dressed. (*Id.*) Defendants assert that while waiting for the clothes cutters and a white jumpsuit, Plaintiff said that he could not breathe. (*Id.* at ¶ 20.) Defendants assert that Sergeant Ingram rolled Plaintiff slightly to his right side to check on him. (*Id.*) Defendants assert that Plaintiff appeared to be inhaling and exhaling without effort while raising his voice at the deputies. (*Id.*) Defendants assert that they told Plaintiff their plan, and were able to cut the clothing without incident. (*Id.*)

The Parties' version of what happened next is largely disputed so the Court will set forth the remainder of events from each Parties' asserted facts.

//

//

---

[5] All inmates on level three disciplinary status or higher are subject to a strip search before celling into their new dormitory cell, as inmates of this status generally have exhibited behavior suggesting a heightened threat to safety of staff or other inmates, and staff use the visual-only search to ensure the inmate has not secreted contraband to the new cell. (Doc. 43 ¶ 18.) Level 3 and above inmates also wear a white jumpsuit as their jail-issued clothing, which is different than the clothing Plaintiff was wearing. (*Id.*)

1.    **Plaintiff's Version**[6]

Plaintiff was ordered to put his right hand under his stomach, but he could not because he could not lift his body and Barker then grabbed Plaintiff's left arm, pulling it away from his body, and kept pulling, even after the arm snapped. (Doc. 38 at 11.) Ingram then shoved Plaintiff's head down one last time. (*Id.*) After the deputies left, Plaintiff could not move his left arm and Plaintiff lay there in shock until Ingram returned with a nurse, who determined Plaintiff's arm was broken; Plaintiff was then transported to the hospital. (*Id.*)

At the hospital, Plaintiff was diagnosed with a left humerus fracture, his arm was placed in a sling, he was prescribed oxycodone for pain, and was told to return for follow-up in one week. (*Id.* at 11.) The doctor also recommended that Plaintiff be given a sarmiento brace after one week, which would have been less painful than a sling. (*Id.* at 15.)

Pemberton then wrote Plaintiff up for failure to do as ordered, disruptive behavior, and threatening staff, and Ingram wrote Plaintiff up for physically assaulting staff and possessing contraband and converting a food item into a weapon to throw at staff. (*Id.*) Plaintiff "got six days in the hole." (*Id.* at 12.) Plaintiff was later questioned about the incident by a detective, but Defendants lied to the detective about what happened. (*Id.* at 12, 16-17.)

2.    **Defendants' Version**

After giving the visual strip search to ensure Plaintiff did not have any contraband anywhere under his clothing, staff told Plaintiff they would be removing Plaintiff's handcuffs. (Doc. 43 ¶ 18.) Plaintiff told deputies he understood, and Sergeant Barker stepped in to remove the handcuffs. (*Id.* ¶ 20.) Barker removed the right cuff first, telling Plaintiff to put his right hand under Plaintiff's body while Barker uncuffed Plaintiff's left wrist. (Doc. 42 ¶ 15.) After Plaintiff did not move his right arm, Barker rolled Plaintiff a few inches to

---

[6] Plaintiff's version of events is mostly based on the facts alleged in his First Amended Complaint. (Doc. 38.) "[A] verified complaint may be treated as an affidavit to oppose summary judgment[.]" *See Keenan v. Hall*, 83 F.3d 1083, 1090 n.1 (9th Cir. 1996); *Jones v. Blanas*, 393 F.3d 918, 923 (9th Cir. 2004) (Where the nonmovant is a pro se litigant, the Court must consider as evidence in opposition to summary judgment all the nonmovant's contentions set forth in a verified complaint or motion.).

the left, physically placing Plaintiff's right arm underneath Plaintiff's body, and rolled Plaintiff back onto his belly. (*Id.*) Barker then removed Plaintiff's left cuff and told Plaintiff to place his left arm under his body, and Plaintiff said that he could not move his left arm, and he believed his left arm was broken. (Doc. 42 ¶ 16; Doc. 43 ¶ 21.) After Plaintiff said he thought his arm was broken, deputies immediately called for medical help, helped him to a seated position, and covered him with a jumpsuit and a sheet to keep him warm while waiting for medical staff to arrive. (Doc. 42 ¶ 16; Doc. 43 ¶ 21.) Jail medical staff checked Plaintiff, and Ingram arranged for an ambulance when medical personnel determined Plaintiff needed hospital attention. (Doc. 43 ¶ 21.)

A federal grand jury later returned a five-count indictment associated with the June 28, 2017 incident, and the United States filed a superseding information charging Plaintiff with one count of assaulting Sergeant Barker, identified as "T.B.," a Multnomah County Sheriff's Officer assisting the United States Marshal, in violation of 18 U.S.C. §111(a)(1). (*United States v. Cyrus Sullivan*, District of Oregon Case No 3:17-CR-00306-JGZ, Docs.1, 118.) Plaintiff submitted a petition to enter a guilty plea affirmatively representing that "On June 28th, 2017, I assaulted a federal officer, and in so doing made physical contact with that officer." (*Id.* at Doc. 122.) The Court accepted the plea, entered judgment, and imposed sentence on the count charged in the information. (*Id.* at Doc. 128.)

