JENNY M. MADKOUR, COUNTY ATTORNEY
FOR MULTNOMAH COUNTY, OREGON
Andrew Weiner, OSB No. 115485
Assistant County Attorney
Multnomah County Attorney
501 S.E. Hawthorne Blvd., Suite 500
Portland, Oregon 97214
Telephone:  (503) 988-3138
Facsimile:  (503) 988-3377
E-mail: andrew.weiner@multco.us
    *Of Attorneys for Defendants*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

Portland Division

| | |
|---|---|
| CYRUS ANDREW SULLIVAN, <br><br> Plaintiff, <br><br> v. <br><br> MULTNOMAH COUNTY, et al, <br><br> Defendants. | No. 3:19-cv-00995-JGZ <br><br> DECLARATION OF KEVIN MURPHY IN SUPPORT DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT |

/// /// ///

/// /// ///

/// /// ///

/// /// ///

Page 1 – DECLARATION OF KEVIN MURPHY IN SUPPORT OF DEFENDANTS'
    MOTION FOR PARTIAL SUMMARY JUDGMENT

I, Kevin Murphy, under penalty of perjury, declare as follows:

1.      I am making this declaration for use as evidence in this lawsuit. I have personal knowledge of all facts in this declaration, and I am competent to testify about any facts in this declaration.

2.      I am a board certified orthopedic surgeon. I have completed a post residency fellowship in the field of arthroscopy and sports medicine. I have 18 years of practice experience with a particular focus on sports medicine, arthroscopy, joint reconstruction, joint replacement and fracture care. I am currently the chief medical officer of the Portland Timbers of Major League Soccer.

3.      Multnomah County retained me to provide an expert opinion regarding medical care provided to the plaintiff, Cyrus Sullivan, related to an injury to Mr. Sullivan's left arm that occurred on June 28, 2017.

4.       I am familiar with the allegations that Mr. Sullivan made in this lawsuit, and I reviewed the relevant medical records and the incident reports associated with the June 28, 2017 altercation.

5.      It is my opinion that Mr. Sullivan suffered a spiral oblique distal third humeral shaft fracture, an injury that is entirely consistent with the deputies' accounts of the June 28, 2017 altercation. It is also my opinion that the diagnosis, treatment, and ultimate functional outcome with regard to the humeral fracture were well within the limits of accepted community standards and standard of care for such an injury.

/// /// ///

/// /// ///

/// /// ///

/// /// ///

Page 2 – DECLARATION OF KEVIN MURPHY IN SUPPORT OF DEFENDANTS'
        MOTION FOR PARTIAL SUMMARY JUDGMENT

6.      I provided an expert witness report in support of my opinions pursuant to Federal Rule of Civil Procedure 26(a)(2), which is attached as Exhibit 1.

I HEREBY DECLARE THAT THE ABOVE STATEMENT IS TRUE TO THE BEST OF MY KNOWLEDGE AND BELIEF, AND THAT I UNDERSTAND IT IS MADE FOR USE AS EVIDENCE IN COURT AND IS SUBJECT TO PENALTY FOR PERJURY.

Dated this __15th__ day of September, 2022.

_____
Kevin Murphy

Page 3 – DECLARATION OF KEVIN MURPHY IN SUPPORT OF DEFENDANTS'
          MOTION FOR PARTIAL SUMMARY JUDGMENT

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

Portland Division

| | |
|---|---|
| CYRUS ANDREW SULLIVAN, | No. 3:19-cv-00995-JGZ |
| Plaintiff, | |
| v. | EXPERT WITNESS REPORT |
| MULTNOMAH COUNTY, et al., | *Dr. Kevin Murphy* |
| Defendants. | |

I, Kevin Murphy, M.D., am a board certified orthopedic surgeon. I have completed a post residency fellowship in the field of arthroscopy and sports medicine. I have 18 years of practice experience with a particular focus on sports medicine, arthroscopy, joint reconstruction, joint replacement and fracture care.  I am currently the chief medical officer of the Portland Timbers of Major League Soccer. I have not authored any publications in the previous 10 years. For additional details, see attached C.V.

In the last four years I provided expert testimony in the following cases: (1) *William Strueloff v. MTC*, (2) *Joanne Carpenter v. State Farm*, (3) *Janet Gibson v. Geico*, and (4) *Gregory Gudger v. State Farm*.

I am receiving compensation for my study and expert testimony in this case as follows. My rate of compensation for expert review and report preparation is $800 per hour. My rate of compensation for expert testimony at deposition or trial is $2,000 per hour.

Page 1 – EXPERT WITNESS REPORT - MURPHY

**Exhibit 1**
**Page 1 of 30**

## CHART REVIEW

**Multnomah County Corrections Health Department:**

This contains medical and health records from 2012 through 2019 for medical conditions and medical care rendered while the patient was incarcerated in the Multnomah County Corrections system during that time. This documents a history of chronic neck and back pain, as well as psychiatric conditions. My review is focused on information pertinent to the injury sustained on June 28, 2017.

**June 28, 2017:** Progress note by Marvin Lilly, RN, documenting Mr. Sullivan, who is a 34-year-old client seen in his cell at the Multnomah County Detention Center. Subjective documents that the nurse was notified by dorm deputy that the client complained of left arm pain following a use of force. The client states the pain is in his left arm and rates it as 10/10. Physical exam documents an apparent muscular/skeletal deformity and edema consistent with a closed humerus fracture noted in the left arm. Motor, neurologic and circulatory examinations are intact to the extremity. The patient denies loss of consciousness or head trauma. The plan is to send the patient to Oregon Health & Science University for evaluation.

**June 28, 2017:** Progress note by Kristyn Smith, RN, documenting that the client is seen following return from OHSU. Sullivan reports that his arm hurts really bad, and he requests pain medication. He expresses concern about eating in his cell with limited mobility. Physical exam documents that the client is calm and cooperative with assessment and has an immobilizer in place. He has full movement of fingers. The skin is pink and appears well-perfused. He is in no acute distress. The discharge paperwork from the hospital documents that the patient has a left humerus fracture and has follow up with Amy Sothern, PA in one week. He is given a prescription for oxycodone. The instructions are to apply ice three times a day. The chart documents that the

Page 2 – EXPERT WITNESS REPORT - MURPHY

**Exhibit 1**
**Page 2 of 30**

patient received Dilaudid at 2308.  The assessment is impaired comfort.  The patient is reassured. He is given an extra blanket.  He is instructed to ice three times a day.  The chart is routed to the APMD for review.

June 28, 2017:  Progress note by Marjorie Taylor, Office Assistant, documenting a referral scheduled on July 7, 2017.

June 29, 2017:  Progress note by Lori Woods, RN, documenting that the patient is seen in his cell at the Multnomah County Detention Center.  He is asking for pain medication for his arm fracture and requesting a high bed as it makes the arm fracture more painful when he tries to sit. He complains of fingers twitching that began after his arm was fractured.  He is using Norco to manage pain, and the twitching was noted to have stopped at 1300.  The physical exam is unremarkable.  Conservative treatment is discussed, and education is provided with regards to the injury.

