Cyrus Sullivan

P.O. Box 86653
Portland, OR 97286

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

Cyrus Andrew Sullivan,                          Case No:  3:19-CV-00995-JGZ

       Plaintiff

v.

Multnomah County et. al.,

       Defendants

**PLAINTIFF's SUMMARY JUDGEMENT RESPONSE, CROSS MOTION, DAUBERT CHALLENGE, AND MOTION TO SUPPRESS**

1.  I the Plaintiff Cyrus Andrew Sullivan, pro-se, talking about myself in the third person to sound more professional, hereby submit this response to Defendants motion for partial summary judgement (E.C.F. 65) which includes a cross motion for summary judgement, *Daubert* challenges, and a request to suppress late and/or inadmissible evidence. The evidentiary motions will be addressed first along with the *Daubert* Challenges followed by Plaintiff's response to Defendants summary judgment motion and finally a cross motion.

**MOTION TO SUPPRESS LATE AND INADMISSIBLE EVIDENCE**

2. Plaintiff challenges the declarations of Dr. Kevin Murphy (E.C.F. 66), Dr. Michael Seale (E.C.F. 67) and Sgt. Brandon Pedro (E.C.F. 68). All three declarations were filed with the court after the discovery deadline. The discovery deadline in this case was July 20, 2022 (E.C.F 63). The declaration of Dr. Murphy is dated September 15, 2022 (E.C.F. 66 p. 3), Dr. Seale's is dated September 15, 2022 (E.C.F. 67 p. 3), and Sgt. Pedro's is dated September 22, 2022 (E.C.F. 68 p. 3). All three dates are clearly after July 20, 2022, so that discovery is late and should be excluded. Under Rule 37(c)(1), "If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." The late declarations provided are "information" within the scope of Rule 37(c)(1) and should be excluded. *See* also Rule 26(e)(2), "additions or changes to this information must be disclosed by the time the party's pretrial disclosures under Rule 26(a)(3) are due." If Defendants wanted to include declarations with those reports, they should have done so before the reports were due.

3. Plaintiff challenges the expert witness reports of Dr. Kevin Murphy and Dr. Michael Seale for being unsworn. While such an error could normally be cured by declarations such as the ones included with the Defendants motion, those declarations should have been turned over to the Plaintiff before the expert discovery deadline. With those declarations properly excluded, the court should not

consider the unsworn expert witness reports. *See Shuffle Master, Inc. v. MP Games LLC*, 553 F. Supp. 2d 1202, 1210 (D. Nev. 2008) "unsworn expert reports are not admissible."

4. Plaintiff challenges the expert witness report of Dr. Murphy for failing to comply with Rule 26(2)(B)(v). While it is true that Dr. Murphy mentions four cases he claims to have testified in an expert capacity in over the previous four years, he only mentions them by the names of the parties (E.C.F. 66 p. 4). He does not include the venues, case numbers, or citations to any opinions. Plaintiff has no way of looking up these cases because they could have been in any state or federal court in this country. Rule 26 requires that expert witness reports contain enough information "to provide an adversary with sufficient information to engage in meaningful cross-examination and prepare a rebuttal." *Republic of Ecuador v. Mackay*, 742 F.3d 860 (9th Cir. 2014). Dr. Murphy's report fails to provide Plaintiff with sufficient information to engage in any cross-examination of his prior testimony. Plaintiff asks that Dr. Murphy's report be deemed inadmissible for failing to comply with Rule 26 and Dr. Murphy be disqualified from testifying due to his failure to provide the court with a proper expert witness report under Rule 26.

**DAUBERT CHALLENGES**

5. Plaintiff challenges the use of Dr. Michael Seale as a medical expert in this case due to a conflict of interest. Plaintiff also challenges the expertise of Dr. Kevin Murphy in

part as a prophylactic measure should the Defendants ever want to use him in support of their etiology theory and challenges his medical opinions based on uncited literature.

**Dr. Michael Seale Partial Daubert Challenge**

6. Dr. Michael Seale is a former defendant in this matter with a personal and professional stake in the outcome which Plaintiff feels should disqualify him as an expert on anything other than facts pertaining specifically to county policy in this case. Plaintiff has conferred with Defense counsel and was given the impression that while Dr. Seale is an expert on county policy that he would be used primarily as a fact witness in this case. Despite this, it seems Defendants intent to use him as a medical expert to review his own care which is not appropriate. Such things are appropriate for an outside expert like Dr. Murphy to review and not a doctor so personally involved like Dr. Seale is. A conflict of interest exists when the provider of medical care and the judge of care quality are the same person. Likewise, Dr. Seale's continued long term employment with Defendants renders any opinion he offers unreliable. Dr. Seale should be precluded from offering expert opinions on his own work and those working underneath him. Opinions tainted by conflicts of interest such as this cannot possibly meet the reliability requirements of *Daubert* and Rule 702.

7. Dr. Seale has another conflict of interest because as the supervisor of Plaintiff's treating physicians there existed at one point a confidential relationship. Other courts have embraced a two-prong conflict of interest test in cases involving experts who've previously provided services to an adverse party: (1) whether the moving party reasonably thought it had a confidential relationship with the former employee/proposed expert; and (2) whether the moving party disclosed relevant confidential or privileged information to that person. See *Wang Labs, Inc. v. Toshiba Corp.*, 762 F. Supp. 1246 (E.D. Va. 1991). Dr. Seale and Plaintiff had a doctor/patient confidential relationship. Dr. Seale also received relevant and privileged information about Plaintiff via his treating physicians. Dr. Seale should be disqualified for having a prior confidential relationship with the Plaintiff which resulted in him coming into possession of information privileged under HIPAA.

8. Dr. Seale also lacks the expertise needed to rebut Dr. Segil due to Dr. Seale being a general practitioner with no specific training or experience in orthopedics. If Defendants felt their in-house medical staff competent to treat Plaintiff's injury, they would not have sent him back to OHSU for orthopedic care. Dr. Seale clearly lacks the expertise needed to render reliable orthopedic opinions. Courts have ruled that expert witnesses must limit their testimony to their area of expertise. They've also recognized that specialty fields like orthopedics are distinct fields of expertise separate from the filed of family medicine which is a broader multi-specialty. *See Carter v. United States*, NO. 2:15-02312 (W.D. La. Dec. 15, 2017) in which a doctor

from a muti-specialty clinic was prohibited from offering an expert opinion on the standard of care in an emergency room due to emergency medicine being a separate and distinct specialty just like orthopedics.

9. Dr. Seale has spent his entire career working in correctional settings. The only possible exception to that is four years he spent in private practice from 1990 to 1994 shortly after graduating from medical school (E.C.F. 67 p. 8). Even if he were familiar with community standards of care in 1994 that wouldn't qualify him to offer an expert opinion on those standards today. If anything, he appears to be out of touch with the community due to spending 28 years working in the corrections bubble. Dr. Seale lacks the experience necessary to know what standard of care is expected in the community.