## B.  Legal Standard

Under the Fourteenth Amendment, force is considered excessive if the officers' use of force was "objectively unreasonable" in light of the facts and circumstances confronting them, without regard to their mental state. *Kingsley*, 576 U.S. at 397 "[O]bjective reasonableness turns on the facts and circumstances of each particular case." *Id.* (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). The reasonableness of a particular use of force must be made "from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." *Id.*

> In determining whether the use of force was reasonable, a court should consider factors including, but not limited to: the relationship between the need for the use of force and the amount

of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.

*Id.*

*Kingsley* also applies to claims that certain officers failed to intervene to protect Plaintiff from the force used by other officers. *Castro*, 833 F. 3d at 1069. To prove that Defendant officers failed to intervene to protect him from the force used by other officers, Plaintiff must show that the decision not to intervene was intentional and that there were reasonable and available measures that the officers did not take that caused the injury that Plaintiff suffered. *Id.* Negligent actions or omissions by the Defendant officers are not actionable under § 1983. *Id.* Plaintiff must show that it was objectively unreasonable for the officers not to intervene.  (*Id.*)

### C.   Discussion

#### 1.   Claims Relating to Force Used on the Fifth Floor

Plaintiff alleges that while he was repeatedly refusing to comply with Defendants' orders and after he threw chips in Defendant Ingram's face, Ingram punched Plaintiff in the face and "other guards slammed and punched him several times." Plaintiff further alleges that as the deputies attempted to remove Plaintiff from his cell, Plaintiff deliberately "went limp" to force Ingram and Barker to carry him, but even after he stopped "going limp," Ingram and Barker continued to give Plaintiff "wedgies."

With regard to the alleged force used on the fifth floor, each instance of force was in response to Plaintiff's admitted non-compliance, Plaintiff does not allege that he sustained any lasting injuries from these events, Plaintiff was posing a security problem as he was deliberately and repeatedly disobeying orders, and the officers were responding to the threat that Plaintiff posed. None of the instances of force alleged with regard to the fifth floor suggest that the force used was extreme or that the force used was unreasonable in light of Plaintiff's actions. Accordingly, summary judgment will be granted in favor of Defendants as to Plaintiff's claims regarding excessive force on the fifth floor.

### 2.    Claims Relating to Force Used on the Fourth Floor

Plaintiff claims that once in the cell on the fourth floor, he was placed face down on the mattress and Ingram kneeled on Plaintiff's upper back while Barker got on top of Plaintiff's middle and lower back, and Plaintiff could barely breathe and stated that he could not breathe, but Ingram said "if you couldn't breathe, you couldn't talk," and shoved Plaintiff's face into the mattress. Plaintiff asserts that the deputies then cut Plaintiff's clothes off and removed his handcuffs. (*Id.*) Plaintiff was ordered to put his right hand under his stomach, but he could not because he could not lift his body and Barker then grabbed Plaintiff's left arm, pulling it away from his body, and kept pulling, even after the arm snapped, and Ingram then shoved Plaintiff's head down one last time before exiting the cell.

### (a)    The Strip Search

Plaintiff appears to assert that officers' actions of cutting off his clothes without first ordering him to take his clothes off constituted excessive force. Plaintiff, however, does not allege any facts suggesting anything about cutting Plaintiff's clothes off was excessive or constituted force, and Defendants were reasonably concerned at that point that Plaintiff was repeatedly not complying with orders and that allowing Plaintiff room to remove his own clothes could pose a threat. Accordingly, to the extent the strip search is part of Plaintiff's excessive force claim, summary judgment will be granted in favor of Defendants as to that claim.

### (b)    Use of Force by Defendants Ingram and Barker

Defendants Ingram and Barker, citing their version of events,[7] state that the force used on the fourth floor was necessary to keep Plaintiff on his stomach while removing handcuffs to minimize the risk of another assault and because Plaintiff was refusing to comply with directions. The Court must accept Plaintiff's version of events as true, however, when ruling on the Motion for Summary Judgment.

---

[7] In their Reply in support of their Motion for Summary Judgment, Defendants concede that there are disputed issues of material fact precluding summary judgment in favor of Defendant Barker. (Doc. 49 at 6-10.)

### (1)    The Relationship Between the Need for the Use of Force and the Amount of Force Used;

Plaintiff alleges that Defendant Ingram refused to take his weight off Plaintiff when Plaintiff stated that he could not breathe while Ingram was kneeling on top of him, Ingram and Barker ordered Plaintiff to move his arms from under his body, which he could not do because he was being crushed into the mattress, Barker gratuitously broke Plaintiff's arm while removing the handcuffs, and Ingram gratuitously pushed Plaintiff's head before exiting the cell. If a jury were to believe Plaintiff's version of events, they could find that there was no need for any of these alleged uses of force. This factor favors Plaintiff.

### (2)    The Extent of Plaintiff's Injury;

Plaintiff sustained a serious injury of a left humerus fracture. Although Defendants appear to contend that Plaintiff's humerus was broken during the original handcuffing of Plaintiff, this is a disputed issue of material fact. This factor favors Plaintiff.