July 3, 2017:  Progress note by Alicia Trull, RN, documenting that the client submitted a request for ice to help with pain and swelling.  This documents that the patient has been referred to OHSU for follow up.

July 5, 2017:  Progress note by Ciprian Panaitescu, RN, documenting that the patient requests to know when he has an outside appointment for his arm and has no other needs.

July 7, 2017:  Progress note by Lori Woods, RN, documenting that the patient was scheduled to be seen at OHSU, but was rescheduled to July 10, 2017 due to an appearance in federal court.

Page 3 – EXPERT WITNESS REPORT - MURPHY

Exhibit 1
Page 3 of 30

**July 9, 2017:** Progress note by Tommie Norton, CHN, patient submits MRF documenting request for pain medication and a follow-up at OHSU. Note also states that the patient fell on Thursday. Patient feels as if his fracture is not healing right. This documents worsening pain in arm.

**July 10, 2017:** Progress note by Nathanael Lyons, RN, documenting an x-ray of the left humerus is scheduled for July 11, 2017.

**July 11, 2017:** Progress note by Katherine Beaumont, RN, documenting follow up in Sullivan's cell at the detention center. Patient is wearing a left arm sling. The outside appointment was noted to be cancelled due to corrections staffing, and he has been scheduled for an in-house orthopedic appointment the following day. Pain meds are refilled.

**July 12, 2017:** Progress note by Brook Holter, PA-C, documenting the patient complains of left arm pain since an incident that occurred two weeks ago. The patient alleges the deputies were trying to handcuff him and inadvertently broke his humerus. He was seen at OHSU that evening and was treated with a sling and swath. He is right-hand dominant. He denies numbness or pain in the radial nerve distribution. Physical exam documents the patient is in a sling and swath and has intact radial, median, ulnar and anterior interosseous nerve sensation and strength. The radial pulse is intact. An x-ray is obtained, which documents an oblique distal third shaft fracture of the humerus with 1 cm diastasis and slight varus angulation. The assessment is left humerus fracture, and the recommendation is to return to OHSU Orthopedics for further recommendation within two weeks. The patient is able to remove his swath, but leave his sling on. He is to start fist pumps for circulation to diminish swelling. Pain medication is recommended for two further weeks. The patient is provided one more blanket for positioning. An appointment is documented for outside orthopedic appointment on July 19, 2017 with Dr. Sothern.

Page 4 – EXPERT WITNESS REPORT - MURPHY

**Exhibit 1**
**Page 4 of 30**

**July 24, 2017:** Progress note by Halcyon Dodd, RN, documenting that the patient was scheduled for an OHSU referral on July 19, 2017, but due to federal court, was unable to attend the appointment, so the patient is going to be rescheduled for the week of July 31, 2017.

**August 2, 2017:** Progress note by Ciprian Panaitescu, RN, documenting that the patient's mother called wanting to remind the medical staff that her son needs to have an outside visit for his left arm fracture. A scheduled appointment for later that week is documented.

**August 3, 2017:** Progress note by Halcyon Dodd, RN, documenting follow up after an outside visit. The orders from the outside physician document that the patient was evaluated for a left distal humerus fracture, and films show early signs of healing. It is okay for gentle range of motion as tolerated at the elbow and shoulder, and the patient was instructed. A Sarmiento brace was attempted, but not okay per deputies. A sling is approved. Patient is okay to remove his sling when sitting. A followup in six weeks with repeat films is recommended. Ibuprofen to augment narcotics is documented.

**August 8, 2017:** Progress note by Angelina Platas, M.D., documenting the left humerus fracture of June 28, 2017, a visit with in-house orthopedics on July 12, 2017, and OHSU orthopedics on August 3, 2017. It is documented that the fracture was said to be healing appropriately, and ongoing conservative care was recommended. Patient is being tapered off of Norco. The assessment is 49 days out from left humerus fracture with appropriate healing with nonsurgical management. The patient is being tapered off narcotics with persistent complaints of pain. Pain medication regimen is documented.

Page 5 – EXPERT WITNESS REPORT - MURPHY

**Exhibit 1**
**Page 5 of 30**

**August 11, 2017:** Progress note by Gwendolyn Lucas, Nurse Practitioner, documenting subjective complaint that the patient is angry with his arm pain and the fact that they are taking away his pain meds. Pain management options are discussed and home exercise program is reviewed.

**August 28, 2017:** Progress note by Angelina Platas, M.D., documenting a planned follow up with orthopedics on September 12, 2017. He reports that his pain is improving with naproxen and gabapentin. He has been doing his exercises and using capsaicin cream. He is concerned with arm stiffness and decreased range of motion. Physical exam documents that the patient is wearing a sling. There is a defect noted on exam about two-thirds of the way down the humerus at the distal end. There is mild tenderness to palpation. He has mild decrease in range of motion of the elbow with just slightly less than 180 degrees of flexion and full extension. He has decreased range of motion of 10 degrees in all directions of the shoulder with some pain in abduction and internal rotation. The assessment is of a left supracondylar humerus fracture with sequelae. A discussion is had with the patient that his arm is not going to straighten out as it heals. The plan is to continue with naproxen, gabapentin and capsaicin.

**September 4, 2017:** Progress note by Alicia Trull, RN, documenting complaints of bruising in his left arm. Physical examination documents light/faded bruising along the triceps. Dr. Platas is consulted, who states that bruising may take weeks to go away. Recommendation is to continue to hold exercises if he is bruising or if they are painful. Follow up appointments are again documented.

**October 13, 2018:** Progress note by Tommie Norton, CHN, with regards to neck pain and pain shooting into Sullivan's right shoulder and arm. This documents that these symptoms are somewhat chronic in nature.

Page 6 – EXPERT WITNESS REPORT - MURPHY

**Exhibit 1**
**Page 6 of 30**

**October 30, 2018:**  X-ray of the cervical spine, documenting no evident acute osseous abnormality radiographically with minimal degenerative disc disease at C5-6.

The remainder of this section documents medical and psychiatric care, as well as medication administration records documenting care provided while the patient was incarcerated in Multnomah County Corrections.

**Oregon Health & Science University:**

**June 28, 2017** (Emergency Department Records): Note by Jennifer Rossi, M.D., documenting that Mr. Sullivan is a 33-year-old male brought to emergency department by sheriffs with complaint of arm pain.  The history states that the patient had been handcuffed with his hands behind his back.  He was agitated and during police handling he felt his right arm pulled backwards and felt a pop in his upper arm with pain.  There have been no prior injuries to that arm, and there is no numbness in his hand.  He is right-handed.  Physical examination documents a very alert male lying on a gurney holding his right arm flexed to 90 degrees on his chest.  Right arm has swelling and deformity about two-thirds of the way down the upper arm.  There is no elbow joint tenderness or effusion.  There is no shoulder tenderness.  There is no wrist tenderness.  There is good grip and normal sensation in the right hand.  There are no abrasions or skin defects. Neurologic exam is normal. Medical decision-making documents a two-view x-ray of the humerus, which was interpreted by the physician as a mildly displaced midshaft humerus fracture. Orthopedics is consulted.