10. Dr. Seale fails to meet the reliability requirements of Rule 702 due to a conflict of interest, lacks the required expertise to rebut Dr. Segil due to not being an orthopedic specialist, and lacks sufficient experience working in the community to offer an expert opinion on community standards of care. He is only qualified to offer an expert opinion on the policies of the Multnomah County Health Department.

**Dr. Kevin Murphy Daubert Challenge**

11. Dr. Murphy is clearly qualified to diagnose and treat broken arms as well as other injuries, but nothing in his CV suggests he has any training or experience which would qualify him to determine how an injury was or could have been sustained in

the first place. Dr. Murphy did not consider the obvious alternative theory and failed to cite the literature he relied upon which renders his opinions unreliable.

**Causation**

12. Daubert challenges can be complicated but this one is simple. Under Daubert, "Factors that a judge should consider include whether the theory or technique in question can be and has been tested, whether it has been subjected to peer review and publication, its known or potential error rate, the existence and maintenance of standards controlling its operation, and whether it is widely accepted in the relevant scientific community." *See Daubert v. Merrell Dow Pharmaceuticals* (509 U.S. 579). In this case, Dr. Murphy offers no theory or technique capable of being reviewed at all. He simply offers one conclusory statement, "Spiral oblique fractures result from twisting mechanism and would be consistent with attempts of the deputies to place Mr. Sullivan's left arm in an internally rotated position behind his back while the inmate struggled against this." (E.C.F. 66 p. 25). Dr. Murphy offers no evidence to back up his opinion besides the opinion itself and a vague explanation related to twisting. His opinion is clearly based on generalities not the specifics of this case. A stark contrast to his opinions regarding Plaintiff's medical care all of which he claims to be based on orthopedic literature. Experts are required to explain the basis for their opinions for those opinions to be admissible under *Daubert*. *See City of Pomona v. SQM North America Corp.* 750 F.3d 1036 (9th Cir. 2014), "In order for a scientific technique to be reliable, there must be evidence in the record indicating

the methodology 'can be or has been tested.' *Cooper v. Brown*, 510 F.3d 870, 880–81 (9th Cir. 2007)."

13. While there are orthopedic surgeons qualified to offer causation opinions in cases such as this, they are unique in that they have dueling skill sets. They typically have degrees in engineering, mechanical engineering, or something similar which qualifies them to do injury causation analyses. Dr. Murphy's undergraduate degree was in biology (E.C.F. 66 p. 27). A biologist is not qualified to determine how injuries are caused. Other orthopedic surgeons with similar educational backgrounds offer causation analysis but in the context of medical malpractice not situations such as this where the injury is unrelated to surgery. Their testimony is typically limited to situations where they believe another doctor caused an injury during a botched procedure. Dr. Murphy did do some biomechanics research 20 years ago, but it was limited to just two studies titled "Quantitative Assessment of Glenohumeral Translation in Spinal Cord Injury" and "The Effects of Total Shoulder Arthroplasty on Glenohumeral Joint Biomechanics" (E.C.F. 66 p. 29). Plaintiff cannot locate copies of either study online but based on the titles believes they were focused solely on the impact of surgeries on shoulder biomechanics. Both studies refer to the Glenohumeral which is the medical term for the shoulder joint. The first study appears to be about the movement of the shoulder as it relates to spinal cord injuries. The second study appears to focus on arthroplasty surgery intended to repair shoulder joints and its impact on shoulder joint biomechanics. Neither of

those studies appear to involve diagnosing the cause of an injury outside the context of injuries caused by surgery and they certainly have nothing to do with diagnosing the causes of broken arms sustained during physical altercations. While it is possible that Dr. Murphy may have studied biomechanics in college at some point, studying something over 20 years ago alone doesn't make anyone qualified to offer an expert opinion on it today.

14. Dr. Murphy also failed to consider other possible causes of injury, so "His failure to consider and exclude other potential causes of [Plaintiff]'s injury before offering an opinion renders his testimony unreliable" *McNabney v. Laboratory Corp. of America*, 153 Fed.Appx. 293, 295 (5th Cir.2005). In this case, Dr. Murphy never considered the pulling and twisting of Plaintiff's arm away from his body on the fourth floor as a possible cause. While it is true that an expert need not rule out every conceivable possible cause of an injury, he must at least consider other options presented for his opinion to be considered reliable under *Daubert*. See Rule 702 Committee Notes on Rules—2000 Amendment ("(3) Whether the expert has adequately accounted for obvious alternative explanations. See *Claar v. Burlington N.R.R.*, 29 F.3d 499 (9th Cir. 1994) (testimony excluded where the expert failed to consider other obvious causes for the plaintiff's condition). Compare *Ambrosini v. Labarraque*, 101 F.3d 129 (D.C.Cir. 1996) (the possibility of some uneliminated causes presents a question of weight, so long as the most obvious causes have been considered and reasonably ruled out by the expert)."). As one of just two alleged causes of injury presented to

this court, Plaintiff's claim backed by experts who Dr. Murphy was retained to rebut couldn't possibly be a more obvious alternative to the Defendants theory.

15. Humpty Dumpty sat on a wall, Humpty Dumpty had a great fall. All the king's horses and all the king's men couldn't put Humpty together again. We've all heard that tale, but what if the king's doctor put Humpty back together again? Would putting Humpty back together again tell that doctor how Humpty was broken in the first place? Anybody who saw Humpty on the ground could tell that he had a great fall, but they wouldn't be able to tell you how far or how fast he fell. Normally that wouldn't matter but what if one person was accused of pushing Humpty from a great height and that person claimed Humpty fell from below? Nobody can answer that question just by putting Humpty back together. An expert would be needed to determine how hard Humpty would have had to hit the ground to break into so many pieces and the minimum height necessary to produce that force. That would require analyzing stuff like Humpty's broken shell pieces or the splatter marks from his yolk. Such analysis falls outside the scope of expertise needed to put Humpty back together again. It doesn't matter how many Humpty's the doctor has put back together. That same doctor could have been told by countless others with similar injuries that they only fell so far, but without doing a proper analysis that doctor's guess is just as good as anyone else's. A doctor could review medical reports and offer qualified opinions as to the seriousness of Humpty's injuries or the quality of care Humpty received, but if he were to add a brief sentence explaining that such

fractures are often caused by a falling mechanism that would not be sufficient to rebut an in-depth scientific analysis of the forces in question by a qualified expert in biomechanics. Reading reports, looking at x-rays, and opining that one hypothesis is possible without further analysis is not a scientific method.

16. Plaintiff asks the court to disqualify the testimony of Dr. Murphy on all issues related to how Plaintiff's arm was broken.

**Failure to Cite Sources**

17. Dr. Murphy makes several references to "orthopedic literature" in his report (E.C.F. 66 p. 25-26) but fails to cite any examples to support his conclusions. "Scientific evidence and expert testimony must have a traceable, analytical basis in objective fact before it may be considered on summary judgment." *Bragdon v. Abbott, 524 U.S. 624, 653 (1998)* citing *General Electric Co. v. Joiner, 522 U. S. 136, 144-145, 146 (1997).* A broad reference to "orthopedic literature" which could cover any number of thousands of books, studies, and articles written about orthopedics over the years fails to provide Plaintiff "with sufficient information to engage in meaningful cross-examination and prepare a rebuttal." *Id.* That is especially true when the expert is attempting to justify an alternative treatment. If Dr. Murphy is aware of any literature which specifically states that a sling and swath is just as good as a Sarmiento Brace in situations such as Plaintiff's, he should have cited at least one of those pieces of literature.