### (3)    Any Effort Made by the Officer to Temper or to Limit the Amount of Force;

According to Plaintiff's version of events, the force used was gratuitous and unnecessary. This factor favors Plaintiff.

### (4)    The Severity of the Security Problem a Issue;

At the time Ingram and Barker allegedly used force in the fourth floor cell, Plaintiff was handcuffed, lying face down on a mattress, and surrounded by officers. Although Plaintiff's actions leading up to this point were a severe security issue as Plaintiff repeatedly ignored the officers' orders, a jury could find that while Plaintiff was lying on the mattress on the fourth floor surrounded by officers, the severity of the security problem had largely abated. Accordingly, this factor slightly favors Plaintiff.

//

//

//

**(5)** **The Threat Reasonably Perceived by the Officer and Whether Plaintiff was Actively Resisting**

Under Plaintiff's version of events, Plaintiff posed no threat at the time and was attempting to comply with the officer's orders. These factors favor Plaintiff.

**(6)** **Disputed Issues of Fact**

Accordingly, the Court concludes there are disputed issues of material fact that must be resolved by a jury on Plaintiff's excessive force claims alleged against Defendants Timothy Barker and Ingram based on the force used on the fourth floor.

**(c)** **Qualified Immunity**

Defendants Ingram and Barker assert that they are entitled to qualified immunity on Plaintiff's excessive force claim because the force used was "taken in the face of an immediate threat to safety and security of a maximum security jail, and without evidence of subjective intent to harm as opposed to a good faith effort to restore order in the facility." (Doc. 40 at 21.)

A defendant in a § 1983 action is entitled to qualified immunity from damages for civil liability if his conduct does not violate clearly established federal statutory or constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

The qualified immunity inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Saucier v. Katz*, 533 U.S. 194, 201 (2001). The plaintiff has the burden to show that the right was clearly established at the time of the alleged violation. *Sorrels v. McKee*, 290 F.3d 965, 969 (9th Cir. 2002); *Romero v. Kitsap Cnty.*, 931 F.2d 624, 627 (9th Cir. 1991). For qualified immunity purposes, "the contours of the right must be sufficiently clear that at the time the allegedly unlawful act is [under]taken, a reasonable official would understand that what he is doing violates that right" and "in the light of pre-existing law the unlawfulness must be apparent." *Mendoza v. Block*, 27 F.3d 1357, 1361 (9th Cir. 1994) (quotations omitted). Therefore, regardless of whether the constitutional violation occurred, the officer should prevail if the right asserted by the

1  plaintiff was not "clearly established" or the officer could have reasonably believed that his

2  particular conduct was lawful. *Romero*, 931 F.2d at 627.

3     As noted, there are disputed issues of material fact as to whether Barker and Ingram

4  violated Plaintiff's Fourteenth Amendment right to be free from excessive force. As

5  discussed above, a reasonable jury could find that this force went beyond what was necessary

6  to maintain order in the situation. Even under the more stringent Eighth Amendment

7  standard, the law is clearly established that an officer cannot use force solely to cause harm

8  maliciously and sadistically. Here, Plaintiff presents facts from which a jury could conclude

9  that Barker and Ingram's use of force was gratuitous and went beyond what was necessary

10 to gain compliance with the officers' orders and was inflicted to cause harm maliciously and

11 sadistically. The Court may not decide qualified immunity based on Defendants' version of

12 the facts.  *See, e.g.*, *Wilkins v. City of Oakland*, 350 F.3d 949, 956 (9th Cir. 2003) ("[w]here

13 the officers' entitlement to qualified immunity depends on the resolution of disputed issues

14 of fact in their favor, and against the non-moving party, summary judgment is not

15 appropriate"); *Lolli v. Cnty. of Orange*, 351 F.3d 410, 421 (9th Cir. 2003).

16    Moreover, at the time of the altercation, it was clearly established that a gratuitous

17 "unprovoked and unjustified" attack by a prison guard violates a prisoner's clearly

18 established rights. *See, e.g., Lolli*, 351 F.3d at 421.

19    Accordingly, Barker and Ingram are not entitled to qualified immunity at this time

20 and the Motion for Summary Judgment will be denied as to Plaintiff's claims that Barker

21 and Ingram used excessive force on the fourth floor.

**(d)    Failure to Protect**

23    Plaintiff asserts that Defendants Kovchevich, Moore, and Hubert were also present

24 during the force used by Barker and Ingram on the fourth floor.  Plaintiff does not make any

25 specific allegations about these Defendants' actions and does not allege that these

26 Defendants could have taken reasonable and available measures to prevent the force used by

27 Ingram and Barker. Rather, it appears that the alleged force happened quickly, and there is

28 no evidence that Kovachevich, Moore, and Hubert had a chance to intervene, and failed to

intervene. Accordingly, summary judgment will be granted in favor of Kovchevich, Moore, and Hubert to the extent Plaintiff alleges these Defendants failed to protect him from the force used by Ingram and Barker on the fourth floor.