ED triage note from Nichole Lanser, RN, documents that the patient presented to the emergency department via EMS in police custody.  The patient reported that he was involved in an altercation where his arm was twisted behind his back and reports pain in his left humerus.  He reports a rubbing sensation.  Circulation, motion, and sensation is intact in the left arm.  There is

a small amount of swelling and hematoma in the left upper arm.  He denies other injury.  Discharge instructions are noted, and the patient is discharged to jail via police car with police officers.

Orthopedic surgery consult with Taylor Lara, MD (Resident), documenting chief complaint of left arm pain.  History of present illness documents that the patient alleges that he was being roughly handled while handcuffed with his arms behind his back.  He felt a pop in his left upper arm and had immediate pain and inability to bear weight.  He denies other pain, numbness, tingling or weakness.  He specifically denies shoulder pain.  Review of systems is otherwise negative.  Physical exam documents swelling over the distal upper arm and tenderness over the distal upper arm.  There is full range of motion of the wrist and fingers.  The exam is limited due to pain in the upper arm.  Motor exam is normal, and sensory exam is normal.  Vascular exam is normal.  Reflexes are not tested.  X-rays are reviewed, which documents a spiral oblique distal humeral shaft fracture without significant angular deformity.  The plan documents that the treatment options were discussed with the patient including a coaptation splint and sling and swath.  The patient elected for initial treatment in a sling and swath considering how painful it was for him to obtain x-rays.  This documents the patient feels he would not be able to tolerate splinting and would be more comfortable in a sling and swatch.  The plan is for nonoperative treatment, and the patient is to follow up in one week for conversion to a Sarmiento brace.

**June 28, 2017:**  OHSU x-ray.  Two-view x-ray of the left humerus documenting an oblique fracture through the distal humeral diaphysis with one-half shaft width posterior displacement of the distal component and minimal anterior apex angulation.  The alignment is normal.  The glenohumeral joint is not profiled for evaluation.

Page 8 – EXPERT WITNESS REPORT - MURPHY

**Exhibit 1**
**Page 8 of 30**

**July 7, 2017:**  Scheduler's note regarding OHSU office visit in Orthopedics at Center for Health and Healing, documenting that the patient scheduled with representatives from Multnomah County Corrections.  Office note is not documented.

**August 3, 2017:**  OHSU office visit in Orthopedics at Center for Health and Healing.  This is a six-week follow up visit.  Patient has remained in his sling.  He denies numbness and tingling and states he has maintained motion of his wrist and fingers since the time of injury.  Physical exam documents motion intact with wrist extension and finger extension.  His skin is intact in the left upper extremity with no obvious swelling.  There is some bony thickening and prominence along the left upper arm, but no tenting or tight areas.  There is no ecchymosis, and the patient has intact flexion and extension of the elbow actively and passively although it is not full.  He is very stiff at his shoulder with passive range of motion and hesitant to move the shoulder.

Films are taken and reviewed with Dr. Orfaly.  The impression is of left distal humerus fracture, angled, subacute with early signs of healing.  The plan is recommendation of continued nonoperative treatment.  Attempted use of Sarmiento was not approved from law enforcement officers with him today, so he is using a sling.  He was encouraged with gentle motion of both the elbow and the shoulder with limited weight bearing and follow up in four weeks with repeat left humerus films.  He is to continue to get and be weaned from pain meds via the facility that he is currently incarcerated in.  The risks and benefits are provided to the patient including permanent restriction in motion at the elbow and the shoulder, nonunion and delayed union.  Also, the possible need for ongoing pain treatment and future surgery is discussed.  Questions are answered, and paperwork is provided to the guards.

**August 3, 2017:** OHSU x-ray. Two-view x-ray of the left humerus documenting an oblique left distal humeral diaphyseal fracture, which has changed configuration and now is with new apex posterior angulation and medial displacement of the distal fragment. Early healing of the fracture is noted. Soft tissue edema is also noted.

**March 12, 2020:** OHSU x-ray. Two-view x-ray of the left humerus documenting unchanged alignment of distal humeral diaphyseal fracture with progressive callus formation across the fracture margins. There is no new fracture or focal osseous destruction. There is normal alignment of the shoulder and elbow.

**March 12, 2020:** OHSU progress note from Amy Sothern, PA, documenting that Cyrus Sullivan is a 36-year-old male with a chief complaint of follow up for left humerus fracture. He was last seen in 2017 and recently reached out, and due to the amount of time since the last visit, he was offered a follow up appointment. He was initially scheduled for an orthopedic follow up on July 7, 2017, but he did not attend his scheduled appointment until August 3, 2017. He remained in a sling during this period. At that point, on August 3, 2017, his chief complaint was left distal humerus pain after his arm was allegedly twisted during an interaction with law enforcement approximately six weeks previous.

At the August 3, 2017 visit, he presented for ongoing definitive treatment. He denied numbness or tingling and stated that he had maintained his motion of the wrist and finger since the time of the injury. The note also documents the physical exam at the time of the June 28, 2017, office visit. He was noted to have an intact neurovascular exam and skin was intact. He had left shoulder stiffness with passive range of motion. X-rays showed a left distal humerus, angled, subacute with early signs of healing.

**Exhibit 1**
**Page 10 of 30**

At the March 12, 2020 visit, he alleged that his arm was snapped by law enforcement intentionally in 2017. Documents ongoing legal issues with regards to his case. He alleged that he was offered a Sarmiento brace at the time of the original fracture but was told by law enforcement that he could not have it. On physical exam, he is well-developed and well-nourished with no acute distress and no immobilization in place. He had intact neurovascular exam. He has slightly decreased left versus right arm full extension. He has full supination, and there is no pain with palpation of the fracture site. X-rays were referenced, which showed significant progression with regards to the healing and slight angulation. The impression is a healed left humerus fracture. The plan documents that the patient is concerned that his fracture care was impacted by delay with referral to ortho initially and that he was not provided a Sarmiento brace. This documents that he has had quite a bit of progression in regards to fracture healing and clinically he is doing well. No fixed follow up plans are made. Return as needed is recommended.

**Bureau of Prisons:**

The first section includes recorded vital signs from June 28, 2017 through February 8, 2018.

**September 14, 2017:**  Bureau of Prisons Health Services Health Screen, documenting a left humerus fracture sustained on June 28, 2017.