18. In *Williams v. Mosaic Fertilizer, LLC, 889 F.3d 1239 (11th Cir. 2018)*, The Eleventh Circuit upheld the exclusion of an expert whose report cited several pieces of literature but failed to provide "endnotes, pin cites, or any other explanations as to what information [the expert] gained from those references or what sources supported what conclusions." "Consequently, the Court [could] not evaluate those sources and determine whether they are based on reliable methodologies or otherwise support his opinions." Likewise, Dr. Murphy has not provided any endnotes, pin cites, or any other explanations as to what information he gained from any sources, nor could he because he did not cite any sources at all.

19. Plaintiff asks the court to disqualify Dr. Murphy from offering opinions based on uncited literature. This should essentially disqualify Dr. Murphy from offering an expert opinion on Plaintiff's medical care because without proper citations the Defendants claim that Dr. Murphy's opinion "is supported by citation to relevant orthopedic literature" (E.C.F. 65 p. 14) cannot possibly be substantiated. Dr. Murphy cites his knowledge of uncited literature as the basis for his beliefs that a Sarmiento Brace would not have properly immobilized Plaintiff's arm and that Plaintiff's arm healed properly. Citations to uncited sources cannot possibly prove anything other than unreliable methodology.

**PLAINTIFF's RESPONSE TO DEFENDANTS MOTION FOR SUMMARY JUDGMENT**

20. Defendants claim county policies and customs were not the moving force behind Plaintiff's injuries using arguments that showcase their deliberate indifference while at the same time attempting to justify inadequate healthcare based on staff risks. Defendants also appear to launch an untimely *Daubert* challenge.

## Monell Claims

21. Plaintiff pleads two *Monell* claims which combined to form the basis of his claims related to inadequate medical care. The combination of rescheduling appointments and refusing to allow Sarmiento Braces.

## Rescheduling

22. Defendants admit in their motion to having a policy of rescheduling outside medical appointments when there are conflicts between those appointments, court dates, and staffing issues. *See* (E.C.F. 65 p. 8) "When there is a conflict, appointments are rescheduled as soon as practicable." The basis for Plaintiff's *Monell* claim related to scheduling is exactly that, Defendants have a policy/custom of rescheduling outside medical appointments instead of giving inmates the care they need when they need it. *See* Plaintiff's original claim, "Multnomah County, MCSO, and MCHD have a policy or custom of cancelling outside medical appointments and taking inmates to court when there is a scheduling conflict, or they fail to train employees to take inmates to the hospital even if they have a conflicting court appearance that day." (E.C.F. 38 p.

42). Defendants falsely assert in their motion that Plaintiff only pled a "direct path" liability theory when the record clearly shows Plaintiff pled multiple theories including "direct path" and decisions by final policymakers or ratification of unconstitutional actions by a subordinate. Plaintiff could not have and still does not know for certain which theory best fits the evidence but is starting to lean more towards a final policymaker theory due to how Defendants have responded to this suit.

23. Defendants have not thrown any county staff members under the bus which would be expected if failure to train were the case. Plaintiff expected Defendants to single out one or more staff members whose individual misconduct were the driving force behind failing to return Plaintiff to OHSU promptly. That would be the best defense to the failure to train theory because it would open the door for them to say that while all staff were properly trained, some of them failed to do as they were taught. That would be a great way to defeat a *Monell* claim based on a failure to train theory, but the Defendants are not doing that. Instead, they are sticking by their people and defending the policy. Those actions are more characteristic of defending final policymakers unless the failure to train is so rampant that the final policymakers themselves were not properly trained to instruct subordinates not to reschedule outside medical appointments.

24. The discovery process has proven Defendants policies and customs worse than originally alleged. Defendants now claim that court conflicts were not the only reason they chose not to take Plaintiff to his follow up. They claim one case was due to "a corrections staffing issue" (E.C.F. 65 p. 9) which they might as well have explained as "we just didn't have time to take him there that day, so we rescheduled." Defendants now admit to making inmate medical care such a low priority that if enough people call in sick nobody will make it to the hospital unless it's a life-or-death emergency and even then, maybe. Those policies and customs were the driving force behind Plaintiff not being taken back to OHSU for his one week follow up until the fifth week. Defendants cannot escape liability simply by proving that Plaintiff's allegations were less serious than the truth. "Defendants thus may not allow security or transportation concerns to override a medical determination that a particular inmate is in need of prompt treatment and must be transported to an appropriate facility." *United States v. State of Michigan*, 680 F.Supp. 928, 1002 (W.D. Mich. 1987).

**Sarmiento Braces**

25. Whether a proper policy of taking inmates to outside medical appointments instead of court or wherever else they might be penciled in for the day regardless of staffing issues would have made a difference depends on the policy against allowing inmates Sarmiento Braces. As Dr. Clive Segil says in his expert witness report (Exhibit A p. 12), ("A Sarmiento brace properly fitted would have improved the position and his

recovery of this fractured humerus over the surgery as suggested and would not have resulted in a mal-united fracture. Also, during the time this would have reduced his pain by keeping a rigid immobilization of a fracture.") Defendants seek to hold harmless the scheduling problems by justifying the denial of Sarmiento Braces based not on medical needs but rather staff concerns. Dr. Murphy completely fails to rebut Dr. Segil's pain reduction claim. Pain is a form of physical injury and increased pain as a result of county policies/customs is an injury inflicted by the county as matter of law. "The term 'bodily injury' means--(A) a cut, abrasion, bruise, burn, or disfigurement; (B) physical pain; (C) illness; (D) impairment of a function of a bodily member, organ, or mental faculty; or (E) any other injury to the body, no matter how temporary." *See* 18 U.S.C. $$ 831(f)(4) (prohibiting transactions involving nuclear materials); 1365(g)(4) (tampering with consumer products); 1515(a)(5) (obstruction of justice); 1864(d)(2) (hazardous or injurious devices on federal lands). *See United States v. Meyers*, 972 F2d 1566, 1573-4 (11th Cir. 1992)(approving jury instruction).

26. Defendants seek to escape liability for failing to offer Plaintiff a surgical option by outsourcing inmate medical care to OHSU then blaming OHSU for not offering the option. Defendants are the ones responsible for inmate medical care not OHSU. OHSU is just as much a federally contracted part of the system as the Defendants are. Plaintiff is also confident that no surgeon would have offered to perform the type of surgery needed if no Sarmiento Brace would be available during recovery.

While that last sentence is not in Dr. Segil's report, Plaintiff would be shocked if Defendants expert thought otherwise. Finally, Defendants did not follow the treatment plan provided by OHSU and therefore cannot blame OHSU for the outcome. Had Defendants followed the advice of OHSU to the letter and Plaintiff still felt wronged then he would take it up with OHSU.