### (e)    Excessive Force *Monell* Claim against Multnomah County, Reese, Glaze, and Morrison

Plaintiff alleges that, in addition to the individual officers who subjected him to excessive force, Multnomah County is liable for "failing to properly train or supervise deputies and nurturing a deviant culture that has existed at the MCSO and MCDC for many years." (Doc. 38 at 31.) Plaintiff also named the MCSO, Multnomah County Sheriff Mike Reese, and two prison officials who conducted use of force reviews, Glaze and Morrison, as defendants in this failure to train claim.

To prevail on a *Monell* claim, Plaintiff must demonstrate that (1) he was deprived of a constitutional right; (2) the municipality had a policy or custom; (3) the policy or custom amounted to deliberate indifference to Plaintiff's constitutional right; and (4) the policy or custom was the moving force behind the constitutional violation. *Mabe v. San Bernardino Cnty., Dep't of Pub. Soc. Servs.*, 237 F.3d 1101, 1110-11 (9th Cir. 2001).

"Policies of omission regarding the supervision of employees . . . can be policies or customs that create . . . liability . . . , but only if the omission reflects a deliberate or conscious choice to countenance the possibility of a constitutional violation." *See Gibson v. Cnty. of Washoe*, 290 F.3d 1175, 1194 (9th Cir. 2002) (quotations omitted).

A "decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983." *Connick v. Thompson*, 563 U.S. 51, 60 (2011). To support a *Monell* claim for failure to train under § 1983, a plaintiff must allege facts demonstrating that the entity's failure to train amounts to "deliberate indifference to the rights of persons with whom the [untrained employees] come into contact." *Connick*, 563 U.S. at 61 (citing *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)).

Deliberate indifference may be shown if there are facts to support that "in light of the duties assigned to specific officers or employees, the need for more or different training is obvious, and the inadequacy so likely to result in violations of constitutional rights, that the policy-makers . . . can reasonably be said to have been deliberately indifferent to the need." *Clement v. Gomez*, 298 F.3d 898, 905 (9th Cir. 2002) (citing *Canton*, 489 U.S. at 390).

Multnomah County may not be sued under § 1983 solely because an injury was allegedly inflicted by one of its employees. *Long v. Cnty. of Los Angeles*, 442 F.3d 1178, 1186 (9th Cir. 2006). Instead, a local government entity may be held liable only when execution of its policy or custom inflicts the injury. *Id.* (citing *Monell v. Dep't of Soc. Servs. of New York*, 436 U.S. 658, 690–94 (1978)). Here, Plaintiff acknowledges that Multnomah County's written use of force policies are not unconstitutional. Rather, Plaintiff alleges that Multnomah County failed to properly train its officers, resulting in the use of excessive force against Plaintiff.

To support his contention that Multnomah County and Sheriff Reese "nurtur[ed] a deviant culture" of routine excessive force violations, Plaintiff points to allegations from sixteen prior actions filed in the District of Oregon between 2004 and 2016. None of those suits resulted in liability for excessive force or deliberate indifference on the part of Multnomah County or any employee. One case, arising out of an employment dispute, resulted in a verdict for the plaintiff. *Traxler v. Multnomah Cnty.*, No. 3:06-CV-1450-KI, 2008 WL 2704445 (D. Or. July 1, 2008), *aff'd*, 596 F.3d 1007 (9th Cir. 2010) (jury verdict for plaintiff on FMLA claim). The other fifteen were dismissed or settled.[8]

---

[8] *See Montoya v. Giusto*, No. 3:02-CV-00446-JE, 2004 WL 3030104 (D. Or. Nov. 24, 2004) (defendant's motion for summary judgment granted); *Anthony v. Cnty. of Multnomah*, No. 3:04-CV-00229-MO, 2006 WL 278193 (D. Or. Feb. 3, 2006) (defendant's motion for summary judgment granted); *Hall v. Multnomah Cnty.*, No. 3:04-CV-00921-JE, 2006 WL 1030175 (D. Or. Apr. 17, 2006) (defendant's motion to dismiss granted); *Hurt v. Multnomah Cnty.*, No. 3:06-CV-01024-PK, ECF Doc. 21 (D. Or. Sept. 25, 2006) (dismissed for failure to file a complaint); *Lucke v. Multnomah Cnty.*, 365 F. App'x 793 (9th Cir. 2010) (district court properly dismissed employment discrimination and retaliation claims because plaintiff failed to demonstrate that County's justifications were a pretext for discrimination); *Crane v. Allen*, No. 3:09-CV-1303-HZ, 2012 WL 602432 (D. Or. Feb. 22, 2012) (defendant's

Because Plaintiff has provided no evidence of a widespread pattern or practice of the use of excessive force at MCDC, and has introduced no evidence demonstrating that Multnomah County was on notice that its training program was so inadequate that it would cause employees to violate detainees' constitutional rights, summary judgment on Plaintiff's *Monell* claim will be granted.

## V.    Claims Relating to Medical Care-§ 1983

Defendants argue that Plaintiff received constant care while in Multnomah County custody and cannot show a violation of his constitutional rights. Defendants further argue that Plaintiff has not identified any policy, practice, or custom of County Health that violated his constitutional rights.