**September 28, 2017:**  Bureau of Prisons Health Services history and physical with Amador Cantu, DO, documenting history of humeral fracture with ecchymosis evident in the medial aspect of the triceps area. There was some weakness and muscle atrophy noted. There is some give-way weakness of the left arm noted, and there is lack of full range of motion of the left arm noted. The rest of the extremity exam is normal.

Page 11 – EXPERT WITNESS REPORT - MURPHY

**Exhibit 1**
**Page 11 of 30**

**September 29, 2017:**  Bureau of Prisons Health Services Clinical Encounter with Amador Cantu, DO, for chief complaint of chronic care.  The patient is seen for chronic conditions unrelated to his left distal humerus fracture.

**October 13, 2017:**  Bureau of Prisons Health Services Clinical Encounter with Amador Cantu, DO, documenting a follow-up x-ray, which was performed on October 11, 2017. X-ray findings document incomplete union and persistent displacement of an old fracture involving the distal left humeral diaphysis.  There is no radiographic evidence for acute fracture.  There is no joint space malalignment.  There is no soft tissue abnormality, and bone mineralization is normal for age.

**December 27, 2017:**  Bureau of Prisons Health Services Clinical Encounter with Amador Cantu, DO, documenting chief complaint of orthopedic/rheumatology.  Documents a two-view x-ray of the left humerus.  Findings document incomplete union and persistent displacement of an old fracture involving the distal left humeral diaphysis. There is no radiographic evidence of acute fracture.  There is no joint space malalignment.  There is no soft tissue abnormality.  Bone mineralization is normal for age.  Impression is of incomplete union and persistent displacement of an old fracture involving the left distal shaft.  Assessment is fracture of shaft of humerus.

The remainder of this section contains various health records and medication records, as well as health-related correspondence without information pertinent to the case other than Mr. Sullivan's request for records to be sent to his attorney.

**Imaging:**

**June 28, 2017:**  Three-view x-ray of the left humerus documenting a spiral oblique fracture of the left distal humerus with no significant comminution.  There appears to be one-half cortical width posterior displacement on the lateral view.  There is one-quarter cortical width lateral

Page 12 – EXPERT WITNESS REPORT - MURPHY

**Exhibit 1**
**Page 12 of 30**

displacement on the AP view. The visualized portions of the humerus and elbow appear normal. There is minimal angulation in either plane.

**August 3, 2017:** Two-view x-ray of the left humerus documenting the aforementioned fracture with early evidence of callus formation noted. There is right apex posterior angulation noted on the lateral view with improved translational alignment. There is very slight apex lateral angulation noted on the AP with minimal shortening and slight improvement in the translational alignment.

**March 12, 2020:** Two-view x-ray of the left humerus documenting a healed fracture of the distal humerus with minimal apex lateral angulation in the AP view with no shortening noted. The visualized portions of the shoulder joint and elbow joint appear normal. The fracture appears well-healed on the lateral view with approximately 20 degrees of apex posterior angulation noted.

**Use of Force Packet, Multnomah County Sheriff's Office for Incident Report #27634:**

July 13, 2017 Incident Report from Deputy Wendy Muth for an incident which occurred on June 28, 2017 at 2035 hours. The narrative of this reports documents that Deputy Muth was working on the evening on June 28, 2017, when a call for additional escorts to 5D came over the radio. She made her way to 5D to assist. When she arrived in 5D, the med tech was there, and all of the inmates were celled. Deputy Simpson and Hubert were on the top tier at cell 23. She went up to cell 23, and Deputy Simpson had the food port open and was ordering Inmate Sullivan to cuff up through the food port. Inmate Sullivan was insulting Deputy Simpson, threatening to put his personal information including his address online and refusing to cuff up. Deputy Simpson closed the food port and called for Acting Sergeant Barker to respond. At that point, Sergeant Ingram arrived to 5D23 and opened the food port and ordered Inmate Sullivan to cuff up several

Page 13 – EXPERT WITNESS REPORT - MURPHY

**Exhibit 1**
**Page 13 of 30**

times.  Inmate Sullivan told Sergeant Ingram to go fuck himself and threatened to put his personal information online and order a hit on him.  Sergeant Ingram closed the food port.

Acting Sergeant Barker arrived to 5D23 and opened the food port and ordered Inmate Sullivan to cuff up.  Inmate Sullivan continued to yell threats and insults and refused to cuff up.  Acting Sergeant Barker closed the food port and stated, okay, we are coming in.  Someone popped the door open.  Acting Sergeant Barker opened the door and Sergeant Ingram moved to enter the cell.  As soon as they began to move in the cell, the inmate threw something at Sergeant Ingram's face.  Deputy Muth could hear it hit the cell walls and floor.  She later became aware that it was flaming hot tortilla chips Inmate Sullivan had thrown.  Sergeant Ingram, Acting Sergeant Barker, Deputy Hubert, and Deputy Simpson, as well as Deputy Muth moved into the cell.  Deputy Simpson had his taser out at the low ready, but because he was behind the others, he was unable to get a good shot.  Sergeants Ingram and Barker pushed Inmate Sullivan up against the cell wall and were trying to get handcuffs on him.  Inmate Sullivan was yelling and trying to turn around and pull away.  Deputy Muth took ahold of Inmate Sullivan's left leg and tried to help control him.  Inmate Sullivan was screaming and kicking with both of his feet.  Deputy Muth heard someone yell for Inmate Sullivan to stop fighting.  Deputy Muth then got kicked high in the stomach by Inmate Sullivan's foot, which put her off balance, and she stumbled to regain her footing.  She slipped on broken chips on the cell floor and fell backwards onto her bottom.  She tried to get back up, but she continued to slip on the chips.  Someone gave her a hand up.

Inmate Sullivan was handcuffed by this time, and they were pulling him out of his cell.  Inmate Sullivan was yelling, making threats, and had gone limp, so they had to pull him out.  At that point, several deputies were there and seemed to have Inmate Sullivan under control, so Deputy Muth stayed behind to gather up his property.  A short time later as Deputy Muth moved

Page 14 – EXPERT WITNESS REPORT - MURPHY

Exhibit 1
Page 14 of 30

Inmate Sullivan's property to the fourth floor disciplinary unit, she became aware that he had been injured and was going to the hospital via an ambulance.

June 29, 2017 Incident Report from Deputy Paul Simpson. This includes another narrative of the June 28, 2017 incident, which is very similar to the previous narrative. This also documents that Sullivan's inmate card notes that he was 230 pounds.

June 29, 2017 Incident Report from Deputy David Kovachevich. This includes another narrative of the June 28, 2017 incident. Deputy Kovachevich was working on the fourth floor. This documents that Deputy Kovachevich heard a radio transmission at 2035 hours that requested an elevator to the fifth floor to take an inmate to the fourth floor. The tone of the person requesting the elevator made Deputy Kovachevich think that there was urgent need for the elevator and that there was the possibility of a fight occurring. Within about 30 seconds, an elevator arrived on the fourth floor with Inmate Sullivan being escorted by Sergeant Ingram and Acting Sergeant Barker. Inmate Sullivan was resisting furiously against Sergeants Ingram and Barker's efforts to guide him through the hallway. There were several other deputies there. Among them were Deputies Simpson and Hubert. Deputy Kovachevich held the sallyport door open for them as they headed toward 4F. He followed behind, and Inmate Sullivan was struggling and resisting the entire way.