27. Defendants' version of events fails to mention that OHSU recommended Plaintiff be returned after one week to be fitted with a Sarmiento Brace. In fact, Defendants flat out lie in their motion by saying, "there is no evidence that the orthopedist believed a Sarmiento brace was necessary." (E.C.F. 65 p. 10). Plaintiff's medical records say, ("Discussed treatment options including coaptation splint and sling and swathe, the patient elected for initial treatment in a sling and swathe considering how painful it was for him to just get X-rays. He felt that he would not be able to tolerate splinting … Follow up in clinic within 1 week for conversion to Sarmiento brace.") (E.C.F. 38 Exhibit 34). The orthopedist clearly believed a Sarmiento Brace necessary, but that Plaintiff's arm should be left in a sling and swath for the first week due to pain and swelling.

28. The risk of injury as a result of Defendants policies and customs should be obvious to any lay person. It doesn't take a doctor to realize that rescheduling outside medical appointments will eventually result in someone suffering somehow someday. Plaintiff need not prove Defendants were aware of anything unique to his case

because the recklessness of rescheduling is obvious in any case. *See Farmer v. Brennan*, 511 U.S. 825 (1994), "prison officials may be held liable for failure to remedy a risk so obvious and substantial that the officials must have known about it."

29. Defendants falsely claim, "Dr. Segil does not say that Plaintiff's arm did not heal properly." (E.C.F. 65 p. 11). Dr. Segil clearly said in his report, "This fracture was improperly treated, and as a result, he is now suffering from a malunited fracture of his humerus with both anterior and varus angulation." (Exhibit 1 p. 12). Defendants' expert does not rebut Dr. Segil's claim but instead seeks to justify the outcome based on generalities related to fractures sustained by other people. They admit it didn't heal properly but claim it probably wouldn't have healed properly no matter what. Dr. Segil contradicts that.

30. Defendants cite irrelevant authorities out of context to justify prioritizing staff safety over providing inmates with the level of medical care they are legally entitled to. Defendants cite *Whitley v. Albers*, 475 U.S. 312 (1986) which has nothing to do with healthcare. *Whitley* involved an excessive force claim brought under the Eighth Amendment in response to staff at Oregon State Penitentiary (OSP) shooting an inmate during a hostage situation. OSP and various staff members were sued under the Eighth Amendment for injuries inflicted by staff during their process of retaking the housing unit. Defendants also cite *Bell v. Wolfish*, 441 U.S. 520 (1979) which

didn't have anything to do with inmate medical care either. *Bell* involved a claim brought by pretrial detainees alleging double bunking to be an unconstitutional form of punishment. Defendants cite *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989) in a manner which might as well amount to an argument that Defendants can defeat any indifference claim simply by producing other medical professionals with different opinions thereby reducing the case from being one of deliberate indifference to simply a difference of opinion. This case differs from *Sanchez* because the defense in that case did not involve admissions that the treatment provided was an alternative to treatment normally provided in the community. Nobody in this case is saying that a sling and swathe is better or just as good as a Sarmiento Brace under the circumstances.  The closest Dr. Murphy gets to calling a sling and swathe just as good as a Sarmiento Brace was saying, "within the standard of care" and "considered appropriate" in some cases which could place the sling and swathe within a range of acceptable treatment under some circumstance but without declaring it just as good in this case or others. The word "appropriate" does not mean just as good. Dr. Murphy also questions the ability of the Sarmiento Brace to properly immobilize the fracture completely but is silent as to whether it would be more or less mobile than a sling and swathe. The appropriate standard is whether or not Plaintiff would have likely suffered less pain during recovery with a Sarmiento Brace not whether it would immobilize the fracture completely. Finally, Defendants cite the unpublished decision in *Gillen v. D'Amico,* 237 F. App'x 173, 173–74 (9th Cir. 2007) which while more analogous to this case is still too different because that case

did not involve treating a healing injury but rather whether to give someone whose leg had already been amputated a wheelchair or crutches instead of a prosthetic leg.

**State Law Negligence Claim**

31. Defendants have argued, "In order for Plaintiff to prevail on a medical negligence claim under Oregon law, he must prove through expert testimony that the County medical staff did not meet the applicable standard of care exercised by a reasonably careful medical professional with like training and expertise in the community. ORS 677.095(1), *Rogers v. Meridian Park Hosp.*, 307 Or 612, 619, 772 P2d 929 (1989)." (E.C.F. 40 p. 26). There is no dispute about that. However, Defendants lied again in their motion by falsely stating that Dr. Segil's report failed to rebut Dr. Seale's. Defendants falsely claim, "Dr. Seale's opinion that Plaintiff received care from jail medical staff consistent with standards in the community is unrebutted by Dr. Segil's expert report. (Seale Report at 4.)" (E.C.F. 65 p. 14). See Dr. Segil's report stating Plaintiff, "would have received better care from other orthopedic surgeons with similar training and experience in the community." (Exhibit p. 12). Dr. Segil's opinion can only be reasonably interpreted as a rebuke of Dr. Seale's opinion because if an inmate would have received better treatment in the community, then his care could not have possibly been consistent with standards in the community.

32. A finding that Defendants were not deliberately indifferent would not shut the door on the negligence claim. Quite the opposite in fact. When inmate medical care is

inadequate for reasons other than being unconstitutional including negligence, "it is medical malpractice, and, as such, the proper forum is the state court" *Estelle v. Gamble*, 429 U.S. 97 (1976). See also *Farmer*, ("An act or omission unaccompanied by knowledge of a significant risk of harm might well be something society wishes to discourage, and if harm does result society might well wish to assure compensation. The common law reflects such concerns when it imposes tort liability on a purely objective basis.")

33. Defendants falsely claim that Plaintiff's negligence claim is based on the failure of OHSU staff to offer a surgical option when in fact Plaintiff was never informed of surgery being a viable option until he received Dr. Segil's report in March of 2022 long after filing his amended complaint. It was then that Plaintiff discovered his quality of care to be worse than originally thought. The grounds for the negligence claim were basically the same as the deliberate indifference claims but without the added burden of having to prove subjective recklessness. Jail medical staff failed to follow treatment recommendations from OHSU resulting in a more painful healing process and a crooked arm.

34. If a reasonable jury choses to believe that Plaintiff would have had access under normal circumstances in the community to timely follow-ups and a Sarmiento Brace would have likely reduced his pain, then the additional pain is an injury caused by negligence. Defendants appear to raise a foreseeability defense as if to suggest that

the harm resulting from categorical rescheduling and denial of Sarmiento Braces could not be reasonably foreseen by policymakers and jail staff. As explained previously, the harm of rescheduling should be obvious to a lay person. The risk of inmates suffering additional pain if never allowed Sarmiento Braces for any reason should be reasonably foreseeable to any competent medical professional. The existence of the brace ban is the result of non-medical personnel telling medical not to let inmates have hard plastic braces. The risk of harm associated with allowing law enforcement personnel to make treatment decisions impacting quality of medical care is reasonably foreseeable. A reasonable policy would be to allow inmates to have anything recommended by medical personnel unless an equal alternative exists. Finding the next best thing always has the foreseeable risk that the patient will be worse off. If allowing inmates to have potential weapons is necessary to make sure they receive the same level of care as they would in society, then not allowing them potential weapons is negligent.