### A.    Facts

Plaintiff went to Oregon Health Sciences University (OHSU) for initial evaluation and treatment and received follow-up care from Multnomah County Corrections Health. (Doc. 46 ¶ 7.) OHSU diagnosed Plaintiff with a fractured left humerus. (*Id.* ¶ 7.) Plaintiff returned to County custody with a sling/swath as a medically adaptive device, along with a plan of care including Norco for pain, icing as needed, and follow-ups with orthopedic consults as needed. (*Id.*) Records indicate that Plaintiff requested or discussed a sarmiento

---

motion for summary judgment granted); *Dinan v. Vetter*, No. 3:12-CV-00615-PK, 2013 WL 9235331 (D. Or. Apr. 10, 2013) (jury verdict for the defendant, finding that he did not use excessive force); *Evans v. Multnomah Cnty.*, No. 3:07-CV-01532-BR, 2013 WL 1700940 (D. Or. Apr. 17, 2013) (defendant's motion for summary judgment granted); *Webster v. Aramark Corr. Servs.*, No. 3:14-CV-00652-AC, 2014 WL 7405656 (D. Or. Dec. 23, 2014) (defendant's motions to dismiss granted); *Davis v. Multnomah Cnty.*, No. 3:14-CV-01815-JO, 2016 WL 2905413 (D. Or. May 16, 2016), *aff'd*, 703 F. App'x 524 (9th Cir. 2017) (defendant's motion for summary judgment granted); *Johnson v. Multnomah Cnty. Sheriff's Off.*, No. 3:16-CV-00633-HZ, 2016 WL 3212409 (D. Or. June 7, 2016) (*in forma pauperis* complaint dismissed for failure to state a claim); *Harris v. City of Portland Police Dept.*, No. 3:15-CV-00853-HZ, 2017 WL 2378357 (D. Or. June 1, 2017) (after bench trial, court determined that officers did not use excessive force and found in favor of all defendants); *MacDonald v. Pedro*, No. 6:06-CV-00715-AA, ECF Doc. 43 (D. Or. June 1, 2007) (action settled); *Yeo v. Washington Cnty.*, No. 3:08-CV-01317, ECF Doc. 154 (D. Or. Nov. 17, 2011) (action settled); *Elliot v. Station*, No. 3:11-CV-01535-ST, ECF Doc. 55 (D. Or. July 26, 2012) (action settled).

brace for his arm, which is a hard plastic brace that serves a similar function as does a sling or swath. (*Id.*) Hard braces are not approved medical adaptive devices in County jail facilities. (*Id.*)

Plaintiff asserts that his request for a "high bed" where he could sit up with less pain was denied and he slept on the floor and, as a result, on July 7, 2017, Plaintiff fell while trying to get up and hit his left elbow on the toilet, which increased his pain and swelling. (Doc. 38 at 13.)

Plaintiff was not returned to the hospital for follow-up after one week as ordered by the hospital physician, but returned after five weeks. (*Id.* at 12-13.) Although Plaintiff was scheduled for medical follow-ups on July 6, 2017 and July 19, 2017, both had to be rescheduled due to court appearances. (*Id.* at 13-14.)

Plaintiff asserts that on July 12, 2017, Defendant Physician's Assistant Holter visited Plaintiff and recommended that Plaintiff be taken back to the hospital in two weeks. (*Id.* at 14.) Plaintiff was taken back to the hospital three weeks after her visit. (*Id.*) Holter told Plaintiff to let his arm hang lower in the sling to allow it to heal better, but she did not have any slings with her. (*Id.*)

Plaintiff had a follow-up with OHSU orthopedics on August 3, 2017, with his fracture healing appropriately at that time, allowing Plaintiff to continue his rehabilitation with physical therapy. (Doc. 46 ¶ 8.) Plaintiff asserts that at the August 3, 2017 appointment, the doctor tried to give Plaintiff a sarmiento brace, but two non-defendant deputies said Plaintiff could not have it because it contained metal. (Doc. 38 at 15.) Plaintiff was then given a sling that let his arm hang lower at a better angle. (*Id.*)

Plaintiff complained of ongoing pain with the arm, and County medical staff prescribed and provided Norco and ibuprofen for pain management. (Doc. 46 ¶ 8.) Plaintiff asserts that on August 11, 2017, an outside pain specialist visited Plaintiff, diagnosed him with nerve pain, and doubled his Gabapentin prescription. (Doc. 38 at 15.) Plaintiff contends that during the five weeks that he was not brought to the hospital for follow-up, pursuant to a policy set either by the MCSO or the Multnomah County Health Department, Plaintiff was

given Norco three times a day, but he contends he should have been given oxycodone every 6 hours. (*Id.* at 13.)

Plaintiff asserts that in October 2017, Plaintiff had an x-ray, which revealed that his bone had not fully fused together, but that a new bone formed at a bad angle. (*Id.* at 16.)