Once in 4F, they moved Inmate Sullivan into cell 13. Inmate Sullivan continued to struggle and fight and, therefore, it became necessary for Ingram and Barker to push him down on the mattress belly down. Only Sergeants Ingram and Barker were in the cell, and Inmate Sullivan was still struggling, so Deputy Kovachevich entered the cell and took control of Inmate Sullivan's legs, crossing them behind his buttocks. Inmate Sullivan was handcuffed behind his back, but continued to struggle. At one point, Inmate Sullivan was able to push Deputy Kovachevich off with his legs, so he had to recross them behind him. Inmate Sullivan continued to struggle during this time.

Page 15 – EXPERT WITNESS REPORT - MURPHY

**Exhibit 1**
**Page 15 of 30**

Then Deputy Kovachevich heard Sergeant Ingram call for the cutter.  It was Deputy Kovachevich's thinking that Sergeant Ingram felt they would not be able to perform a strip search at this point, so he decided to cut Inmate Sullivan's clothing to remove it.

Inmate Sullivan was yelling that he could not breathe and that he has asthma.  Inmate Sullivan was using full sentences, however, and Deputy Kovachevich could hear him inhaling and exhaling, but not wheezing, so Deputy Kovachevich thought he could breathe okay.  When Inmate Sullivan's shirt had been removed, Acting Sergeant Barker began cutting off Inmate Sullivan's pants and boxers.  At this time, Inmate Sullivan began to comply with the directives being issued. At this point, Acting Sergeant Barker began removing the handcuffs, and Deputy Kovachevich let up on Inmate Sullivan's legs and pulled his blue pants off.  Sergeant Ingram ordered Inmate Sullivan to remain belly down on the mattress until they exited the cell.  When they did, the door was secured.  As they left 4F, Sergeants Ingram and Barker commented to each other that they need to call medical to have Inmate Sullivan checked out as it appeared he may have suffered a broken left arm.  Medical arrived within a few minutes, and after a brief examination, agreed the arm was likely broken and Inmate Sullivan would require transport to the hospital.  At that point, Inmate Sullivan appeared to be in pain and stated he could not move his left arm.  The ambulance arrived a while later, and Inmate Sullivan was transported to the hospital.

July 13, 2017 Incident Report from Sergeant Matthew Ingram. This includes another narrative of the June 28, 2017 incident.  Sergeant Ingram was working on June 28, 2017 and received a radio call at about 2030 hours for assistance in housing unit 5D.  This documents efforts for de-escalation and Inmate Sullivan's refusal to be handcuffed through the food port.  Deputies entering the cell were met with an unprovoked attack.  A powdered substance was thrown in Sergeant Ingram's face.  Inmate Sullivan quickly followed this up with closed fist strike in the

Page 16 – EXPERT WITNESS REPORT - MURPHY

**Exhibit 1**
**Page 16 of 30**

direction of his face.  Sergeant Ingram was able to redirect the strike, grabbed Inmate Sullivan's right forearm and used his momentum to turn Inmate Sullivan away from him.  Sergeant Ingram ordered Inmate Sullivan to stop fighting and placed his left arm on Inmate Sullivan's right shoulder and pushed him down.  They landed on the counter inside the cell.  During the initial struggle, Sergeant Ingram's handcuffs had fallen to the cell floor.  Once on the counter, Inmate Sullivan somehow grabbed ahold of Sergeant Ingram's right arm, which was now located under his abdomen.  Sergeant Ingram ordered Inmate Sullivan to let go of his arm and stop resisting.  Inmate Sullivan did not let go of his grip and continued to fight and resist.  Inmate Sullivan started mule kicking the staff and struck Sergeant Ingram in the leg.  At this point, Sergeant Ingram used his left hand to deliver three closed-fist focused blows to the back of Inmate Sullivan's right triceps area.  The intent was to strike a nerve in Inmate Sullivan's arm and, thereby, weaken his grip. Sergeant Ingram grabbed Inmate Sullivan's right arm just above the elbow with his left hand and pulled his arm out away from his body.  This move broke Inmate Sullivan's grasp on his arm. Sergeant Ingram was able to gain control of Inmate Sullivan's right wrist, and he ordered him to place his hands behind his back.

Inmate Sullivan continued to struggle against attempts to place him in handcuffs.  Sergeant Ingram was able to get his right wrist to the small of his back just above his buttocks.  Sergeant Ingram asked for his handcuffs from the staff, and once he regained his handcuffs, he placed Inmate Sullivan's right wrist in the cuff.  Once secured, Sergeant Ingram told Inmate Sullivan to place his left hand behind his back.  It was at this point Sergeant Ingram noticed Acting Sergeant Barker was trying to control Inmate Sullivan's left arm.  Sergeant Ingram continued to give verbal commands to stop resisting and allow them to handcuff him.  Sergeant Ingram could hear the other staff yelling at Inmate Sullivan to do the same.  Inmate Sullivan continued to resist Acting Sergeant

Page 17 – EXPERT WITNESS REPORT - MURPHY

**Exhibit 1**
**Page 17 of 30**

Barker, not allowing his left hand to be placed behind him and was once again instructed to stop fighting. Soon after that, Sergeant Ingram heard a pop noise and Inmate Sullivan's left wrist appeared to the small of his back. Sergeant Ingram placed Inmate Sullivan's left wrist in the handcuff. Sergeant Ingram's report also documents the deputies' continued to struggle to get Inmate Sullivan into the 4F13 cell, cutting off his clothing, and the call to medical staff as documented previously.

July 3, 2017 Incident Report from Deputy Phillip Hubert. This includes another narrative of the June 28, 2017 incident. Deputy Hubert's report is consistent with those previously documented.

July 3, 2017 Incident Report from Deputy Timothy Moore. This includes another narrative of the June 28, 2017 incident. Deputy Moore's report is consistent with those previously documented.

July 15, 2017 Incident Report from Deputy Tim Barker. This includes another narrative of the June 28, 2017 incident. Deputy Barker's report documents that Sergeant Ingram entered Inmate Sullivan's cell just in front of him when Inmate Sullivan suddenly attacked by spinning around and throwing a handful of red powder into their faces. Sergeant Ingram and Deputy Barker struggled to restrain and handcuff Inmate Sullivan. Deputy Barker was able to get his right hand under Inmate Sullivan's left arm and grab his left wrist and was trying to pull his left arm behind his back. Inmate Sullivan was pulling away, and that is when Deputy Barker heard a pop. Deputy Barker waited for a reaction indicating an injury, and there was no indication of this. Deputy Barker was able to get Inmate Sullivan's arm behind his back, and he was placed in handcuffs. The use of force was then de-escalated but Inmate Sullivan struggled with transport to the fourth floor and also went limp. The first time Inmate Sullivan complained about his arm was on 4F after

he was taken out of handcuffs. Inmate Sullivan said he could not move his arm. Deputy Barker asked him to place his hand under himself, and he stated he thought his arm was broken. At that point, the medical team was called.