35. The decision not to allow potentially weaponizable medical equipment is far less sympathetic in a case like this one. In this case, Plaintiff was in no condition to convert the brace into a weapon. Even when the arm was feeling better in late August of 2017, it would have taken Plaintiff a lot of time to remove the metal parts, cut a knife shaped piece of plastic out of the brace, and sharpen it using the concrete floor. Such a threat could be easily mitigated simply by making deputies check the brace during rounds to make sure it had not been tampered with. There

were only three other inmates in the disciplinary unit Plaintiff was first placed in.

Proper searches should've been all they needed to make sure no other inmates

came into possession of the brace. Defendants have not cited any authority and

Plaintiff can think of none which would allow Defendants to successfully defend a

medical malpractice negligence claim based on competing security concerns.

36. Defendants argue that a Sarmiento Brace was not recommended until August 3rd

despite the record clearly indicating that a Sarmiento Brace was recommended the

night of but to be fitted within a week due to pain and swelling (E.C.F. 38 Exhibit 34).

37. Defendants falsely accuse Dr. Segil's opinion of lacking foundation due to his

practice being in southern California and him not having any experience working in a

correctional setting. They offer nothing to suggest that orthopedic surgeons in

southern California are any less competent than surgeons in Oregon or any other

state. Geography is irrelevant. The fact that Dr. Segil has never worked in a

correctional setting indicates he is more qualified than any doctor who is now or has

ever been employed in a correctional setting for a couple reasons. First, medical

personnel employed by correctional facilities are almost always too incompetent to

find better paying work in their field elsewhere which is why they're willing to

subject themselves to the risks associated with working with inmates. Second, a

medical professional in the community if far more likely to recommend a treatment

plan consistent with what someone would expect from a professional of similar

training and experience in the community without his recommendations being tainted by competing interests like court scheduling, staffing conflicts, and denying inmates access to anything capable of being used to make weapons.

38. It is reasonably foreseeable that policies and customs of rescheduling and denying medical equipment such as the ones at issue here will eventually result in harm. If the Defendants continue to defend and enforce such polices the future injury of another inmate is inevitable.

**Untimely Daubert Challenge**

39. Defendants appear to launch an untimely *Daubert* challenge in their motion attacking Dr. Segil's opinions for being "conclusory" and arguing that they "do not create a triable issue of fact" (E.C.F. 65 p. 14). If the Defendants wanted to challenge Dr. Segil's methodology, they should have given the court notice of their intention to file a *Daubert* motion before such notices were due so that the court could have factored their *Daubert* motion into the scheduling order. Instead, Defendants told the court "Defendants do not anticipate filing a *Daubert* motion" back in April (E.C.F. 62 p. 2) after having received Dr. Segil's report. Defendants confirmed they didn't' want to file any *Daubert* motions at the August 4th conference. Defendants are procedurally barred from filing *Daubert* motions at this time. The only possible way Defendants could attempt to file a *Daubert* motion at this time would be if they filed a motion for an extension of time due to excusable neglect under Rule 6(b)(1)(B).

Plaintiff can think of no plausible argument for excusable neglect in this case. Allowing a methodological challenge at this point would prejudice Plaintiff by leading him to believe that he had no reason to think his expert's methodology would be challenged before agreeing with Defendants that no further discovery was needed only for them to turn around and sandbag Plaintiff by filing an untimely *Daubert* motion. Defendants waived their right to file *Daubert* challenges.

## PLAINTIFF's CROSS MOTION FOR SUMMARY JUDGMENT

40. Plaintiff moves for summary judgment on all remaining claims. The motion for summary judgment on use of force claims is on the grounds that Plaintiff's claims regarding causation cannot be reasonably disputed due to unrebutted expert testimony. Those claims include a Fourteenth Amendment claim and a state law battery claim. The unrebutted testimony of Dr. Wilson Hayes proves Plaintiff's version of events the only one given capable of explaining how his arm was broken. The partially unrebutted opinion of Dr. Segil rules out Defendants version of events while the rebuttals supported merely by Dr. Murphy's unreliable methodology can't possibly overcome Dr. Segil's opinions regarding quality of care. On all deliberate indifference claims, there seems to be no dispute as to what Defendants policies and customs are but genuine issues regarding injury severity would remain if Defendants' expert used reliable methodology. Plaintiff also seeks summary judgment on the essential element of foreseeability in his state law negligence claim before asking for a finding of injury liability based on unrebutted testimony

pertaining to pain and Dr. Murphy's failure to use reliable methodology which essentially leaves Defendants without a rebuttal expert.

## Excessive Force and Battery Claims

41. Plaintiff's Fourteenth Amendment excessive force claim, and state law battery claim are based on unrebutted expert testimony when it comes to the cause of the injury. That testimony renders Defendants version of events medically and scientifically impossible thus not something a reasonable juror could believe.

## Unrebutted Biomechanics Expert

42. When partially denying the Defendants first motion for summary judgement, this court wrote that the forced used by Defendants if proven would be considered, "gratuitous and unnecessary" (E.C.F. 55 p. 13). The unrebutted and undisputed expert witness report of Dr. Hayes proves Plaintiff's case. Defendants have had ample time to find a biomechanics expert of their own to refute him but have failed to do so. The court should assume that there are no qualified biomechanics experts capable of rebutting Dr. Hayes because Dr. Hayes is correct. Such an assumption is consistent with Rule 56(e)(2), so Dr. Hayes' report (E.C.F. 38 Exhibit 24) should be considered undisputed facts for the purpose of this motion.

43. The closest thing to a rebuttal of Dr. Hayes offered by Defendants is the opinion of Dr. Murphy who's not qualified in the field of biomechanics. For reasons outlined in

the *Daubert* Challenge, his testimony should not be allowed in a rebuttal capacity as it relates to Dr. Hayes.