## B.   Legal Standard

A pretrial detainee has a right under the Due Process Clause of the Fourteenth Amendment to be free from punishment prior to an adjudication of guilt. *Bell v. Wolfish*, 441 U.S. 520, 535 (1979). "Pretrial detainees are entitled to 'adequate food, clothing, shelter, sanitation, medical care, and personal safety.'" *Alvarez-Machain v. United States*, 107 F.3d 696, 701 (9th Cir. 1996) (quoting *Hoptowit v. Ray*, 682 F.2d 1237, 1246 (9th Cir. 1982)). A pretrial detainee's claim that he has been denied adequate medical care is evaluated under an objective deliberate indifference standard. *Gordon*, 888 F.3d at 1124-25. A plaintiff must show that the denial, delay, or otherwise unreasonable course of medical care was taken in "reckless disregard" of an excessive risk to the plaintiff's health or safety. *Id.* at 1125. The elements of a pretrial detainee's medical care claim against an individual defendant are:

> (i) the defendant made an intentional decision with respect to the conditions under which the plaintiff was confined; (ii) those conditions put the plaintiff at substantial risk of suffering serious harm; (iii) the defendant did not take reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and (iv) by not taking such measures, the defendant caused the plaintiff's injuries.

*Id.*

Whether the conditions and conduct rise to the level of a constitutional violation is an objective assessment that turns on the facts and circumstances of each particular case. *Id.*; *Hearns v. Terhune*, 413 F.3d 1036, 1042 (9th Cir. 2005). However, "a de minimis level of imposition" is insufficient. *Bell*, 441 U.S. at 539 n.21. In addition, the "'mere lack of due care by a state official' does not deprive an individual of life, liberty, or property under the Fourteenth Amendment." *Castro*, 833 F.3d at 1071 (quoting *Daniels v. Williams*, 474 U.S.

327, 330-31 (1986)). Thus, a plaintiff must "prove more than negligence but less than subjective intent—something akin to reckless disregard." *Id.*

### C. Discussion

#### 1. Defendant Holter

Plaintiff alleges that Holter visited him on one occasion and told him he should hold his arm differently and that a different sling would help, but that Holter did not have a different sling with her. These allegations do not show that Holter recognized a substantial risk of Plaintiff suffering serious harm or that by not having a sling with her, Holter failed to appreciate a high degree of risk to Plaintiff or failed to act to abate such a risk. Accordingly, summary judgment will be granted in favor of Defendant Holter.

#### 2. Defendants Seale and Platas

Plaintiff sole factual allegation against Seale and Platas is that these Defendants are medical technicians who pass out pills, but that they could not give him oxycodone due to the MCSO's policy of not allowing any pain medication that is stronger than Norco. Plaintiff does not allege that these Defendants had any authority to prescribe him oxycodone or that they were responsible for the MCSO's policy regarding oxycodone, and Plaintiff has introduced no evidence supporting a claim against these Defendants at this stage of the proceedings. Accordingly, Plaintiff fails to state a claim upon which relief could be granted against Seale and Platas in his First Amended Complaint, and summary judgment will be granted in favor of these Defendants.

#### 3. Defendants MCSO and Reese in his individual capacity

Defendants assert that MCSO is an improper Defendant because the MCSO is not a person under § 1983. Defendants also assert that because Plaintiff has not alleged any individual involvement by Sheriff Reese, any purported individual-capacity claim against Reese should be dismissed. Because Multnomah County is the real party in interest to Plaintiff's § 1983 *Monell* claim, the MCSO will be dismissed. *See, e.g.*, *Lukens v. Portland Police Bureau*, No. 3:11-CV-00827-MO, 2011 WL 5999376, at *2 (D. Or. Nov. 29, 2011) ("the Portland Police Bureau is not a separate entity from the City of Portland and is not

amenable to suit. It is merely the vehicle through which the city fulfills its police functions."); *see* Fed. R. Civ. P. 17; *see also Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985) ("As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity. . . . It is *not* a suit against the official personally, for the real party in interest is the entity.") (internal citation omitted)).

Defendant Reese will be dismissed in his individual capacity because Plaintiff has not alleged any *facts* to support an individual capacity claim against Reese. *See Rizzo v. Goode*, 423 U.S. 362, 371-72, 377 (1976) (To state a valid claim under § 1983, plaintiffs must allege that they suffered a specific injury as a result of specific conduct of a defendant and show an affirmative link between the injury and the conduct of that defendant.); *Iqbal*, 556 U.S. at 676 ("Because vicarious liability is inapplicable to *Bivens* and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution.").

### 4. Defendants Multnomah County, MCHD and Defendant Reese in his official capacity

Plaintiff alleges that Multnomah County and MCHD maintain policies of not allowing narcotics, denying a raised bed that resulted in Plaintiff's fall, failed to institute procedures that would ensure that medical appointments do not interfere with court dates, which caused Plaintiff to miss two follow-up appointments, and maintain a policy of not allowing Plaintiff a sarmiento brace.

Defendants assert that they are entitled to summary judgment because Plaintiff received constant care while in Multnomah County custody and no policies violated Plaintiff's constitutional rights.