July 31, 2017 Incident Report from Deputy Uwe Pemberton. This includes another narrative of the June 28, 2017 incident. Deputy Pemberton's report is consistent with those previously documented.

August 1, 2017 Incident Report from Deputy Matt Dilger. This includes another narrative of the June 28, 2017 incident. Deputy Dilger's report documents that he was called to the scene after staff were already in place and assisting.

Each of the above Incident Reports include reviews by senior corrections staff. Sergeant Gary Glaze's review, dated July 15, 2017, documents that the incident began when Inmate Sullivan took some Gatorade, which he was not supposed to have, from the med tech, ran to his cell and disobeyed the orders of the module deputy. Staff were called to respond to escort Inmate Sullivan to disciplinary housing for rule violations he committed. Sergeant Glaze concludes that after reviewing these use of force and gaining an understanding of how the entire incident unfolded, he believes the staff acted with the goal in mind of preventing further assault from Inmate Sullivan and to get him safely contained in a disciplinary cell. A review of the incident from Lieutenant Kurtiss Morrison is also included, dated August 1, 2017. Lieutenant Morrison concludes that it appears that staff used a reasonable level of force in order to stop the inmate's assaultive behavior, secure him in restraints and move him to disciplinary housing. Another review is included from Captain Jeffery Wheeler, dated October 16, 2017. Captain Wheeler concludes that the staff were confronted by a sudden and unprovoked attack, and responded appropriately to defend themselves from the attack and to accomplish the requirement of securing the inmate for movement to

Page 19 – EXPERT WITNESS REPORT - MURPHY

**Exhibit 1**
**Page 19 of 30**

disciplinary housing.  The use of force was also reviewed by Captain Derrick Peterson without comment, dated November 16, 2017.

**Independent Medical Review from Clive Segil, M.D., Board Certified Orthopedic Surgeon, Encino, California:**

This documents a review of the Incident Reports from the deputies regarding the June 28, 2017 use of force, medical records pertaining to the event, and imaging studies from June 28, 2017, August 3, 2017, and March 12, 2020.  The discussion section concludes that Mr. Sullivan sustained a fracture of the distal third of his left humerus following an altercation with officers in Multnomah County Jail.  Dr. Segil concludes that due to the severity of the injury, Mr. Sullivan would not have been able to fight ferociously or engage in similar behavior as claimed by the officers.  Dr. Segil concludes that the fracture was improperly treated and, as a result, Mr. Sullivan suffers from a malunited fracture of his humerus with both anterior and varus angulation.  It is Dr. Segil's opinion that Mr. Sullivan should have had proper immobilization for this fracture so that it would heal in an anatomical position, and a surgery should have been made available at the time of the injury in the form of an open reduction and internal fixation, which would result usually in a perfectly healed humerus fracture.  Dr. Segil also concludes that a Sarmiento brace properly fitted would have improved the position, and Mr. Sullivan's recovery of this fractured humerus over the surgery as suggested would not have resulted in a malunited fracture.  Dr. Segil also concludes that this would have reduced Mr. Sullivan's pain by keeping rigid immobilization of a fracture.  Dr. Segil concludes that Mr. Sullivan would have received better care from other orthopedic surgeons with similar training and experience in the community.

**Expert Witness Report from Wilson Toby Hayes, PhD:**

This documents Dr. Hayes' review of the available records from law enforcement and the medical records as it pertains to the incident of June 28, 2017.  This includes Dr. Hayes'

qualifications as a biomechanist, although he is not a licensed physician and does not treat patients or fractures. It is Dr. Hayes' opinion that Mr. Sullivan's humeral fracture occurred in the cell 4F13 on the fourth floor of the detention center when he was pinned to the mattress on the cell floor by Deputies Barker and Ingram when his arm was twisted behind his back. His opinion is that the level of force necessary to produce such fractures are consistent with those reported in the literature as associated with motor vehicle collisions, high intensity arm wrestling and fractures noted to occur during high velocity throwing motions. It is Dr. Hayes' opinion that the facts of the case rule out the version of the events provided by the deputies, which assert that the fracture occurred in Mr. Sullivan's cell on the fifth floor as deputies were trying to handcuff him. The basis for this opinion includes the spiral configuration and twist direction of the humeral fracture itself, including its mild angulation and displacement, peer-reviewed literature on the torsional strength of the humerus, Mr. Sullivan's height and weight, incident reports that include how Mr. Sullivan was transferred from the fifth to the fourth floor, Dr. Hayes' interpretation of the radiographs taken on June 28, 2017 and his calculations using the fundamental laws of engineering physics. Dr. Hayes concludes that the twisting forces applied to Mr. Sullivan's forearm were both substantial and violent, applied in a manner that would be expected to cause injury, well within the capability of males similar to Deputies Barker and Ingram and well above the reported torsional fracture strength of the humerus.

## IMPRESSION

As a result of the altercation of June 28, 2017, I believe Mr. Sullivan suffered the following injuries: Spiral oblique distal third left humeral shaft fracture.

## DISCUSSION

After reviewing the medical records and the incident reports provided by deputies involved in the altercation with Mr. Sullivan on June 28, 2017, I believe that the patient suffered a spiral oblique distal third humeral shaft fracture.  I believe that such an injury is entirely consistent with the deputies' accounts of the incident.  Spiral oblique fractures result from twisting mechanism and would be consistent with attempts of the deputies to place Mr. Sullivan's left arm in an internally rotated position behind his back while the inmate struggled against this.  Appropriate treatment for distal third shaft fractures include both operative and nonoperative treatment.  I believe the patient was treated with appropriate conservative management, which was well within the standard of care for treatment of such an injury.

Although there is a documented discussion of use of a Sarmiento brace, it is well recognized in the orthopedic literature that Sarmiento bracing for distal third humeral shaft fractures does not result in appropriate immobilization of such a fracture as the brace typically ends at the level of the fracture and fails to provide appropriate immobilization of the fracture above and below the fracture line.  While operative treatment with open reduction and internal fixation is a viable option for such fractures, nonoperative management in a sling and swath is also considered appropriate.