44. Biomechanics experts are allowed to offer opinions on specific causation in the Ninth Circuit. *See Weber v. TMG Logistics*, No. 18-17236 (9th Cir. 2020), "the district court did not abuse its discretion in allowing [defense biomechanics expert] to opine on whether [Plaintiff]'s injuries were caused by the collision." The court recognized that other "Courts have differed as to whether biomechanics experts can testify on specific causation, and some courts have recognized that such opinion testimony is 'a product of reliable principles and methods.' Fed R. Evid. 702(c); *see Allen v. State Farm Mut. Auto. Ins. Co.*, No. 3:15-CV-0019-HRH, 2016 WL 9086966, at *3 (D. Alaska Aug. 2, 2016)." *Id. Allen* had already been embraced by other districts in This Circuit before the ruling in *Weber*, "the fact that a biomechanical expert is not a medical doctor does not mean that he is not qualified to offer an opinion as to specific causation." *Hudson v. Alaska Airlines*, No. 18-cv-03284-PJH (N.D. Cal 2019) quoting *Allen*. Your Honor's own district has since embraced the Ninth Circuit's opinion in *Weber* as well as *Allen* in *Mitchell v. Geo Grp.*, No. CV-19-04445-PHX-DWL (D. Ariz. 2022) calling the decisions of two other districts in other circuits "persuasive" citing *Pennsylvania Trust Co. v. Dorel Juvenile Group, Inc.*, 851 F.Supp.2d 831, 838-39 (E.D. Pa. 2011) and *Phillips v. Raymond Corp.*, 364 F.Supp.2d 730, 742-43 (N.D. Ill. 2005). As such Dr. Hayes is more than qualified to offer an expert opinion on specific causation and that opinion is unrebutted.

45. In *Allen*, the biomechanics expert qualified to offer causation opinions was none other than Dr. Wilson "Toby" Hayes. Even if the Defendants in this case could argue that some

biomechanics experts might not be qualified to offer specific causations opinions, such arguments cannot change the fact that Dr. Hayes has already been personally qualified by other courts in this Ninth Circuit and those decisions were approved by the Ninth Circuit. Plaintiff asks the court to join the District of Alaska and the Ninth Circuit by accepting Dr. Hayes as qualified to testify on the issue of specific causation.

46. No reasonable fact finder could possibly believe the self-serving testimony of the Defendants themselves over an independent unrebutted qualified expert whose credentials and credibility remain unchallenged.

**Unrebutted Claim of Orthopedic Surgeon**

47. Dr. Segil opined, "Due to the severity of the injury, he would not have been able to fight ferociously, or engage in similar behavior, as cla[i]med by the officers, with this type of injury." (Exhibit 1 p. 11-12). Dr. Murphy said nothing to rebut Dr. Segil on this issue. Even if Dr. Murphy were allowed to present his unqualified causation theory to a jury and the jury believed it, that would only make that theory also possible if only the opinions of Murphy and Hayes are considered because Murphy never rebutted Hayes' claim that Plaintiff's arm could (because it was) have been broken on the fourth floor. Add Dr. Segil's unrebutted opinion to that equation and nobody could possibly believe that the arm was broken on the fifth floor. It simply is not medically or scientifically possible for someone having suffered such an injury to fight or engage in conduct similar to that described by deputies during transport from the fifth floor to the fourth floor. Medical and scientific possibilities fall outside

the scope of knowledge expected of jurors. It takes expert testimony to determine if it is medically or scientifically possible for someone to behave the way Plaintiff is alleged to have behaved considering "how painful it was for him to just get X-rays" (E.C.F. 38 Exhibit 34).

48. Defendants have presented no admissible evidence under Rule 56(c) for the court to consider in rebuttal of Dr. Segil's opinion regarding the medical impossibility of Plaintiff's alleged conduct during transport besides the self-serving declarations of deputies present during the transport. The deputies are lay people incapable of disputing Dr. Segil's expert opinion as a medical doctor. While it may be true in most cases that a conflict between eyewitness accounts typically creates an issue of material fact for a jury to decide, that is not the case when unrebutted expert opinions render the other parties' version of events medically or scientifically impossible. Federal Rule of Evidence 701(c) specifically prohibits lay people from offering opinions in court which are "not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Under Rule 702, "A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;" While Sheriff's deputies are qualified to present their claims in court, they're not qualified to offer opinions as to whether their claims are medically or scientifically possible. Therefore, Plaintiff's claim

supported by expert opinions that it is not medically or scientifically possible for him to have behaved as alleged is a fact uncontradicted by the record.

49. The Supreme Court addressed the event of a defendant's claim being implausible in *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986), "It follows from these settled principles that if the factual context renders respondents' claim implausible — if the claim is one that simply makes no economic sense — respondents must come forward with more persuasive evidence to support their claim than would otherwise be necessary." Likewise, Plaintiff argues that the factual context of this case renders Defendants' claim implausible because it makes no medical or scientific sense, so Defendants should have to come up with more persuasive evidence to support their claim than would otherwise be necessary. *See Id.* at 587, "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." Defendants own self-serving sworn statements attesting to a tale which is neither medically nor scientifically possible cannot possibly overcome Dr. Segil's expert opinion. Due to discovery being closed, it is not possible for Defendants to introduce evidence to rebut Dr. Segil on this matter. The court should rule in Plaintiff's favor on this element. Under Rule 56(e)(2) Dr. Segil's opinion that Plaintiff's alleged conduct during transport is not medically possible should be considered undisputed for the purpose of this motion due to the Defendants failing to address it.

50. This case is similar to *Scott v. Harris*, 550 U.S. 372 (2007), "Where, as here, the record blatantly contradicts the [other party's] version of events so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a summary judgment motion." In Scott, a plaintiff attempted to survive summary judgment by submitting sworn statements blatantly contradicted by video evidence. The court held that despite the normal tendency to view all evidence in the non-movant's favor, the court "should have viewed the facts in the light depicted by the videotape." Likewise, Plaintiff in this case argues that the court should view all facts in the light depicted by the unrebutted expert opinions of Dr. Hayes and Dr. Segil. Dr. Segil's objective and unrebutted expert medical opinion blatantly contradicts Defendants' version of events so that no reasonable jury could believe them. This court should not adopt their version of the "facts" for the purpose of ruling on summary judgment. Dr. Segil's opinion that someone with Plaintiff's injury could not have behaved as alleged is supported by the unrebutted opinion of Dr. Hayes that "the aligned and modest displacement of the fracture fragments do not comport with the 'fierce struggle' of the escort process as described by the deputies." (E.C.F. 38 Exhibit 24 p. 13). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.,* 477 U. S. 242, 247–248 (1986). A material fact is considered "genuine" if a "reasonable jury could

return a verdict for the nonmoving party" based on it, *Id*. Reasonable juries do not return verdicts based on implausible claims because implausible claims are not genuine facts.

51. Other decisions from lower courts further support Plaintiff's arguments. In *Brown v. Kordis*, 46 Fed. Appx. 315, 317 (6th Cir. 2002) a police officer successfully deflected an accusation of shooting someone in the back by providing an unrebutted expert opinion that the suspect was shot in the front, ("There is no genuine issue of material fact in this case. Although Brown claims that Kordis shot him from behind, his statements regarding this issue are contradictory. These inconsistent statements are wholly insufficient to create a genuine issue of fact where the physical evidence and unrebutted expert testimony indicates that the bullet injuring Brown did not come from behind."). Another court held in *Watson v. Allstate*, 224 F. App'x 335, 342 (5th Cir. 2007) quoting *Webster v. Offshore Food Service, Inc.*, 434 F.2d 1191, 1193 (5th Cir. 1970) ("when a party opposing summary judgment fails to present evidence sufficient to make an issue of an expert's conclusion — such as contrary opinion evidence or evidence tending to undermine the expert's credibility or qualifications — and when 'the trier of fact would not be at liberty to disregard arbitrarily the unequivocal, uncontradicted, and unimpeached testimony of an expert witness,' expert testimony may form the basis of summary judgment."). In *Watson*, summary judgment was appropriate when a party "could have presented the kind of 'battle of the experts' that typically renders summary judgment presumptively inappropriate."