With regard to Plaintiff's claims that the policy of not allowing narcotics violated his constitutional rights, the record before the Court shows that Plaintiff's pain was controlled by Norco until he began to be weaned off Norco. On his discharge from the hospital on June 28, 2017, the doctor recommended that Plaintiff be given oxycodone for pain. (Doc. 2-2 at 18.) On June 29, 2017, Plaintiff was seen by RN Woods complaining of pain and she

prescribed Norco; later that day Plaintiff reported that Norco was managing his pain and his twitching had stopped. (Doc. 2-2 at 31-32.) On July 7, 2017, Plaintiff again saw RN Woods and she noted that his primary concern was that he be able to continue Norco until he was seen by OHSU, and she ordered that his Norco be extended. (*Id.* at 33.) On July 13, 2017, Plaintiff saw Seale, and Seale noted that Plaintiff had been seen by a pain specialist yesterday and continued Plaintiff's Norco for two weeks. (*Id.* at 34.) On August 3, 2017, after Plaintiff's hospital follow-up, RN Dodd noted that the hospital stated it was "ok for ibuprofen to augment narcotics," and stated that the plan was to taper Plaintiff off Norco starting August 4, 2017 and add Ibuprofen. (*Id.* at 36.) On August 8, 2017, Platas noted that Plaintiff's last day of Norco would be August 12, 2017, but that Plaintiff was given acetaminophen, ibuprofen, and previously prescribed Gabapentin. (*Id.* at 37.) On August 11, 2017, Plaintiff was seen by NP Lucas, who noted that Plaintiff claimed ibuprofen was ineffective, but that Naproxen had been effective in the past. (*Id.* at 38.) NP Lucas decided to discontinue Tylenol and re-prescribe Norco. (*Id.* at 38-41.)

There is no evidence in this record that even if Defendants had a policy of not allowing oxycodone into the MCDC, that such policy caused Plaintiff serious harm or that the decision to place him on a different pain reliever was a de facto violation of his constitutional rights. Rather, the record before the Court shows that Plaintiff reported to his medical providers that Norco was controlling his pain and he did not complain about pain on Norco until the decision to wean him off Norco. Accordingly, Plaintiff cannot maintain *Monell* claims against Defendants; the record contradicts Plaintiff's allegation that MCSO employees disregarded a serious risk to his health by choosing to prescribe him Norco instead of oxycodone.

With regard to his claim that there was a policy of denying a raised bed that resulted in his fall, Plaintiff has introduced no evidence suggesting that the decision to deny him a raised bed was the result of a policy, practice, or custom of Multnomah County or that raised beds are categorically denied to detainees pursuant to a policy, practice or custom of Multnomah County.

With regard to Plaintiff's claim that he was prevented from attending follow-ups due to a custom of not ensuring that medical appointments do not conflict with court dates, Defendants did not directly address this issue in their Motion. The evidence shows that this happened to Plaintiff on two occasions, and it is possible an expert could testify.[9] Given the lack of briefing, facts, and the possibility that expert testimony could aid this claim, the Court will deny summary judgment on Plaintiff's *Monell* claim regarding of custom of failing to ensure detainees receive adequate medical care due to scheduling conflicts.

Likewise, Defendants acknowledge that Plaintiff was denied a sarmiento brace, but only cite to their expert's testimony to support their decision. They do not address Plaintiff's contention that his bone did not heal properly and do not discuss whether this would have still occurred even if Plaintiff was given a sarmiento brace. Given the lack of briefing, facts, and the possibility that expert testimony could aid this claim, the Court will deny summary judgment on Plaintiff's *Monell* claim regarding the policy of not allowing hard braces into the jail.

**VI.    State Law Assault and Battery**

Plaintiff alleges state law assault and battery claims against Multnomah County, MCSO, Mike Reese, Timothy Barker, Matthew Ingram, Phillip Hubert, Paul Simpson, David Kovachevich, Timothy Moore, Gary Glaze, and Kurtiss Morrison.

In Oregon, "an assault is an intentional attempt to do violence to the person of another coupled with present ability to carry the intention into effect," and battery is a voluntary act that intentionally caused harmful or offensive contact with another." *Cook v. Kinzua Pine Mills Co.*, 207 Or. 34, 48, 293 P.2d 717, 723 (1956). Here, there are no factual allegations supporting Plaintiff's assault and battery claims against Defendants Reese, Hubert, Simpson, Kovachevich, Moore, Glaze or Morrison, and Plaintiff's state law claims against those Defendants will be dismissed.

---

[9] As discussed more fully below, the Parties agreed that summary judgment would not be granted if expert testimony is required until the Parties have been given an opportunity to disclose experts.

For the same reasons discussed with regard to the Court's analysis of excessive force, there are disputed issues of material fact that preclude summary judgment in favor of Defendants Timothy Barker and Ingram as to the state law assault and battery claims.

Defendants correctly assert that Plaintiff's sole cause of action for state law tort claims is against Multnomah County pursuant to Oregon Revised Statutes § 30.265(2). That statute provides:

> The sole cause of action for a tort committed by officers, employees or agents of a public body acting within the scope of their employment or duties and eligible for representation and indemnification under ORS 30.285 or 30.287 is an action under ORS 30.260 to 30.300. The remedy provided by ORS 30.260 to 30.300 is exclusive of any other action against any such officer, employee or agent of a public body whose act or omission within the scope of the officer's, employee's or agent's employment or duties gives rise to the action. No other form of civil action is permitted.