It is well recognized in the orthopedic literature that such fractures often heal with slight varus alignment and apex posterior alignment.  Despite this, it is also well recognized in the orthopedic literature that such malalignment results in little functional limitation with use of the arm and results in good functional outcomes.  It is well-described in the orthopedic literature that acceptable alignment of humeral shaft fractures include 20 degrees of apex posterior angulation, up to 30 degrees of varus angulation, up to 15 degrees of malrotation and up to 3 cm of shortening

Page 22 – EXPERT WITNESS REPORT - MURPHY

Exhibit 1
Page 22 of 30

or completed bayonet apposition.  As of the last available medical records and radiographs, Mr. Sullivan's fracture healed well within what would be considered acceptable alignment, and at his last available documented office visit, his functional limitations were relatively minimal and would likely lead to little, if any, functional limitation or deficits with regard to use of the left upper extremity.

As such, I believe the diagnosis, treatment, and ultimate functional outcome with regard to the humeral fracture which occurred on June 28, 2017, were well within normal limits of the accepted community standards and standard of care for such an injury.


7/20/22

Kevin J. Murphy, M.D.
Orthopedic Surgeon

**Exhibit 1**
**Page 23 of 30**

# Kevin James Murphy, M. D.

Board Certified Orthopaedic Surgeon
Sports Medicine Oregon
7300 SW Childs Road, Suite B
Tigard, OR  97224
(503) 692-8700
kjmurph@me.com

## Education

1994 – 1998 University of Southern California, School of Medicine
Doctor of Medicine, *Graduate with Highest Distinction*

1990 – 1994 Loyola Marymount University
Bachelor of Science, *Magna Cum Laude*, Biology

## Training

2003 – 2004 Stanford/SOAR Sports Medicine Fellowship
Arthroscopic shoulder, elbow, knee and ankle reconstruction

1999 – 2003 University of California, Irvine; School of Medicine
Orthopaedic Surgery Residency Program

1998 – 1999 University of California, Irvine; School of Medicine
General Surgery Internship Program

## Employment

2004 – present Physician
Sports Medicine Oregon

2003 – 2004 Fellow
Stanford/SOAR Sports Medicine Fellowship

1998 – 2003 Resident Physician
University of California, Irvine; School of Medicine

1995 – 1996 Gross Anatomy Tutor, Medical Scholars Program
University of Southern California, School of Medicine

1993 – 1994 Teaching Assistant for Introductory Biology
Loyola Marymount University

1992 – 1994 Biology Tutor, Learning Resource Center
Loyola Marymount University

## Experience

2015 - present Chief Medical Officer, Portland Timbers, Major League Soccer

2016 - present Editorial Review Board, American Journal of Orthopedics

**Exhibit 1**
**Page 24 of 30**

2004 – present          Team Physician, Portland Timbers, Major League Soccer

2014 - 2015             Team Physician, Portland Thunder, Arena Football League

2003 – 2004             Assistant Team Physician, San Francisco 49ers

2003 – 2004             Assistant Team Physician, Stanford University

2003 – 2004             Assistant Team Physician, Santa Clara University

2003 – 2004             Team Physician, Foothill College

2003 – 2004             Assistant Physician, Ballet San Jose Silicon Valley

2004                    NFL Combine Draft Physicals
                        San Francisco 49ers Team Physician
                        Indianapolis, IN
                        February 18-24, 2004

2010 – present          Instructor, Arthrex Medical

2010 – present          Consultant -- Acumed, Medshape, Mitek orthopaedic device companies

2011 – present          Team Physician, Tualatin High School

2008 – 2010             Team Physician, Westview High School

2005 – 2008             Team Physician, Tigard High School

2005                    Event Physician, Vans Invitational
                        Dew Action Sports Tour
                        August 18 – 25, 2005

2005                    Local Medical Provider/Sponsor
                        U.S. Figure Skating National Championships
                        Portland, OR
                        January 9-15, 2005

2004 – 2005             Team Physician, Wilsonville High School

## Memberships

2009 – present          Fellow, American Academy of Orthopaedic Surgeons

2012 – present          Arthroscopy Association of North America

2007 – present          North Pacific Orthopaedic Society

## Research

2003                    Lead Researcher
                        Orthopaedic Biomechanics Laboratory, VA Medical Center – Long Beach

**Exhibit 1**
**Page 25 of 30**

*Quantitative Assessment of Glenohumeral Translation in Spinal Cord Injury*
Podium Presentation - 2003 UCI Dept. of Orthopaedic Surgery Graduate Research Forum

2000 – 2001          Lead Researcher
Orthopaedic Biomechanics Laboratory, VA Medical Center – Long Beach
*The Effects of Total Shoulder Arthroplasty on Glenohumeral Joint Biomechanics*
Poster presentation at 2001 AAOS Academy Meeting
Dallas, TX

1997 – 1998          Research Assistant
L. Dorr M.D., E. MacPherson M.D., J. Broadhead M.D., S. Herron M.D.
University of Southern California, School of Medicine
Aspirin Therapy and the Incidence of DVT Following Total Hip and Knee

Arthroplasty

1994                 Sigma Xi, Scientific Research Society

1993 – 1994          Research Assistant
Stephen Scheck, Ph.D., Associate Professor of Biology
Loyola Marymount University
Assessed Effects of High-Dose Prednisolone on Pancreatic Function and Bone Density in the Rat, as well as Effects of Simulated Weightlessness on the Estrous Cycle of the Rat

1993                 Southern California Undergraduate Research Forum
California Institute of Technology
Podium Presentation: *The Effects of Simulated Weightlessness on the Estrous Cycle of the Rat*

## Honors and Awards

1997 – 1998          Alpha Omega Alpha, Honor Medical Society
University of Southern California, Gamma Chapter

1998                 Phi Kappa Phi Honor Society
University of Southern California

1998                 Association of Pathology Chairs Honor Society
University of Southern

1998                 Berman Pharmacology Award
University of Southern California, School of Medicine

1994                 Alpha Sigma Nu, Jesuit Honor Society
Loyola Marymount University

1994                 Presidential Citation
Loyola Marymount University
Excellence in Academic Achievement and Community Service

1994                 Graduate of the Year, Department of Biology

**Exhibit 1**
**Page 26 of 30**

Loyola Marymount University

1994                 Jerome Korth Award
                     Loyola Marymount University
                     Highest Core Curriculum GPA in College of Science and Engineering

## Presentations

2017                 *Tibial Fixation:  What I Do And How I Do It?*
                     Faculty: Emerging Techniques in Orthopedics Conference
                     Las Vegas NV
                     October 19 - 21, 2017

2017                  *The Bend Way Symposium*
                      Faculty
                     Bend, OR
                     June 2017

2016                 *Injection Therapy for Knee Osteoarthritis*
                      Faculty: Innovative Techniques: The Knee Course
                      Las Vegas NV
                     October 2016

2015                 *Injection Therapy for Knee Osteoarthritis*
                     Faculty: Emerging Techniques in Orthopedics Conference
                     Las Vegas NV
                     September 2015

2011                 *Current Treatment Strategies for the Treatment of Articular Cartilage Defects*
                     Speaker: Arthrex Fellows Completion Initiative
                     Naples, FL
                     June 9, 2011