Like *Watson*, Defendants in this case failed to set the stage for a "battle of the experts" at trial which makes summary judgment on questions of causation appropriate based on the uncontroverted report of Dr. Hayes and Dr. Segil's uncontroverted opinion that nobody with Plaintiff's injury could have behaved as describe during transport. *See also Kelly-Brown v. Winfrey*, 659 F. App'x 55 (2d Cir. 2016) "Affirming grant of summary judgment based in part on unrebutted expert testimony" and *Luby v. Carnival Cruise Lines, Inc.,* 633 F. Supp. 40, 42 n.3 (S.D. Fla. 1986), "Where, as here, an issue is one of the kind on which expert testimony must be presented, and the affidavit of the expert is uncontradicted, summary judgment is proper." In *Luby*, the uncontradicted opinion of an architect with experience designing cruise ships that the bathroom where *Luby* was injured was properly designed was sufficient to prevail at summary judgement because *Luby* offered no contradicting expert opinion. Likewise in this case, expert testimony is equally needed to determine the medically and scientifically possible causes of Plaintiff's injury. Defendants offer no qualified rebuttal to Plaintiff's biomechanics expert from anyone with any training or experience in injury reconstruction.

52. Under the Fourteenth Amendment, Plaintiff need only prove the amount of force used was objectively unreasonable. With the Defendants' version of events being deemed impossible, there is only one other explanation for Plaintiff's injuries before this court. That explanation is backed by two unrebutted experts. That explanation has already been described as "gratuitous and unnecessary" force by this court, so

such conduct easily meets the "objectively unreasonable" requirement of *Kingsley v. Hendrickson*, 576 U.S. 389 (2015). Summary judgement of liability as to Plaintiff's Fourteenth Amendment excessive force and state law battery claims should be granted under Rule 56(e)(3) due to undisputed experts rendering Defendants' theory implausible. See also *Security-First Natl. Bk. v. Lutz*, 322 F.2d 348, 355 (9th Cir. 1963) ("the trier may not act arbitrarily in disregarding uncontradicted and entirely probable testimony of witnesses whose qualifications and judgment have not been discredited. See, e.g., *In re Williams' Estate* (9 Cir. 1958), 256 F.2d 217; *Fitts' Estate v. C.I.R.* (8 Cir. 1956), 237 F.2d 729; *Boston Ins. Co. v. Read* (10 Cir. 1948), 166 F.2d 551, 2 A.L.R.2d 1155."). Defendants have not questioned the judgment or qualifications of Dr. Hayes at all which makes summary judgment based on his report appropriate at this time as a matter of law. Likewise, Defendants have not questioned the qualifications of Dr. Segil so his unrebutted opinion as to the medical probability of someone with Plaintiff's injury behaving as alleged during transport should be accepted as an undisputed medical fact by this court. "Generally speaking, courts routinely rely on unrebutted testimony, particularly from experts, to grant summary judgment" *Armantrout v. Squibb (in re Plavix Mktg., Sales Practices & Prods. Liab. Litig.),* MDL No. 2418, 27 n.7 (D.N.J. Aug. 17, 2017).

53. Plaintiff should be granted summary judgement on his excessive force and battery claims because uncontroverted experts have proven Defendants version of events to be neither medically nor scientifically possible. They've also proven Plaintiff's version

of events to be the only medically or scientifically possible explanation for his injury before this court.

### Medical Claims

54. There seems to be no genuine dispute as to what Defendants policies and customs are regarding rescheduling and hard plastic braces. Defendants have explained their policies in detail hoping to justify them. Such broad policies which categorically deny outside medical care to all inmates in cases of court scheduling conflicts or staffing shortages and denies Sarmiento Braces regardless of need are deliberately indifferent to the serious medical needs of inmates. There also seems to be no rebuttal to Dr. Segil's claim that a Sarmiento Brace would have reduced Plaintiff's pain.

55. While Dr. Murphy seems to be a highly qualified orthopedic surgeon, he has failed to use sound methodology in this case. With Dr. Murphy properly disqualified under *Daubert* for failing to cite the literature he based his opinions on, Defendants are left with no expert to rebut Plaintiff's medical claims.

### Indifferent Rescheduling

56. Outside medical appointments are arranged in advance when in house treatment options are deemed insufficient. That fact makes outside medical appointments a medical necessity. Any policy of delaying necessary medical care is deliberately indifferent to the serious medical needs of inmates. Policymakers need not be aware

of any specific medical condition for which inmates might suffer more pain or not recover fully if denied timely care. The risk of harm should be obvious to any reasonably competent policymaker. Deliberately disregarding such risks in the interests of judicial economy or simply not wanting to re-assign staff to transport duty at the last minute cannot possibly justify denying necessary medical care. Defendants are at fault for making these policies or failing to train staff to do otherwise. Either way the Defendants "could have prevented the violation with an appropriate policy" *Gibson v. County of Washoe*, 290 F.3d 1175, 1194 (9th Cir. 2002).

57. The only genuine issues of material fact possibly remaining to be decided on this matter are whether this policy/custom injured Plaintiff and if so to what degree? Those questions should be resolved in Plaintiff's favor due to Dr. Murphy's failure to use reliable methodology.

**Hard Plastic Brace Ban**

58. Categorically denying hard plastic braces including Sarmiento Braces to all inmates regardless of their needs is deliberately indifferent to any inmate whose recovery would be more painful without a hard plastic brace or depends on prompt corrective action to prevent an injury from healing improperly. Any reasonably competent policymaker should have foreseen the harms which would inevitably befall someone someday. If the policy is not at fault, then the policymaker clearly failed to train subordinates to do otherwise. Defendants are deliberately indifferent either way.

59. This case is similar to *Wood v. Housewright*, 900 F.2d 1332 (9th Cir. 1990) in which the Ninth Circuit adopted the position of the Northern District of Georgia in *Jones v. Evans*, 544 F. Supp. 769 (N.D. Ga. 1982) holding, "that a nonmedical employee's interference with prescribed care 'can almost never be characterized as other than deliberate and indifferent.'" Wood involved the confiscation of a sling when an "official made a conscious decision to confiscate the sling whether or not it was medically necessary." The *Wood* court explained that "policies and procedures, of course, must ensure that prisoners are not wrongfully deprived of necessary medical supplies or equipment." This case is far worse due to Multnomah County issuing a blanket ban on hard plastic braces. Had the defendants in *Wood* banned slings whether or not they're medically necessary they'd be just like the Defendants in this case. Defendants have already conceded that the brace ban is a security policy created by nonmedical people, so it's hard to call that anything other than "deliberate and indifferent" under *Woo*d.