Or. Rev. Stat. Ann. § 30.265.  Accordingly, Plaintiffs tort claims for assault and battery are properly maintained solely against Multnomah County, and all other Defendants to the assault and battery claims will be dismissed.

Multnomah County asserts that because the use of force was justified, Plaintiff cannot maintain the assault and battery claim, but the Court has already found there are disputed issues of material fact precluding summary judgment on this basis.

## VII.    State Law Negligence

Plaintiff alleges negligence claims based on deficiencies in medical care against Defendants Multnomah County, MCSO, Mike Reese, Timothy Barker, Matthew Ingram, Wendy Muth, Phillip Hubert, Paul Simpson, Uwe Pemberton, Timothy Moore, Gary Glaze, Kurtiss Morrison, David Kovachevich, Erica Barker, and Brook Holter.

Defendants assert that in order to prevail on a medical negligence claim under Oregon law, Plaintiff must prove through expert testimony that the County medical staff did not meet the applicable standard of care exercised by a reasonably careful medical professional with like training and expertise in the community. (Doc. 40 at 26.) This argument, however, is precluded by the Parties' agreement at the Scheduling Conference that if Plaintiff required

expert testimony to prove a claim, Plaintiff would be given an opportunity to find an expert. (*See* Doc. 53 at 3, 19 (noting that the Parties requested bifurcated discovery and after significant discussion finding that "[i]f the parties don't want to do expert disclosure initially, then the summary judgment motion should only pertain to issues that don't address—or don't require expert disclosure"). Accordingly, the Motion for Summary Judgment will denied as to Plaintiff's state law negligence claims. However, because Defendant Multnomah County is the proper Defendant to these claims, the Court will dismiss all other Defendants from these claims. *See* Or. Rev. Stat. Ann. § 30.265.

## VIII.  State Law Defamation

Plaintiff alleges state law defamation claims against Defendants Multnomah County, MCSO, Mike Reese, Timothy Barker, Matthew Ingram, Wendy Muth, Phillip Hubert, Paul Simpson, Uwe Pemberton, Timothy Moore, Gary Glaze, Kurtiss Morrison, David Kovachevich, Erica Barker, and Brook Holter. Plaintiff alleges that every allegation Defendants made against him, including that he threatened to put out a "hit" on Erica Barker, tried to punch Ingram, elbowed Barker, kicked Muth, ground the chips he threw into powder form, and resisted after leaving the cell on the fifth floor, were false and were told to Detective Bybee resulting in defamation of Plaintiff.

Defendants argue that Plaintiff's defamation claims are barred because Oregon recognizes an absolute privilege for statements made in furtherance of public duties and because Plaintiff did not bring these claims within the one-year statute of limitations. Defendants assert that because the alleged statements were generated in the exercise of the MCSO staff's work as the corrections department for the County, the statements are privileged and cannot be defamation as a matter of law.

In his First Amended Complaint, Plaintiff alleges that Defendants gave false statements to Detective Bybee resulting in defamation, and Plaintiff cites to Detective Bybee's report dated June 28, 2017. Oregon's statute of limitations for defamation is one year. Or. Rev. Stat. § 12-120(2). Plaintiff filed this action on June 25, 2019. Accordingly, Plaintiff's defamation claims are barred by the one-year statute of limitations, and summary

judgment as to the defamation claims will be granted in favor of Defendants.[10]

**IT IS ORDERED** that Defendants' Motion for Summary Judgment (Doc. 40) is **granted in part and denied in part** as follows:

(1)    The Motion is **denied** as to:

(a)    Plaintiff's Fourteenth Amendment excessive force claim alleged against Defendants Ingram and Barker based on their conduct on the fourth floor as discussed herein;

(b)    Plaintiff's Fourteenth Amendment *Monell* claims regarding a custom of failing to ensure detainees receive adequate medical care due to scheduling conflicts and the policy of not allowing hard braces into the jail, asserted against Multnomah County, the MCHD, and Reese in his official capacity;

(c)    Plaintiff's state law assault and battery claim against Multnomah County based on Barker and Ingram's conduct on fourth floor as discussed herein; and

(d)    Plaintiff's state law negligence claim against Multnomah County.

(2)    The Motion is otherwise **granted**.

(3)    Defendants Multnomah County Sheriff's Office, Mike Reese, solely in his individual capacity,[11] Muth, Hubert, Simpson, Pemberton, Moore, Glaze, Morrison, Kovachevich, Erica Barker, Seale, Holter, Platas, and Dodd are **dismissed from this action**.

(4)    All claims with the exception of the claims listed in (1) above are **dismissed from this action**.

//

//

//

//

//

---

[10] Because the Court finds that the defamation claims are barred by the statute of limitations, the Court need not determine whether Oregon's absolute privilege would also bar Plaintiff's defamation claims.

[11] Reese remains a Defendant solely in his official capacity.

1      (5)    The parties shall meet to discuss deadlines for conducting expert discovery, including disclosure of expert reports, and any other deadlines necessary for resolution of this action. The parties shall submit a joint scheduling proposal addressing these issues within twenty-one (21) days of the date of entry of this Order.

Dated this 17th day of September, 2021.

_____
Honorable Jennifer G. Zipps
United States District Judge