2010                 *Treatment Option for the First Time Anterior Dislocator*
                     Speaker: Arthrex Road Show
                     Seattle, WA
                     June, 2010

2008                 *Common Athletic Injuries in the Pediatric Athlete*
                     Speaker:  Kaiser Permanente Pediatric Department Grand Rounds
                     Portland, OR
                     August 19, 2008

2006                 *The Cause of Shoulder Pain*
                     Speaker:  Willamette Falls Hospital
                     Oregon City, OR
                     September 20, 2006

2006                 *Diagnosis and Management of Cartilage Defects in the Knee*
                     Speaker:  Willamette Falls Hospital
                     Oregon City, OR
                     June 8, 2006

**Exhibit 1**
**Page 27 of 30**

2006                     *Tactical Training*
                         Speaker:   City of Tualatin, Oregon Police Department
                         Tualatin, OR
                         March 14, 2006

2006                     *Total Joints*
                         Speaker:  Legacy Meridian Park Hospital Total Joint Center
                         Tualatin, OR
                         January 19, 2006
                         February 16, 2006

2005                     *Diagnosis and Management of Cartilage Defects in the Knee*
                         Speaker:  Willamette Falls Hospital
                         Portland, OR
                         October 27, 2005

2005                     *Joint Intervention:  Treating Knee Cartilage Defects*
                         Speaker:  Willamette Falls Hospital Community Health and Education
                         Portland, OR
                         October 5, 2005

2004                     *Elbow Pain in a Pitcher*
                         Stanford University Sports Medicine Grand Rounds
                         June 1, 2004

2003                     *Rotator Cuff Injury in a Quarterback*
                         Stanford University Sports Medicine Grand Rounds
                         October 14, 2003

2003                     *Quantitative Assessment of Glenohumeral Translation in Spinal Cord Injury*
                         Podium Presentation - 2003 UCI Dept. of Orthopaedic Surgery Graduate Research
                         Forum

2001                     *The Effects of Total Shoulder Arthroplasty on Glenohumeral Joint Biomechanics*
                         Poster presentation at 2001 AAOS Academy Meeting
                         Dallas, TX

## License

2006                     Washington State Medical License #MD46646

2004                     Oregon State Medical License #MD25228

1999                     California State Medical License #A70690

1999                     Drug Enforcement Agency #BM670685x

## Certification

2007                     ABOS Part II: Pass

**Exhibit 1**
**Page 28 of 30**

| | |
|---|---|
| 2003 | ABOS Part I:   Pass (95th percentile) |
| 1996 | USMLE Step I:  243 (94) |
| 1998 | USMLE Step II: 239 (91) |
| 1998 | USMLE Step III:   221 (88) |

## Scientific Meetings

| | |
|---|---|
| 2011 | Metcalf Memorial Arthroscopic Surgery Meeting/AANA Winter Meeting<br>Snowbird, UT<br>March 24 – 27, 2011 |
| 2010 | Metcalf Memorial Arthroscopic Surgery Meeting<br>Sun Valley, ID<br>January 31 – February 2, 2010 |
| 2009 | AAOS Academy Meeting<br>Las Vegas, NV<br>February 25-28, 2009 |
| 2008 | OAO Pain Management Conference<br>Bend, OR<br>April 5. 2008 |
| 2008 | AAOS Academy Meeting<br>AOSSM Specialty Day<br>San Francisco, CA<br>March 5-9, 2008 |
| 2007 | Cartilage Restoration of the Knee<br>AAOS Orthopaedic Learning Center<br>Rosemont,<br>June 8-9, 2007 |
| 2006 | AAOS/ASES Shoulder Arthroplasty: Surgical Indications and Techniques<br>AAOS Orthopaedic Learning Center<br>Rosemont, IL<br>October 6-7, 2006 |
| 2006 | Elbow reconstruction: Arthroscopy, Instability, and Arthroplasty<br>AAOS Orthopaedic Learning Center<br>Rosemont, IL<br>September 29 – 30th, 2006 |
| 2006 | Postgraduate Institute for Medicine<br>National Visiting Professor Series<br>Technique in Orthopaedic surgery and Strategic Pain Management<br>Portland, OR<br>June 20, 2006<br>Category I:  1.5 CME hours |
| 2006 | Northwest Physicians Insurance |

**Exhibit 1**
**Page 29 of 30**

Quality Factor Program
Portland, OR
March 23, 2006
Category I:  1 CME hour

2005            Stryker Navigation System
                Orthopaedic Learning Lab
                Phoenix, AZ
                December 6-7, 2005

2004            Stryker Navigation System
                Orthopaedic Learning Lab
                Central Oregon
                October 19, 2004

## Personal

Born June 28, 1972 – San Francisco, CA
Married – Laura Murphy M.D., Pediatrician
Children – Sean (12), Bridget (11), Ryan (7)

## References

Michael F. Dillingham, M.D.
Sports, Orthopedic and Rehabilitation Medicine Associates
500 Arguello Street, Suite 100
Redwood City, CA 94063
(650) 995-1285

Gary S. Fanton, M.D.
Stanford University School of Medicine
Sports Medicine Service
450 Broadway Street, Pavilion A
Redwood City, CA 94063
(650) 723-5643

Gavin Wilkinson
General Manager/Technical Director
Portland Timbers Football Club
1844 SW Morrison
Portland, OR 97205
(503) 553-5400

Nik Wald, ATC
Head Athletic Trainer
Portland Timbers Football Club
1844 SW Morrison
Portland, OR 97205
(503) 553-5400

updated 10/2014

**Exhibit 1**
**Page 30 of 30**

## CERTIFICATE OF SERVICE

I hereby certify that on September 2 3, 2022, I arranged for service of the foregoing

**DECLARATION OF KEVIN MURPHY IN SUPPORT OF DEFENDANTS' MOTION**

**FOR PARTIAL SUMMARY JUDGMENT** on:

Cyrus Andrew Sullivan
PO Box 86653
Portland, OR 97286
Email: sullivancyrus@hotmail.com

by the following method or methods as indicated:

(  )    by **mailing** to said person(s) a true copy thereof, said copy placed in a sealed envelope, postage prepaid and addressed to said person(s) at the last known address for said person(s) as shown above, and deposited in the post office at Portland, Oregon, on the date set forth above.

(  )    by **e-mailing** to said person(s) a true copy thereof in Word format, at the email address as shown above, pursuant to L.R. 5.2(b).

(  )    by **facsimile** to said person(s) a true copy thereof at the facsimile number shown above, which is the last known facsimile number for said person(s) on the date set forth above. A copy of the confirmation report is attached hereto.

( **X** )    by **email** to said person(s) at their last known email address(es) shown above and through the Court's efiling system.

**/s/ Ona Davis**

_____

Ona Davis
Paralegal for Andrew Weiner

Page 1 – CERTIFICATE OF SERVICE