60. *Wood* also suffered from a similar scheduling problem which resulted in a significant delay treating his shoulder after a pin came loose due to him not having a sling. *Wood* was referred to an outside orthopedic specialist by the prison doctor but was not taken to the specialist for several weeks. The court held that the prison should have arranged for him to see a specialist right away but instead cited excuses like lack of medical records to justify repeated delays. The court explained, "even if the State gets 'a week or so' to arrange for treatment, it does not get a fresh 'week or

so' at every step of the way." Under *Wood* even if the Defendants in this case were entitled to a week or so to arrange treatment they were not entitled to a fresh "week or so" every time they canceled an appointment. "Once the authorities were aware of *Wood*'s serious medical needs, their foot-dragging response to those needs, evidenced by the delay of nearly eight weeks between complaint and treatment, cannot be characterized as anything other than deliberate and wilful indifference."

61. The only remaining questions on this matter seem to be whether Plaintiff's arm would have likely healed at a better angle and how less painful would his recovery have been? This could have produced a genuine issue of material fact for a jury to decide had Dr. Murphy used sound methodology. This court has already ruled this an issue requiring expert testimony, so with Dr. Murphy's opinions based on uncited literature properly excluded there remains no genuine issue of dispute for a jury to decide. Plaintiff is entitled to summary judgement as a matter of law.

### Foreseeability

62. As to the foreseeability element of his state law negligence claim, a finding of deliberate indifference requires more evidence than a finding of negligence. Negligence can be established in part based on failing to remedy a reasonably foreseeable risk. Even if rescheduling and denying hard plastic braces were not subjectively reckless activities due to Defendants not being aware of any specific

named risks pertaining to the Plaintiff at the time, the risks were at least reasonably foreseeable.

63. It is reasonably foreseeable that a policy of rescheduling outside medical appointments in the community will eventually result in an inmate not receiving the same level of care he would receive in the community. Likewise, refusing to allow inmates hard plastic braces under any circumstances creates a reasonably foreseeable risk of inmates in need of such braces not receiving the same level of care they would receive in the community.

64. Authorities cited by Defendants support Plaintiff on this matter. *Towe v. Sacagawea, Inc.*, 357 Or. 74, 87 (2015) establishes that "foreseeability and causation are separate elements." Under Oregon law, "one is negligent only if he, as an ordinary reasonable person, ought reasonably to foresee that he will expose another to an unreasonable risk of harm." *Stewart v. Jefferson Plywood Co.*, 255 Or. 603, 609 (Or. 1970). Dr. Seale or any medical professional responsible for implementing county policies should foresee the unreasonable risk of harm such policies subject all inmates to. "Foreseeability is an element of fault; the community deems a person to be at fault only when the injury caused by him is one which could have been anticipated because there was a reasonable likelihood that it could happen." *Id*. The risk of an inmate suffering someday from rescheduling or not allowing hard braces is obvious thus reasonably foreseeable.

**Unrebutted Pain Claim**

65. Dr. Murphy stops short at fully rebutting Dr. Segil's claim that a Sarmiento "would have reduced his pain by keeping a rigid immobilization of a fracture." (Exhibit 1 p. 12). The closest Dr. Murphy got to rebutting Dr. Segil on that matter was, "Although there is a documented discussion of use of a Sarmiento brace, it is well recognized in the orthopedic literature that Sarmiento bracing for distal third humeral shaft fractures does not result in appropriate immobilization of such a fracture as the brace typically ends at the level of the fracture and fails to provide appropriate immobilization of the fracture above and below the fracture line." (E.C.F. 66 p. 25). While that appears to be a genuine dispute as to whether the arm could have been fully immobilized, it stops short of addressing pain management at all. While it could be reasonably inferred that Dr. Murphy believes Plaintiff would have probably been disappointed in the result of a Sarmiento Brace due to it not immobilizing his arm as well as he though it would, that does not rebut Dr. Segil's claim that his pain would have been reduced. Viewing Dr. Murphy's report in the light most favorable to the Defendants it can best be said that Plaintiff would not have received the amount of pain relief expected but there is nothing to suggest his pain would not have been reduced at all. Hypothetically, if someone is experiencing pain on a scale of 9/10 on a regular basis and something would have reduced it to 8/10 then that 1/10 increment is an injury caused by the Defendants. Plaintiff is not sure how much of a pain reduction he would have received and would consider that to be a genuine issue of fact for a jury to decide had Dr. Murphy used reliable methodology, but

whether Plaintiff would have experienced a pain reduction at all appears unrebutted by Dr. Murphy. Plaintiff's pain satisfies the injury element.

**Summary Judgment Required as Matter of Law**

66. Plaintiff argues the combination of rescheduling and denial of a hard plastic brace to be the driving forces behind his recovery being more painful and his arm healing crooked. While experts could have presented a genuine factual dispute as to the impact these policies had on Plaintiff in this specific case, whether the policies themselves are deliberately indifferent in general are questions of law ripe for summary judgment at this time. Findings of municipal liability under *Monell v. Department of Soc. Svcs.*, 436 U.S. 658 (1978) are appropriate in "situations where, as here, the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted or promulgated by those whose edicts or acts may fairly be said to represent official policy." Where, as here, the "inadequacy is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *Canton v. Harris*, 489 U.S. 378 at 390 (1989). Plaintiff is entitled to summary judgment on the deliberate indifference elements of his *Monell* claims.

67. Plaintiff is entitled to summary judgment on the foreseeability element of the negligence claim as a matter of law. See *Stewart*, even under conditions which "may

not be a common cause of injury" risk of harm is reasonably foreseeable when "it cannot be said that this setting for possible injury is so uncommon that a jury could not reasonably describe as foreseeable the risk of harm which it creates."

68. Plaintiff is entitled to summary judgment on the injury element of his *Monell* and negligence claims as a matter of law. Plaintiff's unrebutted expert opinion that he would have been in less pain with a Sarmiento Brace satisfies the requirement that Plaintiff prove an injury as a result of Defendants' policies. The extent of the injury could remain an issue of genuine dispute, but the fact that there was an injury is not disputed and the rest cannot be reasonably disputed due to Dr. Murphy failing to use reliable methodology.

69. Plaintiff is entitled to summary judgment of on his *Monell* and state law negligence claims due to all the elements being met. Plaintiff has proven through unrebutted expert testimony that county policies are deliberately indifferent, and he suffered an injury as a result which satisfies his burden under *Monell*. He also proved the potential for injury to be reasonably foreseeable and he suffered injury as a result which satisfies his negligence burden under state law.

**Conclusion**

70. Defendants' late discovery should be stricken from the record, their expert reports should also be stricken for being unsworn, Dr. Murphy should be disqualified from

disputing Dr. Hayes due to his lack of knowledge in the field of biomechanics and he should also be disqualified from disputing Dr. Segil for using unreliable methodology, Defendants motion for summary judgment should be denied, and Plaintiff is legally entitled to summary judgment on his excessive force, battery, *Monell*, and negligence claims as a matter of law.

Respectfully submitted this 3rd day of November 2022.

/s/cyrussullivan_____

Cyrus A. Sullivan
Plaintiff, Pro Se